IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
JAN - 4 2006
U.S. COURT OF FEDERAL CLAIMS

EVERGREEN AVIATION GROUND LOGISTICS ENTERPRISES, INC.
3850 Three Mile Lane
McMinnville, Oregon 97128,

Plaintiff,

v.

UNITED STATES,

Defendant.

No. 6-11 C

COMPLAINT FOR DECLARATORY RELIEF

For it complaint, Evergreen Aviation Ground Logistics Enterprises, Inc. (EAGLE), alleges as follows:

Nature of the Case

1. The United States Postal Service, by a final decision of January 3, 2006 (attached as Attachment A), has vitiated its contractual obligation to provide for handling the amount of mail it promised if it was able to do so. Despite ample mail available to comply with its commitment, USPS has been acting as if its contractual obligations were meaningless and threatens to continue to do so for the remaining term of the contract, which includes the potential of three additional option years. USPS is severely damaging EAGLE by its conduct, and EAGLE requests a declaration that USPS is in material breach of its obligations to provide the promised amounts of mail to EAGLE. EAGLE requests expedited treatment of this case as provided by Rule 57.

Jurisdiction

2. This court has jurisdiction under section 1491(a) of the Judicial Code. 28 U.S.C. § 1491(a) (2000), and section 10 of the Contract Disputes Act, 41 U.S.C. § 609(a) (2000). EAGLE requested a final decision on the interpretation issues involved in this case by letter dated October 25, 2005 (attached as Attachment B). By letter dated January 3, 2006 (Attach. A), the Contracting Officer for USPS denied EAGLE's interpretation claims, one expressly and one constructively. This action is brought within twelve months of the date of receipt of the final decision, and so it is timely. *See* 41 U.S.C. § 609(a)(3).

Parties

3. EAGLE is a fully-owned subsidiary of Evergreen International Aviation, Inc., which is privately held by Evergreen Holdings. EAGLE provides ground logistics and other transportation-related services, for both government and commercial customers.

4. The United States acted in this matter through the United States Postal Service. The current USPS Contracting Officer is Cheryl R. Brazil.

Statement of Facts

5. In 2001, USPS competed its mail handling services for its various types of mail in various regions throughout the United States. EAGLE won three of those regions – Pacific, Southeast, and Great Lakes – and was awarded USPS Contract Nos. SNET-01-PR, SNET-01-SER, and SNET-01-GLR ("Contract"). These three contracts were consolidated into a single contract document with a beginning

contract term date of August 27, 2001, and an ending of contract term date of August 26, 2006, with three one-year options available to USPS.

6. Under the Contract, EAGLE provided handling services to support USPS's air transportation network and not its ground network. Tasks included packing air containers, draying the mail and containers, and loading and unloading the aircraft.

7. In early 2003, EAGLE and USPS representatives had a series of meetings in which they negotiated a reformation of the Contract. The Reformed Contract has an effective date of March 1, 2003, and the same base period ending date and option periods. The Reformed Contract is the agreement in place between the parties at this time and that is in issue in this action. (Excerpts of the Reformed Contract are attached in Attachment C.)

8. "Part One: Schedule" of the Reformed Contract provides in pertinent part as follows:

> **A.1 Pricing**
>
> The purpose of these performance based service contracts is for the Postal Service to purchase and the Terminal Handling Supplier (THS) to provide integrated material handling services in support of the United States Postal Service's air and ground networks.
> The contracts awarded under this solicitation shall be priced as follows:
>
> a. The parties anticipate that the Postal Service will provide to the THS approximately 1.25 billion pounds of mail during each calendar year of the three contracts (SNET-01-GLR, SNET-01-PR, SNET-01-SER) and that the annual contract compensation for 1.25 billion pounds is estimated to be approximately $46.8 million, including fixed

> and variable costs. However, the parties recognize that the Postal Service does not guarantee a minimum weight of mail will be provided to the THS, and does not guarantee that annual compensation will total $46.8 million dollars. Actual compensation will vary according to the actual weight and density of mail provided to the THS in accordance with Sections A.1.b through A.1.j.

(Attach. C at 3, § A.1.)

9. "Section B Statement of Work" of the Reformed Contract provides in relevant part as follows: "The integrated material handling the services to be purchased are primarily intended to support Express, Priority, and First-Class mail." (Attach. C at 12, § B.5.b(1).) The Reformed Contract adds mail handling for USPS's ground network. (Attach. C at 3, § A.1; at 10, § B.1.)

10. USPS has had during the entire period of the Reformed Contract, including currently, sufficient "Express, Priority, and First-Class" mail in its "air and ground networks" for the regions covered by the Reformed Contract to provide EAGLE mail at the rate of 1.25 billion pounds annually. USPS also has had during the entire period of the Reformed Contract, including currently, Standard mail that it could provide for handling to EAGLE in the regions covered by the Reformed Contract.

11. USPS since the effective date of the Reformed Contract has provided EAGLE with mail for handling at a rate of approximately 1.0 billion pounds per year, rather than 1.25 billion pounds per year, resulting in millions of dollars less revenue per year to EAGLE.

12. EAGLE has repeatedly complained to USPS about the shortfall in the pounds of mail delivered by USPS to EAGLE for handling under the Reformed Contract.

13. In a letter from Mr. Brian T. Bauer, President of EAGLE, to Contracting Officer Brazil dated September 20, 2005 (attached as Attachment D), EAGLE demanded assurances from USPS that it would conform to its contractual obligations to provide 1.25 billion pounds annually. Mr. Bauer wrote,

> Unless USPS begins to comply with its contractual obligation to give EAGLE 1.25 billion pounds of mail per year, EAGLE is faced with the prospect of continuing, substantial losses for the remaining year of the base contract period and the three option years. Thus, EAGLE must demand immediate assurances by USPS that USPS would make all good faith efforts required to provide EAGLE for handling 1.25 billion pounds of mail from USPS's air and ground networks for all four of these contract years. We would also appreciate identification of what steps USPS is or will be taking to reach this contractual weight commitment.

(Attach. D at 2.)

