UNITED STATES POSTAL SERVICE

# Amendment to Transportation Services Contract

## Part I - Amendment pursuant to

| 1a. Contract No. | 1b. Amendment No. | 1c. Effective Date | 1d. Begin Contract Term | 1e. End Contract Term |
|---|---|---|---|---|
| SNET-01-PR<br>SNET-01-SER<br>SNET-01-GLR | 04 | 03/01/2003 | 08/27/2001 | 08/26/2006 |

| 1f. For Mail service in or between | City & State | City & State |
|---|---|---|
| | Pacific, Great Lakes, Southeast Regions | |

## Part II – Contractor

| 2a. Name and address of contractor (street, city, state, and zip+4) | 2b. Social Security Number or Taxpayer ID No. |
|---|---|
| Evergreen Aviation Ground Logistics Enterprises Inc. (EAGLE)<br>EVERGREEN EAGLE<br>3850 Three Mile Lane<br>McMinnville, OR 97128-9496 | 93-0876736<br>2c. Telephone (Area code and number)<br>503 472-9361 |

## Part III – Description of amendment

Effective March 1, 2003, the U.S. Postal Service and the THS agree to a reformation of the contracts listed above, as follows:

Part 1, Schedule, including Sections A, B, C, D, E, F, and G, is replaced and superseded in its entirety by the attached revised Part 1, Sections A, B, C, D, E, F, and G.

Part 2, Section H of the contract, "General Clauses," attached, is replaced and superseded in its entirety by the attached revised Section H.

Section I of the contract, "List of Attachments," is replaced and superseded in its entirety by the attached revised Section I.

Section L of the contract, "Representations and Certifications," is incorporated by reference and remains in effect in the reformed contracts.

Attachments A, B, C, F, G, and K are replaced and superseded in their entirety by the attached revised Attachments A, B, C, G, and K.

Attachments G & K must be updated by the supplier for each of its sites and submitted to the contracting officer by August 30, 2003.

New Attachments M, "Terminal Handling Service Provider Operations Plan," and N, "Business Rules," attached, are included in the reformed contracts.

Attachment F of the contract, "Cargo Container Checklist," and Attachment L of the contract, "Wage Determinations," are incorporated by reference and remain in effect in the reformed contracts.

Existing sections and attachments of the contract which are not expressly incorporated into the reformed contracts as described above, will not become part of the reformed contracts and are no longer in effect after March 1, 2003.

The reformed contracts, as described above, the clauses and documents which the reformed contract expressly incorporates by reference, and this Form 7406 represent the entire agreement of the parties.

It is mutually agreed that any and all claims arising out of the contract period prior to March 1, 2003, will be resolved according to the Terms and Conditions contained in the Settlement Agreement and Release that was properly executed by the parties on April 18, 2003.

The parties hereunder have caused this amendment to be executed, effective the date set forth in Part III.

| Contractor | U.S. Postal Service |
|---|---|
| Signature of person authorized to sign and date<br>[signature] Signature — 8/03/03 Date | Signature of contracting officer and date<br>[signature] Signature — 8/01/03 Date |
| Name and title of person authorized to sign<br>BRIAN BAUER<br>PRESIDENT | Name and title of contracting officer |

PS Form 7406, June 1990

# Evergreen Eagle Reformed Contract


PART 1: SCHEDULE 3

Section A. Items and Prices 3
A.1 Pricing 3
A.2 Items and Prices 7

Section B Statement of Work 10
B.1 Overview 10
B.2 Background 10
B.3 Supplier Qualifications 11
B.4 Scope 11
B.5 Term and Frequency of Contract 11
B.6 Subcontracting 12
B.7 Operational Requirements 12
B.8 Contingency Plans 29
B.9 Security 30
B.10 Personnel Screening 33
B. 11 Information Exchange 36
B.12 Administration 37

Section C. Delivery or Performance 38
C.1 On-Time Performance 38
C.2 Performance Standards 38
C.3 Irregularities 40

SECTION D. PACKAGING AND MARKING 45

SECTION E. INSPECTION AND ACCEPTANCE 45
E.1 Deliverables 45

SECTION F. PAYMENT 47
F.1 Rate 47
F.2 Payment - Fixed Price (Clause 2-26) (January 1997) (Tailored) 47
F.3 Interest (Clause B-22) (January 1997) 48
F.4 Payment Due Date 48
F.5 Direct Deposit 48
F.6 Disallowance of Costs (Clause B-17) (January 1997) 48
F.7 Economic Price Adjustment 49
F.8 Compensation for Scanned Mail 50

Section G. Special Clauses 51
G.1 Definitions (Clause B-1) (January 1997) (Tailored) 51
G.2 Damages 57
G.3 Changes (Clause B-2) (January 1997) (Tailored) 57
G.4 Federal, State and Local Taxes (Clause 7-6) (January 1997) (Tailored) 59
G.5 Suspension of Contract 60
G.6 Option for Extra Service 60
G.7 Responsibility for Postal Property 61
G.8 Indemnification and Insurance 61
G.9 FAA and Local Airport Authority Requirements 62
G.10 Other Contracts 62
G.11 Responsibility for Postal Containers 62

G.12 Ceiling on Termination for Convenience Costs 62

**PART 2: CLAUSES AND ATTACHMENTS** **65**

**Section H. Contract Clauses** **65**
a. Clause 4-1 General Terms and Conditions (January 2002) 65
b. Clause 4-2 Contract Terms and Conditions Required to Implement Policies, Statutes or Executive Orders (January 2002) 65

**Section I. List of Attachments** **65**

# Part 1: Schedule

## *Section A. Items and Prices*

### A.1 Pricing

The purpose of these performance based service contracts is for the Postal Service to purchase and the Terminal Handling Supplier (THS) to provide integrated material handling services in support of the United States Postal Service's air and ground networks.

The contracts awarded under this solicitation shall be priced as follows:

a. The parties anticipate that the Postal Service will provide to the THS approximately 1.25 billion pounds of mail during each calendar year of the three contracts (SNET-01-GLR, SNET-01-PR, SNET-01-SER) and that the annual contract compensation for 1.25 billion pounds is estimated to be approximately $46.8 million, including fixed and variable costs. However, the parties recognize that the Postal Service does not guarantee a minimum weight of mail will be provided to the THS, and does not guarantee that annual compensation will total $46.8 million dollars. Actual compensation will vary according to the actual weight and density of mail provided to the THS in accordance with Sections A.1.b through A.1.j.

b. Fixed Costs: The Postal Service shall pay the Supplier one twenty-sixth (1/26) of the agreed upon annual price as defined in schedule A.2.a to compensate the supplier for its fixed costs for all three contracts. The fixed cost will be paid on a bi-weekly basis. This annual price may not be altered without written authorization of the Contracting Officer.

c. Variable Costs:

1) The Supplier shall be compensated for its mail handling service pursuant to the density-based adjusting scale (the sliding scale). The per pound price by air stop is shown on schedule A.2.b. At each stop, as density varies from 6.5 pounds per cubic foot, variable price will vary in a direct inverse relationship. As pounds per cubic foot rises, variable price per pound will fall by the same ratio, and as pounds per cubic foot falls, variable price per pound will rise by the same ratio. The USPS reserves the right to adjust the density factor once a year based upon USPS historical operating data. Attachment A to the Statement of Work sets forth the baseline weight of the mail for each air stop. Variable cost compensation for a schedule period by air stop will be based upon

the baseline weight per schedule period multiplied by the sliding scale price per pound using actual air stop density. For purposes of establishing bi-weekly payments to the supplier, a density factor of 6.5 $lbs./ft^3$ will be employed. No later than 21 days after the end of each schedule period, the Postal Service and the Supplier shall reconcile actual weights and density to determine whether a compensation adjustment is necessary. The actual density of the mail shall be determined from the scanned data submitted by the Supplier, pursuant to the methodology described within Attachment N - Business Rules and pursuant to Section F.8 of the contract. The density of the mail during Christmas Season shall not be considered for purposes of calculating the average actual density achieved. The Supplier shall achieve the highest density reasonably practicable. The Postal Service reserves the right to review and evaluate the processes and procedures used by the Supplier to maximize the density of the mail. If the Postal Service identifies means or methodologies to enhance the ability of the Supplier to achieve higher densities, it will provide that information as it is developed. In any event, the Postal Service will conduct an initial study of the Supplier's mail handling procedures and techniques after the effective date of this Statement of Work and advise the Supplier of its finding no later than October 1, 2003.

