IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| EVERGREEN AVIATION GROUND LOGISTICS ENTERPRISES, INC., Plaintiff, v. UNITED STATES, Defendant. | No. 06-11C<br>Allegra, J. |

PROPOSED FINDINGS OF UNCONTROVERTED FACT IN
SUPPORT OF EAGLE'S CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(h)(1), EAGLE sets forth the following material facts upon which it bases its motion and to which EAGLE believes there is no genuine dispute.

Parties

1. Evergreen Aviation Ground Logistics Enterprises, Inc. (EAGLE), provides ground logistics and other transportation-related services, for both government and commercial customers. (Attach. A (Bonham Aff.) ¶ 3.)

2. The United States acted in the matter through the United States Postal Service. The current USPS Contracting Officer is Cheryl R. Brazil. (EAGLE's Resp. to Defendant's Findings ¶¶ 2, 13; Attach. A (Bonham Aff.) ¶¶ 55-58 & exs. 21, 23.)

Initial Contract Solicitation and Award

3. In late 2000, USPS and FedEx entered into a contract for FedEx to transport mail by air for USPS in the United States. (Attach. A (Bonham Aff.) ¶ 4.)

4. Under the FedEx/USPS contract, FedEx agreed to handle Express, Priority, and First-Class Mail. (Attach. A (Bonham Aff.) ¶ 4.)

5. In 2001, USPS under Solicitation HQ-2001-12 solicited contractors for its "Shared Network" (SNET) for air terminal handling of its mail. (Attach. A (Bonham Aff.) ¶ 5.)

6. USPS in the SNET solicitation invited companies to propose offers for the mail handling for the entire United States, with the United States divided into seven regions. Companies could submit offers on one or more regions. (Attach. A (Bonham Aff.) ¶ 5 & ex. 1.)

7. USPS designed the SNET solicitation to support the contract it had entered into in late 2000 with FedEx for transportation by air of Express, Priority, and First-Class Mail. (Attach. A (Bonham Aff.) ¶¶ 4-5, 7-8, 12 & ex. 1.)

8. USPS in Attachment A to the SNET solicitation provided estimated amounts of mail for the various air terminals specified in each of the regions. (Attach. A (Bonham Aff.) ¶ 7 & ex. 1, attach. 4.)

9. In 2001, USPS awarded EAGLE SNET contracts under the SNET solicitation for three of the seven regions – Pacific, Southeast, and Great Lakes.

The contract numbers are SNET-01-PR, SNET-01-SER, and SNET-01-GLR. USPS consolidated the contracts into a single contract document ("Initial Contract"). USPS awarded SNET contracts only to EAGLE for these regions. (Attach. A (Bonham Aff.) ¶¶ 6, 51 & ex. 1.)

10. The amount of mail estimated by USPS in Attachment A to the SNET solicitation (as amended) for the three regions it awarded to EAGLE was approximately 870 million pounds per year, combined. (Attach. A (Bonham Aff.) ¶ 7 & ex. 1.)

11. The Initial Contract was a requirements-type contract specifying EAGLE as the "Terminal Handling Supplier" (THS). EAGLE as the THS was to handle all mail at the air terminals in its awarded regions that was transported by FedEx under its contract for air transportation services with USPS. (Attach. A (Bonham Aff.) ¶¶ 8, 10 & ex. 1.)

12. The Initial Contract contained the following provisions:

a. "The contract awarded under this solicitation will be of the fixed price type as defined in Section 2.4.6 of the USPS Purchasing Manual. Offerors' price proposal shall be submitted by per annum rate." (§ A.1 at 1.)

b. "The THS will be responsible for providing ground handling services, facility, mail drayage, loading and unloading mail or freight, building and breaking air containers, simple sortation and maintenance of ground handling equipment from and to the aircraft as specified throughout this Statement of Work." (§ B.1.c at 2.)

c. "The basic purpose of this Statement of Work (SOW) is to specifically detail the duties and responsibilities of the third party ground handler

and the United States Postal Service (USPS) and the contracted aviation supplier. . . . It is imperative that the THS accomplish the task set forth in order to assure success for both USPS and the aviation supplier. . . . The THS will provide the ground handling and drayage services that will be the conduit between the aviation supplier and USPS and that guarantees on time performance." (§ B.2.a, b, c at 2.)

d. "The term of the contract shall be for a five (5) year term beginning on August 27, 2001 and ending at the close of business August 26, 2006. This agreement will also contain three - 1 year options." (§ B.5.a at 3.)

e. "***'Aviation Supplier'*** under this agreement is the sole supplier of air transportation and the terminal handler at the hub transfer point." (§ G.1 at 25 (emphasis in original).)

