IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| EVERGREEN AVIATION GROUND LOGISTICS ENTERPRISES, INC., Plaintiff, v. UNITED STATES, Defendant. | No. 06-11C<br>Allegra, J. |

AFFIDAVIT OF DANIEL G. BONHAM

County of Yamhill )
) ss:
State of Oregon )

The affiant, Daniel G. Bonham, being duly sworn, states as follows:

Personal

1. I am the Director of Marketing of Evergreen Aviation Ground Logistics Enterprises, Inc. (EAGLE). I report directly to Mr. Brian T. Bauer, formerly President and now CEO of EAGLE. I have firsthand knowledge of what I state in this affidavit.

2. As part of my duties, I have had direct contact with USPS representatives concerning the Shared Network (SNET) contract from its inception. Communications with USPS concerning contractual and performance issues of the SNET contract are part of my assigned responsibilities. My offices are at EAGLE's headquarters in McMinnville, Oregon.

Background and Initial Contract Solicitation and Award

3. EAGLE provides ground logistics and other transportation-related services, for both government and commercial customers. EAGLE is a fully-owned subsidiary of Evergreen International Aviation, Inc., which is privately held by Evergreen Holdings.

4. In late 2000, USPS and FedEx entered into a contract for FedEx to transport mail by air for USPS in the United States. According to the press releases and the published reports, FedEx was to transport for USPS Express and Priority Mail and some First-Class Mail.

5. On or about April 23, 2001, USPS issued solicitation HQ-2001-12 for what it called its "Shared Network – SNET." Under the solicitation, USPS invited companies to submit offers for mail handling to support the FedEx contract. USPS divided the United States into seven regions, and companies could submit offers on one or more regions. Excerpts from the SNET solicitation as amended, which became the Initial Contract awarded to EAGLE, are attached as Exhibit 1 to this affidavit.

6. On or about July 3, 2001, USPS awarded EAGLE SNET contracts under the SNET solicitation for three of the seven regions – Pacific, Southeast, and Great Lakes. The contract numbers are SNET-01-PR, SNET-01-SER, and SNET-01-GLR. USPS consolidated the contracts into a single contract document ("Initial

Contract"). Excerpts from the Initial Contract are attached as Exhibit 1 to this affidavit.

7. USPS in Attachment A to the SNET solicitation and Initial Contract provided estimated amounts of mail for the various air terminals specified in each of the regions. A few terminals were deleted in the amendments to the SNET solicitation, including Memphis, as FedEx was to do its own handling at its Memphis hub. The amount of mail estimated by USPS for the three regions it awarded to EAGLE in the Initial Contract was approximately 870 million pounds per year, combined. (Ex.1.)

8. The Initial Contract was a requirement-type contract specifying EAGLE as the "Terminal Handling Supplier" ("THS"). EAGLE as the THS was to handle all mail at the air terminals in its awarded regions that was transported by FedEx under the FedEx contract for air transportation services.

9. Under the Initial Contract, EAGLE was paid an annual, fixed fee for its services for each region, irrespective of the amount of mail handled. (Ex. 1 at 1 (Schedule).)

10. In neither the SNET solicitation nor the Initial Contract did USPS identify the Initial Contract as an "indefinite-delivery" or "indefinite-delivery, indefinite-quantity" (IDIQ) contract. The Initial Contract did not specify maximum and minimum amounts of mail to be handled, just estimated quantities. EAGLE

did not understand the Initial Contract to be an indefinite-quantity or IDIQ contract, but, rather, a requirements contract. (Ex. 1 & attach. A.)

11. USPS representatives never identified the Initial Contract to EAGLE as an "indefinite-quantity" or "IDIQ" contract. Instead, they told us we were handling all the FedEx requirements in the regions awarded.

Performance Under the Initial Contract

12. EAGLE began performance under the Initial Contract in mid-2001. The actual contract term, though, was to begin August 27, 2001, which coincided with the start-up of transportation services by FedEx under the FedEx/USPS contract.

13. Partially due to measures taken by the Congress and USPS after the attacks of September 11, 2001, the amount of mail delivered to EAGLE for handling under the Initial Contract was overall significantly in excess of the estimates provided by USPS in Attachment A of the Initial Contract, achieving a rate of approximately 1.0 billion pounds per year at lesser densities than estimated.

