Bonham Ex. 6

## Daniel Bonham

**From:** Daniel Bonham [dbonham@evergreen-eagle.com]
**Sent:** Friday, June 13, 2003 6:07 PM
**To:** Dwight Young, Sr.
**Cc:** Brian Bauer
**Subject:** RE: Rudy Model

Dwight-
No - we first saw this model in early march and had developed different variations. The original intent of this model was to justify the past expenses and was based on an entirely different weight and cube - 774,403,663 and 119,139,025 respectively.

We then started working with the model to more accurately affect other cost changes that had taken place since the BAFO. For example, our version had increased the cost of bases that we had come to an agreement with the USPS regarding the change in operations and the costs associated- MKE, MSP, SFO, OAK, and the fixed cost changes, and the subcontractor cost changes and excluded any absorption factor.

Daniel

-----Original Message-----
From: Dwight Young, Sr. [mailto:dyoung@herbalife.tv]
Sent: Friday, June 13, 2003 5:39 PM
To: Daniel Bonham; Dwight Young (Home)
Cc: Brian Bauer
Subject: RE: Rudy Model

Daniel:
Important question - are you saying you never saw this model until after our agreement of 4/11/2003??
Dwight

-----Original Message-----
From: Daniel Bonham [mailto:dbonham@evergreen-eagle.com]
Sent: Friday, June 13, 2003 8:19 PM
To: Dwight Young (Home)
Cc: Brian Bauer
Subject: Rudy Model

Attached is the model that Tom Black sent to me after the agreement was made. The second is the summary portion of the model that we created to reflect the agreement.

My conversation with Tom Black hit on the following points:

I wanted Tom to understand that the following cost elements were not included in the model: 1.) pricing agreements made for MKE, MSP and SFO, 2.) the cost associated with the daysort, 3.) the cost associated with the concessions made (the one hour absorption on both ends {2 hours} and the separation flex.

Tom stated costs in model are from BAFO and do not include out of original scope services or relocations except for change in facility cost and the subcontracted trucking costs in LAX, ONT and OAK.

We both agreed that the model is theoretical and is not based on actual cost incurred.

I would further comment that there are other fundamental flaws in the formula- including the following: 1.) failure to include the weight guarantee (negative flex), miscalculation of profit, miscalculation of port fees, and the actual cost items as described above and discussed with Tom.

As such, you can see that it was never our understanding nor intent to use this exact version (data and specific calculations) as an applicable model for future calculation. Rather, we considered the model to be a tool to negotiate the annualized contracted rate.

During the meeting the question arose about the weights we were all using to project the future compensation for this agreement and if the combination used in the original George Rudy model of 180,211,869 cubes and 1,250,000,000 weight at a density of 6.94 was correct. At that time we were told to modify the cube to 192,307,692 so that at the same weight of 1.25 billion pounds would equal the 6.5 density that the operations group desired. Although this had a negative effect on the overall value of the contract - we made the adjustment in hopes of coming to an agreement.

The day of the meeting was also the first time USPS allowed us to include in the cost at the top of the model the subcontracted trucking costs. Although these costs were supported in a report I shared with GR and TO- that day they were included without question. This would lead me to believe that it was never the USPS's intent to use this formula as a basis for compensation either.

Although I will be out of the office next week- I will be checking my email regularly and will be reachable through the temporary cell phone number Brian gave you.

Daniel

**MEMORANDUM OF UNDERSTANDING**

This Memorandum of Understanding sets forth the principal terms and conditions agreed upon by the United States Postal Service ("USPS") and Evergreen Aviation Ground Logistics Enterprise, Inc. ("EAGLE") regarding an amendment to the Shared Network Agreement (Solicitation HQ-2001-12) ("Shared Network Contract" or the "Contract"). The parties agree that substantial work remains to memorialize the agreements reached and commit to use their best efforts to prepare and execute a revised Statement of Work no later than May 1, 2003.

**Fixed Costs**: All estimated fixed costs shall be calculated and paid separately from the variable costs incurred to perform the services set forth in the Contract. USPS shall reimburse EAGLE one-fifty second (1/52) of the fixed costs on a weekly basis. Fixed costs shall not be altered without written authorization of the Contracting Officer.

**Pricing**: EAGLE shall be compensated pursuant to the agreed-upon compensation scale. (Exhibit 1). A density factor of 6.5 $lbs/ft^3$ shall be used to calculate the minimum compensation to be paid to EAGLE. USPS reserves the right to adjust the density factor once a year based upon historical operating data. On a monthly basis, the parties will reconcile actual weights and density to determine if a compensation adjustment is required. The parties have valued the Contract at $46,800,000, including both variable and fixed costs and with an anticipated weight of 1.25 billion pounds of mail.

Density shall be determined from scanned data pursuant to a methodology agreed upon by the parties, including on-site validation and audit. For purposes of reconciliation, the density of the mail during the Christmas Season shall not be considered. The parties agree to draft, test and validate the methodology for calculating and verifying density no later than May 1, 2003. Any discrepancy regarding the density that shall be used to calculate EAGLE's compensation shall be resolved by resort to the relevant data provided by Federal Express, which shall be provided to EAGLE.

EAGLE commits to using its best efforts to achieve the highest density reasonably practicable. The parties commit to review the processes and procedures used by EAGLE to maximize the density of the mail. USPS shall conduct a study after the effective date of the amended Statement of Work to determine if additional efficiencies can be realized and to meet with EAGLE no later than October 1, 2003 to review its findings.

**Absorption**: Attachment A to the Statement of Work sets forth the baseline weight of mail for each air stop, which shall serve as the basis for calculating the minimum compensation to be paid EAGLE pursuant to the weight-based sliding scale. In the event that the daily metric at any given air stop exceeds the baseline weight by twenty percent (20%) or less, EAGLE shall not be entitled to any additional compensation. Downward fluctuations in the weight of the mail will not serve as a basis to discount the minimum compensation to be paid under the Contract. In the event the designated

average daily baseline exceeds the baseline weight by more than twenty percent (20%) for the scheduled period, EAGLE shall be entitled to additional compensation only for the weight of the mail in excess of the twenty percent (20%) increase. In the event that the average daily actual weight declines more than twenty percent (20%) below the average daily baseline weight for the scheduled period, USPS shall be entitiled to a reduction for each pound less than 80% of the average daily baseline weight at the established daily per pound rate.

**Separations**: EAGLE agrees to perform the number of separations at each site as specified in Attachment B to the Revised Statement of Work. EAGLE agrees to provide at no cost to USPS up to fifty-six (56) additional separations during the life of the Contract, however, USPS may not direct more than four (4) additional separations at any air stop. EAGLE shall be compensated at predetermined rates by air stop for each additional separation directed by USPS beyond the 56 separations described above. USPS shall have the option to request a credit for up to ten (10) separations during the life of the contract, the value of which shall be determined by the then existing average network price for separations. For purposes of this provision, a substitution of one separation for another at any given air stop shall not constitute an additional separation within the meaning of this provision.