14. By letter dated October 14, 2005 (attached as Attachment E), Contracting Officer Brazil responded to Mr. Bauer's September 20 letter by stating that USPS would not make any assurances that it would provide EAGLE with mail at a rate of 1.25 billion pounds annually because that amount as stated in the Reformed Contract was an estimate and not a guarantee.

15. By letter dated October 25, 2005 (Attach. B), EAGLE requested a final decision from Contracting Officer Brazil that USPS has an obligation under the Reformed Contract to provide EAGLE with approximately 1.25 billion pounds of

mail annually if such mail is available from its air and ground networks in the regions covered by the Reformed Contract. EAGLE also requested a final decision that USPS is and has been in material breach.

16. By letter dated January 3, 2006 (Attach. A), Contracting Officer Brazil issued her final decision. She denied that USPS has any contractual obligations to tender the amount of mail specified in the Reformed Contract if it is available. She did not address the issue of the materiality of the asserted breach. Thus, she constructively denied that part of the claim, as the 60-day limit of the Contract Disputes Act has passed.

Injury to EAGLE

17. The pricing structure of the Reformed Contract makes this breach by USPS particularly damaging to EAGLE. Under the Reformed Contract, USPS pays EAGLE for "baseline" amounts for each of the various localities serviced and then nothing for the first twenty percent of weight over the specified "baseline" weights. (Attach. C at 4-5, § A.1.d.) Twenty percent over the total baseline weight is approximately 1.0 billion pounds. EAGLE expected to make up for this "absorption" twenty percent over the baseline by being able to charge for the promised additional twenty-five percent beyond the "absorption" collar (*i.e.*, between 1.0 and 1.25 billion pounds), assuming that amount of mail was available in the USPS air and ground networks.

18. When EAGLE executed the Reformed Contract, it knew USPS could provide mail at a rate of 1.25 billion pounds annually from its air and ground

networks in the three regions, and it believed it highly likely that USPS would be able to continue to do so during the remainder of the base and option periods. EAGLE relied on the USPS commitment to provide mail at a rate of 1.25 billion pounds annually if such amounts were available when it agreed to the Reformed Contract.

19. EAGLE estimates that it has been suffering and will continue to suffer lost revenues at a rate of approximately $10,000,000 per year due to USPS's failure to provide it for handling up to 1.25 billion pounds annually, unless this Court provides EAGLE the requested declaratory relief.

20. EAGLE's damages are continuing and are a significant hardship, damaging EAGLE's competitiveness in both government and commercial marketplaces.

21. There is a substantial likelihood that USPS will exercise one or more of the options under the Reformed Contract. In any event, the obligations of the parties with respect to the weight commitment are directly relevant to whether USPS would exercise the options.

22. Damages cannot make EAGLE whole. The failure to receive the promised business and its revenues under the Reformed Contract has limited EAGLE's business opportunities, harms its competitiveness, and threatens it with continuing and substantial monetary and nonmonetary losses.

## Count I

## Breach of Contract

23. EAGLE incorporates by reference paragraphs 1 through 22 above.

24. USPS is contractually obligated to use its good faith efforts to supply EAGLE with mail for handling at a rate of approximately 1.25 billion pounds annually if it has sufficient mail to do so in its air and ground networks for the regions covered by the Reformed Contract.

25. USPS has not provided EAGLE with mail for handling at the rate of 1.25 billion pounds annually and has announced that it has no obligation to do so. USPS is not currently providing EAGLE mail at that rate.

26. USPS is in breach of the Reformed Contract.

27. USPS is in anticipatory breach of the Reformed Contract.

28. EAGLE and USPS are in dispute over the proper interpretation of the Reformed Contract with respect to the weight commitment.

WHEREFORE, for the reasons stated above, EAGLE seeks, and is entitled to, the declaratory relief as stated in its Requests for Relief.

## Count II

## Materiality of Breach

29. EAGLE incorporates by reference paragraphs 1 through 28 above.

30. USPS has refused to comply with its contractual obligations.

31. USPS's failure to comply with its contractual obligations is a material breach of the Reformed Contract.

32. EAGLE and USPS are in dispute concerning the materiality of the breach alleged by EAGLE.

WHEREFORE, for the reasons stated above, EAGLE seeks, and is entitled to, declaratory relief as stated in its Requests for Relief

## Requests for Relief

EAGLE prays that the Court provide it with the following relief:

1. A declaratory judgment that:

a. USPS must use its good faith efforts to supply EAGLE mail for handling under the Reformed Contract at a rate of 1.25 billion pounds annually if such mail is available to USPS in its air and ground networks in the regions covered by the Reformed Contract; and

b. USPS materially breached the Reformed Contract; and

2. such other relief as the Court may deem just and proper, including attorneys' fees and other costs of this action.

Respectfully submitted,

Frederick W. Claybrook, Jr.
(Counsel of Record)
Daniel R. Forman
Jenny Kim

Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington, D.C. 20004
(202) 624-2500
Attorneys for EAGLE

January 4, 2006

## Index of Attachments

Attachment A: USPS Final Decision of January 3, 2006

Attachment B: October 25, 2005, EAGLE request for a final decision

Attachment C: Excerpts from the Reformed Contract

Attachment D: September 20, 2005, EAGLE demand letter

Attachment E: October 14, 2005, USPS letter

# ATTACHMENT A

SUPPLY MANAGEMENT

UNITED STATES
POSTAL SERVICE

**VIA CERTIFIED MAIL RETURN RECEIPT**
**REQUESTED NO. 7099 3400 0008 5889 7029**

January 3, 2006

Mr. Brian T. Bauer, President
Evergreen Aviation Ground
Logistics Enterprises, Inc. – E.A.G.L.E.
3850 Three Mile Lane
McMinnville, OR 97128

Re: Final Decision on Non-Monetary Dispute Dated October 25, 2005

Dear Mr. Bauer:

We are in receipt of your request for a final decision and contract interpretation on the three reformed SNET contracts, SNET-01-PR, SNET-01-SER and SNET-01-GLR. Evergreen has alleged that these contracts are requirements contracts and that the Postal Service did not give it all its required volume for these three contracts to Evergreen, thereby missing the 1.25 billion pound per year contract estimate and breaching the contracts.