2) Variable cost payments will be reconciled on a schedule period basis to reflect actual volumes scanned. Until scanning for compensation is implemented, beginning March 1, 2003, the supplier will be paid, on a bi-weekly basis, 85% of one twenty-sixth (1/26) of the total projected annual variable cost. After scanning for compensation is implemented, compensation will be computed based only on scanned mail. Scanning for compensation will begin on December 29, 2003 or thereafter as determined by the USPS. Additionally, an annual payment reconciliation will be made to adjust the total payment for 12 schedule periods. The first annual reconciliation will be made after the schedule period ending February 29, 2004.

d. <u>Absorption</u>: In the event that the average actual daily weight at any given air stop exceeds the designated baseline weight by twenty percent (20%) or less during each schedule period of the contract the Supplier shall not be entitled to any additional compensation. In the event the average daily actual weight exceeds the designated baseline weight by more than twenty percent (20%) during any scheduled period, the Supplier shall be entitled to additional compensation only for the weight of the mail in excess of the twenty-percent (20%) increase. If the average daily actual weight is more than 20% below the average daily designated baseline weight during any scheduled period, the Postal Service will be entitled to a reduction for each pound less than eighty percent (80%) of the average daily designated baseline weight. Pricing outside of the absorption ranges will be in accordance with schedule A.2.b and in accordance with the sliding scale. After scanning for compensation is implemented, the

average daily actual weight will be the average daily actual weight scanned. The average daily actual weight scanned shall include only volumes receiving all required scans enumerated in Section F.8.

e. <u>Compensation for Services Provided During the Christmas Season</u>: The Christmas Season shall be defined as the period beginning the day after Thanksgiving and concluding at midnight on December 24th. During the Christmas Season, the Supplier shall be compensated for the actual weight of the mail, but not at a rate per pound in excess of that established for each air stop at a density of 5.5 $lbs./ft^3$. In the event the actual density achieved exceeds 5.5 $lbs./ft^3$, the actual density shall be used to calculate the compensation due to the Supplier.

f. <u>Labor Rates for Extra Services</u>: The Postal Services shall compensate the Supplier for out-of-scope work directed by the Contracting Officer or the designated COTR based on the loaded hourly labor rates and the loaded overtime rates by air stop as described herein. The Contracting Officer or COTR must authorize this work before it is performed. The Postal Service may audit and verify the loaded hourly labor rates and the loaded overtime rates.

g. <u>Separations</u>: In the event that the Postal Service adds separations in excess of those permitted pursuant to section B.2.e, the Postal Service shall compensate the Supplier at the additional separation rate established for each air stop as set forth herein. In the event that the Postal Service exercises its option to receive a credit for up to twelve (12) separations, the Postal Service shall be entitled to a credit equivalent $66.47 per separation per operating day, which is the average additional daily separation rate for those sites which have had separation reduction since the beginning of the contract period. If the Postal Service does not exercise its option to receive credit for these twelve separations, the Postal Service may instead, use this credit to increment separations until the end of the contract period. The Postal Service is entitled to a net additional 46 separations without additional charge until the end of the contract period. However, should the Postal Service request a net increase of more than four separations at any site or a net of more than 58 separations at all sites, a daily site charge per schedule A.2.C - Separation Pricing will be incurred. Additionally, should the Postal Service request a further reduction in separations, schedule A.2.C rates will be used to determine the daily credit per site.

h. <u>Ad Hoc Services</u>: In the event that the Postal Service directs the Supplier to expand its window of operations for any shift at any air stop on an ad hoc basis to address unexpected early arrivals, delays or work load, the Supplier shall not be entitled to additional compensation for the first hour before the commencement of a shift or the first hour after the completion of a shift. For services provided in excess of the first hour before the commencement of a shift or the first hour after completion of a shift, compensation will be at the hourly rates defined under schedule A.2.d.

i. <u>Compensation for Services Provided between February 28, 2003, and the Effective Date of the Amended Statement of Work</u>: The Supplier's compensation for work performed between March 1, 2003, and the effective date of this amended Statement of Work shall be calculated and paid pursuant to the terms of this amended Statement of Work.

j. <u>Supplemental Invoices for Product or Services Rendered at Prices Not Specified in the Schedules</u>: Any invoices for products or services rendered at prices that are not specified in the pricing Schedules herein, must be submitted to the contacting officer and accompanied by data explaining the following:

1. The cause(s)

2. The effective dates and locations

3. A detailed description of the methodology used to arrive at the estimated costs - if such costs are not based upon actual costs incurred for the particular product or service.

Note: No invoice for subcontractor services shall be based upon cost plus a percentage of cost.

k. <u>Scanning</u>: The Postal Service and supplier agree that pay for scanning will be implemented effective December 29, 2003, or thereafter as determined by the USPS.

## A.2 Items and Prices

| | Periods | Periodic Payment | Total Annual Payment |
|---|---|---|---|
| a. Fixed Costs | 26 | $244,768.90 | $6,363,991.40 |

(Contracts SNET-01-GLR, SNET-01-SER, and SNET-01-PR)

b. Variable Cost @ 6.5 lb/cu ft density

| Air Stop | Variable Price per Pound |
|---|---|
| Des Moine | $0.0255 |
| Detroit - DT | $0.0441 |
| Sioux Falls | $0.0439 |
| Grand Fork | $0.0329 |
| Grand Rap | $0.0401 |
| Wichita - IC | $0.0315 |
| Indianapoli | $0.0402 |
| Kansas Cit | $0.0235 |
| Milwaukee | $0.0226 |
| Minneapoli | $0.0289 |
| Omaha - C | $0.0257 |
| Chicago - ( | $0.0186 |
| Atlanta - A | $0.0274 |
| Orlando - N | $0.0258 |
| Miami - MI/ | $0.0363 |
| Knoxville - | $0.0298 |
| Honolulu H | $0.0441 |
| Los Angele | $0.0410 |
| Oakland - ( | $0.0529 |
| San Franci | $0.0455 |
| Ontario - C | $0.0580 |
| San Diego | $0.0391 |
| Sacrament | $0.0253 |
| | |
| Total | $0.0366 |

C. Separation Pricing

| Air Stop | Cost/Credit per Separation |
|---|---|
| LAX | $123.19 |
| ONT | $71.80 |
| SAN | $35.86 |
| OAK | $82.04 |
| SFO | $104.84 |
| SMF | $20.49 |
| HNL | $0.00 |
| ATL | $22.42 |
| MIA | $66.86 |
| MCO | $51.45 |
| TYS | $7.97 |
| ORD | $48.72 |
| IND | $40.50 |
| DTW | $35.04 |
| GRR | $28.26 |
| DSM | $35.75 |
| MKE | $55.39 |
| GFK | $13.94 |
| FSD | $7.16 |
| MCI | $40.02 |
| ICT | $11.96 |
| OMA | $29.24 |
| MSP | $47.60 |

d. Labor Rates for Extra or Ad Hoc Services

| Air Stop | Loaded Hourly Labor Rate |
|---|---|
| LAX | $16.68 |
| ONT | $22.49 |
| SAN | $16.46 |
| OAK | $20.17 |
| SFO | $25.78 |
| SMF | $15.93 |
| HNL | $23.17 |
| ATL | $15.30 |
| MIA | $15.08 |
| MCO | $14.44 |
| TYS | $12.14 |
| ORD | $21.84 |
| IND | $20.34 |
| DTW | $26.52 |
| GRR | $20.49 |
| DSM | $17.32 |
| MKE | $18.10 |
| GFK | $16.44 |
| FSD | $14.69 |
| MCI | $19.77 |
| ICT | $15.62 |
| OMA | $18.38 |
| MSP | $23.48 |

Loaded hourly labor rates include the supplier's direct labor and the fringe benefits, overhead, and profit applied to direct labor.

## B.1 Overview

The purpose of this performance based service contract is to provide integrated material handling services in support of the U. S. Postal Service's air and ground networks. The main components of the integrated material handling services are facilities, scanning services, container preparation, surface (roller-bed and /or dolly) transportation, limited simple distribution, record keeping and electronic data submissions at the locations listed in **Attachment A (Cities Served & Daily Baseline Pounds for Daytime Network).**

The components of this integrated material handling system must meet on time service performance (origin and destination tender times) a minimum of 98% of the time on a by site-by-site basis during each schedule period.

## B.2 Background

a. The Postal Service has entered into a contract with an aviation supplier for transportation service of U.S. Mail. The contract for transportation service requires the Postal Service to engage in expanded material handling operations, namely the scanning and loading and scanning and unloading of the above listed products into and out of air containers. The Postal Service determined that it would acquire the additional integrated material handling capabilities through a competitive outsourcing to qualified suppliers under Solicitation HQ-2001 -12, which resulted in a contract between the Postal Service and the terminal handling supplier (referred to throughout the contract documents as "the supplier" or "the THS").

b. This contract does not specify the processes that the THS must employ to achieve the services required by this contract. The Postal Service will provide the hours of operation, locations of operation, estimate of the mail that the THS should expect to process at each site, distribution requirements, the aviation supplier's ramp locations (for air container drayage planning) and information recording and Electronic Data Interchange (EDI) requirements.

c. During the term of the contract, the Postal Service will periodically provide the THS updated matrices estimating the mail that the THS should expect to process at each site.