(Attach. A (Bonham Aff.) ex 1.)

13. Under the Initial Contract, EAGLE was paid an annual, fixed fee for its services for each region, irrespective of the amount of mail handled. (Attach. A (Bonham Aff.) ex. 1 at 1 (Schedule).)

14. In the document itself, USPS did not identify the Initial Contract as an indefinite-delivery, indefinite-quantity (IDIQ) contract and did not specify maximum and minimum amounts of mail to be handled. (Attach. A (Bonham Aff.) ¶ 10 & ex. 1.)

15. USPS never stated to EAGLE that it considered the Initial Contract to be an IDIQ contract. USPS told EAGLE that the Initial Contract was a requirements contract to handle the mail transported by air by FedEx under its contract with USPS in the three regions awarded to EAGLE. (Attach. A (Bonham Aff.) ¶ 11.)

<u>Performance Under the Initial Contract</u>

16. EAGLE began performance under the Initial Contract in mid-2001. The actual contract term, though, was to begin August 27, 2001, which coincided with the start-up of transportation services by FedEx under the FedEx/USPS contract. (Attach. A (Bonham Aff.) ¶ 12.)

17. Partially due to measures taken by the Congress and USPS after the attacks of September 11, 2001, the amount of mail delivered to EAGLE for handling under the Initial Contract was overall significantly in excess of the estimates provided by USPS in the Initial Contract, achieving a rate of approximately 1.0 billion pounds per year at lesser densities than estimated. (Attach. A (Bonham Aff.) ¶ 13.)

18. As a result of the greater-than-estimated amounts of mail provided to EAGLE under the Initial Contract, EAGLE had to expand substantially several of its handling facilities at the terminals for which it was responsible. EAGLE's personnel costs also increased substantially over what would have been necessary to handle the specified estimated amounts. (Attach. A (Bonham Aff.) ¶ 14.)

19. EAGLE informed USPS of its substantial and unexpected costs to handle the greater-than-estimated amounts of mail and requested compensation for its extra cost and a reformation of the Initial Contract. (Attach. A (Bonham Aff.) ¶ 15.)

Negotiation of MOU

20. Beginning in early 2002 and continuing into 2003, USPS and EAGLE representatives met to negotiate a lump-sum payment to EAGLE and a reformation of the Initial Contract. (Attach. A (Bonham Aff.) ¶ 16 & ex. 2.)

21. USPS prepared a "pay model" for a reformed arrangement that it presented for the first time in negotiations in early February 2003. The parties continued to use the pay model as a basis for discussion during the meetings of February, March, and April 2003. (Attach. A (Bonham Aff.) ¶ 18 & exs. 3-5.)

22. EAGLE told USPS that the ultimate purpose of the negotiations was to generate sufficient revenue for EAGLE under the Reformed Contract on a going-forward basis that it would justify the additional capital expenditures made to that point by EAGLE to service USPS. The pay model, as modified during negotiations, generated revenues of approximately $46.8 million per year. That computation reflected in the pay model took into account the 20% absorption and made assumptions with respect to variables such as density, volume, and weight. (Attach. A (Bonham Aff.) ¶¶ 19, 20, 37 & ex. 5; Attach. B (Bauer Aff.) ¶ 4.)

23. In each variation of the pay model, USPS identified the number of pounds to be handled annually as 1.25 billion. (Attach. A (Bonham Aff.) ¶ 21 & exs. 3-5.)

24. During discussions in 2003, USPS confirmed to EAGLE that it anticipated making 1.25 billion pounds of mail per year available for handling under the contract by EAGLE. (Attach. A (Bonham Aff.) ¶¶ 21, 37 & exs. 4, 5; Attach. B (Bauer Aff.) ¶¶ 5, 6.)

25. USPS never said in negotiations concerning the pay model or otherwise that it could choose not to provide EAGLE with 1.25 billion pounds of mail per year even if there were adequate mail in the system to do so. (Attach. A (Bonham Aff.) ¶ 21; Attach. B (Bauer Aff.) ¶¶ 5, 7.)