14. As a result of the greater-than-estimated amounts of mail provided to EAGLE under the Initial Contract, EAGLE had to expand substantially several of its handling facilities at the terminals for which it was responsible. These included, but were not limited to, the facilities at the Minneapolis/St. Paul (MSP) and Detroit (DTW) airports. The San Francisco/Oakland traffic was split, with a new facility being established at the San Francisco International Airport (SFO). EAGLE's

personnel costs also increased substantially over what would have been necessary to handle the specified estimated amounts.

15. EAGLE informed USPS of its substantial and unexpected cost to handle the greater-than-estimated amounts of mail and requested compensation for its extra costs and a reformation of the Initial Contract.

Negotiation of MOU

16. Beginning in late 2002 and continuing into 2003, USPS and EAGLE representatives met to negotiate a lump-sum payment to EAGLE and the reformation of the Initial Contract. On or about April 10, 2003, I prepared a "Chronology of Evergreen/USPS Negotiations" as of that date. The chronology is attached as Exhibit 2 to this affidavit.

17. These negotiations involved multiple face-to-face meetings in Washington, D.C., as reflected in my chronology (by a small airplane in the left margin). I was a participant in almost all of those meetings. In particular, I was in attendance at the negotiation meetings in 2003 during which USPS and EAGLE representatives discussed the details of a going-forward arrangement which resulted in the reformation of the Initial Contract.

18. At a meeting in D.C. in early February 2003, George Rudy of USPS presented a "pay model" that he said he had prepared that set out projections of what USPS would pay EAGLE on a going-forward basis. Examples of various

iterations of the pay model used in the negotiations by the parties are attached as Exhibits 3 to 5 to this affidavit.

19. The pay model was part of the USPS response to EAGLE's repeatedly expressed position that EAGLE needed an assurance of additional revenue under the SNET contract on a going-forward basis to cover its added capital, personnel, and other costs put in place by EAGLE to handle the greater-than-estimated amounts of mail provided since the Initial Contract began.

20. The pay model, as modified during negotiations, generated revenue of approximately $46.8 million per year, which was a level acceptable to EAGLE. The computation reflected in the pay model assumed payment on a "per pound" basis and took into account a 20% absorption based on the Initial Contract poundage estimates and made assumptions with respect to variables such as density, volume, and weight. (Ex. 5.)

21. In each version of the pay model, USPS identified the number of pounds to be handled annually by EAGLE as 1.25 billion. During discussions in February, March, and April 2003, USPS representatives confirmed to me and other EAGLE representatives that USPS anticipated making 1.25 billion pounds of mail available per year for handling under the amended contract. USPS never said in any negotiations, concerning the pay model or otherwise, that it could choose not to provide EAGLE with 1.25 billion pounds of mail per year even if there were adequate mail in the USPS system to do so. (Exs. 3-5.)

22. During the meeting in D.C. on April 11, 2003, USPS representatives said that the density used in the pay model should be lowered to 6.5 lbs./ft.$^3$ from a higher density used in the prior version. To retain the agreed-upon revenue figure of $46.8 million, that required an adjustment of either the volume or the weight of the mail. I asked USPS representatives which number should be adjusted. A USPS Shared Network representative responded that the volume should be revised and the 1.25 billion pound figure should be retained, as the weight was a firm number. A June 13, 2003, e-mail from me to Mr. Young of USPS discussing this event is attached as Exhibit 6 to this affidavit.

23. Neither I nor other EAGLE representatives played any part in determining the figure of 1.25 billion pounds per year. That figure was put forward solely by USPS and was presented to us as being generated by the USPS Shared Network personnel. Having said that, EAGLE was aware that there was at that time ample mail existing in the USPS air and ground transportation networks to supply 1.25 billion pounds of mail per year to EAGLE for handling. While EAGLE believed it was handling all the FedEx air mail for its regions, there were both other air and ground shippers of mail that EAGLE did not service in the regions and there were other types of mail available, such as Standard Mail and Periodicals.