**Out of Scope Work Changes**: EAGLE shall not perform out of scope work under the Contract without written authorization from the Contracting Officer or the USPS designated Contracting Officer's Technical Representative ("COTR") who shall specify either a fixed price for the services to be provided or a method by which to calculate the compensation to be paid. Out of scope work shall constitute any service not specified in the Statement of Work and the attachments thereto. USPS shall identify the designated COTR for each air stop who shall be authorized to bind the USPS with respect to emergency services to be provided for up to 72 hours.

**Ad hoc Services**: EAGLE agrees to extend its window of operations for each shift at each air stop up to one hour at commencement or completion of each day at no additional costs to USPS to perform ad hoc services necessary to perform the services set forth in the Contract.

**Services Provided During the Christmas Season**: The Christmas season shall be defined as the period beginning the day after Thanksgiving and concluding at midnight on December 24th. During the Christmas period, EAGLE shall not be compensated at a rate per pound in excess of that established for a density of 5.5 lbs/ft$^3$. In the event the actual density achieved exceeds 5.5 lbs/ft$^3$, the actual density shall be used to calculate the compensation due EAGLE.

**Labor Rates for Extra Services**: EAGLE shall provide USPS a loaded hourly labor rate and an overtime rate, by air stop, that is consistent with Department of Labor requirements for use in connection with out-of-scope services directed by the Contracting Officer or the designated COTR. The labor rates submitted by EAGLE shall be subject to audit and verification by USPS.

**Compensation for Services Provided After February 28, 2003**: EAGLE shall be compensated for out-of-scope services provided after February 28, 2003 and before the effective date of the Amended Statement of Work upon the same terms and conditions as set forth in the Amended Statement of Work.

**Confidentiality**: The parties agree to keep the terms and conditions of this Memorandum of Understanding confidential and shall not disclose the same unless required by law. Nothing in this Memorandum of Understanding shall preclude EAGLE from disclosing the terms and conditions set forth herein to its tax advisors, auditors or any financial institution with which it does business provided the third party is advised of this Confidentiality provision and agrees to adhere to it Nothing in this Memorandum of Understanding shall preclude USPS from disclosing the terms and conditions set forth herein to Congress and consultants to the Postal Service.

Seen and agreed this 11th day of April, 2003 in Washington, D.C.

Brian T. Bauer
President, EAGLE

J. Dwight Young
Manager,Transportion Portfolio

# SETTLEMENT AGREEMENT AND RELEASE

This Settlement and Release Agreement ("Settlement Agreement") is entered into as of April 18, 2003, by and between Evergreen Aviation Ground Logistics Enterprises, Inc. ("EAGLE") and the United States Postal Service (the "Postal Service"). EAGLE and the Postal Service collectively shall be referred to as the "Parties."

**WHEREAS**, effective August 27, 2001, the Parties entered into the Shared Network Agreement, Solicitation HQ-2001-12, (the "Shared Network Agreement" or the "Contract") pursuant to which EAGLE provides certain terminal handling services to the Postal Service;

**WHEREAS**, since the effective date of the Shared Network Agreement, EAGLE has performed certain additional terminal handling services and has expanded its operations and facilities in designated locations beyond that contemplated under the terms and conditions of the Contract (the "Additional Services");

**WHEREAS**, EAGLE has and is continuing to provide Additional Services and is entitled to an equitable adjustment in the compensation to be paid under the Shared Network Agreement;

**WHEREAS**, on February 20, 2003, EAGLE submitted a certified contract claim (the "Claim") in the amount of $32,593,685.79 for the compensation it believes is rightfully owed for the Additional Services provided up to and through January 31, 2003 (Exhibit 1) ;

**WHEREAS**, on April 7, 2003, EAGLE filed an amendment to the Claim (the "Amendment") in the amount of $2,113,653.09 for compensation it believes is rightfully owed for the Additional Services provided during February 2003 (Exhibit 2);

**WHEREAS**, the Postal Service has provided conditional payments in the amount of $13,586,614.60 as preliminary compensation to EAGLE for the Additional Services provided under the Shared Network Agreement;

**WHEREAS**, EAGLE has continued to perform the Additional Services through the date of this Settlement Agreement and will continue to do so unless directed otherwise by the Postal Service;

**WHEREAS**, the Parties wish to resolve the Claim, the Amendment, and enter into an agreement with respect to the compensation to be paid to EAGLE with respect to the Additional Services provided by EAGLE between March 1, 2003 and the effective date of an Amended Statement of Work for the Shared Network Agreement;

**NOW, THEREFORE**, for and in consideration of the covenants, conditions, promises and releases contained herein, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

**1.** **Amended Statement of Work**. The Parties shall execute the documentation necessary to amend the current Statement of Work for the Shared Network Agreement to incorporate the changes agreed upon and memorialized in the April 11, 2003 Memorandum of Understanding attached hereto as Exhibit 3.

**2.** **Settlement Payment**. EAGLE shall retain the $13,586,614.60 in conditional payments previously made by the Postal Service. The Postal Service agrees to pay EAGLE up to and not to exceed an additional Seventeen Million Six Hundred Thousand Dollars ($17,600,000) as follows: (i) subject to Claim Reconciliation as set forth in Sections 3 and 4 below, the Postal Service shall pay EAGLE an additional Eight

Million Eight Hundred Thousand Dollars ($8,800,000) no later than five (5) business days after execution of this Settlement Agreement; (ii) subject to Claim Reconciliation as set forth in Sections 3 and 4 below, the Postal Service shall make a final settlement payment to EAGLE in the amount of Eight Million Eight Hundred Thousand Dollars ($8,800,000) within twenty (20) business days after the Defense Contract Agency Audit ("DCAA") submits its report (the "DCAA Report") regarding the sufficiency of EAGLE's accounting system and the reasonableness, allowability and proper allocation of the costs identified in the Claim and Amendment (the "Final Payment"); (iii) in the event the DCAA Report is not completed by May 31, 2003, the Postal Service shall pay EAGLE on June 2, 2003, fifty percent (50%) of the Final Payment or Four Million Four Hundred Thousand Dollars ($4,400,000); and (iv) to the extent that the DCAA Report is received by the Postal Service prior to May 31, 2003, and confirms the reasonableness, allowability and proper allocation of a portion of EAGLE's claim in excess of the amounts already paid by the Postal Service to EAGLE, the Postal Serve shall pay that excess on within ten (10) days, with any remaining balance to be resolved through the Reconciliation Process. The Postal Service and EAGLE arrived at Seventeen Million Six Hundred Thousand Dollars ($17,600,000) as the maximum balance of the payment owed to EAGLE by adding the Claim amount ($32,593,685.79) and the Amendment amount ($2,113,653.09) and subtracting the conditional payment amount ($13,586,614.60) and EAGLE's compromise amount ($3,520,724.28, of which $1,483,945.38 is foregone interest on the Claim which was included in the original Claim amount).

| | |
|---|---|
| Total Claim Amount | $34,707,338.88 |
| Conditional Payments Received | $13,586,614.60 |
| Net Claim Amount | $21,120,724.28 |
| EAGLE Discount of Claim | $3,520,724.28 |
| Maximum Outstanding Balance | $17,600,000.00 |
| Amount Payable in Five Business Days | $8,800,000.00 |
| Final Payment Amount | $8,800,000.00 |

3. **<u>Amount Subject to Claim Reconciliation</u>**. The Parties acknowledge that the DCAA is in the process of auditing the Claim and Amendment to verify the reasonableness, allowability and allocability of the costs identified therein and assess the sufficiency of EAGLE's accounting system. In the event the DCAA concludes that the costs identified in the Claim and Amendment are reasonable, verifiable, allowable and properly allocated to the Shared Network Agreement, the Postal Service shall make the Final Payment as described in Section 2 above. The Postal Service maintains that the twenty-percent (20%) absorption factor is an element of allowability, and EAGLE maintains that it is not. The parties agree to resolve this issue, if necessary, through the Claim Reconciliation.