The Postal Service disagrees with your characterization of the referenced contracts as "requirements" contracts. The Postal Service asserts that these contracts are instead Indefinite Quantity contracts where the consideration is the yearly fixed cost described in Section A.1.b. of the contract, which is paid bi-weekly, irrespective of the volume of mail processed by Evergreen. In fact, Evergreen will receive this fixed cost even if it does not process one piece of mail under these contracts.

At contract reformation, effective March 1, 2003, that fixed payment was over $6.3 million per year and has been adjusted up per bilateral modification according to the terms of the contracts. Since the above referenced agreements are indefinite quantity contracts containing sufficient consideration, there is no breach of contract as you allege.

Furthermore, estimates and how they were derived are irrelevant to a discussion of breach in an indefinite quantity contract. However, even if these contracts were requirements contracts, the law is clear that the estimate, here 1.25 billion pounds per year, is not guaranteed. Even in requirements contracts, breach does not occur if the actual amounts tendered do not reach the estimated amounts.

This is the final decision of the contracting officer pursuant to the Contract Disputes Act of 1978 and the clause of your contract entitled Claims and Disputes. You may appeal this decision to the Postal Service Board of Contract Appeals by mailing or otherwise furnishing written notice (preferably in triplicate) to the contracting officer within 90 days from the date you receive this decision. The notice

475 L'ENFANT PLAZA SW
WASHINGTON DC 20260-6210
WWW.USPS.COM

should identify the contract by number, reference this decision, and indicate that an appeal is intended. Alternatively, you may bring an action directly in the United States Court of Federal Claims within 12 months from the date you receive this decision.

Sincerely,

Cheryl R. Brazil
Contracting Officer

cc: Mr. Claybrook, Jr.
Mr. Hendel
Mr. Young
Mr. Pajunas
Mr. Griffith
Mr. Spatola
Mr. O'Reilly
Ms. Vance
Mr. Shapiro

# ATTACHMENT B

1001 Pennsylvania Avenue, NW, Washington, DC 20004-2595 ▪ p202 624-2500 ▪ f202 628-5116

crowell moring

Frederick W. Claybrook, Jr.
(202) 624-2695
RClaybrook@crowell.com

October 25, 2005

**BY TELECOPY**

Cheryl Brazil,
Contracting Officer
U.S. Postal Service
Room 4900
475 L'Enfant Plaza, SW
Washington, D.C. 20260-6210

Re: Request for Final Decision on Contract Interpretation Claims Under SNET Contract

Dear Ms. Brazil:

Evergreen Aviation Ground Logistics Enterprises Inc. ("EAGLE") has asked me to respond your letter of October 14, 2005, in which you stated that USPS has no obligation under the SNET contract to provide EAGLE with approximately 1.25 billion pounds of mail annually to ground handle. EAGLE requests a final decision that USPS does have such an obligation. In addition, EAGLE requests a final decision that USPS is in material breach.

1.25 Billion Pounds Interpretation Claim

USPS committed in the reformed SNET Contract (SNET-01-PR, SNET 01-SER, and SNET-01-GLR, as reformed and effective March 1, 2003) to provide EAGLE with approximately 1.25 billion pounds of mail annually. USPS has not done so since the effective date of the reformed contract, and you effectively stated in your letter of October 14, 2005, that USPS will not make the necessary efforts to do so because it did not guarantee that weight to EAGLE. EAGLE requests USPS to reconsider that position and to recognize its contractual obligation to provide approximately 1.25 billion pounds of mail to EAGLE per year.

The central provision of the SNET Contract is found in section A of the Schedule and reads as follows:

**A.1 Pricing**

The purpose of these performance based service contracts is for the Postal Service to purchase and the Terminal Handling Supplier (THS) to provide integrated material handling services in support of the United States Postal Service's air and ground networks.

The contracts awarded under this solicitation shall be priced as follows:

a. The parties anticipate that the Postal Service will provide to the THS approximately 1.25 billion pounds of mail during each calendar year of the three contracts (SNET-01-GLR, SNET-01-PR, SNET-01-SER) and that the annual contract compensation for 1.25 billion pounds is estimated to be approximately $46.8 million, including fixed and variable costs. However, the parties recognize that the Postal Service does not guarantee a minimum weight of mail will be provided to the THS, and does not guarantee that annual compensation will total $46.8 million dollars. Actual compensation will vary according to the actual weight and density of mail provided to the THS in accordance with Sections A.1.b through A.1.j.

As stated in section B.5.b(1), "The integrated material handling services to be purchased are primarily intended to support Express, Priority, and First-Class mail." USPS does not claim that there is insufficient "Express, Priority, and First-Class" mail in its "air and ground networks" for the regions covered by EAGLE's contract to provide EAGLE sufficient mail to meet the 1.25 billion pounds specified, and EAGLE is well aware that there are sufficient volumes of these three "primar[y]" classes to meet the specified weight. If needed, USPS could also supply Standard mail to meet that specified weight.

In fact, despite repeated requests, USPS has not increased the weight of the mail handled by EAGLE under the SNET Contract to the anticipated levels, even though there was sufficient mail in the system to do so, and has taken a position that it has no obligation to do so because it did not guarantee that 1.25 billion pounds of mail would be provided. This interpretation is in error for the following reasons, among others:

(1) USPS's interpretation as expressed in your October 14 letter makes the contract language about 1.25 billion pounds meaningless and the contract illusory and void for indefiniteness and lack of mutuality. A commitment by one party only to provide a certain amount of mail if it wants to – and not if it doesn't – is no commitment at all. *See* RESTATEMENT (SECOND) OF CONTRACTS § 37 (1979) (if performance is optional, contract is illusory). Such an interpretation is disfavored at law. *See E.H. Sales, Inc. v. United States*, 340 F.2d 358, 360 (Ct. Cl. 1965).