The Postal Service will provide such updated matrices from six (6) times per year up to fifteen (15) times per year, without modifying the pricing or other terms of the contract.

d. Distribution requirements at origin are to scan and trans-load mail, from Postal Service supplied mail transport equipment to air carrier supplied air containers, into either bypass (direct) or mixed air containers.

e. Distribution requirements at destination are to unload the mail from air containers, scan and separate mail into either shape based and/or zip code range as listed in Attachment C (Separations). The Postal Service may make unlimited changes to the specific destinating separations listed in Attachment C (Separations) at no additional cost to the Postal Service as long as the absolute total net number of separations for a given site does not increase. The THS agrees to provide at no cost to USPS up to fifty-eight (58) net additional separations during the life of the contract, including a maximum of four (4) net additional separations at any air stop. However, if the ceiling of four (4) net separations is exceeded at any given site, or a net of fifty-eight separations across all sites, a daily site charge per schedule A.2.C will be incurred.

For purposes of this provision, a substitution of one separation for another at any given air stop shall not constitute an additional separation within the meaning of this provision. An increase in the absolute total number of separations for a given site must be approved in writing by the contracting officer prior to implementation.

**B.3 Supplier Qualifications**

The THS shall maintain its ability to meet the service requirements specified in this contract.

**B.4 Scope**

The sites covered by this contract are listed in Attachment A (Cities Served & Daily Baseline Pounds for Daytime Network). Additional sites may be added to the Network during the contract period. All fixed costs and variable costs for any new site will be approved by the Contracting Officer prior to start up of the new site.

**B.5 Term and Frequency of Contract**

a. Term

The term of this reformed contract shall be from **March 1, 2003** through and including August 26, 2006. This contract contains three (3), one (1) year options exercisable by the Postal Service in its sole discretion upon delivery of written notice to the THS at least 60 days prior to the expiration of the contract.

For purposes of the application of the Department of Labor Area Wage Determinations per the Service contract Act, the original effective date of the contract, August 27, 2001, shall apply.

b. Frequency

1) The integrated material handling services to be purchased are primarily intended to support Express, Priority and First Class Mail. Service will be daily except Mondays and the following widely observed holidays, New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving, and Christmas Day. If required to work on any of the above days, the THS will be compensated for variable costs only.

2) Annual operation will total approximately 307 days per year.

**B.6 Subcontracting**

a. The THS shall not, without the prior written approval of the contracting officer, subcontract any portion of the work that is a core function defined as follows: core functions are defined as a an integral component of the integrated material handling process described under section B.7

b. Non-core support functions, i.e., functions that are not directly related to the acceptance, packaging, or movement of mail, such as the fueling of ground equipment; do not require prior approval from the contracting officer.

**B.7 Operational Requirements**

a. The THS shall design and implement an integrated material handling system that provides the following services to outbound mail:

1) Off load multiple trucks or dollies of mail that arrive in either rolling mail transport equipment, deck loaded, or in baggage carts. At pure trucking locations deck loaded trucking can be up to 100% of transportation.

2) Move the mail into a secure facility for processing.

3) In the usual course, the THS shall take mail out of postal supplied mail transport equipment, scan the mail, and load into an air container where all the product is destined for the same location (a bypass or direct container), or after scanning, load the mail into an air container in which the product is destined for multiple locations (a mixed air container). All containers shall be loaded in such a manner to maximize the amount of mail that will be put in each container. The THS shall be responsible for modifying its processes as necessary in order to deal with unscheduled and unexpected events, including aviation and surface service failures and delays.
The THS must have and shall maintain sufficient space available so that multiple bypass and mixed containers can be loaded at the same time. Air containers shall be loaded in conformance to matrices provided by the Postal Service at least twenty-one (21) days prior to effective date, which will designate approximately how many mixed air containers and bypass or direct air containers are to be dispatched to the aviation supplier.

4) Once loaded, weigh all containers and affix a D&R tag to bypass (direct) and mixed containers, place bypass tape on the direct air containers, then transport the air containers on the appropriate equipment to the designated location and tender to the air carrier by the time specified in Attachment B (Ground Handler Specifications).

5) During the aforementioned process record data in the required format and communicate or transmit to the Postal Service as directed. Some of the required data programs are the Transportation Information Management Evaluation System (TIMES) and the Terminal Handling Services Daily Mail Condition Report (THS DMCR).

6) All THS locations are required to input inbound and outbound USPS surface truck arrival and departure data into a USPS electronic data collection system. The USPS system is the Transportation Information Management Evaluation System (TIMES), and a Web-based version of the system will be made accessible to all authorized THS personnel. Each THS facility shall ensure that

transportation movement data is placed into TIMES real time, within one (1) hour of arrival/departure of all scheduled and unscheduled trips. The data shall be entered sequentially based on actual arrival and departure of scheduled and unscheduled transportation.

b. The following is provided as information relative to the data collection process.

1. Transportation Information Management Evaluation System (TIMES) is an electronic system that produces an automated PS Form 5398X to track Highway Contract Routes (HCR) and Postal Vehicle Service (PVS) inbound and outbound transportation. It provides real time data entry of moves, utilizing computers. Reports focus attention on arrival and departure times, volume by class, containerization and Load/Unload times.

2. A single data entry transportation movement event can be processed in less than one minute. The process will be outlined in the training package. The following list of simplified data entry elements are required. This list is not all inclusive.

3. For inbound load, input unloads, vehicle ID, Driver, and container content information.

4. For outbound load, input load, vehicle ID, Driver, and container content information.

5. Desired facility code.

6. Load start time.

7. Load seal number {if applicable}.

8. Percent fill of vehicle.

9. Percent of vehicle bed loaded {if applicable}.

10. Amount of Preferred Mail (First Class Mail).

11. Amount of Priority Mail.

12. Amount of Express Mail.

13. Was all of the mail dispatched (either Y or N). If no, indicate percentage of the vehicle left behind.

14. Load end date and time.

15. Content remarks {if applicable}.

16. Number of full containers by container type.

17. Number of empty containers by container type.

18. Each THS user who enters data into TIMES is required to have access to the USPS proprietary system. Selected users must complete PS Form 1357, Request for Computer Access, and submit to Headquarters Shared Networks for processing and clearance.

Initial training will be provided by the USPS for authorized users. The THS shall have sufficient attendees to ensure that they can conduct operations in compliance with this section (B.7 Operational Requirements) and train future new hires.

The THS will be responsible for the security of all computer related equipment and scanners that are associated with this scanning requirement. The THS must immediately notify the proper USPS officials by telephoning the USPS HELP Desk at 1.800. USPS HELP of any scanning equipment failures.

The scanners perform an automatic upload every 100 scans. In order for the automatic upload function to perform correctly, the scanner must be within correct range of the access point. At the end of every operation, the THS is required to conduct a manual upload for every scanner.

c. Material Handling Specifications.

The THS shall design and implement an integrated material handling system that provides the following services to inbound mail:

1) Have sufficient transportation available to transport air containers from the aviation supplier's transfer point to a secure facility.

2) Scan D&R tag on inbound bypass (direct) containers and remove bypass identification tape.

3) Unload air containers / truck. Scan all D&R tags on each handling unit from all air containers, as they are unloaded.

4) Perform a simplified distribution process making the required separations (as indicated in Attachment C - Separations) into postal supplied mail transport equipment.

5) Present (stage) containers for pick up by postal supplied transportation in accordance with Attachment B (Ground Handler Specifications).

6) During the aforementioned process record data in the required format and communicate or transmit to the Postal Service as directed.

7) At all times, while mail is in the supplier's possession, the supplier is responsible for ensuring the protection of the mail from theft and depredation, including weather damage.

d. Services Provided by Supplier

The THS is required to furnish the necessary resources to provide the following services:

1) All unloading, scanning, weighing and marking of containers, distribution, and loading of mail originating and/or destinating at the supplier's Terminal Handling Site.

2) Surface transportation for mail which both originates and destinates within the supplier's THS service area, surface transportation to the designated tender points for mail that must be delivered to the transfer point for outbound transportation, and surface transportation from the transfer point with mail destined for delivery to points within the THS service area.

3) THS site(s) or space that meets the requirements of the supplier's design and the performance specifications of this contract.