26. During the meeting on or about April 11, 2003, the parties agreed that the density assumed by USPS should be reduced to 6.5 pounds/ft.$^3$. To retain the agreed upon revenue of $46.8 million, that required an adjustment of either the volume or the weight. EAGLE asked USPS which number should be adjusted. USPS responded that the volume should be revised and the 1.25 billion pounds should be retained, as the weight was a firm number. (Attach. A (Bonham Aff.) ¶ 22 & ex. 6.)

27. At the time of the negotiations in 2003, EAGLE understood that, if aviation suppliers in addition to FedEx and ground transportation suppliers were also considered, USPS would have available 1.25 billion pounds per year to supply to EAGLE for handling under the Reformed Contract, considering all types of mail. EAGLE's understanding was accurate. (Attach. A (Bonham Aff.) ¶ 23; Attach. B (Bauer Aff.) ¶ 6.)

28. On April 11, 2003, EAGLE and USPS executed a memorandum of understanding ("MOU") setting forth the principal terms and conditions upon which they had agreed in negotiations regarding amendments to the Initial Contract and that were to be finalized in a revised contract. (Attach. A (Bonham Aff.) ¶¶ 24-27 & ex. 7.)

29. The MOU stated in part as follows: "The parties have valued the Contract at $46,800,000, including both variable and fixed costs and with anticipated weight of 1.25 billion pounds of mail." The MOU also set forth the agreed terms concerning "absorption." (Attach. A (Bonham Aff.) ¶¶ 25, 26 & ex. 7.)

30. On or about April 18, 2003, EAGLE and USPS executed a "Settlement Agreement and Release" that provided for additional payments to EAGLE for performance under the Initial Contract through February 2003. (Attach. A (Bonham Aff.) ¶ 28 & ex. 8.)

<u>Negotiation of the Reformed Contract Text</u>

31. On or about April 8, 2003, USPS provided to EAGLE for its review and comment a revised contract. USPS later provided EAGLE with a freestanding revised Schedule including a revised section A.1, "Items and Pricing." (Attach. A (Bonham Aff.) ¶ 29 & exs. 9, 11.)

32. EAGLE and USPS exchanged several drafts of the Reformed Contract from April 2003 through July 2003. (Attach. A (Bonham Aff.) ¶¶ 29, 30 & exs. 9, 10, 12-17.)

33. On or about July 31, 2003, USPS forwarded to EAGLE a draft of the Reformed Contract with additional modifications. On or about July 31, 2003, EAGLE informed USPS that it would accept the July 31 draft of the Reformed Contract as presented. That draft became the executed Reformed Contract. (Attach. A (Bonham Aff.) ¶¶ 31, 32 & ex. 18.)

<u>Negotiation of the 1.25B Provision</u>

34. On or about May 30, 2003, USPS in the negotiation of the Reformed Contract proposed the amended pricing clause as follows:

> The contract awarded under this solicitation shall be priced as follows:
>
> a. This Contract, including prices for the suppliers' [sic] fixed and variable cost, is valued at approximately $46,800,000 annually. Actual paid compensation may vary from this amount depending upon the weight and density of the mail handled by the Supplier. The anticipated weight of the mail per annum is 1.25 billion pounds, including the twenty percent (20%) absorption factor discussed below.

During negotiation of the Reformed Contract, EAGLE made no material modifications to this proposed section A.1.a. (Attach. A (Bonham Aff.) ¶ 33 & ex. 11.)

35. In the July 11, 2003, proposed draft of the Reformed Contract USPS provided to EAGLE, USPS revised section A.1.a, without input from EAGLE, to read as follows:

> The contract awarded under this solicitation shall be priced as follows:

> a. The parties anticipate that the Postal Service will provide to the THS approximately 1.25 billion pounds of mail during each calendar year of the contract and that the annual contract compensation for 1.25 billion pounds of mail could reach approximately $46.8 million. However, the parties recognize that the Postal Service does not guarantee a minimum weight of mail to be provided to the THS, and does not guarantee that annual compensation will total $46.8 million dollars. Actual compensation will vary according to the actual weight and density of mail provided to the THS, in accordance with Sections. A.1.b through A.1.j.