24. In furtherance of these negotiations, on April 11, 2003, EAGLE and USPS executed a memorandum of understanding (MOU) setting forth the principal terms and conditions upon which we had agreed regarding amendments to the Initial Contract. The MOU is attached as Exhibit 7 to this affidavit.

25. The MOU of April 11 set out the parties' agreement that EAGLE would receive approximately $46,800,000 per year, subject to adjustments for various factors, but with an anticipated weight of 1.25 billion pounds of mail per year.

26. The MOU also set out in general the agreed terms concerning "absorption." The USPS had insisted upon, and EAGLE had agreed, not to charge USPS for the first 20% of mail handled over the estimated amounts shown in Attachment A to the Initial Contract, as to be amended (performed on a terminal-by-terminal basis).

27. The MOU also reflected that the parties intended to set out their understandings as set out in the MOU in a revised contract document.

28. On April 18, 2003, EAGLE and USPS executed a "Settlement Agreement and Release" that provided for payments to EAGLE for performance under the Initial Contract through February 2003. A copy of that agreement is attached as Exhibit 8 to this affidavit.

Negotiation of the Reformed Contract Text

29. At the same time as EAGLE and USPS representatives were negotiating the MOU, on or about April 8, 2003, USPS provided EAGLE for its review and comment a revised contract. On or about May 12, 2003, USPS provided EAGLE with a further revised draft contract. Excerpts from the April 8, 2003,

USPS proposed draft are attached as Exhibit 9 to this affidavit; excerpts of the USPS proposed draft of May 12, 2003, are attached as Exhibit 10 to this affidavit.

30. USPS provided a freestanding draft Schedule on or about May 30, 2003, excerpts from which are attached as Exhibit 11 to this affidavit. From May 2003 to July 2003, EAGLE and USPS exchanged several drafts of what was to become the "Reformed Contract." Excerpts from other drafts are attached as Exhibits 12 to 17 to this affidavit.

31. On or about July 31, 2003, USPS forwarded to EAGLE a draft of the Reformed Contract with additional modifications. On or about July 31, 2003, EAGLE informed USPS that it would accept the USPS draft of the Reformed Contract as presented by USPS, and this July 31 draft became the executed Reformed Contract. Excerpts of the July 31, 2003, draft Reformed Contract are attached as Exhibit 18 to this affidavit.

32. Mr. Bauer executed the cover page for EAGLE and Mr. Dwight Young for USPS on August 3 and 1, 2003, respectively. The amendment has an effective date of March 1, 2003. (Ex. 18, cover pg.)

Negotiation of the 1.25B Provision

33. On or about May 30, 2003, USPS in the negotiation of the Reformed Contract proposed the amended pricing clause as follows:

> The contract awarded under this solicitation shall be priced as follows:

> a. This Contract, including prices for the suppliers' [sic] fixed and variable cost, is valued at approximately $46,800,000 annually. Actual paid compensation may vary from this amount depending upon the weight and density of the mail handled by the Supplier. The anticipated weight of the mail per annum is 1.25 billion pounds, including the twenty percent (20%) absorption factor discussed below.

(Ex. 11.) During negotiation of the Reformed Contract, EAGLE made no material modifications to this proposed section A.1.a.

34. In the July 11, 2003, "final" draft of the Reformed Contract provided by USPS, USPS revised section A.1.a, without input from EAGLE, to read as follows:

> The contract awarded under this solicitation shall be priced as follows:
>
> a. The parties anticipate that the Postal Service will provide to the THS approximately 1.25 billion pounds of mail during each calendar year of the contract and that the annual contract compensation for 1.25 billion pounds of mail could reach approximately $46.8 million. However, the parties recognize that the Postal Service does not guarantee a minimum weight of mail to be provided to the THS, and does not guarantee that annual compensation will total $46.8 million dollars. Actual compensation will vary according to the actual weight and density of mail provided to the THS, in accordance with Sections. A.1.b through A.1.j.

(Ex. 16 at 1.)