Any costs deemed by the DCAA to be unreasonable, not verifiable, not allowable and/or not properly allocated to the Shared Network Agreement shall be subject to recoupment or being withheld from the Final Payment (the "Dispute Amount"). It is the intent of the Parties that the only funds that may be withheld from the Final

Payment are those which constitute the Dispute Amount. Accordingly, in the event the Dispute Amount is less than the Final Payment or any portion thereof that has not been distributed, the Postal Service shall pay EAGLE the difference within ten (10) business days of providing notice of its intent to pursue Claim Reconciliation.

4. **Claim Reconciliation Process**. In the event the DCAA determines that an amount in the Claim or Amendment is unreasonable, not verifiable, not allowable and/or not properly allocated to the Shared Network Agreement, and the Postal Service agrees with the DCAA assessment, then the Postal Service shall provide notice to EAGLE that it intends to pursue Claim Reconciliation within twenty (20) business days of receipt of the DCAA Report. Such notice shall specify the Dispute Amount, consistent with Section 3 above, and set forth the specific reason(s) the Postal Service contends that the claimed amounts are unreasonable, not verifiable not allowable or not allocable. In this regard, the only issues that may serve as the basis for Claim Reconciliation are the reasonableness, allocability, allowability and verifiable nature of the costs presented in the Claim and Amendment. The Postal Service shall provide EAGLE with a copy of the DCAA Report at the time it issues notice of its intent to seek Claim Reconciliation. The Postal Service shall pursue any rights it may have under Claim Reconciliation within the period required pursuant to Claim Reconciliation.

Unless otherwise agreed by the Parties, they shall have thirty (30) calendar days from the date the Postal Service provides notice of its intent to pursue Claim Reconciliation to resolve between themselves any dispute regarding the magnitude of the Final Payment or any reimbursement to be made. In the event the Parties are unable to resolve the matter within the time allotted, the parties first shall attempt to agree upon an

alternative dispute resolution ("ADR") process for the Claim Reconciliation and shall resort to the process in the Contracts Dispute Act only if they were unable to agree on an ADR process.

5. **Release by EAGLE**. Except for the magnitude of the Final Payment, EAGLE, for itself and its predecessors, successors, assigns, parents, subsidiaries, affiliates, insurers, heirs, officers, directors, partners, employees, agents, and attorneys, hereby releases, remises and forever discharges the Postal Service, and all of its predecessors, successors, assigns, parents, subsidiaries, affiliates, insurers, heirs, officers, directors, partners, employees, agents, and attorneys from any and all claims, causes of action, damages, liabilities, demands, rights and losses of whatever nature, including but not limited to contract or tort, law or equity, whether known or unknown, asserted or unasserted, that EAGLE ever had, now have, or may have for acts, events or occurrences prior to and through February 28, 2003, relating in any way to the Shared Network Agreement, the Claim, or the Amendment that were or could have been asserted by EAGLE (the "Released EAGLE Claims").

6. **Release by the Postal Service**. Except for the magnitude of the Final Payment, the Postal Service, for itself and its predecessors, successors, assigns, parents, subsidiaries, affiliates, insurers, heirs, officers, directors, partners, employees, agents, and attorneys, hereby releases, remises and forever discharges EAGLE, and all of its predecessors, successors, assigns, parents, subsidiaries, affiliates, insurers, heirs, officers, directors, partners, employees, agents, and attorneys from any and all claims, causes of action, damages, liabilities, demands, rights and losses of whatever nature, including but not limited to contract or tort, law or equity, whether known or unknown, asserted or

unasserted, that the Postal Service ever had, now have, or may have for acts, events or occurrences prior to and through February 28, 2003, relating in any way to the Contract, the Claim, or the Amendment that were or could have been asserted by the Postal Service (the "Released Postal Service Claims" and, together with the Released EAGLE Claims, the "Released Claims").

7. **Ownership of Claims**. The Parties hereby represent and warrant that they have not in any way transferred by agreement, operation of law, or otherwise the Released Claims.

8. **Authority**. The Parties each warrant and represent that they have the legal right and authority to execute this Settlement Agreement and to bind themselves to every respective promise or covenant contained in this Settlement Agreement.

9. **Binding Upon Parties**. This Settlement Agreement will be binding upon and inure to the benefit of the Parties and the other persons and entities being released.

10. **Changes**. The Parties agree that this Settlement Agreement constitutes the entire agreement between the Parties and may not be altered, amended, modified or otherwise changed except by a writing duly executed by the Plaintiff and Defendants.

11. **Deemed Prepared By Both Parties**. This Settlement Agreement shall be construed as if the Parties jointly prepared it and any uncertainty or ambiguity shall not be interpreted against any one Party.

12. **No Additional Consents**. Each party represents and warrants that the consent of no other person or entity claiming through or under such warranting party is

required to settle and consent to dismissal of the Complaint and to effectuate the terms of this Settlement Agreement.

13. Notice. Any notice required or permitted to be given under this Settlement Agreement shall be in English and shall be in writing. A notice may be: (a) delivered personally; (b) sent by registered or certified U.S. Mail with return receipt requested; or (c) sent by telecopy (with confirmation of such notice) to the intended recipient thereof and then by U.S. mail. Such notices shall be deemed to be duly given and received (i) on the third business day after posting if mailed as provided; (ii) when delivered personally (including delivery by private courier service) unless such day is not a business day; or (iii) in the case of telecopy (with confirmation of such notice), when sent, so long as it was received during working hours (8:00 a.m. to 5:00 p.m.) for the intended recipient on a business day and otherwise such delivery shall be deemed to be made on the next succeeding business day. The initial addresses for notices shall be:

a. If to EAGLE, to:

Brian T. Bauer
President, EAGLE
3850 Three Mile Lane
McMinnville, Oregon 97128-9496
Fax: (503) 472-9150;

With a copy to:

Mitchell S. Ettinger, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Washington, D.C. 20005
Fax: (202) 393-5760; and

b. If to the Postal Service, to:

J. Dwight Young
Manager, Transportation Portfolio

United States Postal Service
475 L'Enfant Plaza S.W.
Room 4900
Washington, D.C. 20009
Fax: (202) *[To Come].*

Each Party may change or update its addresses upon written notice.