(2) Such an interpretation also violates common sense and does violence to the understandings of the parties when they negotiated the reformed contract. EAGLE recognized that, in a contract of this type, it would be impossible to hit 1.25 billion pounds exactly. However, EAGLE understood USPS to be committing itself to providing approximately that poundage if it were available and to making the necessary efforts to do so. In essence, the reformed SNET Contract is a requirements contract for up to 1.25 billion pounds of mail annually.

(3) That is not only expressed in the contract, but also implied as a matter of law. The covenant of good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner. *See* RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981). "Every contract, as an aspect of the duty of good faith and fair dealing, imposes an implied obligation that neither party will do anything that will hinder or delay the other party in performance of the contract." *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2000). The covenant "imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to . . . destroy the reasonable expectations of the other party regarding the [purpose] of the contract." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005).

(4) Similarly, EAGLE did not understand the contract to give USPS an "out" to ignore the 1.25 billion pounds language because it did not "guarantee" that weight of mail. EAGLE understood that it was taking the risk that there might be a major drop-off in the mail sent by customers of USPS. It did not understand itself to be taking the risk that, even though customer mailings would be sufficient to support a 1.25-billion-pound level, USPS could elect not to provide that much mail.

(5) The pricing structure of the contract would not make sense otherwise. *See United States v. Winstar Corp.*, 518 U.S. 839, 863-64 (1996) (Souter, J.) (contract should not be read in a way that would not make business sense). The parties had extended discussions during negotiations in 2003 about the absorption "collar" for variable costs. Under the terms as insisted upon by USPS, USPS pays EAGLE nothing for the first 20% of weight over the baseline weight. The only way that made economic sense for EAGLE was for USPS to commit to an additional 25% beyond the collar for which EAGLE would be paid if those mail volumes were available. Again, EAGLE thought that the risk it was taking that the mail would be unavailable was minimal; it did not take the risk that USPS, for whatever reason, could decide not to tender available mail to EAGLE.

For these reasons, EAGLE requests USPS to reconsider its interpretation expressed in your October 14 letter and to issue a final decision concerning USPS's contractual commitment under section A.1. In particular, EAGLE requests a final decision that USPS is obligated under the SNET Contract to provide EAGLE with approximately 1.25 billion pounds of mail annually if there is sufficient mail in USPS's air and ground networks to do so.

Material Breach Interpretation Claim

For purposes of this material breach claim, EAGLE assumes that USPS in its final decision does not concur with EAGLE's contract interpretation concerning the weight obligation. USPS, for its part, must assume for purposes of this material breach claim that EAGLE's contract interpretation is the correct one. EAGLE requests a final decision that, under the two assumptions just stated, USPS has been and is continuing in material breach. The amounts involved are in the millions, with USPS denying EAGLE approximately 25% of the promised volume. This alone makes USPS's breach material. *See Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1550-52 (Fed. Cir. 1992).

Summary of Requests for Final Decisions

In summary, EAGLE requests final decisions from the Contracting Officer confirming as follows:

(1) USPS is obligated under the SNET contract to provide EAGLE for ground handling approximately 1.25 billion pounds of mail annually from its air and ground networks if available;

(2) If USPS does not provide the requested final decision interpretation in (1) above but EAGLE's interpretation on this issue is correct, USPS was and is in material breach.

As the damage to EAGLE from USPS's breach continues to accumulate, EAGLE requests your final decision to be issued as promptly as possible and well before the sixty-day deadline of the Contract Disputes Act. EAGLE reserves its right to file damages claims and to raise additional theories of entitlement when doing so, including but not limited to fraud in the inducement and promissory estoppel, should facts discovered or positions taken by USPS so warrant.

Sincerely yours,

Frederick W. Claybrook, Jr.
Attorney for EAGLE

cc: Mr. Brian Bauer
Mr. Daniel G. Bonham
Ms. Liane C. Kelly
David P. Hendel, Esq.

2262402v2

# ATTACHMENT C

UNITED STATES POSTAL SERVICE

# Amendment to Transportation Services Contract

Validity unknown Les Griffith Digitally signed by Les Griffith DN: cn=Les Griffith, o=US Postal Service, ou=Air Transportation CMC, c=US Date: 2003.07.31 10:15:44 -04'00' Reason: This document is ready for approval Location: Washington, DC

## Part I - Amendment pursuant to

| 1a. Contract No. | 1b. Amendment No. | 1c. Effective Date | 1d. Begin Contract Term | 1e. End Contract Term |
|---|---|---|---|---|
| SNET-01-PR<br>SNET-01-SER<br>SNET-01-GLR | | 03/01/2003 | 08/27/2001 | 08/26/2006 |

| 1f. For Mail service in or between | City & State: Pacific, Great Lakes, Southeast Regions | City & State |
|---|---|---|

## Part II – Contractor

| 2a. Name and address of contractor (street, city, state, and zip+4) | 2b. Social Security Number or Taxpayer ID No. |
|---|---|
| Evergreen Aviation Ground Logistics Enterprises Inc. (EAGLE)<br>EVERGREEN EAGLE<br>3850 Three Mile Lane<br>McMinnville, OR 97128-9496 | 93-0876736<br>2c. Telephone (Area code and number)<br>503 472-9361 |

Les Griffith Digitally signed by Les Griffith DN: CN = Les Griffith, C = US, O = Air Transportation CMC, OU = US Postal Service Reason: Revised on 03-05-2004 to Embedd Model into Attachment N Location: Washington DC Date: 2006.03.23 08:01:51 -05'00'

## Part III -- Description of amendment

Effective March 1, 2003, the U.S. Postal Service and the THS agree to a reformation of the contracts listed above, as follows:

Part 1, Schedule, including Sections A, B, C, D, E, F, and G, is replaced and superseded in its entirety by the attached revised Part 1, Sections A, B, C, D, E, F, and G.

Part 2, Section H of the contract, "General Clauses," attached, is replaced and superseded in its entirety by the attached revised Section H.

Section I of the contract, "List of Attachments," is replaced and superseded in its entirety by the attached revised Section I.

Section L of the contract, "Representations and Certifications," is incorporated by reference and remains in effect in the reformed contracts.

Attachments A, B, C, F, G, and K are replaced and superseded in their entirety by the attached revised Attachments A, B, C, G, and K.