4) All mail processing and materials handling equipment to meet the requirements of the supplier's design and the performance specifications.

5) Container tracking, weighing, and performance measurement data.

6) Acquire, train, maintain, and manage supplier's personnel qualified to perform the requirements of the contract.

7) Security requirements set forth in section B.9.

e. Inputs

At origin, the Postal Service will separate Express, Priority and First Class Mail from all other classes of mail. The majority of Express and Priority parcels tendered to the supplier will be in Postal supplied mail transport equipment. Typically, the mail will be presented to the supplier at the supplier's location, loaded into either Postal Service mail transport equipment or on pallets. On occasion, the mail may be presented in floor-loaded trailers. All containerized mail will be sorted by the Postal Service so that it can be transloaded into the appropriate direct (bypass) or mixed air containers.

f. Outputs

At origin, the mail presented shall be scanned, sorted, and T-stacked into air containers in accordance with the Postal Service supplied matrix. The air containers shall be weighed and labeled with the appropriate D&R tag. A bypass container gets a D&R tag with a $ (dollar sign) and red and white bypass identification tape placed in an X pattern on the door of the air container. The bypass cans shall be the correct number and to the destinations indicated in the schedule period matrix. Mixed cans get a D&R tag with a % (percent) sign but do not get any tape applied. All air containers shall then be transported to the aviation supplier's transfer point in accordance with the times

indicated in Attachment B (Ground Handler Specifications).

g. At Destination

At destination, the mail will normally be presented in air containers. The mail shall be transported from the transportation supplier's transfer point in roller bed equipped trucks, or by tug and dolly to the THS supplier's facility. The mail shall be unloaded from the air containers, scanned, and distributed in accordance with the separations indicated in Attachment C (Separations). The bypass container D&R tags shall be scanned, indicating receipt. The mail is to be sorted into Postal Service supplied Mail Transportation Equipment (MTE) and then presented (staged) for pickup by Postal Service supplied ground transportation in accordance with the schedule indicated in Attachment C (Separations). There are some instances where the THS will be required to deliver the destinating mail to the AMC / Postal facility. All exceptions to the above are listed in Attachment B.

h. Network_City Schedules and Updates

1) The aviation supplier shall provide all air transportation and aviation support services.

2) The planned hours of operation are set forth in Attachment B (Ground Handler Specifications). The THS shall adhere to the hours of operation listed in Attachment B (Ground Handler Specifications). A failure to scan for destinating mail is a failure to complete one of the following scans: arrival, departure, tender, and delivery. Actual tender and delivery times will be measured to determine if the supplier meets the on-time performance standard of 98% on time performance.

3) During the term of the contract, the Postal Service may periodically provide the THS updated planned hours of operation, which include arrival, departure, tender, and delivery times for each site. Such updates may necessitate revisions in the surface vehicle schedules and the tender and delivery times. The THS shall accommodate such revisions at no additional cost to the Postal Service, as long as the duration of the operating hours remains constant. The Postal Service may alter the planned hours of operation as frequently as fifteen (15) times per year without amending the pricing or other terms of this contract.

4) Regardless of the planned hours of operation provided by the Postal Service, the THS shall handle mail that may arrive or leave late due to irregular air or surface operations. Variations between actual operations times versus planned hours of operation must be expected and shall be planned for by the supplier. The contract pricing includes variations of one hour or less between actual operations times versus the times set forth in the most recent update provided by the Postal Service, at no additional cost to the Postal Service.

i. Surface Transportation between Postal and THS Facilities

1) The Postal Service will provide surface transportation between Postal facilities and THS facility and THS facilities and Postal delivery points as per Attachment B (Ground Handler Specifications). There are some instances where the THS will be required to deliver the destinating mail to the AMC / Postal facility All Destinating delivery exceptions are listed in Attachment B (Ground Handler Specifications).

2) See Attachment C (Separations) for the volume arrival profile.

3) The THS is responsible for providing surface transportation between the aviation supplier's transfer point and the THS.

j. Peak Season Matrix

The THS may also be required to provide additional peak season service which would include the handling (loading/unloading and mail handling) of all Postal Service aviation suppliers and surface transportation at THS locations. In the event that this becomes necessary, the THS will be notified at least sixty (60) days prior to implementation. The THS shall not be compensated at a rate per pound in excess of that established for a density of 5.5 $lbs/ft^3$. In the event the actual density achieved exceeds 5.5 $lbs/ft^3$, the actual density shall be used to calculate the compensation due the THS. The per pound rates and pricing parameters set out in Section A.1, Items and Pricing, include and apply to such additional peak season work.

1) During the peak holiday (the peak season shall be defined as the period beginning the day after Thanksgiving and concluding at midnight on December 24th) season, additional transportation (air and surface) may be used.

2) The THS will be provided a peak season matrix and will be prepared to handle the additional volume during the peak season.

SPECIAL NOTE: If ordered by the contracting officer, The THS shall provide additional service throughout the year which would include the handling (loading/unloading and mail handling) of all Postal Service aviation suppliers and surface transportation at THS locations. The per pound rates and pricing parameters set out in Section A.1, Items and Pricing, include and apply to such additional work.

k. Volume

1) Volume is measured and compensated by weight, in pounds.

2) The daily baseline weight for each site is set forth in Attachment A.

l. Facility

1) The THS space shall be located on airport grounds or within a reasonable distance and travel time to ensure a timely transfer of mail between the Aviation supplier facility, the USPS Air Mail Center and surface dispatch vehicles.

2) If the THS space is located off airport, it is the THS's responsibility to transport the mail to and from their facility, the aviation supplier transfer point, and to the USPS facility, if necessary.

3) Once established, the THS may not change the location of the facility. Any change in workspace location can only be effected with the prior written consent of the contracting officer.

4) The facility or workspace platform shall be capable of accommodating the loading and unloading of surface vehicles up to 53 feet long and between 48 to 52 inches in height from the ground to trailer bed.

5) The facility shall be capable of providing access for all container sizes and types , as set forth below in this paragraph, as well as contain proper roller deck equipment to ensure containers can be handled efficiently and safely. Air

containers can only be moved using forklifts if they are used in conjunction with slave pallets. Air container types may include LD3s, AYYs, and AMJs and any other type of air containers. Additional air container types may be used.

6) The site shall provide for limited vehicle parking for two Postal support employee(s).

**SPECIAL NOTE: Fork lifts can only be utilized with slave pallets in the movement or positioning of any air containers.**

m. Ramp Operations

1) Express Mail shall be separated and delivered to the Postal Service in such a way that the mail will be delivered first before any other classes of mail are unloaded. Express Mail is clearly identified as "EXPRESS MAIL" on the outside of the parcel and is pouched in an orange sack with blue stripes marked "EXPRESS MAIL" on the outside of the sack.

2) The THS shall accept mail tendered by the Postal Service and the aviation supplier, in containers or as loose load, and dray the mail if necessary. If required, the supplier shall stage the mail in a secure facility/area for loading at a later time.

n. Aviation Supplier Responsibilities: Ramp Operations

The Aviation Supplier shall position or stage all necessary outbound equipment at least four (4) hours prior to the latest-tender time. The THS shall transport the containers from the aviation supplier's transfer point to the THS facility or work space.

1) Replace damaged equipment no later than sixty (60) minutes prior to the latest tender time, providing notification is made within two (2) hours of latest tender time

2) Assist in the off loading of Cargo Transport Vehicles (CTV)/dollies at the AMC or designated site.

3) Deliver four (4) air cargo containers within the first twenty (20) minutes and the remaining containers within one hour of aircraft arrival to the THS facility or staging area.

4) Communicate changing operations, i.e. tail swaps, arrival/departure times, etc.

o. THS Responsibilities: Ramp Operations

1) The THS shall stay current with changing conditions, including but not limited to, tail swaps, late aircraft and/or surface vehicles, mechanical breakdowns, weather, etc. and make adjustments accordingly.

2) The THS may be required to dray mail from the AMC or designated Postal site. The THS shall ensure the correct number of containers and dollies are received from aviation supplier for build up.

3) The THS shall develop in effective lines of communication with the aviation supplier to ensure the timely receipt of necessary equipment.

4) The THS is responsible for inspecting all air containers. Once containers have been inspected and accepted, the THS is responsible for damage that occurs when containers are in its possession. All containers shall be inspected for damage at each point of receipt and all findings shall be reported as outlined in this document.

5) The THS is required to build both mixed and direct or bypass containers. All direct or bypass containers shall be identified on the placard and with "bypass tape". The local Postal official will supply "bypass" tape.

6) The THS shall ensure that air containers tendered to the aviation supplier are "T-stacked" to the greatest extent possible. "T-stacking" is the interlocking of sacks, parcels, and trays to maximize utilization as well as assist in securing the load.