(Attach. A (Bonham Aff.) ¶ 34 & ex. 16.)

36. In the draft of the Reformed Contract which USPS submitted to EAGLE on or about July 17, 2003, USPS revised section A.1.a of the July 11 version by specifying the three contract numbers and changing "could reach approximately $46.8 million" to "is estimated to be approximately $46.8 million, including fixed and variable costs." This version of the section is as it appears in the Reformed Contract, and it reads as follows:

> The contracts awarded under this solicitation shall be priced as follows:
>
> a. The parties anticipate that the Postal Service will provide to the THS approximately 1.25 billion pounds of mail during each calendar year of the three contracts (SNET-01-GLR, SNET-01-PR, SNET-01-SER) and that the annual contract compensation for 1.25 billion pounds is estimated to be approximately $46.8 million, including fixed and variable costs. However, the parties recognize that the Postal Service does not guarantee a minimum weight of mail will be provided to the THS, and does not guarantee that annual compensation will total $46.8 million dollars. Actual compensation will vary according to the actual weight and density of mail provided to the THS in accordance with Sections A.1.b through A.1.j.

(Attach. A (Bonham Aff.) ¶ 34 & exs. 17 at 1, 18 at 3.)

37. Mr. Bonham of EAGLE asked Mr. Tom Black of USPS why USPS had added the "no guarantee" language to section A.1.a. Mr. Black told Mr. Bonham that USPS had added it because USPS could not guarantee that it would have available any specific amount of mail in the future, as the amount of mail tendered to USPS by the public was not in the control of USPS. Mr. Bonham informed Mr. Bauer of EAGLE of the substance of this conversation prior to Mr. Bauer's executing the Reformed Contract. (Attach. A (Bonham Aff.) ¶ 36; Attach. B (Bauer Aff.) ¶ 7.)

38. EAGLE understood that it was accepting the risk that the customers might not tender as much as 1.25 billion pounds of mail to USPS. However, EAGLE understood that USPS was agreeing to provide that amount of mail if it were available. (Attach. A (Bonham Aff.) ¶¶ 19-21, 37; Attach. B (Bauer Aff.) ¶¶ 6-9.)

39. USPS never told EAGLE prior to EAGLE's acceptance of the Reformed Contract that, under USPS's interpretation of any version of the language of section A.1.a, USPS had the option to supply EAGLE with mail at a rate of less than 1.25 billion pounds per annum even if that amount of mail were available. (Attach. A (Bonham Aff.) ¶¶ 38, 58; Attach. B (Bauer Aff.) ¶¶ 5, 8.)

40. EAGLE told USPS during negotiations of the MOU and the Reformed Contract that it understood USPS to be committing to supply it with

approximately 1.25 billion pounds of mail annually under the Reformed Contract. (Attach. A (Bonham Aff.) ¶ 37; Attach. B (Bauer Aff.) ¶¶ 4, 5.)

41. EAGLE understood that it was accepting the risk that the estimated poundage and revenue would not be exactly 1.25 billion pounds and $46.8 million, as it is impossible to provide a given poundage of mail precisely, especially as the total is a combination of different amounts for over twenty terminals over three regions. In addition, the dollar figure is subject to different pricing by location and adjustments spelled out in section A.1 (such as for density experienced). Thus, EAGLE understood itself to be taking the risk of minor variations from the poundage, provided USPS used good faith efforts to meet the specified amount. (Attach. A (Bonham Aff.) ¶ 39.)

Negotiation of "Aviation Supplier" Definition

42. In its initial draft of the revised Statement of Work it provided EAGLE in April 2003, USPS amended the definition of "Aviation Supplier" to read as follows: "***'Aviation Supplier'*** under this agreement is a supplier of air transportation and terminal handler at hub transfer point." (Emphasis in original.) (Attach. A (Bonham Aff.) ¶ 40 & ex. 9 at 46.)

43. The phrase "terminal handler at hub transfer point" also appeared in the definition of "Aviation Supplier" in the Initial Contract. (Attach. A (Bonham Aff.) ¶ 41 & ex. 1 at 25.)

44. Under the Initial Contract, "Aviation Supplier" related expressly to a "sole" supplier of air transportation, which was FedEx. (Attach. A (Bonham Aff.) ¶ 42 & ex. 1 at 25.)