35. In the draft of the Reformed Contract which USPS submitted to EAGLE on or about July 17, 2003, USPS again slightly revised section A.1.a by specifying the three contract numbers and changing "could reach approximately $46.8 million" to "is estimated to be approximately $46.8 million, including fixed

and variable costs." This version of the section is as it appears in the Reformed Contract, and it reads as follows:

> The contracts awarded under this solicitation shall be priced as follows:
>
> a. The parties anticipate that the Postal Service will provide to the THS approximately 1.25 billion pounds of mail during each calendar year of the three contracts (SNET-01-GLR, SNET-01-PR, SNET-01-SER) and that the annual contract compensation for 1.25 billion pounds is estimated to be approximately $46.8 million, including fixed and variable costs. However, the parties recognize that the Postal Service does not guarantee a minimum weight of mail will be provided to the THS, and does not guarantee that annual compensation will total $46.8 million dollars. Actual compensation will vary according to the actual weight and density of mail provided to the THS in accordance with Sections A.1.b through A.1.j.

(Ex. 17 at 1; Ex. 18 at 3.)

36. I asked Tom Black of USPS why USPS had added the "no guarantee" language to section A.1.a. He told me that USPS's legal department had instructed that the "no guarantee" language be added because USPS could not guarantee that it would have available any specific amount of mail in the future, as the amount of mail tendered to USPS by the public was not in the control of USPS. He mentioned that the public might shift from sending letters to sending more e-mail correspondence. I communicated the substance of this conversation I had with Mr. Black to Mr. Bauer.

37. EAGLE understood that it was accepting the risk that the USPS's customers might not tender as much as 1.25 billion pounds of mail to USPS, *i.e.*,

that USPS did not guarantee that it would have that much mail to tender to EAGLE. However, EAGLE understood that USPS was agreeing to provide that amount of mail if it were available. I and other EAGLE representatives on more than one occasion asked USPS personnel during the negotiations leading up to the MOU and the Reformed Contract to confirm the 1.25-billion-pound figure, and they always confirmed that that was the amount that we should plan on receiving. This was part and parcel of generating approximately $46.8 million per year under the Reformed Contract, which was the crux of the deal.

38. USPS never told EAGLE prior to EAGLE's acceptance of the Reformed Contract that, under USPS's interpretation of any version of the proposed language of section A.1.a, USPS had the option to supply EAGLE with mail at a rate of less than 1.25 billion pounds per annum, even if that amount of mail were available.

39. I and others at EAGLE also understood that we were accepting the risk that the estimated poundage and revenue would not be exactly 1.25 billion pounds and $46.8 million. It is simply impossible to hit a given poundage of mail on the nose, especially as it is a combination of different figures for over twenty terminals over three regions. In addition, the dollar figure is subject to different pricing by location and adjustments spelled out in section A.1 (such as for density experienced). Thus, EAGLE understood itself to be taking the risk of minor variations from the poundage, provided USPS used good faith efforts to meet that estimate. We did not understand this minimal flexibility to give USPS carte blanche as to how much mail it could give us.

Negotiation of "Aviation Supplier" Definition

40. In its initial draft of the revised Statement of Work that it provided EAGLE in April 2003, USPS amended the definition of "Aviation Supplier" to read as follows: "'***Aviation Supplier***' under this agreement is a supplier of air transportation and terminal handler at hub transfer point." (Emphasis in original.) (Ex. 9 at 46.)

41. The phrase "terminal handler at hub transfer point" also appeared in the definition of "Aviation Supplier" in the Initial Contract. (Ex. 1 at 25.)

42. Under the Initial Contract, "Aviation Supplier" related expressly to a "sole" supplier of air transportation, which was FedEx. (Ex. 1 at 25.)

43. Under the Initial Contract, the phrase "terminal handler at hub transfer point" in the definition of "Aviation Supplier" referred to the fact that FedEx was handling the mail itself at Memphis, the "hub transfer point" of FedEx, even though Memphis was one of the listed terminals for EAGLE in the solicitation (it was removed in an amendment to the Initial Contract). (Ex. 1 at 25.)

44. In a draft submitted during late May or June 2003, EAGLE suggested deleting the phrase "and terminal handler at hub transfer point" from the definition of "Aviation Supplier" in the Reformed Contract. USPS accepted that deletion without further comment. (Ex. 13 at 43; Ex. 15 at 49; Ex. 16; Ex. 17; Ex. 18 at 51.)