**14. Counterparts**. This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument and may be delivered via electronic transmission with the same force and effect as if it was executed and delivered by the parties simultaneously in the presence of one another.

**15. Confidentiality**. The Parties agree hereafter to maintain the confidentiality of any information provided by either party during the settlement of this matter, and will further maintain the confidentiality of statements made and acts taken during the negotiation of this Settlement Agreement. In addition, the Parties further agree that, unless required by law, requested by a member of Congress or consented to in advance by the other party, they will not disclose or publicize the terms and conditions of this Settlement Agreement to anyone not a party to the Settlement Agreement. Nothing in this provision (i) shall impede EAGLE's or the Postal Service's ability to comply with any federal or state disclosure requirements; or (ii) shall limit in any way EAGLE's right to disclose the terms, amount, and the fact of this Settlement Agreement to its parent company, its officers and directors, financial and tax advisors, financial institutions with which it is doing business or potential investors.

**IN WITNESS WHEREOF**, this Settlement Agreement has been executed as of the 18th day of April, 2003.

Evergreen Aviation Ground Logistics Enterprises, Inc.

By:________________________
Brian Bauer, President

Date:________________________

United States Postal Service

By: [signature]
J. Dwight Young, Manager, Transportation Portfolio

Date: 4/18/2003 - 19:55 EST

---

**From:** Brian Bauer [mailto:bbauer@evergreen-eagle.com]
**Sent:** Tuesday, April 08, 2003 3:17 PM
**To:** Daniel Bonham
**Subject:** FW: Going-Forward SOW

-----Original Message-----
**From:** Sykes, Russell A - Washington, DC [mailto:russell.a.sykes@usps.gov]
**Sent:** Tuesday, April 08, 2003 2:11 PM
**To:** bbauer@evergreen-eagle.com
**Cc:** Campbell, William A - Washington, DC; Young, Dwight - Washington, DC; Strange, Keith - Washington, DC; Vogel, Paul E - Washington, DC; O'Reilly, Tim - Washington, DC; Brazil, Cheryl R - Washington, DC
**Subject:** Going-Forward SOW

Brian:

Attached you will find the SOW terms and conditions for a "going-forward" contract. We welcome your review.

Thanks

# United States Postal Service

## Solicitation HQ-2001-12

## Shared Network - SNET

## Solicitation for
## Air Terminal Handling
## Request for Proposal

**Contract Term**

**August 27, 2001 – August 27, 2006**

***Section A. Items and Prices***

**A.1 Items and Pricing**

The purpose of this performance based service contract is for the Postal Service to purchase and the Terminal HS to provide integrated material handling services in support of the United States Postal Service's air and ground networks.

The method to be used in evaluating proposals is stated in Section M, Evaluation and Award Factors.

The contract awarded under this solicitation will be priced as follows:

a. A firm fixed price that represents the annual price for meeting all contract requirements on the average daily baseline weight for each site, set forth in Attachment A (Cities Served & Average Daily Baseline Weights for Daytime Network), which in the aggregate is 3,570,189 pounds of mail per day.

b. Fluctuations in the daily weight of mail handled at each site are anticipated and the annual contract price includes and accounts for such fluctuations within a specified range of variance between the average daily baseline weights set forth in Attachment A (Cities Serves & Baseline Average Daily Volume for Daytime Network) and the average daily weight of handled during a given schedule period. The Schedule Period is approximately a four-week period of time. The average daily weights of mail handled at each site will be the weights provided in the Aviation Supplier's invoices to the Postal Service, as verified by postal assignment data and THS scan data; however, in the event that weight differences between the Aviation Supplier's invoices and the postal assignment data or THS scan data cannot be reconciled, the Aviation Supplier's invoices will control. Specifically, if the average daily weight of mail actually handled at a given site during a given schedule period is from 20 percent below to 20 percent above the average daily baseline weight for the site, no pricing adjustment will be made. If the average daily weight of mail actually handled at a given site during a given schedule period exceeds the average daily baseline weight for the site by 20 percent or less, the THS shall perform the additional workload at no additional cost to the Postal Service and

shall not be entitled to any additional compensation. If the average weight of mail actually handled at a given site over a given schedule period fluctuates downward by 20 percent or less of the average daily baseline weight for the site, the Postal Service shall not be entitled to a price reduction.

c. If the average daily weight of mail actually handled at a given site during a given schedule period exceeds the average daily baseline weight for the site by more than 20 percent, the THS shall be entitled to additional compensation only for the average daily pounds in excess of 120 percent of the average baseline weight, calculated as follows: the variable cost per pound rate set forth in [Supply Management provide] of the contract multiplied by the difference between the average daily weight of mail for the handled for the schedule period and the average daily baseline weight for the site, multiplied by the number of operating days in the schedule period.

If the average daily weight of mail actually handled at a given site over a given schedule period fluctuates downward by more than 20 percent of the average daily baseline weight for the site, then the Postal Service shall be entitled to a discounted price. This discounted price will be calculated by the variable cost per pound rate set forth in [Supply Management provide] of the contract multiplied by the difference between the average daily weight of mail handled for the schedule period and the average daily baseline weight for the site, multiplied by the number of operating days in the schedule period. The daily weights of mail handled at each site will be weights provided in the Aviation Supplier's invoices to the Postal Service, as verified by postal assignment data and THS scan data; however, in the event that weight differences between the Aviation Supplier's invoices and the postal assignment data or THS scan data cannot be reconciled, the Aviation Supplier's invoices will control.

***Section B Statement of Work***

**B.1 Overview**

The purpose of this performance based service contract is to provide integrated material handling services in support of the U. S. Postal Service's air and ground networks. The main components of the integrated material handling services are facilities, scanning services, container preparation, surface (roller-bed and /or dolly) transportation, limited simple distribution, record keeping and electronic data submissions at the locations listed in Attachment A, (Cities Served & Baseline Volume for the Daytime Network). The components of this integrated material handling system must meet on time service performance (origin and destination tender times) a minimum of 98% of the time on a by site-by-site basis during each schedule period. The daily baseline weight for each site, as set forth in Attachment A (Cities Serves & Baseline Average Daily Volume for Daytime Network) totals, in the aggregate, approximately 21 million pounds per week.