Attachments G & K must be updated by the supplier for each of its sites and submitted to the contracting officer by August 30, 2003.

New Attachments M, "Terminal Handling Service Provider Operations Plan," and N, "Business Rules," attached, are included in the reformed contracts.

Attachment F of the contract, "Cargo Container Checklist," and Attachment L of the contract, "Wage Determinations," are incorporated by reference and remain in effect in the reformed contracts.

Existing sections and attachments of the contract which are not expressly incorporated into the reformed contracts as described above, will not become part of the reformed contracts and are no longer in effect after March 1, 2003.

The reformed contracts, as described above, the clauses and documents which the reformed contract expressly incorporates by reference, and this Form 7406 represent the entire agreement of the parties.

It is mutually agreed that any and all claims arising out of the contract period prior to March 1, 2003, will be resolved according to the Terms and Conditions contained in the Settlement Agreement and Release that was properly executed by the parties on April 18, 2003.

The parties hereunder have caused this amendment to be executed, effective the date set forth in Part III.

| Contractor | U.S. Postal Service |
|---|---|
| Signature of person authorized to sign and date<br><br>Signature Date | Signature of contracting officer and date<br><br>Signature Date |
| Name and title of person authorized to sign | Name and title of contracting officer |

# Evergreen Eagle Reformed Contract


## PART 1: SCHEDULE 3

**Section A. Items and Prices** **3**
A.1 Pricing 3
A.2 Items and Prices 7

**Section B Statement of Work** **10**
B.1 Overview 10
B.2 Background 10
B.3 Supplier Qualifications 11
B.4 Scope 11
B.5 Term and Frequency of Contract 11
B.6 Subcontracting 12
B.7 Operational Requirements 12
B.8 Contingency Plans 29
B.9 Security 30
B.10 Personnel Screening 33
B. 11 Information Exchange 36
B.12 Administration 37

**Section C. Delivery or Performance** **38**
C.1 On-Time Performance 38
C.2 Performance Standards 38
C.3 Irregularities 40

## SECTION D. PACKAGING AND MARKING 45

## SECTION E. INSPECTION AND ACCEPTANCE 45
E.1 Deliverables 45

## SECTION F. PAYMENT 47
F.1 Rate 47
F.2 Payment - Fixed Price (Clause 2-26) (January 1997) (Tailored) 47
F.3 Interest (Clause B-22) (January 1997) 48
F.4 Payment Due Date 48
F.5 Direct Deposit 48
F.6 Disallowance of Costs (Clause B-17) (January 1997) 48
F.7 Economic Price Adjustment 49
F.8 Compensation for Scanned Mail 50

**Section G. Special Clauses** **51**
G.1 Definitions (Clause B-1) (January 1997) (Tailored) 51
G.2 Damages 57
G.3 Changes (Clause B-2) (January 1997) (Tailored) 57
G.4 Federal, State and Local Taxes (Clause 7-6) (January 1997) (Tailored) 59
G.5 Suspension of Contract 60
G.6 Option for Extra Service 60
G.7 Responsibility for Postal Property 61
G.8 Indemnification and Insurance 61
G.9 FAA and Local Airport Authority Requirements 62
G.10 Other Contracts 62
G.11 Responsibility for Postal Containers 62

G.12 Ceiling on Termination for Convenience Costs 62

**PART 2: CLAUSES AND ATTACHMENTS 65**

**Section H. Contract Clauses 65**

a. Clause 4-1 General Terms and Conditions (January 2002) 65

b. Clause 4-2 Contract Terms and Conditions Required to Implement Policies, Statutes or Executive Orders (January 2002) 65

**Section I. List of Attachments 65**

# Part 1: Schedule

## *Section A. Items and Prices*

### A.1 Pricing

The purpose of these performance based service contracts is for the Postal Service to purchase and the Terminal Handling Supplier (THS) to provide integrated material handling services in support of the United States Postal Service's air and ground networks.

The contracts awarded under this solicitation shall be priced as follows:

a. The parties anticipate that the Postal Service will provide to the THS approximately 1.25 billion pounds of mail during each calendar year of the three contracts (SNET-01-GLR, SNET-01-PR, SNET-01-SER) and that the annual contract compensation for 1.25 billion pounds is estimated to be approximately $46.8 million, including fixed and variable costs. However, the parties recognize that the Postal Service does not guarantee a minimum weight of mail will be provided to the THS, and does not guarantee that annual compensation will total $46.8 million dollars. Actual compensation will vary according to the actual weight and density of mail provided to the THS in accordance with Sections A.1.b through A.1.j.

b. Fixed Costs: The Postal Service shall pay the Supplier one twenty-sixth (1/26) of the agreed upon annual price as defined in schedule A.2.a to compensate the supplier for its fixed costs for all three contracts. The fixed cost will be paid on a bi-weekly basis. This annual price may not be altered without written authorization of the Contracting Officer.

c. Variable Costs:

1) The Supplier shall be compensated for its mail handling service pursuant to the density-based adjusting scale (the sliding scale). The per pound price by air stop is shown on schedule A.2.b. At each stop, as density varies from 6.5 pounds per cubic foot, variable price will vary in a direct inverse relationship. As pounds per cubic foot rises, variable price per pound will fall by the same ratio, and as pounds per cubic foot falls, variable price per pound will rise by the same ratio. The USPS reserves the right to adjust the density factor once a year based upon USPS historical operating data. Attachment A to the Statement of Work sets forth the baseline weight of the mail for each air stop. Variable cost compensation for a schedule period by air stop will be based upon

the baseline weight per schedule period multiplied by the sliding scale price per pound using actual air stop density. For purposes of establishing bi-weekly payments to the supplier, a density factor of 6.5 $lbs./ft^3$ will be employed. No later than 21 days after the end of each schedule period, the Postal Service and the Supplier shall reconcile actual weights and density to determine whether a compensation adjustment is necessary. The actual density of the mail shall be determined from the scanned data submitted by the Supplier, pursuant to the methodology described within Attachment N - Business Rules and pursuant to Section F.8 of the contract. The density of the mail during Christmas Season shall not be considered for purposes of calculating the average actual density achieved. The Supplier shall achieve the highest density reasonably practicable. The Postal Service reserves the right to review and evaluate the processes and procedures used by the Supplier to maximize the density of the mail. If the Postal Service identifies means or methodologies to enhance the ability of the Supplier to achieve higher densities, it will provide that information as it is developed. In any event, the Postal Service will conduct an initial study of the Supplier's mail handling procedures and techniques after the effective date of this Statement of Work and advise the Supplier of its finding no later than October 1, 2003.