7) The THS shall ensure that all containers are fully loaded to maximize the amount of mail that is placed in each container. The THS shall ensure that the mail is not spread out throughout all air containers but rather all air containers are to be fully utilized.

8) The THS shall not load any mail into air containers that is not properly prepared (i.e., trays without sleeves, handling units without D&R Tags, etc.). If such mail is tendered, the THS shall contact the local Postal official to jointly determine the disposition of the mail.

9) Weigh all outbound mail to identify density obtained and weight within allowable limits. The aviation supplier has identified the following maximum allowable weights (including tare weight) for each type of air cargo container: They are:

(i) AYY = 2,415 pounds

(ii) LD-3 = 3,500 pounds

(iii) AMJ = 6,950 pounds

10) Placard all containers tendered to the aviation supplier. Placards shall contain destination, weight, and mail type. USPS will develop and supply all placards.

11) The THS and USPS must develop in effective lines of communication with the aviation supplier to ensure the timely delivery and dispatch of mail. All efforts shall be made to provide an efficient and effective delivery to the aviation supplier.

12) Assist the aviation supplier in positioning or loading / unloading air containers onto CTV/dollies. The THS shall off-load all of the Aviation Supplier's CTVs/dollies within 20 minutes of their actual arrival at the site.

13) In the unlikely event that mail tendered to the THS is in excess (overflow) of what may be accepted by the aviation supplier, the THS shall:

a) Secure the mail
b) Scan all handling units and record number of pieces, weight, and destination of all overflow handling units
c) Immediately notify the AMC or local Postal official after becoming aware of both an under utilization or an overflow situation.
d) The Postal official will direct the THS to either deliver the mail to the aviation supplier or return it to the AMC or designated facility.
e) All overflow mail shall be delivered to the local AMC/designated Postal facility or to the aviation supplier site within twenty (20) minutes of notification from the Postal official.
f) Provide a written report of the overflow to the local Postal official with a copy to the contracting officer or designee.

p. THS Responsibilities: Delivery to USPS

1) The THS shall stay abreast of potentially changing conditions, including but not limited to, tail swaps, late aircraft and/or surface vehicles, mechanical breakdowns, etc. and make adjustments accordingly.

2) The THS shall dray mail from the aviation supplier's transfer point or designated site.

3) The THS shall off load air containers off all CTVs or dollies within twenty (20) minutes of their actual arrival to the site designated.

4) Unload all mail from air containers / trucks as required. Note: In some rare instances, the THS may receive Intact/Direct air cargo containers. If this occurs, the THS is required to take receipt and deliver these containers as directed by the routing label. This may encompass loading the containers onto roller-bed equipment. The same variable costs will be charged for any of the above services.

5) Sort all mail as required (refer to Attachment C, Separations) and load onto a conveyor belt system at the AMC or Postal designated delivery point or into USPS MTE at the THS sort facility.

6) The local USPS Official will specify and supply the type of MTE to be used.

7) Make shape and zip code-based separations as indicated in Attachment C (Separations) for letter trays, flat tubs, sacks and outsides. The separations may be made by tray slide label or D&R Tag (Dispatch & Routing Tag), depending on the mail type. In some locations, the USPS may require the THS to load mail from airline containers directly onto a sorting system. To the greatest extent possible, the THS should face all tray/tub labels towards the outside of the container.

8) Placard all containers in accordance with Postal needs (templates will be provided by the Postal Service, but the THS must reproduce as needed).

9) Load and dispatch all outbound surface vehicles as required.

10) The THS and USPS must develop in a cooperative line of communication with the aviation supplier to ensure the timely delivery and dispatch of mail. All efforts shall be made to provide an efficient and effective delivery to the USPS.

q. THS Responsibilities At End of Operations -

1) Complete all necessary reporting functions.

2) Coordinate the next day's operation with USPS and the aviation supplier, as necessary.

3) Coordinate the repositioning of CTV/dollies and air containers for the next day's operation.

r. Surface Vehicle Operations

1) The Postal Service is responsible for surface vehicle operations between the USPS facilities and the THS facility. Exceptions to the above are listed in Attachment B (Ground Handler Specifications).

2) The THS is responsible for the loading/unloading of all surface vehicles operating to and from the THS facility. The Postal Service may assist the THS with loading/unloading. Special note for all Drop – and – Pick trailer operations. The THS is responsible for placing load strap or a positioning a bar in the trailers as the trailer is being loaded. These load straps or positioning bars shall be placed at each third of the trailer up to two-thirds. The driver of the vehicle is responsible for placing the final load strap or positioning bar in the trailer as well as securing the doors of the trailer.

3) The THS shall also complete the TIMES data as previously indicated.

4) The THS shall stay abreast of potentially changing conditions, including but not limited to late arriving or departing trucks, mechanical breakdowns, etc. and make adjustments accordingly. The THS shall absorb the operational and cost impacts of vehicles up to 60 minutes early or late.

s. Special Handling Procedures

1) Hazardous Materials (HAZMAT)

a) Hazmat and restricted materials are defined as a substance or material in a quantity and form that may pose a risk to health, safety, or property in commerce. The THS shall comply with Title 14, CFR, Part 139, and Hazardous Materials Regulations (HMR; 49 CFR 100 through 199), and any state, FAA, USPS, and local laws and regulations pertaining to HAZMAT. The THS will establish a response plan and develop and initiate a continued training program in accordance with Part 139.321, Title 14, CFR.

b) The THS shall ensure employees are trained for HAZMAT Awareness only.

c) The THS shall not tender any HAZMAT to the aviation supplier.

2) Live Animals

a) The THS is required to handle live animals with certain restrictions and conditions (see Domestic Mail Manual, sections 124.63 and 124.64)

b) The THS shall not tender any live animals to the current aviation supplier. Any live animals received are to be returned to the Postal Service. In the event that the THS scope is expanded to include container preparation to commercial passenger airlines the Postal Service will provide a list of such airlines to the THS and the THS shall tender live animals to such airlines.

3) Non-Transferable Pieces

The THS shall isolate all non-transferable pieces and those believed to be potentially hazardous including, but not limited to, damaged mail, mail without routing information Hazardous Material (HAZMAT), live animals, and tender them to the Postal Service as directed by the Contracting Officer or representative.

4) Surface Only Mail

a) The aviation supplier shall not accept mail identified as "surface only" mail.

b) Surface only mail can be identified as a parcel or sack of mail affixed with Label 127, Surface Transportation Only.

c) It is the intention of the Postal Service to ensure that no "surface only" mail is tendered to the THS.

5) **SPECIAL NOTE:** It is the intention of the Postal Service to ensure that no HAZMAT, Live Animals (at this time), Non-Transferable Pieces, or Surface Only Mail is tendered to the THS. However, in the event these mail types are found in the mail tendered, the THS shall:

a) Identify and isolate the mail.
b) Safeguard the mail
c) Notify the local Postal official
d) Follow USPS instructions relative to returning the mail to USPS.

t. Ground Handling Equipment

1) The THS shall supply all ground handling equipment needed to support ramp operations for the THS Operation.

2) The THS is responsible for all fuel and maintenance in support of its ground handling equipment.

3) The THS shall supply the operation with equipment of type, quantity, and quality sufficient to establish and maintain an effective and efficient operation. This equipment may include but not limited to:

a) Tugs/cargo tractor
b) Forklift trucks & slave pallets
c) Conveyor belt loaders
d) Freight/baggage carts
e) Pallet jacks
f) Stationary container racks
g) Scales to weigh containers and/or baggage carts
h) Ball-mat and rollers
i) Dollies
j) Roller bed 53 foot trucks
k) Other equipment as necessary

u. Air Cargo Containers

1) The aviation supplier will provide all air containers.

2) The THS shall ensure that all air cargo containers are secured and maintained for the exclusive use of the Postal Service.

3) The THS shall inspect each container for mail immediately upon receipt. As the responsible party, the THS shall inspect each air cargo container upon receipt for damage, using the Air Cargo Container Checklist (see Attachment F). The checklists shall remain on file with the THS for one (1) year. If damage is noted, the THS shall report it to the USPS and the aviation supplier immediately for replacement. Mail found in supposedly empty containers shall be brought to the attention of the local Postal official immediately.

4) The THS is responsible for damage to air cargo containers that is identified as occurring while under the control of the THS and is required to reimburse the Postal Service for damages to air cargo containers in its possession. The charges for a damaged container are as follows:

a) Upper portion damage to ULD/container = $ 500

b) Damage to base of ULD/container = $1,500

c) Damage to entire container, needs replacement = $2,500

5) The THS is also required to conduct periodic inventories to ensure an ample container supply. It is the THS's responsibility to ensure all containers, air and surface, are in workable condition and available to ensure timely dispatches and transfer of mail.