45. Under the Initial Contract, the phrase "terminal handler at hub transfer point" in the definition of "Aviation Supplier" referred to the fact that FedEx was handling the mail itself at Memphis, the "hub transfer point" of FedEx, even though Memphis was one of the terminals originally listed in the SNET solicitation. (Attach. A (Bonham Aff.) ¶ 43 & ex. 1 at 25.)

46. In comments on a draft submitted during late May or June 2003, EAGLE suggested deleting the phrase "and terminal handler at hub transfer point" from the definition of "Aviation Supplier" in the Reformed Contract. USPS accepted that deletion without further comment. (Attach. A (Bonham Aff.) ¶ 44 & exs. 13 at 43, 15 at 49, 16, 17, 18 at 51.)

47. EAGLE suggested deletion of the phrase "and terminal handler at hub transfer point" because FedEx was no longer intended to be the sole service supplier of air transportation under the Reformed Contract. (Attach. A (Bonham Aff.) ¶ 45.)

<u>Negotiation of Other Relevant Provisions</u>

48. The opening paragraph of section A.1 was proposed by USPS in the initial draft of the Reformed Contract to read as follows:

> The purpose of this performance based service contract is for the Postal Service to purchase and the Terminal HS to provide integrated material handling services in support of the United States Postal Service's air and ground networks.

EAGLE never proposed a substantive amendment to this provision, and it appears in the Reformed Contract as initially proposed by USPS (except in one non-substantive respect, *i.e.*, "Terminal HS" modified to "Terminal Handling Supplier (THS)"). (Attach. A (Bonham Aff.) 46 & exs. 9 at 2, 10 at 1, 11, 15 at 1, 16, 17, 18 at 3.)

49. The first sentence of section B.1 was proposed by USPS in the initial draft of the Reformed Contract to read as follows: "The purpose of this performance based service contract is to provide integrated material handling services in support of the U.S. Postal Service's air and ground networks." EAGLE never proposed an amendment to this provision, and it appears in the Reformed Contract as initially proposed by USPS. (Attach. A (Bonham Aff.) ¶ 47 & exs. 9 at 4, 10 at 3, 12 at 2, 13 at 1, 14, 15 at 7, 16, 17, 18 at 10.)

50. Section B.5.b(1) was proposed by USPS in the initial draft of the Reformed Contract to read as follows: "The integrated material handling services to be purchased are primarily intended to support Express, Priority and First Class Mail." EAGLE never proposed an amendment to this provision, and it appears in the Reformed Contract as initially proposed by USPS. There was no corresponding provision in section B.5.b of the Initial Contract. (Attach. A (Bonham Aff.) ¶ 48 & exs. 9 at 6, 10 at 5, 12 at 4, 13 at 3, 14, 15 at 9, 16, 17, 18 at 12.)

51. The Attachment A list of terminals and baseline weights is conformed to the terminals actually serviced and uses the original figures in the Initial Contract. Thus, the combined total baseline weight around which the absorption collar operates is approximately 870 million pounds. (Attach. A (Bonham Aff.) ¶ 49 & ex. 18, attach. A.)

52. Section G-10 of the Reformed Contract refers to "work by any other supplier or by Postal Service employees." The suppliers referenced in this section are not other mail handlers like EAGLE, but suppliers of mail transportation services like FedEx and the Postal Service itself. (Attach. A (Bonham Aff.) ¶ 50 & ex. 18 at 62.)

53. The last sentence of section B.2.a of the Reformed Contract refers to "qualified suppliers" in addition to EAGLE. In this sentence, USPS points out that, when USPS competed the entire country under the SNET solicitation, it divided the country into seven different regions and awarded seven contracts, one for each region, with multiple handling suppliers invited to quote on each region. USPS awarded only one SNET contract for each of the three regions that EAGLE won (consolidating them into one document), and the Initial Contract was a requirements contract for all of the mail transported by air by FedEx in those three regions. (Attach. A (Bonham Aff.) ¶¶ 5, 51 & exs. 1, 18 at 10.)

<u>Reformed Contract Terms</u>

54. On or about August 3, 2003, the parties amended the Initial Contract and USPS reissued it almost in its entirety as the Reformed Contract. The amendment has an effective date of March 1, 2003. (Attach. A (Bonham Aff.) ¶ 32 & ex. 18.)