45. EAGLE suggested deletion of the phrase "and terminal handler at hub transfer point" because FedEx was no longer intended to be the sole service supplier of air transportation under the Reformed Contract.

Negotiation of Other Relevant Provisions

46. The opening paragraph of section A.1 was proposed by USPS in the initial draft of the Reformed Contract to read as follows:

> The purpose of this performance based service contract is for the Postal Service to purchase and the Terminal HS to provide integrated material handling services in support of the United States Postal Service's air and ground networks.

EAGLE never proposed a substantive amendment to this provision, and it appears in the Reformed Contract as initially proposed by USPS (except in one non-substantive respect, i.e., "Terminal HS" was modified to "Terminal Handling Supplier (THS)"). (Ex. 9 at 2; Ex. 10 at 1; Ex. 11; Ex. 15 at 1; Ex. 16; Ex. 17; Ex. 18 at 3.)

47. The first sentence of section B.1 was proposed by USPS in the initial draft of the Reformed Contract to read as follows: "The purpose of this performance based service contract is to provide integrated material handling services in support of the U.S. Postal Service's air and ground networks." EAGLE never proposed an amendment to this provision, and it appears in the Reformed Contract as initially proposed by USPS. (Ex. 9 at 4; Ex. 10 at 3; Ex. 12 at 2; Ex. 13 at 1; Ex. 14; Ex. 15 at 7; Ex. 16; Ex. 17; Ex. 18 at 10.)

48. The first sentence of section B.5.b(1) was proposed by USPS in the initial draft of the Reformed Contract to read as follows: "The integrated material handling services to be purchased are primarily intended to support Express, Priority and First Class Mail." EAGLE never proposed an amendment to this provision, and it appears in the Reformed Contract as initially proposed by USPS. There was no corresponding sentence in section B.5.b of the Initial Contract. (Ex. 9 at 6; Ex. 10 at 5; Ex. 12 at 4; Ex. 13 at 3; Ex. 14; Ex. 15 at 9; Ex. 16; Ex. 17; Ex. 18 at 12.)

49. The Attachment A list of terminals and baseline weights is conformed to the terminals actually serviced and uses the original figures in the Initial Contract. Thus, the combined total baseline weight around which the absorption collar operates is approximately 870 million pounds. (Ex. 18, attach. A.)

50. It has been brought to my attention that USPS in its motion to dismiss (at 15-16) has made reference to section G-10 of the Reformed Contract and its reference to "work by any other supplier or by Postal Service employees." The suppliers referenced here are not other mail handlers like EAGLE, but suppliers of mail transportation services like FedEx and the Postal Service itself. (Ex. 18 at 62.)

51. Similarly, USPS argues in its motion (at 15) that a passage from B.2 of the Reformed Contract shows that USPS can use "multiple suppliers," not just EAGLE. The passage it quotes only points out that, when USPS competed the entire country under the SNET solicitation, it divided the country into seven

different regions and awarded seven contracts, one for each region. However, USPS awarded only one SNET contract for each of the three regions that EAGLE won (consolidating them into one document), and the Initial Contract was a requirements contract for all of the mail transported by air by FedEx in those three regions. Having said this, it has always been true that there have been other suppliers of air and ground transportation of mail in the three regions besides FedEx, and the mail transported by those carriers has been handled by the carriers themselves or under other arrangements. The Reformed Contract retained the requirement for EAGLE to handle the FedEx air mail and expanded it, with USPS under the Reformed Contract agreeing to provide approximately 1.25 billion pounds per year from sources not limited to FedEx.

EAGLE Complaints and USPS Final Decision

52. As early as March 2004, EAGLE complained to USPS that USPS was not providing mail under the Reformed Contract at a rate of 1.25 billion pounds per year. A copy of EAGLE's letter of on or about March 30, 2004, is attached as Exhibit 19 to this affidavit. (I did not retain a signed copy, and the computer program auto-dates the copy now printed out.)

53. EAGLE repeatedly thereafter complained to USPS about the shortfall in pounds of mail delivered by USPS to EAGLE for handling under the Reformed Contract.