**B.2 Background**

a. The Postal Service has entered into a contract with an aviation supplier for transportation service of U.S. Mail. The contract for transportation service requires the Postal Service to engage in expanded material handling operations, namely the scanning and loading and scanning and unloading of the above listed products into and out of air containers. The Postal Service determined that it would acquire the additional integrated material handling capabilities through a competitive outsourcing to qualified suppliers under Solicitation HQ-2001 -12, which resulted in a contract between the Postal Service and the terminal handling supplier (referred to throughout the contract documents as "the supplier" or "the THS").

b. This contract does not specify the processes that the THS must employ to achieve the services required by this contract. The Postal Service will provide the hours of operation, locations of operation, estimate of the mail that the THS should expect to process at each site, distribution requirements, the aviation supplier's ramp locations (for

air container drayage planning) and information recording and Electronic Data Interchange (EDI) requirements.

c. During the term of the contract, the Postal Service will periodically provide the THS updated matrices estimating the mail that the THS should expect to process at each site. The Postal Service will provide such updated matrices from six (6) times per year up to fifteen (15) times per year, without modifying the pricing or other terms of the contract.

d. Distribution requirements at origin are to scan and trans-load mail, from Postal Service supplied mail transport equipment to air carrier supplied air containers, into either bypass (direct) or mixed air containers.

e. Distribution requirements at destination are to unload the mail from air containers, scan and separate mail into either shape based and/or zip code range as listed in Attachment C. (THS Separations). The Postal Service may make unlimited changes to the specific destinating separations listed in Attachment C (Separations) at no additional cost to the Postal Service as long as the absolute total number of separations for a given site does not increase. An increase in the number of destinating separations will be limited to two (2) per site per year of contract operations within the original pricing. An increase in the absolute total number of separations for a given site must be approved in writing by the contracting officer prior to implementation and for each additional separation over and above the two (2) per year; USPS will pay a maximum of $100.00 per operating day per additional separation.

**B.3 Supplier Qualifications**

The THS shall maintain its ability to meet the service requirements specified in this contract.

**B.4 Scope**

The sites covered by this contract are listed in Attachment A (Cities Served & Baseline Volume for Daytime Network). Additional sites may be added to the Network during the contract period. All fixed costs and variable costs for any new site will be approved by the Contracting Officer prior to start up of the new site.

**B.5 Term and Frequency of Contract**

a. Term

The term of the contract shall be from **April 3, 2003** through and including August 26, 2006. This contract contains three (3), one (1) year options exercisable by the Postal Service in its sole discretion upon delivery of written notice to the THS at least 60 days prior to the expiration of the contract.

b. Frequency

1) The integrated material handling services to be purchased are primarily intended to support Express, Priority and First Class Mail. Service will be daily except Mondays and the following widely observed holidays, New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving, and Christmas Day. If required to work on any of the above days, the THS will be compensated for variable costs only.

2) Annual operation will total approximately 307 days per year.

**B.6 Subcontracting**

a. The THS shall not, without the prior written approval of the contracting officer, subcontract any portion of the work that is a core function defined as follows: core functions are defined as a an integral component of the integrated material handling process described under section B.7. b. Non-core support functions, i.e., functions that are not directly related to the acceptance, packaging, or movement of mail, such as the fueling of ground equipment; do not require prior approval from the contracting officer.

**B.7 Operational Requirements**

a. The THS shall design and implement an integrated material handling system that provides the following services to outbound mail:

1) Off load multiple trucks or dollies of mail that arrive in either rolling mail transport equipment, deck loaded, or in baggage carts. At pure trucking locations deck loaded trucking can be up to 100% of transportation.

***Section G. Special Clauses***

**G.1 Definitions (Clause B-1) (January 1997) (Tailored)**

As used in this contract, the following terms have the following meanings:

***"AAY or AAY Container"*** also called a "DEMI" can is an air cargo container with a footprint of 62 by 88 inches, an interior cubic capacity of 201.5 feet.

***"Area Distribution Center" (ADC)*** means any USPS or third Party location that receives packages inbound to a market from the aviation supplier or acts as a destination that receives mail.

***"Air Stop"*** means a city, site or location where mail is dispatched or received, usually identified by a three-digit alpha code designation for the corresponding airport.

***"Air Mail Center" (AMC)*** means any USPS or third Party location that acts as an origin or destination location for tendering mail to or from the aviation supplier outbound or inbound from a market or acts as an origin or destination location for tendering.

***"Airworthy"*** means the conformity of an ULD with the conditions set forth in Attachment III to the Operation Specifications

***"All Purpose Container" (APC)*** is a type of USPS mail transport equipment into which mail is sorted.

***"AMJ or M-1"*** an air cargo container with a footprint of 96 by 125 inches, an interior cubic capacity of 586 feet and maximum gross weight of 15,000 pounds

***"Aviation Supplier"*** under this agreement is a supplier of air transportation and terminal handler at hub transfer point.

**From:** Brian Bauer [mailto:bbauer@evergreen-eagle.com]
**Sent:** Monday, May 12, 2003 10:22 AM
**To:** Daniel Bonham
**Subject:** FW: Latest SOW

-----Original Message-----
**From:** Brazil, Cheryl R - Washington, DC [mailto:cheryl.r.brazil@usps.gov]
**Sent:** Monday, May 12, 2003 9:51 AM
**To:** Brian Bauer
**Subject:** FW: Latest SOW

Brian,

This is the latest version of the SOW.

Cheryl Brazil

-----Original Message-----
**From:** Rosen, Aimee J - Washington, DC - Contractor
**Sent:** Wednesday, May 07, 2003 11:02 AM
**To:** Brazil, Cheryl R - Washington, DC
**Subject:** Latest SOW

***Aimee J. Rosen***

***Transportation Portfolio/Dwight Young***

***Supply Management, U.S. Postal Service***

***475 L'Enfant Plaza, SW, Room 4900***

***Washington, DC 20260-6210***

***202-268-8244***

***arosen@email.usps.gov***

Deleted: ¶
¶
¶
¶
¶
United States Postal Service¶
¶
¶
¶
Solicitation HQ-2001-12¶
¶
¶
Shared Network - SNET¶
¶
¶
¶
¶
Solicitation for ¶
Air Terminal Handling ¶
Request for Proposal¶
¶
¶
¶
¶
¶
¶
¶
¶
¶
Contract Term¶
¶
¶
¶
August 27, 2001 -- August 27, 2006¶
¶
----------Page Break----------
United States Postal Service
Solicitation
for Air Terminal Handling Services ¶
¶ ... [1]

Deleted: Marilyn R. Davis

Deleted: Manager, Shared Networks Implementation ¶
National Mail Transportation Purchasing US Postal Service¶
475 L'Enfant Plaza SW, Room 4900 475 L'Enfant Plaza SW, Room 1P635¶
Washington, DC 20260-6210
Washington, DC 20260-7132¶
¶
¶
The United States Postal Service hereby solicits proposals for air terminal handling services at various air stops across the United States. The terminal handling supplier must provide primarily build and break services. Arrival, departure, tender, and delivery schedules for each air stop are defined in the Attachments. ¶ ... [2]

Formatted: Numbering: Continuous

## *Section A. Items and Prices*

### A.1 Items and Pricing

The purpose of this performance based service contract is for the Postal Service to purchase and the Terminal HS to provide integrated material handling services in support of the United States Postal Service's air and ground networks.

The method to be used in evaluating proposals is stated in Section M, Evaluation and Award Factors.