2) Variable cost payments will be reconciled on a schedule period basis to reflect actual volumes scanned. Until scanning for compensation is implemented, beginning March 1, 2003, the supplier will be paid, on a bi-weekly basis, 85% of one twenty-sixth (1/26) of the total projected annual variable cost. After scanning for compensation is implemented, compensation will be computed based only on scanned mail. Scanning for compensation will begin on December 29, 2003 or thereafter as determined by the USPS. Additionally, an annual payment reconciliation will be made to adjust the total payment for 12 schedule periods. The first annual reconciliation will be made after the schedule period ending February 29, 2004.

d. <u>Absorption</u>: In the event that the average actual daily weight at any given air stop exceeds the designated baseline weight by twenty percent (20%) or less during each schedule period of the contract the Supplier shall not be entitled to any additional compensation. In the event the average daily actual weight exceeds the designated baseline weight by more than twenty percent (20%) during any scheduled period, the Supplier shall be entitled to additional compensation only for the weight of the mail in excess of the twenty-percent (20%) increase. If the average daily actual weight is more than 20% below the average daily designated baseline weight during any scheduled period, the Postal Service will be entitled to a reduction for each pound less than eighty percent (80%) of the average daily designated baseline weight. Pricing outside of the absorption ranges will be in accordance with schedule A.2.b and in accordance with the sliding scale. After scanning for compensation is implemented, the

average daily actual weight will be the average daily actual weight scanned. The average daily actual weight scanned shall include only volumes receiving all required scans enumerated in Section F.8.

e. Compensation for Services Provided During the Christmas Season: The Christmas Season shall be defined as the period beginning the day after Thanksgiving and concluding at midnight on December 24th. During the Christmas Season, the Supplier shall be compensated for the actual weight of the mail, but not at a rate per pound in excess of that established for each air stop at a density of 5.5 lbs./ft$^3$. In the event the actual density achieved exceeds 5.5 lbs./ft$^3$, the actual density shall be used to calculate the compensation due to the Supplier.

f. Labor Rates for Extra Services: The Postal Services shall compensate the Supplier for out-of-scope work directed by the Contracting Officer or the designated COTR based on the loaded hourly labor rates and the loaded overtime rates by air stop as described herein. The Contracting Officer or COTR must authorize this work before it is performed. The Postal Service may audit and verify the loaded hourly labor rates and the loaded overtime rates.

g. Separations: In the event that the Postal Service adds separations in excess of those permitted pursuant to section B.2.e, the Postal Service shall compensate the Supplier at the additional separation rate established for each air stop as set forth herein. In the event that the Postal Service exercises its option to receive a credit for up to twelve (12) separations, the Postal Service shall be entitled to a credit equivalent $66.47 per separation per operating day, which is the average additional daily separation rate for those sites which have had separation reduction since the beginning of the contract period. If the Postal Service does not exercise its option to receive credit for these twelve separations, the Postal Service may instead, use this credit to increment separations until the end of the contract period. The Postal Service is entitled to a net additional 46 separations without additional charge until the end of the contract period. However, should the Postal Service request a net increase of more than four separations at any site or a net of more than 58 separations at all sites, a daily site charge per schedule A.2.C - Separation Pricing will be incurred. Additionally, should the Postal Service request a further reduction in separations, schedule A.2.C rates will be used to determine the daily credit per site.

h. Ad Hoc Services: In the event that the Postal Service directs the Supplier to expand its window of operations for any shift at any air stop on an ad hoc basis to address unexpected early arrivals, delays or work load, the Supplier shall not be entitled to additional compensation for the first hour before the commencement of a shift or the first hour after the completion of a shift. For services provided in excess of the first hour before the commencement of a shift or the first hour after completion of a shift, compensation will be at the hourly rates defined under schedule A.2.d.

i. Compensation for Services Provided between February 28, 2003, and the Effective Date of the Amended Statement of Work: The Supplier's compensation for work performed between March 1, 2003, and the effective date of this amended Statement of Work shall be calculated and paid pursuant to the terms of this amended Statement of Work.

j. Supplemental Invoices for Product or Services Rendered at Prices Not Specified in the Schedules: Any invoices for products or services rendered at prices that are not specified in the pricing Schedules herein, must be submitted to the contacting officer and accompanied by data explaining the following:

1. The cause(s)

2. The effective dates and locations

3. A detailed description of the methodology used to arrive at the estimated costs - if such costs are not based upon actual costs incurred for the particular product or service.

Note: No invoice for subcontractor services shall be based upon cost plus a percentage of cost.

k. Scanning: The Postal Service and supplier agree that pay for scanning will be implemented effective December 29, 2003, or thereafter as determined by the USPS.

**A.2 Items and Prices**

| | Periods | Periodic Payment | Total Annual Payment |
|---|---|---|---|
| a. Fixed Costs | 26 | $244,768.90 | $6,363,991.40 |

(Contracts SNET-01-GLR, SNET-01-SER, and SNET-01-PR)

b. Variable Cost @ 6.5 lb/cu ft density

| Air Stop | Variable Price per Pound |
|---|---|
| Des Moine | $0.0255 |
| Detroit - D | $0.0441 |
| Sioux Falls | $0.0439 |
| Grand Fork | $0.0329 |
| Grand Rap | $0.0401 |
| Wichita - I( | $0.0315 |
| Indianapoli | $0.0402 |
| Kansas Cit | $0.0235 |
| Milwaukee | $0.0226 |
| Minneapoli | $0.0289 |
| Omaha - C | $0.0257 |
| Chicago - ( | $0.0186 |
| Atlanta - A | $0.0274 |
| Orlando - M | $0.0258 |
| Miami - MI/ | $0.0363 |
| Knoxville - | $0.0298 |
| Honolulu H | $0.0441 |
| Los Angele | $0.0410 |
| Oakland - ( | $0.0529 |
| San Franci | $0.0455 |
| Ontario - C | $0.0580 |
| San Diego | $0.0391 |
| Sacrament | $0.0253 |
| | |
| Total | $0.0366 |