6) All air cargo containers shall be properly placarded and identified by the THS for delivery to destination and contain the following information:

a) Origin
b) Destination
c) Direct/intact can (one destination)
d) Weight
e) Mail class
f) Percent Utilization
g) Date
h) URSA Code

The THS shall ensure that all the information stated on the placard is complete and accurate.

v. Scanning

The THS is responsible for the scanning of mail and/or equipment and the protection of all scanning equipment. The Postal Service shall be responsible for providing the THS with sufficient scanning equipment at each THS facility, including back-up scanning equipment, to ensure that the THS may perform the required scanning function. However, the THS may, at no additional cost to the Postal Service, elect to provide its own scanning equipment in lieu of or in addition to Postal Service provided scanning equipment. The Postal Service shall provide the software to operate the scanning equipment. However, the THS shall be responsible for providing any software development, upgrades, or special software required to operate THS-provided scanning equipment. Each party shall be responsible for performing routine maintenance on the scanning equipment provided by it. The THS shall be responsible for the cost of replacing lost or damaged scanning equipment, regardless of which party provided the scanning equipment.

w. Mail Transport Equipment (MTE)

1) Standard empty Mail Transport Equipment (MTE), rolling equipment, cardboard will be supplied by the Postal Service.

2) The THS is responsible for requesting additional empty equipment as needed.

3) The THS is responsible for any damage to Postal or aviation supplier equipment while in their possession.

4) Damage to any other mail handling equipment, such as stationary racks, slides, conveyors, etc., is the responsibility of the THS.

**B.8 Contingency Plans**

a. The THS shall develop, maintain and update a current contingency plan for dealing with unscheduled and unexpected events affecting the expeditious operation of the facility, including aviation and surface service failures and delays.

b. These plans must be in writing and submitted to the contracting officer for approval.

c. All THS employees shall be trained to a level of familiarity, so that implementation of a contingency can be exercised without unnecessary delay.

d. Unscheduled and unexpected events shall include, but not be limited to the following:

1. Late arriving aircraft
2. Late arriving trucks
3. Early arriving aircraft
4. Early arriving trucks
5. Mail arriving out of normal sequence
6. One late truck
7. Trucks not on-site for dispatch
8. Inclement weather (snow, thunderstorms, etc.) – operating
9. Inclement weather (snow, thunderstorms, etc.) – protection of the mail
10. Labor actions
11. An inability to complete all loading in time to meet tender
12. Overflow mail
13. Having less MTE (air cargo containers or surface containers) than required
14. Having damaged and/or non-air worthy air containers

15. Having damaged surface containers
16. Handling of damaged or non-labeled mail
17. Matrix and schedule changes
18. Loose load mail
19. HAZMAT – acceptable and non-acceptable pieces
20. Handling and staging of live animals
21. Assisting aviation supplier in positioning containers on and off dollies
22. Assisting aviation supplier in maintaining open line of communications
23. Running out of supplies such as placards, bypass tape, etc.
24. Power losses
25. Natural Disasters
26. Equipment breakdowns
27. Airport closings
28. ATC Problems

**B.9 Security**

The THS shall provide at all times a secure and safe environment for the mail and employees working in support of this contract in the areas where ramp, sort, and administrative functions are performed including all buildings, aircraft, equipment, vehicles, and other property located thereon, on a 24 hour basis, 7 days a week at THS facility.

a. The THS shall provide safe and secure work environment at all times.

b. The THS shall maintain and preserve the sanctity of the mail.

c. All security procedures are subject to review by the Postal Inspection Service.

d. Failure to protect and secure the mail shall be subject to liquidated damages. Any time security deficiencies are identified, the contracting officer may unilaterally direct the THS to upgrade the level of security based on Inspection Service reports.

e. The THS may also be held responsible for claims made against the Postal Service for items stolen from the mails while in the THS's possession. However, if the THS has complied with all recommended security procedures and has cooperated with Postal officials, the THS would not be held liable for loss due to theft by its employees.

f. The THS shall report all security breaches and mail tampering to the local Postal Official in charge immediately upon identifying an occurrence.

The THS shall establish a system for the identification of individuals having access to US Mail under the contract. A single system shall be used to identify both THS and subcontractor employees. At a minimum, each employee shall be issued a laminated identification badge with a color photograph of the bearer. Badges shall be of such nature as to clearly distinguish the bearers from employees who do not have legitimate access to the US Mail. Accountability controls for badges shall be developed and such plans shall be included in the Security Design Plan.

All THS employees must store personal effects including but not limited to coats (weather permitting), purses, backpacks, etc. prior to accessing the workroom floor or area where mail is processed, staged, or otherwise located.

g. The THS shall provide the following:

1. Procedures to protect persons and property at the ramp operation and facility are outlined in a Security Design Plan and approved by the Postal Inspection Service prior to implementation.
2. A level of security that ensures the protection and sanctity of mail. This includes, but is not limited to, protection from theft, inclement weather, etc.
3. Compliance with all applicable Federal Aviation Administrations (FAA), Postal Service, Transportation Security Agency (TSA) and other agency regulations.
4. Procedures to provide a secure handoff and staging of mail with the aviation supplier to ensure mail are safeguarded.
5. A system, which deters all unauthorized personnel from having, access to the mail.
6. Inspection Service and other USPS employees access to the site and facility, at all times both with and without prior knowledge of visit.
7. A reporting system that identifies all mail found to be tampered with or rifled within, and adjacent to, the facility as well as found in vehicles.
8. A photo identification system for all employees authorized entry into the building.
9. Limited access to the site and facility through controlled access points with a maintained record of access for a minimum of one year. All other doors, except for those used for mail receipt, delivery, and dispatch, must be equipped with a 110 db horn which will sound every time the door is open and will continue to sound as long as the door remains open. The door should also be equipped with a visual device

such as a strobe light. If the door is not on the workroom floor, it is required to have a remote signaling device to notify management the door is being used.

h. If a non-Postal facility is required, the Postal Service requires that the offeror expressly address the following requirements in an Alternate Security Design Plan:

1. A burglar alarm system.

2. The THS is required to provide an investigative office space for exclusive use of the Inspection Service. This space must have a view of the work floor, a bathroom, direct access to the workroom floor, and a covert and surreptitious entry. The THS shall supply and install a burglar alarm system approved by the Inspection Service for the investigative office space.

3. The THS shall provide a criminal investigative system, which will facilitate the collection of evidence for use in Inspection Service investigations. The system is for exclusive use of Inspection Service. The THS will not have access to the system except for preventive maintenance and required repairs. The system must provide a clear view of the work floor, loading docks, mail vehicles, lunchrooms, employee entrance, rest room entrance, and entrance to any locker rooms. The system should provide a continuous, uninterrupted, and independent viewing of one or more employees moving through the facility and be fully functioning and operational for the term of the contract.

   The system must provide a clear and detailed view of all employees on the workroom floor under natural, artificial, variable, and low light conditions. The system must provide viewing capability inside trailers at the dock locations. The system must permit scrutiny of hand movements of an employee regardless of the location of obstructions such as sorting cases, counters, cages, desks, and any automated systems that may be installed in these facilities. The system must permit observations and tracking of employee actions from at least three directions simultaneously and provide for the recording of events from these observation points. The system must be designed to provide observation of an individual or a piece of mail throughout the building. The system must provide simultaneous, continuous, uninterrupted, and independent viewing of one or more employees moving rapidly throughout the facility. The system must be able to operate without any environmental interference.

4. The fencing around the facility, if required, must be designed or modified to allow the Inspection Service free and hidden access to the space provided for the criminal investigative system.

5. Investigative Test System - the THS shall provide a theft testing system that provides periodic blind testing of the facility to test the integrity of mail security. One such system utilized the Electronic Article Surveillance system as used in retail operations to prevent shoplifting. Another such system would utilize a Radio Frequency Identification (RFID) tag that provides individual identification of each test piece. The system must interface with the observation system. If a Closed Circuit Television (CCTV) system is used, the test system will automatically call up the appropriate camera and video recorder to provide a visual record of events.