55. The Reformed Contract contains the following provisions:

a. "Effective March 1, 2003, the U.S. Postal Service and the THS agree to a reformation of the contracts listed above [SNET-01-PR, SNET-01-SER, and SNET-01-GLR] . . . ." (Title pg.)

b. **"A.1 Pricing**

"The purpose of these performance based service contracts is for the Postal Service to purchase and the Terminal Handling Supplier (THS) to provide integrated material handling services in support of the United States Postal Service's air and ground networks.

"The contracts awarded under this solicitation shall be priced as follows:

"a. The parties anticipate that the Postal Service will provide to the THS approximately 1.25 billion pounds of mail during each calendar year of the three contracts (SNET-01-GLR, SNET-01-PR, SNET-01-SER) and that the annual contract compensation for 1.25 billion pounds is estimated to be approximately $46.8 million, including fixed and variable costs. However, the parties recognize that the Postal Service does not guarantee a minimum weight of mail will be provided to the THS, and does not guarantee that annual compensation will total $46.8 million dollars. Actual compensation will vary according to the actual weight and density of mail provided to the THS in accordance with Sections A.1.b through A.1.j." (§ A.1 at 3 (emphasis in original).)

c. "<u>Absorption</u>: In the event that the average actual daily weight at any given air stop exceeds the designated baseline weight by twenty percent (20%) or less during each schedule period of the contract the

Supplier shall not be entitled to any additional compensation. In the event the average daily actual weight exceeds the designated baseline weight by more than twenty percent (20%) during any schedule period, the Supplier shall be entitled to additional compensation only for the weight of the mail in excess of the twenty-percent (20%) increase. . . . " (§ A.1.d at 4.)

d. "The purpose of this performance based service contract is to provide integrated material handling services in support of the U.S. Postal Service's air and ground networks." (§ B.1 at 10.)

e. "The term of this reformed contract shall be from **March 1, 2003** through and including August 26, 2006. This contract contains three (3), one (1) year options exercisable by the Postal Service in its sole discretion upon delivery of written notice to the THS at least 60 days prior to the expiration of the contract." (§ B.5.a at 12 (emphasis in original).)

f. "The integrated material handling services to be purchased are primarily intended to support Express, Priority and First Class Mail." (§ B.5.b at 12.)

g. "***'Aviation Supplier'*** under this agreement is a supplier of air transportation." (§ G.1 at 51 (emphasis in original).)

(Attach. A (Bonham Aff.) ex. 18.)

56. The Reformed Contract does not identify itself as an IDIQ contract, does not contain the standard USPS clause for IDIQ contracts, and does not set minimum and maximum amounts of mail for EAGLE to handle. (Attach. A (Bonham Aff.) ex. 18.)

57. Prior to execution of the Reformed Contract, USPS never stated to EAGLE that, in its opinion, the Reformed Contract was or would be an IDIQ contract. (Attach. A (Bonham Aff.) ¶ 58; Attach. B (Bauer Aff.) ¶ 8.)

58. Prior to execution of the Reformed Contract, USPS never told EAGLE that the Reformed Contract would change the contract type from that of the Initial Contract. (Attach. A (Bonham Aff.) ¶ 58.)

59. Prior to the execution of the Reformed Contract, USPS told EAGLE that, under the Reformed Contract, EAGLE would continue to handle all the FedEx traffic, plus more, to give EAGLE 1.25 billion pounds and $46.8 million annually. (Attach. A (Bonham Aff.) ¶¶ 37, 38, 58; Attach. B (Bauer Aff.) ¶¶ 5, 6, 8.)

60. If the Reformed Contract were an IDIQ contract or USPS otherwise had the option to order less than 1.25 billion pounds per year in its discretion, EAGLE would be at risk that USPS would only take sufficient quantities to take advantage of the 20% "free zone" of the absorption collar and no more. (Attach. A (Bonham Aff.) ¶ 59; Attach. B (Bauer Aff.) ¶ 9.)

61. In EAGLE's view, taking the risk of giving USPS unlimited discretion in how much mail it was to provide to EAGLE would have made no business sense and would have been foolhardy and unacceptable. (Attach. A (Bonham Aff.) ¶¶ 60, 61; Attach. B (Bauer Aff.) ¶ 9.)