54. In one such complaint, a letter from Mr. Brian T. Bauer, President of EAGLE, to Contracting Officer Brazil dated September 20, 2005, EAGLE demanded assurances from USPS that it would conform to its contractual obligations to provide 1.25 billion pounds annually. EAGLE's September 20, 2005, letter is attached as Exhibit 20 to this affidavit.

55. By letter dated October 14, 2005, Contracting Officer Brazil responded to Mr. Bauer's September 20 letter by stating that USPS would not make any assurances that it would provide EAGLE with mail at a rate of 1.25 billion pounds annually because that amount as stated in the Reformed Contract was an estimate and not a guarantee. She did not deny that USPS had available sufficient mail in its air and ground networks to supply the full 1.25 billion pounds, but indicated that USPS's estimate of its actual requirements had been overstated. She did not claim that the Reformed Contract is an IDIQ Contract. USPS's October 14, 2005, letter is attached as Exhibit 21 to this affidavit.

56. By letter dated October 25, 2005, EAGLE requested a final decision from Contracting Officer Brazil that USPS has an obligation under the Reformed Contract to provide EAGLE with approximately 1.25 billion pounds of mail annually if such mail is available from the USPS air and ground networks in the regions covered by the Reformed Contract. EAGLE also requested a final decision that USPS is and has been in material breach. EAGLE's October 25, 2005, letter is attached as Exhibit 22 to this affidavit.

57. By letter dated January 3, 2006, Contracting Officer Brazil issued her final decision. She denied that USPS has any contractual obligations to tender the amount of mail specified in the Reformed Contract if it is available. She did not address the issue of the materiality of the asserted breach. The January 3, 2006, final decision is attached as Exhibit 23 to this affidavit.

58. Contacting Officer Brazil asserted in the final decision that the Reformed Contract is a "Indefinite Quantity" contract, rather than a requirements-type contract. At no time during our negotiations of either the MOU or the Reformed Contract did any USPS personnel say that we were putting in place an "Indefinite Quantity" or IDIQ arrangement. Nor did any USPS personnel ever say that USPS was changing the basis contract type of the Initial Contract, which was a requirements contract. The EAGLE representatives, including myself, understood the Reformed Contract to continue the FedEx work and to add to it other available traffic to total approximately 1.25 billion pounds per year. We expressed that often to USPS personnel during negotiations of the MOU and Reformed Contract, USPS representatives repeatedly affirmed it, and we were never told to the contrary by the USPS personnel with whom we spoke and corresponded.

59. Based on the fact that USPS never increased the amount of mail that EAGLE was to handle above its approximate "free zone" of the 20% absorption collar, EAGLE believes that there is substantial reason to suspect that USPS never intended to provide the additional amounts of mail to EAGLE and that USPS did not negotiate or perform in good faith.

60. The interpretation of the contract asserted by Contracting Officer Brazil, *i.e.*, that USPS has unlimited discretion to provide less than 1.25 billion pounds of mail per year to EAGLE even if USPS has that much available, makes no business sense.

61. The Contracting Officer suggested in the final decision that, because USPS is paying EAGLE a relatively small "fixed cost" amount under the Reformed Contract relating to EAGLE's capital improvements (approximately $6.3 million per year over the base term), the contract has adequate consideration. EAGLE had made not only substantial capital improvements to handle the USPS traffic experienced, but also substantial additional labor commitments to be able to handle traffic at that level and as promised by USPS. The Reformed Contract only made economic sense if USPS had made a commitment to provide approximately 1.25 billion pounds of mail annually if it were available that would generate approximately $46.8 million in total revenue (over 85% of which was estimated in the variable, as opposed to fixed, costs category).

Further affiant saith not.

Daniel G. Bonham

Sworn to and subscribed before me
on this 15th day of March 2006.

Carolyn F. Smithrud
Notary Public
Yamhill County, Oregon

OFFICIAL SEAL
CAROLYN F SMITHRUD
NOTARY PUBLIC - OREGON
COMMISSION NO. 372815
MY COMMISSION EXPIRES NOV. 9, 2007