The contract awarded under this solicitation will be priced as follows:

a. A firm fixed price that represents the annual price for meeting all contract requirements on the daily baseline weight for each site, set forth in Attachment A (Cities Served & Daily Baseline Pounds for Daytime Network), which in the aggregate is 3,570,189 pounds of mail per day.

**Deleted:** average daily
**Deleted:** average
**Deleted:** Average
**Deleted:** Baseline Weights
**Deleted:** Weights for Daytime Network

b. Fluctuations in the daily weight of mail handled at each site are anticipated and the annual contract price includes and accounts for such fluctuations within a specified range of variance between the average daily baseline weights set forth in Attachment A (Cities Served & Daily Baseline Pounds for Daytime Network) and the average daily weight of mail handled during a given schedule period. The Schedule Period is approximately a four-week period of time. The average daily weights of mail handled at each site will be the weights provided in the Aviation Supplier's invoices to the Postal Service, as verified by postal assignment data and THS scan data; however, in the event that weight differences between the Aviation Supplier's invoices and the postal assignment data or THS scan data cannot be reconciled, the Aviation Supplier's invoices will control. Specifically, if the average daily weight of mail actually handled at a given site during a given schedule period is from 20 percent below to 20 percent above the average daily baseline weight for the site, no pricing adjustment will be made. If the average daily weight of mail actually handled at a given site during a given schedule period exceeds the average daily baseline weight for the site by 20 percent or less, the THS shall perform the additional workload at no additional cost to the Postal Service and shall not be entitled to any additional compensation. If the average weight of mail

**Deleted:** Attachment A (Cities
**Deleted:** Serves
**Deleted:** Served & Baseline Average Daily Volume for Daytime Network)

***Section B Statement of Work***

## B.1 Overview

The purpose of this performance based service contract is to provide integrated material handling services in support of the U. S. Postal Service's air and ground networks. The main components of the integrated material handling services are facilities, scanning services, container preparation, surface (roller-bed and /or dolly) transportation, limited simple distribution, record keeping and electronic data submissions at the locations listed in Attachment A (Cities Served & Daily Baseline Pounds for Daytime Network)The components of this integrated material handling system must meet on time service performance (origin and destination tender times) a minimum of 98% of the time on a by site-by-site basis during each schedule period. The daily baseline weight for each site, as set forth in Attachment A (Cities Served & Daily Baseline Pounds for Daytime Network) totals, in the aggregate, approximately 21 million pounds per week.

**Deleted:** Attachment A, (Cities Served & Baseline Volume for the Daytime Network).

**Deleted:** Attachment A (Cities Serves & Baseline Average Daily Volume for Daytime Network)

**Deleted:** . *(What is the composite of the total of 21mm pounds? The previous document referenced 17mm. Is 21mm with flex, etc.)*

## B.2 Background

a. The Postal Service has entered into a contract with an aviation supplier for transportation service of U.S. Mail. The contract for transportation service requires the Postal Service to engage in expanded material handling operations, namely the scanning and loading and scanning and unloading of the above listed products into and out of air containers. The Postal Service determined that it would acquire the additional integrated material handling capabilities through a competitive outsourcing to qualified suppliers under Solicitation HQ-2001 -12, which resulted in a contract between the Postal Service and the terminal handling supplier (referred to throughout the contract documents as "the supplier" or "the THS").

b. This contract does not specify the processes that the THS must employ to achieve the services required by this contract. The Postal Service will provide the hours of operation, locations of operation, estimate of the mail that the THS should expect to process at each site, distribution requirements, the aviation supplier's ramp locations (for

**B.5 Term and Frequency of Contract**

a. Term

The term of the contract shall be from March 1, 2003 through and including August 26, 2006. This contract contains three (3), one (1) year options exercisable by the Postal Service in its sole discretion upon delivery of written notice to the THS at least 60 days prior to the expiration of the contract.

Deleted: April 3, 2003

b. Frequency

1) The integrated material handling services to be purchased are primarily intended to support Express, Priority and First Class Mail. Service will be daily except Mondays and the following widely observed holidays, New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving, and Christmas Day. If required to work on any of the above days, the THS will be compensated for variable costs only.

2) Annual operation will total approximately 307 days per year.

**B.6 Subcontracting**

a. The THS shall not, without the prior written approval of the contracting officer, subcontract any portion of the work that is a core function defined as follows: core functions are defined as a an integral component of the integrated material handling process described under section B.7. b. Non-core support functions, i.e., functions that are not directly related to the acceptance, packaging, or movement of mail, such as the fueling of ground equipment; do not require prior approval from the contracting officer.

**B.7 Operational Requirements**

a. The THS shall design and implement an integrated material handling system that provides the following services to outbound mail:

## *Section G. Special Clauses*

### G.1 Definitions (Clause B-1) (January 1997) (Tailored)

As used in this contract, the following terms have the following meanings:

***"AYY or AYY Container"*** also called a "DEMI" can is an air cargo container with a footprint of 62 by 88 inches, an interior cubic capacity of 201.5 feet.

Deleted: *AAY*

Deleted: *AAY*

***"Area Distribution Center" (ADC)*** means any USPS or third Party location that receives packages inbound to a market from the aviation supplier or acts as a destination that receives mail.

***"Air Stop"*** means a city, site or location where mail is dispatched or received, usually identified by a three-digit alpha code designation for the corresponding airport.

***"Air Mail Center" (AMC)*** means any USPS or third Party location that acts as an origin or destination location for tendering mail to or from the aviation supplier outbound or inbound from a market or acts as an origin or destination location for tendering.

***"Airworthy"*** means the conformity of an ULD with the conditions set forth in Attachment III to the Operation Specifications

***"All Purpose Container" (APC)*** is a type of USPS mail transport equipment into which mail is sorted.

***"AMJ or M-1"*** an air cargo container with a footprint of 96 by 125 inches, an interior cubic capacity of 586 feet and maximum gross weight of 15,000 pounds

***"Aviation Supplier"*** under this agreement is a supplier of air transportation and terminal handler at hub transfer point.

## Section A. Items and Prices

### A.1 Pricing

The purpose of this performance based service contract is for the Postal Service to purchase and the Terminal HS to provide integrated material handling services in support of the United States Postal Service's air and ground networks.