C. Separation Pricing

| Air Stop | Cost/Credit per Separation |
|---|---|
| LAX | $123.19 |
| ONT | $71.80 |
| SAN | $35.86 |
| OAK | $82.04 |
| SFO | $104.84 |
| SMF | $20.49 |
| HNL | $0.00 |
| ATL | $22.42 |
| MIA | $66.86 |
| MCO | $51.45 |
| TYS | $7.97 |
| ORD | $48.72 |
| IND | $40.50 |
| DTW | $35.04 |
| GRR | $28.26 |
| DSM | $35.75 |
| MKE | $55.39 |
| GFK | $13.94 |
| FSD | $7.16 |
| MCI | $40.02 |
| ICT | $11.96 |
| OMA | $29.24 |
| MSP | $47.60 |

d. Labor Rates for Extra or Ad Hoc Services

| Air Stop | Loaded Hourly Labor Rate |
|---|---|
| LAX | $16.68 |
| ONT | $22.49 |
| SAN | $16.46 |
| OAK | $20.17 |
| SFO | $25.78 |
| SMF | $15.93 |
| HNL | $23.17 |
| ATL | $15.30 |
| MIA | $15.08 |
| MCO | $14.44 |
| TYS | $12.14 |
| ORD | $21.84 |
| IND | $20.34 |
| DTW | $26.52 |
| GRR | $20.49 |
| DSM | $17.32 |
| MKE | $18.10 |
| GFK | $16.44 |
| FSD | $14.69 |
| MCI | $19.77 |
| ICT | $15.62 |
| OMA | $18.38 |
| MSP | $23.48 |

Loaded hourly labor rates include the supplier's direct labor and the fringe benefits, overhead, and profit applied to direct labor.

## *Section B Statement of Work*

### B.1 Overview

The purpose of this performance based service contract is to provide integrated material handling services in support of the U. S. Postal Service's air and ground networks. The main components of the integrated material handling services are facilities, scanning services, container preparation, surface (roller-bed and /or dolly) transportation, limited simple distribution, record keeping and electronic data submissions at the locations listed in **Attachment A (Cities Served & Daily Baseline Pounds for Daytime Network).**

The components of this integrated material handling system must meet on time service performance (origin and destination tender times) a minimum of 98% of the time on a by site-by-site basis during each schedule period.

### B.2 Background

a. The Postal Service has entered into a contract with an aviation supplier for transportation service of U.S. Mail. The contract for transportation service requires the Postal Service to engage in expanded material handling operations, namely the scanning and loading and scanning and unloading of the above listed products into and out of air containers. The Postal Service determined that it would acquire the additional integrated material handling capabilities through a competitive outsourcing to qualified suppliers under Solicitation HQ-2001 -12, which resulted in a contract between the Postal Service and the terminal handling supplier (referred to throughout the contract documents as "the supplier" or "the THS").

b. This contract does not specify the processes that the THS must employ to achieve the services required by this contract. The Postal Service will provide the hours of operation, locations of operation, estimate of the mail that the THS should expect to process at each site, distribution requirements, the aviation supplier's ramp locations (for air container drayage planning) and information recording and Electronic Data Interchange (EDI) requirements.

c. During the term of the contract, the Postal Service will periodically provide the THS updated matrices estimating the mail that the THS should expect to process at each site.

The Postal Service will provide such updated matrices from six (6) times per year up to fifteen (15) times per year, without modifying the pricing or other terms of the contract.

d. Distribution requirements at origin are to scan and trans-load mail, from Postal Service supplied mail transport equipment to air carrier supplied air containers, into either bypass (direct) or mixed air containers.

e. Distribution requirements at destination are to unload the mail from air containers, scan and separate mail into either shape based and/or zip code range as listed in Attachment C (Separations). The Postal Service may make unlimited changes to the specific destinating separations listed in Attachment C (Separations) at no additional cost to the Postal Service as long as the absolute total net number of separations for a given site does not increase. The THS agrees to provide at no cost to USPS up to fifty-eight (58) net additional separations during the life of the contract, including a maximum of four (4) net additional separations at any air stop. However, if the ceiling of four (4) net separations is exceeded at any given site, or a net of fifty-eight separations across all sites, a daily site charge per schedule A.2.C will be incurred.

For purposes of this provision, a substitution of one separation for another at any given air stop shall not constitute an additional separation within the meaning of this provision. An increase in the absolute total number of separations for a given site must be approved in writing by the contracting officer prior to implementation.

**B.3 Supplier Qualifications**

The THS shall maintain its ability to meet the service requirements specified in this contract.

**B.4 Scope**

The sites covered by this contract are listed in Attachment A (Cities Served & Daily Baseline Pounds for Daytime Network). Additional sites may be added to the Network during the contract period. All fixed costs and variable costs for any new site will be approved by the Contracting Officer prior to start up of the new site.

**B.5 Term and Frequency of Contract**

a. Term

The term of this reformed contract shall be from **March 1, 2003** through and including August 26, 2006. This contract contains three (3), one (1) year options exercisable by the Postal Service in its sole discretion upon delivery of written notice to the THS at least 60 days prior to the expiration of the contract.

For purposes of the application of the Department of Labor Area Wage Determinations per the Service contract Act, the original effective date of the contract, August 27, 2001, shall apply.

b. Frequency

1) The integrated material handling services to be purchased are primarily intended to support Express, Priority and First Class Mail. Service will be daily except Mondays and the following widely observed holidays, New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving, and Christmas Day. If required to work on any of the above days, the THS will be compensated for variable costs only.

2) Annual operation will total approximately 307 days per year.