**B.10 Personnel Screening**

a. For the purposes of this contract, an employee of the THS shall be deemed to have access to mail if that person loads, unloads, drays or otherwise handles mail containers, sacks, trays, or other mail distribution equipment, or performs any mail distribution function either on an airport or at an off airport location.

b. The THS and all subcontractors shall be responsible for assuring that all employees who are to have access to the U.S. Mail, as described above, have undergone the security screening process prior to having that access.

c. The THS shall furnish, for each employee, the following forms and information to the Security Clearance Unit, U.S. Postal Inspection Service, 225 N. Humphreys Blvd., 4th Floor, Memphis, TN 38161-0008 (Memphis ISOSG):

   1) Certification and Transmittal Cover Letter

   2) PS-Form 2181-C, Authorization and Release Background Investigations

   3) PS-Form 2025, Contract Personnel Questionnaire

   4) FD-258, Applicant Fingerprint Chart

   Note: All forms and further instruction can be obtained by calling the local Inspection Office in Memphis, TN at (901) 747-7712.

d. The THS's security screening process shall include:

1) A criminal records check- the records check shall be made through local agencies (city, county, state) where the employee has resided and/or worked for the past five years.
2) Employment verification - the verification shall identify reasons for termination or resignation from prior positions during the five years prior to employment under this contract.
3) Fingerprints - all employees shall be fingerprinted and those finger print files shall be maintained at a central location at the facility at which the employee works. The fingerprint chart must be submitted to the Memphis ISOSG, who shall in turn submit them to OPM for a check of the FBI national database. A check of the fingerprint database is essential, and in the event that a classifiable print cannot be obtained, a second card submission is allowed. In the event the second card is also unclassifiable, the employee's clearance shall be rescinded, and he or she may no longer have access to the mail.
4) The results from a drug-screening test for prohibited drugs. The term prohibited drugs means marijuana, cocaine, opiates, phencyclidine (PCP), amphetamines, or a substance specified in Schedule 1 or Schedule 2 of the Controlled Substances Act, 21, U.S.C. 811, 812 unless the drug is being used as authorized by a legal prescription or other exemption under Federal, State, or local law. A laboratory certified by the U.S. Department of Health and Human Services must perform the drug test meeting the requirements of the Substance Abuse and Mental Health Services Administration. The prime suppliers and all subcontractors must maintain the name of the institution conducting the test and a document indicating whether the employee passed or tested positive.
5) Verification of U.S. citizenship or legal work status authorizing them to work in the United States.

e. The THS shall not employ under this contract any person who:

1) Has not met the requirements of the personnel security screening procedures as outlined in this section.
2) Tested positive for a prohibited drug without the authorization by a legal prescription or other exemption under Federal, state or local law.
3) Is on parole, probation, or suspended sentence for commission of a felony during the past five years.

4) Has been convicted of any criminal violation during the past five years, for offenses involving dishonesty, moral turpitude, and illegal financial gain, theft, or assault.
5) Has been convicted of illegal use, possession, sale, or transfer of controlled substances during the past five years.
6) Has pending felony criminal charges. An individual shall not be authorized access to US mail until the charge(s) are satisfactorily resolved.

f. In extreme circumstances where it may be impossible for an employee to complete the screening process, the supplier shall notify the Contracting Officer of this situation and request an exemption from the screening process. This request for exemption must be submitted on a case-by-case basis. If the Contracting Officer grants an exemption, that employee shall only be allowed access to mail if they are escorted (supervised) by a previously screened employee, that has successfully completed the screening procedure, or an employee hired prior to contract award. At no time can an employee that has not completed the screening requirements have access to the mail without supervision. Even in cases where the Contracting Officer approves an exemption, the employee must still be fingerprinted.

g. All information identified through personnel screening shall be held by the supplier and made available for review by US Postal Inspectors upon their request. Upon request for inspection of the personnel screening records, the THS and subcontractor shall identify where the records are kept and make them available for inspection at the employees' work location.

h. Employee records shall contain, at a minimum, the following information:

1) Social Security Number
2) Current Address
3) Date of Birth
4) Employee Identification Badge Number
5) Finger Print Card

**B. 11 Information Exchange**

a. The THS shall maintain a contact person to interface (via telephone, fax, e-mail, etc.) with Postal Officials / Headquarters, Shared Networks designated by the contracting officer. The THS contact person must be available to attend and participate in operations (e.g., Dagger) meetings required by the Postal Service.

b. The THS shall provide, upon request of the Postal Service, special reports, information, and internal operational documentation specifically associated with the performance of the operation. At a minimum, the following reports will be required:

1) Planned work hours by DOL Wage Classification
2) Container inventory report
3) Significant personnel issue (e.g., theft, security violations, etc.)
4) Disputes involving aviation suppliers, USPS, FAA, the airport authorities, employees, or any other entity or individual, where there is any potential effect on performance of this contract.
5) Equipment maintenance schedules
6) Unscheduled maintenance on equipment
7) Accident reports, personnel or equipment involved
8) Container weights
9) Through-put volume information

c. The THS is required to self-report performance results as outlined in Section C (Delivery or Performance) of this contract daily to USPS for the following irregularities:

1) Failure to Load
2) Failure to Deliver
3) Mis-delivered mail
4) Failure to Protect
5) Failure to Protect USPS equipment
6) Failure to Protect Aviation Supplier's air containers
7) Failure to Scan
8) Failure to Report Information into TIMES / DMCR

d. The THS shall provide a copy of the Terminal Handling Services Operations Plan (see Attachment M) with all sections of the plan complete within 1 week of the beginning of a

schedule block with the Aviation Supplier. The THS Operations Plan shall be sent electronically to Headquarters, Shared Networks USPS for review and approval.

**B.12 Administration**

a. THS Employees

1. The THS shall provide all necessary security and administrative paperwork for each person employed by the THS.
2. The THS shall provide all training and necessary training equipment for all tasks performed by THS employees in relation to the THS's operations related to this contract.
3. The THS shall make all payroll records available to the Postal Service upon request.

b. Operations Meetings

The THS is responsible for attending and participating in operations meetings with the Postal Service and transportation suppliers as designated.

c. Telephones

1. The THS is responsible for procurement, payment, installation, and servicing of all telephone equipment to be used within their office space.
2. The THS shall be responsible for providing all network communications between themselves, the aviation supplier, and USPS.

d. Removal of Trash, Garbage, etc.

The THS is responsible for the disposal of trash, garbage, hazardous waste, and other refuse within their site.

e. Smoking Policy

The THS shall adopt and enforce a smoking policy consistent with the following:

All Postal facilities are designated as "Smoke Free" environments. There will be no smoking in the induction area, the sort area, truck dock areas, ramp areas, near any mail handling activity, or within 50 feet of any flammable liquid.

## *Section C. Delivery or Performance*

### C.1 On-Time Performance

The Postal Service requires a high level of on-time performance for all mail tendered to and delivered by the THS so that the Postal Service can provide timely delivery to its customers. The THS must deliver all mail to the designated delivery point at the Postal facility (AMC) at or before the scheduled delivery time as shown in Attachment B (Ground Handler Specifications). See Section C.2, Performance Standards.

### C.2 Performance Standards

While the Postal Service anticipates one hundred percent performance, the following minimum levels of performance are required. For Irregularity Categories #1 and #2, the supplier shall maintain at least ninety-eight percent level of performance and may be assessed liquidated damages if more than 2% of the volume in pounds in a Schedule Period fails. See section C.3.e (2). For irregularity categories #3 through #8 the supplier shall maintain a one hundred percent level of performance and may be assessed liquidated damages for any failure regardless of the percentage volume or number of occurrences of failure in a Schedule Period. See section C.3.e (2). The USPS will assess liquidated damages as appropriate.

a. Delivery

1. The supplier must ensure that all mail receipt, sortation, transfers, and drayage is completed on or before the scheduled times listed in Attachment B,
2. This includes mail delivered to the all delivery points in this contract. They include, but are not limited to:
   a) The AMC or designated Postal facility or site.
   b) The aviation supplier's designated facility or site
   c) Loaded and secured on outbound surface vehicles providing service from the THS facility or site.
3. While there may be times when the amount of time to process mail for delivery will be shortened (ex. late arriving aircraft, etc.), it is still the THS's responsibility to make every effort to maintain on-time deliveries. For the purposes of performance

measurement, and only for measurement, additional time, equal to the amount of time lost, will be calculated.

4. In addition to a minimum on-time delivery performance level of 98% for both originating and destinating operations (section C.3.c(2), "Category #2 – Failure to Deliver"), the THS will tender 75% of all originating Unit Load Devices to the aviation supplier by 04:00 on each day of operation, or as specified in Attachment B. While the Postal Service anticipates a THS performance level of 100% on delivery by 04:00 ,or as specified in Attachment B., the THS is expected to maintain a minimum level of performance of 98% on this metric during each Schedule Period on a site by site basis. Attachment B (Ground Handler Specifications) list all approved exceptions to this rule. Future Exceptions to the 75% rule will only be granted through the Contracting Officer.

b. Distribution

1. While the Postal Service requires one hundred percent sort accuracy, the supplier is required to maintain a minimum accuracy level of ninety eight percent site by site.
2. Documentation used to measure performance in this category will be supplied to the THS upon request, and upon the assessment of Liquidated Damages.
3. The supplier shall develop a quality control inspection system to ensure the highest level of sort accuracy is achieved and maintained through out the term of this contract.

c. Protection of the Mail

The supplier shall protect the mail at all times as outlined in this contract. Unlike in the performance categories of Delivery and Distribution, the supplier is required to maintain a minimum performance level of 100% in Protection of the Mail.

d. Scanning the Mail

The supplier is expected to scan the mail in accordance with the USPS Standard Operating Procedure, during its build and break operations as outlined in Attachment N.