62. Based on the fact that USPS never increased the amount of mail that EAGLE was to handle above its approximate "free zone" of the 20% absorption collar, EAGLE believes that there is substantial reason to suspect that USPS never intended to provide the additional amounts of mail to EAGLE and that USPS did not negotiate or perform in good faith. (Attach. A (Bonham Aff.) ¶ 59.)

<u>Performance and Damages Suffered by EAGLE</u>

63. USPS has had enough mail in its air and ground networks in the regions covered by the Reformed Contract to supply mail to EAGLE under the Reformed Contract at a rate of 1.25 billion pounds per year from March 1, 2003, to the present. (Attach. A (Bonham Aff.) ¶ 23; Attach. B (Bauer Aff.) ¶ 6.)

64. The actual volumes of mail handled by EAGLE under the Reformed Contract since its effective date of March 1, 2003, through February 28, 2006, are as follows:

| Year | Actual Pounds | Annualized Pounds |
|---|---|---|
| 2003 | 784,601,929 | 941,522,315 |
| 2004 | 1,010,089,544 | 1,010,089,544 |
| 2005 | 1,050,499,950 | 1,050,499,950 |
| 2006 | 53,321,649 | 1,023,109,140 |

These amounts are based on EAGLE's records, which show more poundage than USPS claims EAGLE has handled. (Attach. C (Schrock Aff.) ¶ 5 & tab 2.)

65. Computed using the method USPS claims to apply for the absorption calculation, if USPS had provided EAGLE with 1.25 billion pounds per year, assuming the same rate of increase over the various terminals EAGLE services under the Reformed Contract, EAGLE would have had additional revenues of approximately $28,000,000 for the period of March 1, 2003, through February 28, 2006, or approximately $10,000,000 per year. (Attach. C (Schrock Aff.) ¶ 4 & tab 1.)

EAGLE Complaints and USPS Final Decision

66. As early as March 2004, EAGLE complained to USPS that USPS was not providing mail under the Reformed Contract at a rate of 1.25 billion pounds per year. (Attach. A (Bonham Aff.) ¶ 52 & ex. 19.)

67. EAGLE repeatedly thereafter complained to USPS about the shortfall in pounds of mail delivered by USPS to EAGLE for handling under the Reformed Contract. (Attach. A (Bonham Aff.) ¶ 53.)

68. In a letter from Mr. Brian T. Bauer, President of EAGLE, to Contracting Officer Brazil dated September 20, 2005, EAGLE demanded assurances from USPS that it would conform to its contractual obligations to provide 1.25 billion pounds annually. (Attach. A (Bonham Aff.) ¶ 54 & ex. 20.)

69. By letter dated October 14, 2005, Contracting Officer Brazil responded to Mr. Bauer's September 20 letter by stating that USPS would not make any assurances that it would provide EAGLE with mail at a rate of 1.25 billion pounds annually because that amount as stated in the Reformed Contract is an estimate and not a guarantee. She did not claim that the Reformed Contract is an "Indefinite Quantity" or IDIQ Contract. (Attach. A (Bonham Aff.) ¶ 55 & ex. 21.)

70. By letter dated October 25, 2005, EAGLE requested a final decision from Contracting Officer Brazil that USPS had an obligation under the Reformed Contract to provide EAGLE with approximately 1.25 billion pounds of mail

annually if such mail is available from the USPS air and ground networks in the regions covered by the Reformed Contract. EAGLE also requested a final decision that USPS is and has been in material breach. (Attach. A (Bonham Aff.) ¶ 56 & ex. 22.)

71. By letter dated January 3, 2006, Contracting Officer Brazil issued her final decision. She denied that USPS has any contractual obligations to tender the amount of mail specified in the Reformed Contract if it is available. She claimed that the Reformed Contract is an "Indefinite Quantity" Contract, rather than a requirements-type contract. She did not address the issue of the materiality of the asserted breach. (Attach. A (Bonham Aff.) ¶¶ 57, 58 & ex. 23.)

Respectfully submitted,

s/Frederick W. Claybrook, Jr.

Frederick W. Claybrook, Jr.
(Counsel of Record)
Daniel R. Forman
Jenny Kim

Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington, D.C. 20004
(202) 624-2500
Attorneys for EAGLE

March 17, 2006

2725862