The contract awarded under this solicitation shall be priced as follows:

a. This Contract, including prices for the suppliers' fixed and variable costs, is valued at approximately $46,800,000 annually. Actual paid compensation may vary from this amount depending upon the weight and density of the mail handled by the Supplier. The anticipated weight of the mail per annum is 1.25 billion pounds, including the 20% absorption factor discussed below.

b. Fixed Costs: The Postal Service shall pay the Supplier one fifty-second (1/52) of the agreed upon annual price as defined in schedule A.2.a to compensate the supplier for its fixed costs. This annual price may not be altered without written authorization of the Contracting Officer.

c. Variable Costs: The Supplier shall be compensated for its mail handling service pursuant to the density-based adjusting scale (the sliding scale). The per pound price by air stop is shown on schedule A.2.b. At each stop, as density varies from 6.5 pounds per cubic foot, variable price will vary in a direct inverse relationship. As pounds per cubic foot rises, variable price per cubic foot will fall by the same ratio, and as pounds per cubic foot falls, variable price per cubic foot will rise by the same ratio. The USPS

reserves the right to adjust the density factor once a year based upon USPS historical operating data. Attachment A to the Statement of Work sets forth the baseline weight of the mail for each air stop. Variable cost compensation for a schedule period by air stop will be based upon the baseline weight per schedule period multiplied by the sliding scale price per pound using actual air stop density. The density of the mail during Christmas Season shall not be considered for purposes of calculating the average actual density achieved. For purposes of establishing the compensation owed to the Supplier, a density factor of 6.5 $lbs./ft^3$ will be employed. No later than 21 days after the end of each schedule period, the Postal Service and the Supplier shall reconcile actual weights and density to determine whether a compensation adjustment is necessary. The actual density of the mail shall be determined from the scanned data submitted by the Supplier, pursuant to the methodology described within Attachment N - Business Rules. The Supplier shall achieve the highest density reasonably practicable. The Postal Service reserves the right to review and evaluate the processes and procedures used by the Supplier to maximize the density of the mail. If the Postal Service identifies means or methodologies to enhance the ability of the Supplier to achieve higher densities, it will provide that information as it is developed. In any event, the Postal Service will conduct an initial study of the Supplier's mail handling procedures and techniques after the effective date of this

Statement of Work and advise the Supplier of its finding no later than October 1, 2003.

d. Absorption: In the event that the average actual daily weight at any given air stop exceeds the designated baseline weight by twenty percent (20%) or less during each schedule period of the contract the Supplier shall not be entitled to any additional compensation. In the event the average daily actual weight exceeds the designated baseline weight by more than twenty percent (20%) during any scheduled period, the Supplier shall be entitled to additional compensation only for the weight of the mail in excess of the twenty-percent (20%) increase. At the Oakland and San Francisco ramps only, in the event that the average daily actual weight is below the average daily designated weight during any scheduled period, the Postal Service shall be entitled to a reduction for each pound less than the average daily designated weight. At all other sites if the average daily actual weight is more than 20% below the average daily designated weight during any scheduled period, the Postal Service will be entitled to a reduction for each pound less than eighty percent (80%) of the average daily designated weight. Pricing outside of the absorption ranges will be in accordance with schedule A.2.b and in accordance with the sliding scale.

e. Compensation for Services Provided During the Christmas Season: The Christmas Season shall be defined as the period beginning the day after Thanksgiving and concluding at midnight on December 24th. During the

## A.2 Items and Prices

| | Annual Periods | Periodic Payment | Total Annual Payment |
|---|---|---|---|
| a. Fixed Costs | 52 Weeks | $122,384.45 | $6,363,991.40 |

b. Variable Cost @ 6.5 lb/cuft density

| Air Stop | Variable Price Per Pound |
|---|---|
| Des Moines - DSM | $0.0255 |
| Detroit - DTW | $0.0441 |
| Sioux Falls- FSD | $0.0439 |
| Grand Forks - GFK | $0.0329 |
| Grand Rapids - GRR | $0.0401 |
| Wichita - ICT | $0.0315 |
| Indianapolis - IND | $0.0402 |
| Kansas City - MCI | $0.0235 |
| Milwaukee - MKE | $0.0226 |
| Minneapolis - MSP | $0.0289 |
| Omaha - OMA | $0.0257 |
| Chicago - ORD | $0.0186 |
| Atlanta - ATL | $0.0274 |
| Orlando - MCO | $0.0258 |
| Miami - MIA | $0.0363 |
| Knoxville - TYS | $0.0298 |
| Honolulu HNL | $0.0441 |
| Los Angeles - LAX | $0.0410 |
| Oakland - OAK | $0.0529 |
| San Francisco - SFO | $0.0455 |
| Ontario - ONT | $0.0580 |
| San Diego - SAN | $0.0391 |
| Sacramento - SMF | $0.0253 |
| Total | $0.0366 |

C. Separation Pricing

| Air Stop | Cost/Credit Per Separation |
|---|---|
| LAX | $123.19 |
| ONT | $71.80 |
| SAN | $35.86 |
| OAK | $82.04 |
| SFO | $104.84 |

Bonham Ex. 12

**From:** Brian Bauer [mailto:bbauer@evergreen-eagle.com]
**Sent:** Saturday, May 31, 2003 8:37 AM
**To:** Mark Walton (E-mail); Bob Miller (E-mail); Liane Kelly (E-mail); Daniel Bonham (E-mail)
**Cc:** Bob Lane (E-mail)
**Subject:** FW: Zip Files with EAGLE THS Contract Revisions

4th quarter

Please review ASAP – Mark & Bob please review carefully the attachments and insure they are correct.

SOW comments only on major issues.

Thanks

BB

-----Original Message-----
**From:** Griffith, Leslie A - Washington, DC [mailto:leslie.a.griffith@usps.gov]
**Sent:** Saturday, May 31, 2003 5:28 AM
**To:** bbauer@evergreen-eagle.com
**Cc:** Young, Dwight - Washington, DC; Brazil, Cheryl R - Washington, DC; Gillespie, Donna S - Washington, DC; Black, Thomas G - Washington, DC; Rosen, Aimee J - Washington, DC - Contractor
**Subject:** Zip Files with EAGLE THS Contract Revisions

Brian,

I'm trying to facilitate wrapping up the reformation of your THS contracts. As you may or may not know, Dwight has been out of the office due to illness.

Attached is a zip file that contains a letter responsing to your recommendations, and revised DRAFT SOW and attachments. Please review these. We realize that some corrections will have to be made; however, we'd like to reiterate that we are well on the way to completion.

Les Griffith
Manager, Air Transportation CMC

# Section A. Items and Prices

**SEE SEPARATE DOCUMENT DATED AS "DRAFT 5-30-03".**

## *Section B Statement of Work*

### B.1 Overview

The purpose of this performance based service contract is to provide integrated material handling services in support of the U. S. Postal Service's air and ground networks. The main components of the integrated material handling services are facilities, scanning services, container preparation, surface (roller-bed and /or dolly) transportation, limited simple distribution, record keeping and electronic data submissions at the locations listed in **Attachment A (Cities Served & Daily Baseline Pounds for Daytime Network)**The components of this integrated material handling system must meet on time service performance (origin and destination tender times) a minimum of 98% of the time on a by site-by-site basis during each schedule period. The daily baseline weight for each site, as set forth in Attachment A (Cities Served & Daily Baseline Pounds for Daytime Network) totals, in the aggregate, approximately 21 million pounds per week.