**B.6 Subcontracting**

a. The THS shall not, without the prior written approval of the contracting officer, subcontract any portion of the work that is a core function defined as follows: core functions are defined as a an integral component of the integrated material handling process described under section B.7

b. Non-core support functions, i.e., functions that are not directly related to the acceptance, packaging, or movement of mail, such as the fueling of ground equipment; do not require prior approval from the contracting officer.

**B.7 Operational Requirements**

a. The THS shall design and implement an integrated material handling system that provides the following services to outbound mail:

# ATTACHMENT D

EVERGREEN EAGLE

3850 Three Mile Lane McMinnville, OR 97128
Phone (503) 472-9361 FAX (503) 472-9150

September 20, 2005

Cheryl R. Brazil
Purchasing and Supply Management Specialist
United States Postal Service
475 L' Enfant Plaza SW Room 4900
Washington DC 20260-6012

Re: Continued Shortfall Under
EAGLE's Reformed SNET Contract

Dear Ms. Brazil:

Another contract year has just concluded, and USPS continues to fail to provide EAGLE with the weight of mail to which it is contractually entitled. This failure by USPS has put EAGLE in a significant loss position under the SNET contract. As a result, EAGLE must demand assurances from USPS that it will conform to its contractual obligations.

When we negotiated the reformed contract in the spring and summer of 2003, one of the most significant building blocks – if not the most significant – was that USPS would increase the volume of mail then being handled by EAGLE by approximately 25%, to 1.25 billion pounds per year. USPS has never come through on that commitment, despite repeated requests by EAGLE and despite there being more than adequate mail in the USPS air and ground networks to provide those volumes to EAGLE for handling. EAGLE has tried to work with USPS on this matter, repeatedly reminding it of its obligations, but the total weight handled for the contract year ending August 26, 2005, like for the prior contract year, was under 1.0 billion pounds. Largely because of USPS's failure to provide the amount of mail it said it would, EAGLE is suffering significant losses under the Contract.

Unless USPS begins to comply with its contractual obligations to give EAGLE 1.25 billion pounds of mail per year, EAGLE is faced with the prospect of continuing, substantial losses for the remaining year of the base contract period and the three option years. Thus, EAGLE must demand immediate assurances by USPS that USPS will make all good faith efforts required to provide EAGLE for handling 1.25 billion pounds of mail from USPS's air and ground networks for all four of these contract years. We would also appreciate identification of what steps USPS is or will be taking to reach this contractual weight commitment.

Your prompt response would be greatly appreciated.

Sincerely,

Brian T. Bauer
President

cc: D. Bonham
L. Kelly

# ATTACHMENT E

SUPPLY MANAGEMENT

UNITED STATES
POSTAL SERVICE

October 14, 2005

Mr. Brian Bauer
Evergreen E.A.G.L.E.
3850 Three Mile Lane
McMinnville, OR 97128-9496

Dear Mr. Bauer:

This is in response to your letter, dated September 20, 2005, where you state that the Postal Service continues to fail to provide EAGLE with the weight of mail to which it is contractually entitled. You mention that because of this failure, EAGLE continues to suffer financial loss under the reformed SNET contracts. You demand adequate assurances that the Postal Service will provide EAGLE with the 1.25 billion pounds of mail you state is required for this contract year and for the 3 option years left on these contracts.

The Postal Service is not required to provide EAGLE with 1.25 billion pounds of mail under the three reformed SNET contracts (PR, SER, GLR) and so it will not be making such assurances. In addition, it has not been decided yet whether the Postal Service will even exercise any of the three options, so such assurance would be premature at best for that portion of the contracts.

As we stated in our April 28, 2005 letter to you on this matter, the contracts specifically state that the 1.25 billion pounds was an estimate and not a guarantee. Instead, the parties agreed that actual compensation would vary according to the actual weight and density of mail provided to EAGLE. See Section A.1 (a)-(j).

Once again, it is my understanding that the two parties jointly developed this contractual volume estimate as a fair and reasonable projection of future volume. The total number of pounds was based on density of the mail flow at the time and it has changed over time. Unfortunately, the actual volume has not reached the projection of late. Even if you disagree that the parties came up with the numbers jointly, I understand that the Postal Service contributed numbers that were based on historical and trend data available at the time and so reflected our best forecast of the expected volume in future years. Since the Postal Service consulted historical data, we believe our estimates were not negligent or careless and we certainly did not offer them in bad faith. We offered the best data we could at that time.

We would also like to point out that we have provided EAGLE an advance copy of each schedule block matrix at least twenty-one days in advance of the start of each schedule block, allowing EAGLE to react and plan accordingly for the appropriate labor. With few exceptions, the matrices have been accurate. EAGLE has also been compensated for the changes in density as related to the baseline. These density adjustments have consistently resulted in higher prices per pound over the baseline.

We consulted our attorneys concerning your previous allegations of negligently generated estimates. It is our understanding that the relevant case law would show that a 25% shortfall is not a grossly unreasonable estimate. We also understand the case law to state that when an estimate forms part of a government contract, like it did in this case, the risks associated with variances between actual requirements and estimated quantities are allocated to the supplier. Therefore, it was a risk EAGLE took when it signed this reformation which listed these numbers as estimates only–that the numbers might fall short. We also understand that it would be EAGLE's burden to show the Postal Service

475 L'ENFANT PLAZA SW
WASHINGTON DC 20260-6210
202 268 2096
FAX: 202 268 4313

negligently prepared the estimate. Since I understand the numbers to have been determined jointly, a factual issue would be present and have to be decided before one could determine the Postal Service prepared the estimate negligently.

Finally, we understand the case law to state that a supplier cannot succeed in these types of cases simply by arguing that a more reasonable approach to estimating the requirement was available or that the Postal Service could have created or searched for more accurate data.

Since this is our position, we are unable to give EAGLE any assurances that the volume it receives will be at any particular level. We believe we are performing our contract requirements as negotiated by the parties and as memorialized in the reformed contracts.

Sincerely,

Cheryl R. Brazil

Cheryl R. Brazil
Contracting Officer

cc: Mr. Pajunas
Mr. Young
Mr. Spatola
Mr. Griffith
Ms. Vance