**C.3 Irregularities**

a. The Postal Service requires one hundred percent contract compliance. Actions by the THS that result in service failures are considered irregularities where the supplier has failed to meet a minimum performance standard set forth in Section C.2.

b. When an irregularity occurs, the supplier shall promptly take all necessary corrective action to bring performance into contract compliance.

c. For the purposes of this work the following conditions are considered irregularities under this contract:

**1) Category #1 – Failure to Load**

A failure to accept and load mails as specified in the contract.

**2) Category #2 – Failure to Deliver**

A failure to deliver mail as scheduled to the designated location as specified in the contract.

**3) Category #3 – Misdelivered**

Any mail delivered to the wrong destination. This includes, but is not limited to, mail placed in the wrong container, containers loaded onto the incorrect truck, and containers incorrectly placarded.

**4) Category #4 – Failure to Protect**

Is a failure to protect and safeguard mail from depredation, rifling, inclement weather, mistreatment, or other hazard while in THS's control.

**5.) Category # 5 – Failure to Protect USPS Equipment.**

Is a failure to protect or safeguard USPS scanning equipment

**6.) Category #6 – Failure to Protect the Aviation Supplier's Air Containers**

Is a failure to protect or safeguard the Aviation Supplier's air containers.

**7.) Category #7 – Failure to Scan**

A failure to scan for originating mail is a failure to complete one or more of the following scans:

1) The container D&R tag before the build of each container;
2) Each handling unit D&R tag for each handling unit loaded into the container;
3) The container D&R tag, at the close of each container;
4) The container D&R tag upon tender to the aviation supplier,
5) Each handling unit and container D&R tag on each trans-loaded container.
6) The D&R tags of the mail remaining after the containers are dispatched to the aviation supplier.

A failure to scan for destinating mail is a failure to complete one or more of the following scans:

1) The container D&R tag upon receipt from the aviation supplier;
2) The container upon opening the container (First Unload Time),
3) The D&R tag of each handling unit unloaded from the container,
4) The container upon completion of the unload (Last Unload Time).
5) The missent Handling Units.

**8.) Category –Failure to Report Times**

A failure to report information into the Transportation Information Management Evaluation System (TIMES) within one (1) hour after arrival/departure of inbound/ outbound transportation via highway.

d. Adjudication of Irregularities

1) All irregularities will be documented by the Postal official who first identifies the occurrence.
2) The THS will receive a copy of the written documentation and the original will be forwarded to the contracting officer. Such documentation will be provided to the supplier 14 days prior to the date set for the discussions referred to in 3 and 4 below.
3) The contracting officer, or his/her designee, will meet with the supplier after the end of each Schedule Period and review the irregularities.
4) Once the supplier and the Postal Service have discussed the irregularities, the contracting officer will make a determination if further action is required.

5) In addition to the adjudication process conducted on a Schedule Period basis, an annual reconciliation will be made to adjust the liquidated damages as necessary for the preceding 12 schedule periods.

e. Liquidated Damages

1) After the contracting officer has adjudicated the irregularities, a determination will be made if further action is warranted to foster contract compliance. That further action may include the assessment of liquidated damages to the supplier.

2) When more than one irregularity occurs on the same mail (example - Failure to Load and Failure to deliver on the same mail), only one liquidated damage, the highest, will be assessed. All calculations of percentages will be carried to two (2) decimal points, which is used as the multiplier in the example assessment in a) below. Liquidated damage assessments may be made per incident using the following formulas:

**Category #1 – Failure to Load**

If more than 2% of the volume in pounds in a Schedule Period fail, then the assessment as set forth below may be made on a site-by site basis.

Assessment: The total volume of failed mail (mail not loaded) divided by the total volume assigned (per the Baseline volume - Attachment A), plus the adjusted volume above baseline per schedule period, equals the percentage of failed mail. The percentage of failed mail is then multiplied by the supplier's average site rate over a scheduled period, and that product equals the liquidated damage. The adjustment will be completed through reconciliation with the supplier.

Example: 3,200 pounds of Failed Mail divided by the total Volume Assigned (plus adjustment) 150, 000 pounds equals a percentage of failed mail of 2.13 percent. The percentage of failed mail or .0213 multiplied by the supplier's average daily site rate over a schedule period of $60,000 equals a liquidated damage of $1,280.00.

**Category #2 – Failure to Deliver**

If more than 2% of the volume in pounds in a Schedule Period fails, then the assessment as set forth below may be made on a site by site basis

Assessment: The total volume of failed to deliver mail (mail not delivered or late) divided by the total volume assigned during the Schedule Period yields the percentage of Failure to Deliver mail. If the percentage is greater than 2% of the Schedule Period volume, the pounds of Fail to Deliver mail is multiplied by the supplier's average daily site rate over the Schedule Period and that product equals the liquidated damage. The adjustment will be completed through reconciliation with the supplier.

**Category #3 – Mis-Delivered**

All misdelivered mail is subject to the liquidated damage assessment.

Assessment: The number of pounds of mail incorrectly loaded into a container, vehicle, or incorrectly placarded, etc., which results in the delivery of mail to an incorrect location is multiplied by $0.60 per pound.

**Category #4 – Failure to Protect**

All mail falling into this category is subject to the liquidated damage assessment.

Assessment: The number of handling units of mail unprotected multiplied by $50.00 per handling unit.

**Category #5 – Failure to Protect USPS Equipment**

All USPS supplied equipment is subject to this assessment.

Assessment Example: The number of scanners that have been identified as lost or damaged beyond repair multiplied by actual costs.

**Category #6 – Failure to Protect the Aviation Supplier's Air Containers**

Assessment: The THS is deemed to be responsible for damage to air cargo containers that are identified as being damaged while under the control of the THS. Assessments will be made to directly offset charges paid to the aviation supplier by the Postal Service. Currently, these charges are as shown below.

- Upper portion damage to ULD/container = $ 500
- Damage to base of ULD/container = $1,500
- Damage to entire container, needs replacement = $2,500

**Category #7 - Failure to Scan**

A failure to scan for originating mail is a failure to complete one or more of the following scans:

1) The container D&R tag before the build of each container;
2) Each handling unit D&R tag for each handling unit loaded into the container;
3) The container D&R tag, at the close of each container;
4) The container D&R tag upon tender to the aviation supplier,
5) Each handling unit and container D&R tag on each trans-loaded container.
6) The D&R tags of the mail remaining after the containers are dispatched to the aviation supplier.

A failure to scan for destinating mail is a failure to complete one or more of the following scans:

1) The container D&R tag upon receipt from the aviation supplier;
2) The container upon opening the container (First Unload Time),
3) The D&R tag of each handling unit unloaded from the container,
4) The container upon completion of the unload (Last Unload Time),
5) The missent handling unit.

Pursuant to the methodology set forth in A.1, only volumes receiving all scans as enumerated herein shall be eligible for compensation.

Compensation and payment will be calculated based upon the total number of pounds of mail that have been scanned by the THS during the schedule period. The calculation will be as follows:

i. In accordance with section A.1.c, the variable price per pound for an air stop is the per pound price shown on schedule A.2.b as adjusted by the density based adjusting scale (the sliding scale).
ii. The number of pounds scanned is adjusted for Absorption as described in section A.1.d.
iii. Variable price per pound multiplied by total pounds scanned as adjusted for Absorption equals the variable cost compensation due the supplier.

**Category #8– Failure to Report Information into TIMES**

The liquidated damages are calculated by assessing $1.00 per event. An event is defined as any time the inbound/outbound highway transportation trip is not entered into TIMES within one (1) hour.

f. Repeated Irregularities

Repeat irregularities, with no or ineffectual attempts at correction, may result in contract termination for default.

## Section D. Packaging and Marking

The section is not applicable to this contract.

## Section E. Inspection and Acceptance

E.1 Deliverables

a. Terminal Handling Equipment Information

b. Operating Plan

c. Contingency Plan

d. Supplier Contact list (including any and all subcontractors)

e. Communications Plan

f. Human Resources Plan (include staffing, operations training, HAZMAT training, etc.)