### B.2 Background

a. The Postal Service has entered into a contract with an aviation supplier for transportation service of U.S. Mail. The contract for transportation service requires the Postal Service to engage in expanded material handling operations, namely the scanning and loading and scanning and unloading of the above listed products into and out of air containers. The Postal Service determined that it would acquire the additional integrated material handling capabilities through a competitive outsourcing to qualified suppliers under Solicitation HQ-2001 -12, which resulted in a contract between the Postal Service and the terminal handling supplier (referred to throughout the contract documents as "the supplier" or "the THS").

b. This contract does not specify the processes that the THS must employ to achieve the services required by this contract. The Postal Service will provide the hours of operation, locations of operation, estimate of the mail that the THS should expect to

during the contract period. All fixed costs and variable costs for any new site will be approved by the Contracting Officer prior to start up of the new site.

**B.5 Term and Frequency of Contract**

a. Term

The term of the contract shall be from **March 1, 2003** through and including August 26, 2006. This contract contains three (3), one (1) year options exercisable by the Postal Service in its sole discretion upon delivery of written notice to the THS at least 60 days prior to the expiration of the contract.

b. Frequency

1) The integrated material handling services to be purchased are primarily intended to support Express, Priority and First Class Mail. Service will be daily except Mondays and the following widely observed holidays, New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving, and Christmas Day. If required to work on any of the above days, the THS will be compensated for variable costs only.

2) Annual operation will total approximately 307 days per year.

**B.6 Subcontracting**

a. The THS shall not, without the prior written approval of the contracting officer, subcontract any portion of the work that is a core function defined as follows: core functions are defined as a an integral component of the integrated material handling process described under section B.7. b. Non-core support functions, i.e., functions that are not directly related to the acceptance, packaging, or movement of mail, such as the fueling of ground equipment; do not require prior approval from the contracting officer.

**B.7 Operational Requirements**

***Section G. Special Clauses***

**G.1 Definitions (Clause B-1) (January 1997) (Tailored)**

As used in this contract, the following terms have the following meanings:

***"AYY or AYY Container"*** also called a "DEMI" can is an air cargo container with a footprint of 62 by 88 inches, an interior cubic capacity of 201.5 feet.

***"Area Distribution Center" (ADC)*** means any USPS or third Party location that receives packages inbound to a market from the aviation supplier or acts as a destination that receives mail.

***"Air Stop"*** means a city, site or location where mail is dispatched or received, usually identified by a three-digit alpha code designation for the corresponding airport.

***"Air Mail Center" (AMC)*** means any USPS or third Party location that acts as an origin or destination location for tendering mail to or from the aviation supplier outbound or inbound from a market or acts as an origin or destination location for tendering.

***"Airworthy"*** means the conformity of an ULD with the conditions set forth in Attachment III to the Operation Specifications

***"All Purpose Container" (APC)*** is a type of USPS mail transport equipment into which mail is sorted.

***"AMJ or M-1"*** an air cargo container with a footprint of 96 by 125 inches, an interior cubic capacity of 586 feet and maximum gross weight of 15,000 pounds

***"Aviation Supplier"*** under this agreement is a supplier of air transportation and terminal handler at hub transfer point.

Deleted: 5-31-03 ¶
¶

***Section B Statement of Work***

## B.1 Overview

The purpose of this performance based service contract is to provide integrated material handling services in support of the U. S. Postal Service's air and ground networks. The main components of the integrated material handling services are facilities, scanning services, container preparation, surface (roller-bed and /or dolly) transportation, limited simple distribution, record keeping and electronic data submissions at the locations listed in **Attachment A (Cities Served & Daily Baseline Pounds for Daytime Network).** The components of this integrated material handling system must meet on time service performance (origin and destination tender times) a minimum of 98% of the time on a by site-by-site basis during each schedule period. The daily baseline weight for each site, as set forth in Attachment A (Cities Served & Daily Baseline Pounds for Daytime Network) totals, in the aggregate, approximately 21 million pounds per week.

## B.2 Background

a. The Postal Service has entered into a contract with an aviation supplier for transportation service of U.S. Mail. The contract for transportation service requires the Postal Service to engage in expanded material handling operations, namely the scanning and loading and scanning and unloading of the above listed products into and out of air containers. The Postal Service determined that it would acquire the additional integrated material handling capabilities through a competitive outsourcing to qualified suppliers under Solicitation HQ-2001 -12, which resulted in a contract between the Postal Service and the terminal handling supplier (referred to throughout the contract documents as "the supplier" or "the THS").

b. This contract does not specify the processes that the THS must employ to achieve the services required by this contract. The Postal Service will provide the hours of operation, locations of operation, estimate of the mail that the THS should expect to process at each site, distribution requirements, the aviation supplier's ramp locations (for

Deleted: 5-31-03 ¶
¶

**B.5 Term and Frequency of Contract**

a. Term

The term of the contract shall be from **March 1, 2003** through and including August 26, 2006. This contract contains three (3), one (1) year options exercisable by the Postal Service in its sole discretion upon delivery of written notice to the THS at least 60 days prior to the expiration of the contract.

b. Frequency

1) The integrated material handling services to be purchased are primarily intended to support Express, Priority and First Class Mail. Service will be daily except Mondays and the following widely observed holidays, New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving, and Christmas Day. If required to work on any of the above days, the THS will be compensated for variable costs only.

2) Annual operation will total approximately 307 days per year.

**B.6 Subcontracting**

a. The THS shall not, without the prior written approval of the contracting officer, subcontract any portion of the work that is a core function defined as follows: core functions are defined as a an integral component of the integrated material handling process described under section B.7. b. Non-core support functions, i.e., functions that are not directly related to the acceptance, packaging, or movement of mail, such as the fueling of ground equipment; do not require prior approval from the contracting officer.

**B.7 Operational Requirements**

a. The THS shall design and implement an integrated material handling system that provides the following services to outbound mail:

***Section G. Special Clauses***

**G.1 Definitions (Clause B-1) (January 1997) (Tailored)**

As used in this contract, the following terms have the following meanings:

***"AYY or AYY Container"*** also called a "DEMI" can is an air cargo container with a footprint of 62 by 88 inches, an interior cubic capacity of 201.5 feet.

***"Area Distribution Center" (ADC)*** means any USPS or third Party location that receives packages inbound to a market from the aviation supplier or acts as a destination that receives mail.

***"Air Stop"*** means a city, site or location where mail is dispatched or received, usually identified by a three-digit alpha code designation for the corresponding airport.

***"Air Mail Center" (AMC)*** means any USPS or third Party location that acts as an origin or destination location for tendering mail to or from the aviation supplier outbound or inbound from a market or acts as an origin or destination location for tendering.

***"Airworthy"*** means the conformity of an ULD with the conditions set forth in Attachment III to the Operation Specifications

***"All Purpose Container" (APC)*** is a type of USPS mail transport equipment into which mail is sorted.

***"AMJ or M-1"*** an air cargo container with a footprint of 96 by 125 inches, an interior cubic capacity of 586 feet and maximum gross weight of 15,000 pounds

***"Aviation Supplier"*** under this agreement is a supplier of air transportation.

***"Break and Build"*** means the effort of loading and unloading both air and surface containers for the purpose of transporting mail.