Deleted: ¶
DRAFT 5-31-03

Deleted: 6-10-03

Deleted: *Section B Statement of Work*¶
¶

## B.1 Overview

The purpose of this performance based service contract is to provide integrated material handling services in support of the U. S. Postal Service's air and ground networks. The main components of the integrated material handling services are facilities, scanning services, container preparation, surface (roller-bed and /or dolly) transportation, limited simple distribution, record keeping and electronic data submissions at the locations listed in **Attachment A (Cities Served & Daily Baseline Pounds for Daytime Network).** The components of this integrated material handling system must meet on time service performance (origin and destination tender times) a minimum of 98% of the time on a by site-by-site basis during each schedule period.

Deleted: The daily baseline weight for each site, as set forth in Attachment A (Cities Served & Daily Baseline Pounds for Daytime Network) totals, in the aggregate, approximately 21 million pounds per week.

## B.2 Background

a. The Postal Service has entered into a contract with an aviation supplier for transportation service of U.S. Mail. The contract for transportation service requires the Postal Service to engage in expanded material handling operations, namely the scanning and loading and scanning and unloading of the above listed products into and out of air containers. The Postal Service determined that it would acquire the additional integrated material handling capabilities through a competitive outsourcing to qualified suppliers under Solicitation HQ-2001 -12, which resulted in a contract between the Postal Service and the terminal handling supplier (referred to throughout the contract documents as "the supplier" or "the THS").

b. This contract does not specify the processes that the THS must employ to achieve the services required by this contract. The Postal Service will provide the hours of operation, locations of operation, estimate of the mail that the THS should expect to process at each site, distribution requirements, the aviation supplier's ramp locations (for air container drayage planning) and information recording and Electronic Data Interchange (EDI) requirements.

c. During the term of the contract, the Postal Service will periodically provide the THS updated matrices estimating the mail that the THS should expect to process at each site.

Deleted: 1

Deleted:

Deleted: ¶
DRAFT 5-31-03

Deleted: 6-10-03

**B.5 Term and Frequency of Contract**

a. Term

The term of the contract shall be from **March 1, 2003** through and including August 26, 2006. This contract contains three (3), one (1) year options exercisable by the Postal Service in its sole discretion upon delivery of written notice to the THS at least 60 days prior to the expiration of the contract.

b. Frequency

1) The integrated material handling services to be purchased are primarily intended to support Express, Priority and First Class Mail. Service will be daily except Mondays and the following widely observed holidays, New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving, and Christmas Day. If required to work on any of the above days, the THS will be compensated for variable costs only.

2) Annual operation will total approximately 307 days per year.

**B.6 Subcontracting**

a. The THS shall not, without the prior written approval of the contracting officer, subcontract any portion of the work that is a core function defined as follows: core functions are defined as a an integral component of the integrated material handling process described under section B.7. b. Non-core support functions, i.e., functions that are not directly related to the acceptance, packaging, or movement of mail, such as the fueling of ground equipment; do not require prior approval from the contracting officer.

**B.7 Operational Requirements**

a. The THS shall design and implement an integrated material handling system that provides the following services to outbound mail:

Deleted: 1

Deleted:

Deleted: ¶ DRAFT 5-31-03

Deleted: 6-10-03

## Section G. Special Clauses

### G.1 Definitions (Clause B-1) (January 1997) (Tailored)

As used in this contract, the following terms have the following meanings:

*"AYY or AYY Container"* also called a "DEMI" can is an air cargo container with a footprint of 62 by 88 inches, an interior cubic capacity of 201.5 feet.

*"Area Distribution Center" (ADC)* means any USPS or third Party location that receives packages inbound to a market from the aviation supplier or acts as a destination that receives mail.

*"Air Stop"* means a city, site or location where mail is dispatched or received, usually identified by a three-digit alpha code designation for the corresponding airport.

*"Air Mail Center" (AMC)* means any USPS or third Party location that acts as an origin or destination location for tendering mail to or from the aviation supplier outbound or inbound from a market or acts as an origin or destination location for tendering.

*"Airworthy"* means the conformity of an ULD with the conditions set forth in Attachment III to the Operation Specifications

*"All Purpose Container" (APC)* is a type of USPS mail transport equipment into which mail is sorted.

*"AMJ or M-1"* an air cargo container with a footprint of 96 by 125 inches, an interior cubic capacity of 586 feet and maximum gross weight of 15,000 pounds

*"Aviation Supplier"* under this agreement is a supplier of air transportation.

Deleted: transportation.

Deleted: 1

Deleted:

## Section A. Items and Prices

### A.1 Pricing

The purpose of this performance based service contract is for the Postal Service to purchase and the Terminal HS to provide integrated material handling services in support of the United States Postal Service's air and ground networks.

The contract awarded under this solicitation shall be priced as follows:

a) This Contract, including prices for the suppliers' fixed and variable costs, is valued at approximately $46,800,000 annually. Actual paid compensation may vary from this amount depending upon the weight and density of the mail handled by the Supplier. The anticipated weight of the mail per annum is 1.25 billion pounds, including the 20% absorption factor discussed below.

b) Fixed Costs: The Postal Service shall pay the Supplier one fifty-second (1/52) of the agreed upon annual price as defined in schedule A.2.a to compensate the supplier for its fixed costs. This annual price may not be altered without written authorization of the Contracting Officer.

c) Variable Costs: The Supplier shall be compensated for its mail handling service pursuant to the density-based adjusting scale (the sliding scale). The per pound price by air stop is shown on schedule A.2.b. At each stop, as density varies from 6.5 pounds per cubic foot, variable price will vary in a direct inverse relationship. As pounds per cubic foot rises, variable price per cubic foot will fall by the same ratio, and as pounds per cubic foot falls, variable price per cubic foot will rise by the same ratio. The USPS reserves the right to adjust the density factor once a year based upon USPS historical operating data. Attachment A to the Statement of Work sets forth the baseline weight of the mail for each air stop. Variable cost compensation for a schedule period by air stop will be based upon the baseline weight per schedule period multiplied by the sliding scale price per pound using actual air stop density. The density of the mail during Christmas Season shall not be considered for purposes of calculating the average actual density achieved. For purposes of establishing the compensation owed to the Supplier, a density factor of 6.5 $lbs./ft^3$ will be employed. No later than 21 days after the end of each schedule period, the Postal Service and the Supplier shall reconcile actual weights and density to determine whether a compensation adjustment is necessary. The actual density of the mail shall be determined from the scanned data submitted by the Supplier, pursuant to the methodology described within Attachment N - Business Rules. The Supplier shall achieve the highest density reasonably practicable. The Postal Service reserves the right to review and evaluate the processes and procedures used by the Supplier to maximize the density of the mail. If the Postal Service identifies means or methodologies to enhance the ability of the Supplier to achieve higher densities, it will provide that information as it is developed. In any event, the Postal Service will conduct an initial study of the Supplier's mail handling procedures and techniques after the effective date of this Statement of Work and advise the Supplier of its finding no later than October 1, 2003.

d) Absorption: In the event that the average actual daily weight at any given air stop exceeds the designated baseline weight by twenty percent (20%) or less during each schedule period of the contract the Supplier shall not be entitled to any additional compensation. In the event the average daily actual weight exceeds the designated baseline weight by more than twenty percent (20%) during any scheduled period, the Supplier shall be entitled to additional compensation only for the weight of the mail in excess of the twenty-percent (20%) increase. At the Oakland and San Francisco ramps only, in the event that the average daily actual weight is below the average daily designated weight during any scheduled period, the Postal Service shall be entitled to a reduction for each pound less than the average daily designated weight. At all other sites if the average daily actual weight is more than 20% below the average daily designated weight during any scheduled period, the Postal Service will be entitled to a reduction for each pound less than eighty percent (80%) of the average daily designated weight. Pricing outside of the absorption ranges will be in accordance with schedule A.2.b and in accordance with the sliding scale.

e) Compensation for Services Provided During the Christmas Season: The Christmas Season shall be defined as the period beginning the day after Thanksgiving and concluding at midnight on December 24th. During the Christmas Season, the Supplier shall be compensated for the actual weight of the mail, but not at a rate per pound in excess of that established for each air stop at a density of 5.5 lbs./$ft^3$. In the event the actual density achieved exceeds 5.5 lbs./$ft^3$, the actual density shall be used to calculate the compensation due to the Supplier.

f) Labor Rates for Extra Services: The Postal Services shall compensate the Supplier for out-of-scope work directed by the Contracting Officer or the designated COTR based on the loaded hourly labor rates and the loaded overtime rates by air stop as described herein. The Contracting Officer or COTR must authorize this work before it is performed. The Postal Service may audit and verify the loaded hourly labor rates and the loaded overtime rates.

g) Separations: In the event that the Postal Service adds separations in excess of those permitted pursuant to section B.2.e, the Postal Service shall compensate the Supplier at the additional separation rate established for each air stop as set forth herein. In the event that the Postal Service exercises its option to receive a credit for up to twelve (12) separations, the Postal Service shall be entitled to a credit equivalent $66.47 per separation, which is the average additional daily separation rate for those sites which have had separation reduction since the beginning of the contract period. If the Postal Service does not exercise its option to receive credit for these ten separations, the Postal Service may instead, use this credit to increment separations until the end of the contract period. The Postal Service is entitled to a net additional 46 separations without additional charge until the end of the contract period. However, should the Postal Service request a net increase of more than four separations at any site or a net of more than 58 separations at all sites, a daily site charge per schedule A.2.C - Separation Pricing will be incurred. Additionally, should the Postal Service request a further reduction in separations, schedule A.2.C rates will be used to determine the daily credit per site.

h) Ad Hoc Services: In the event that the Postal Service directs the Supplier to expand its window of operations for any shift at any air stop on an ad hoc basis to address unexpected early arrivals, delays or work load, the Supplier shall not be entitled to additional compensation for the first hour before the commencement of a shift or the first hour after the completion of a shift. For services provided in excess of the first hour before the commencement of a shift or the first hour after completion of a shift, compensation will be at the hourly rates defined under schedule A.2.d.

**Comment:** Don Spatola: Section A.1.d. Evergreen - Eagle states that SFO and Oak should have a positive and negative flex of 20%. These two sites are different because EZ chose to make them different. The section A as currently written states; "At the Oakland and San Francisco ramps only, in the event that the average daily actual weight is below the average daily designated weight during any scheduled period, the Postal Service shall be entitled to a reduction for each pound less than the average daily designated weight." This is how the model worked when we came to agreement and a change now is a major change and major financial impact on the contract. The example used to come to the $46.8 M agreement included a negative as a result of the unlimited downward flex.

i) Compensation for Services Provided between February 28, 2003, and the Effective Date of the Amended Statement of Work: The Supplier's compensation for work performed between March 1, 2003, and the effected date of this amended Statement of Work shall be calculated and paid pursuant to the terms of this amended Statement of Work.

j) Supplemental Invoices for Product or Services Rendered at Prices Not Specified in the Schedules: Any invoices for products or services rendered at prices that are not specified in the pricing Schedules herein, must be accompanied by data explaining the following:

1. The cause(s)
2. The effective dates and locations
3. A detailed description of the methodology used to arrive at the estimated costs - if such costs are not based upon actual costs incurred for the particular product or service.

Note: No invoice for subcontractor services shall be based upon cost plus a percentage of cost.

**A.2 Items and Prices**

| | Annual Periods | Periodic Payment | Total Annual Payment |
|---|---|---|---|
| a. Fixed Costs | 52 Weeks | $122,384.45 | $6,363,991.40 |

b. Variable Cost @ 6.5 lb/cuft density

| Air Stop | Variable Price Per Pound |
|---|---|
| Des Moines - DSM | $0.0255 |
| Detroit - DTW | $0.0441 |
| Sioux Falls- FSD | $0.0439 |
| Grand Forks - GFK | $0.0329 |
| Grand Rapids - GRR | $0.0401 |
| Wichita - ICT | $0.0315 |
| Indianapolis - IND | $0.0402 |
| Kansas City - MCI | $0.0235 |
| Milwaukee - MKE | $0.0226 |
| Minneapolis - MSP | $0.0289 |
| Omaha - OMA | $0.0257 |
| Chicago - ORD | $0.0186 |
| Atlanta - ATL | $0.0274 |
| Orlando - MCO | $0.0258 |
| Miami - MIA | $0.0363 |
| Knoxville - TYS | $0.0298 |
| Honolulu HNL | $0.0441 |
| Los Angeles - LAX | $0.0410 |
| Oakland - OAK | $0.0529 |
| San Francisco - SFO | $0.0455 |
| Ontario - ONT | $0.0580 |
| San Diego - SAN | $0.0391 |
| Sacramento - SMF | $0.0253 |
| Total | $0.0366 |

# Section B Statement of Work

## B.1 Overview

The purpose of this performance based service contract is to provide integrated material handling services in support of the U. S. Postal Service's air and ground networks. The main components of the integrated material handling services are facilities, scanning services, container preparation, surface (roller-bed and /or dolly) transportation, limited simple distribution, record keeping and electronic data submissions at the locations listed in **Attachment A (Cities Served & Daily Baseline Pounds for Daytime Network).** The components of this integrated material handling system must meet on time service performance (origin and destination tender times) a minimum of 98% of the time on a by site-by-site basis during each schedule period.

## B.2 Background

a. The Postal Service has entered into a contract with an aviation supplier for transportation service of U.S. Mail. The contract for transportation service requires the Postal Service to engage in expanded material handling operations, namely the scanning and loading and scanning and unloading of the above listed products into and out of air containers. The Postal Service determined that it would acquire the additional integrated material handling capabilities through a competitive outsourcing to qualified suppliers under Solicitation HQ-2001 -12, which resulted in a contract between the Postal Service and the terminal handling supplier (referred to throughout the contract documents as "the supplier" or "the THS").

b. This contract does not specify the processes that the THS must employ to achieve the services required by this contract. The Postal Service will provide the hours of operation, locations of operation, estimate of the mail that the THS should expect to process at each site, distribution requirements, the aviation supplier's ramp locations (for air container drayage planning) and information recording and Electronic Data Interchange (EDI) requirements.

**B.5 Term and Frequency of Contract**

a. Term

The term of the contract shall be from **March 1, 2003** through and including August 26, 2006. This contract contains three (3), one (1) year options exercisable by the Postal Service in its sole discretion upon delivery of written notice to the THS at least 60 days prior to the expiration of the contract.

b. Frequency

1) The integrated material handling services to be purchased are primarily intended to support Express, Priority and First Class Mail. Service will be daily except Mondays and the following widely observed holidays, New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving, and Christmas Day. If required to work on any of the above days, the THS will be compensated for variable costs only.

2) Annual operation will total approximately 307 days per year.

**B.6 Subcontracting**

a. The THS shall not, without the prior written approval of the contracting officer, subcontract any portion of the work that is a core function defined as follows: core functions are defined as a an integral component of the integrated material handling process described under section B.7. **b.** Non-core support functions, i.e., functions that are not directly related to the acceptance, packaging, or movement of mail, such as the fueling of ground equipment; do not require prior approval from the contracting officer.

**B.7 Operational Requirements**

a. The THS shall design and implement an integrated material handling system that provides the following services to outbound mail:

## Section G. Special Clauses

### G.1 Definitions (Clause B-1) (January 1997) (Tailored)

As used in this contract, the following terms have the following meanings:

***"AYY or AYY Container"*** also called a "DEMI" can is an air cargo container with a footprint of 62 by 88 inches, an interior cubic capacity of 201.5 feet.

***"Area Distribution Center" (ADC)*** means any USPS or third Party location that receives packages inbound to a market from the aviation supplier or acts as a destination that receives mail.

***"Air Stop"*** means a city, site or location where mail is dispatched or received, usually identified by a three-digit alpha code designation for the corresponding airport.

***"Air Mail Center" (AMC)*** means any USPS or third Party location that acts as an origin or destination location for tendering mail to or from the aviation supplier outbound or inbound from a market or acts as an origin or destination location for tendering.

***"Airworthy"*** means the conformity of an ULD with the conditions set forth in Attachment III to the Operation Specifications

***"All Purpose Container" (APC)*** is a type of USPS mail transport equipment into which mail is sorted.

***"AMJ or M-1"*** an air cargo container with a footprint of 96 by 125 inches, an interior cubic capacity of 586 feet and maximum gross weight of 15,000 pounds

***"Aviation Supplier"*** under this agreement is a supplier of air transportation.

***"Break and Build"*** means the effort of loading and unloading both air and surface containers for the purpose of transporting mail.

Bonham Ex. 16

UNITED STATES POSTAL SERVICE

# Amendment to Transportation Services Contract

## Part I - Amendment pursuant to

| 1a. Contract No. | 1b. Amendment No. | 1c. Effective Date | 1d. Begin Contract Term | 1e. End Contract Term |
|---|---|---|---|---|
| SNET-01-PR<br>SNET-01-SER<br>SNET-01-GLR | | 03/01/2003 | 08/27/2001 | 08/26/2006 |

| 1f. For Mail service in or between | City & State | City & State |
|---|---|---|
| | Pacific, Great Lakes, Southeast Regions | |

## Part II – Contractor

| 2a. Name and address of contractor (street, city, state, and zip+4) | 2b. Social Security Number or Taxpayer ID No. |
|---|---|
| Evergreen Aviation Ground Logistics Enterprises Inc. (EAGLE)<br>EVERGREEN EAGLE<br>3850 Three Mile Lane<br>McMinnville, OR 97128-9496 | 93-0876736<br>2c. Telephone (Area code and number)<br>503 472-9361 |

## Part III -- Description of amendment

Effective March 1, 2003, the U.S. Postal Service and the THS agree to a reformation of the contracts listed above, as follows:

Part 1, Schedule, including Sections A, B, C, D, E, F, and G, is replaced and superseded in its entirety by the attached revised Part 1, Sections A, B, C, D, E, F, and G.

Part 2, Section H of the contract, "General Clauses," attached, is replaced and superseded in its entirety by the attached revised Section H.

Section I of the contract, "List of Attachments," is replaced and superseded in its entirety by the attached revised Section I.

Section L of the contract, "Representations and Certifications," is incorporated by reference and remains in effect in the reformed contracts.

Attachments A, B, C, F, G, and K are replaced and superseded in their entirety by the attached revised Attachments A, B, C, G, and K.

Attachments G & K must be updated by the supplier for each of its sites and submitted to the contracting officer by August 30, 2003.

New Attachments M, "Terminal Handling Service Provider Operations Plan," and N, "Business Rules," attached, are included in the reformed contracts.

Attachment F of the contract, "Cargo Container Checklist," and Attachment L of the contract, "Wage Determinations," are incorporated by reference and remain in effect in the reformed contracts.

Existing sections and attachments of the contract which are not expressly incorporated into the reformed contracts as described above, will not become part of the reformed contracts and are no longer in effect after March 1, 2003.

The reformed contracts, as described above, the clauses and documents which the reformed contract expressly incorporates by reference, and this Form 7406 represent the entire agreement of the parties.

It is mutually agreed that any and all claims arising out of the contract period prior to March 1, 2003, will be resolved according to the Terms and Conditions contained in the Settlement Agreement and Release that was properly executed by the parties on April 18, 2003.

The parties hereunder have caused this amendment to be executed, effective the date set forth in Part III.

| Contractor | U.S. Postal Service |
|---|---|
| Signature of person authorized to sign and date<br><br>Signature Date | Signature of contracting officer and date<br><br>Signature Date |
| Name and title of person authorized to sign | Name and title of contracting officer |

# Part 1: Schedule

## Section A. Items and Prices

### A.1 Pricing

The purpose of this performance based service contract is for the Postal Service to purchase and the Terminal Handling Supplier (THS) to provide integrated material handling services in support of the United States Postal Service's air and ground networks.

The contract awarded under this solicitation shall be priced as follows:

Formatted: Font: 14 pt, Bold, Italic

a. The parties anticipate that the Postal Service will provide to the THS approximately 1.25 billion pounds of mail during each calendar year of the contract and that the annual contract compensation for 1.25 billion pounds of mail could reach approximately $46.8 million. However, the parties recognize that the Postal Service does not guarantee a minimum weight of mail to be provided to the THS, and does not guarantee that annual compensation will total $46.8 million dollars. Actual compensation will vary according to the actual weight and density of mail provided to the THS, in accordance with Sections A.1.b through A.1.j.

b. Fixed Costs: The Postal Service shall pay the Supplier two fifty-seconds (2/52) of the agreed upon annual price as defined in schedule A.2.a to compensate the supplier for its fixed costs. The fixed cost will be paid on a bi-weekly basis. This annual price may not be altered without written authorization of the Contracting Officer.

c. Variable Costs:

1) The Supplier shall be compensated for its mail handling service pursuant to the density-based adjusting scale (the sliding scale). The per pound price by air stop is shown on schedule A.2.b. At each stop, as density varies from 6.5 pounds per cubic foot, variable price will vary in a direct inverse relationship. As pounds per cubic foot rises, variable price per pound will fall by the same ratio, and as pounds per cubic foot falls, variable price per pound will rise by the same ratio. The USPS reserves the right to adjust the density factor once a year based upon USPS historical operating data. Attachment A to the Statement of Work sets forth the baseline weight of the mail for each air stop. Variable cost compensation for a schedule period by air stop will be based upon the baseline weight per schedule period multiplied by the sliding scale price per pound using actual air stop density. For purposes of establishing bi-weekly payments to the supplier, a density factor of 6.5 $lbs./ft^3$ will be employed. No later than 21 days after the end of each schedule period, the Postal Service and the Supplier shall reconcile actual weights and density to determine whether a compensation adjustment is necessary.

The actual density of the mail shall be determined from the scanned data submitted by the Supplier, pursuant to the methodology described within Attachment N - Business Rules and pursuant to Section F.8 of the contract. The density of the mail during Christmas Season shall not be considered for purposes of calculating the average actual density achieved. The Supplier shall achieve the highest density reasonably practicable. The Postal Service reserves the right to review and evaluate the processes and procedures used by the Supplier to maximize the density of the mail. If the Postal Service identifies means or methodologies to enhance the ability of the Supplier to achieve higher densities, it will provide that information as it is developed. In any event, the Postal Service will conduct an initial study of the Supplier's mail handling procedures and techniques after the effective date of this Statement of Work and advise the Supplier of its finding no later than October 1, 2003.

2) Interim Pay Procedures effective March 1, 2003 through December 29, 2003, or subsequent schedule period start date as determined by the USPS, the supplier will be paid 85% of the projected variable cost on a bi-weekly basis. These payments will be reconciled at the end of each schedule period to adjust final payment to reflect the actual volumes handled. Additionally, an annual payment reconciliation will be made to adjust the total payment for twelve schedule periods. The first annual reconciliation will be made after the schedule period ending February 29, 2004.

d. Absorption: In the event that the average actual daily weight at any given air stop exceeds the designated baseline weight by twenty percent (20%) or less during each schedule period of the contract the Supplier shall not be entitled to any additional compensation. In the event the average daily actual weight exceeds the designated baseline weight by more than twenty percent (20%) during any scheduled period, the Supplier shall be entitled to additional compensation only for the weight of the mail in excess of the twenty-percent (20%) increase. If the average daily actual weight is more than 20% below the average daily designated baseline weight during any scheduled period, the Postal Service will be entitled to a reduction for each pound less than eighty percent (80%) of the average daily designated baseline weight. Pricing outside of the absorption ranges will be in accordance with schedule A.2.b and in accordance with the sliding scale.

e. Compensation for Services Provided During the Christmas Season: The Christmas Season shall be defined as the period beginning the day after Thanksgiving and concluding at midnight on December 24th. During the Christmas Season, the Supplier shall be compensated for the actual weight of the mail, but not at a rate per pound in excess of that established for each air stop at a density of 5.5 $lbs./ft^3$. In the event the actual density achieved exceeds 5.5 $lbs./ft^3$, the actual density shall be used to calculate the compensation due to the Supplier.

FINAL DRAFT 7-11-2003

**A.2 Items and Prices**

| | Annual Periods | Periodic Payment | Total Annual Payment |
|---|---|---|---|
| a. Fixed Costs | 52 Weeks | $122,384.45 | $6,363,991.40 |

b. Variable Cost @ 6.5 lb/cuft density

| Air Stop | Variable Price Per Pound |
|---|---|
| Des Moines - DSM | $0.0255 |
| Detroit - DTW | $0.0441 |
| Sioux Falls- FSD | $0.0439 |
| Grand Forks - GFK | $0.0329 |
| Grand Rapids - GRR | $0.0401 |
| Wichita - ICT | $0.0315 |
| Indianapolis - IND | $0.0402 |
| Kansas City - MCI | $0.0235 |
| Milwaukee - MKE | $0.0226 |
| Minneapolis - MSP | $0.0289 |
| Omaha - OMA | $0.0257 |
| Chicago - ORD | $0.0186 |
| Atlanta - ATL | $0.0274 |
| Orlando - MCO | $0.0258 |
| Miami - MIA | $0.0363 |
| Knoxville - TYS | $0.0298 |
| Honolulu HNL | $0.0441 |
| Los Angeles - LAX | $0.0410 |
| Oakland - OAK | $0.0529 |
| San Francisco - SFO | $0.0455 |
| Ontario - ONT | $0.0580 |
| San Diego - SAN | $0.0391 |
| Sacramento - SMF | $0.0253 |
| Total | $0.0366 |

## Section B Statement of Work

### B.1 Overview

The purpose of this performance based service contract is to provide integrated material handling services in support of the U. S. Postal Service's air and ground networks. The main components of the integrated material handling services are facilities, scanning services, container preparation, surface (roller-bed and /or dolly) transportation, limited simple distribution, record keeping and electronic data submissions at the locations listed in **Attachment A (Cities Served & Daily Baseline Pounds for Daytime Network).**

The components of this integrated material handling system must meet on time service performance (origin and destination tender times) a minimum of 98% of the time on a by site-by-site basis during each schedule period.

### B.2 Background

a. The Postal Service has entered into a contract with an aviation supplier for transportation service of U.S. Mail. The contract for transportation service requires the Postal Service to engage in expanded material handling operations, namely the scanning and loading and scanning and unloading of the above listed products into and out of air containers. The Postal Service determined that it would acquire the additional integrated material handling capabilities through a competitive outsourcing to qualified suppliers under Solicitation HQ-2001 -12, which resulted in a contract between the Postal Service and the terminal handling supplier (referred to throughout the contract documents as "the supplier" or "the THS").

b. This contract does not specify the processes that the THS must employ to achieve the services required by this contract. The Postal Service will provide the hours of operation, locations of operation, estimate of the mail that the THS should expect to process at each site, distribution requirements, the aviation supplier's ramp locations (for air container drayage planning) and information recording and Electronic Data Interchange (EDI) requirements.

**B.5 Term and Frequency of Contract**

a. Term

The term of the contract shall be from **March 1, 2003** through and including August 26, 2006. This contract contains three (3), one (1) year options exercisable by the Postal Service in its sole discretion upon delivery of written notice to the THS at least 60 days prior to the expiration of the contract.

b. Frequency

1) The integrated material handling services to be purchased are primarily intended to support Express, Priority and First Class Mail. Service will be daily except Mondays and the following widely observed holidays, New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving, and Christmas Day. If required to work on any of the above days, the THS will be compensated for variable costs only.

2) Annual operation will total approximately 307 days per year.

**B.6 Subcontracting**

a. The THS shall not, without the prior written approval of the contracting officer, subcontract any portion of the work that is a core function defined as follows: core functions are defined as a an integral component of the integrated material handling process described under section B.7

b. Non-core support functions, i.e., functions that are not directly related to the acceptance, packaging, or movement of mail, such as the fueling of ground equipment; do not require prior approval from the contracting officer.

**B.7 Operational Requirements**

a. The THS shall design and implement an integrated material handling system that provides the following services to outbound mail:

# Section G. Special Clauses

## G.1 Definitions (Clause B-1) (January 1997) (Tailored)

As used in this contract, the following terms have the following meanings:

***"AYY or AYY Container"*** also called a "DEMI" can is an air cargo container with a footprint of 62 by 88 inches, an interior cubic capacity of 201.5 feet.

***"Area Distribution Center" (ADC)*** means any USPS or third Party location that receives packages inbound to a market from the aviation supplier or acts as a destination that receives mail.

***"Air Stop"*** means a city, site or location where mail is dispatched or received, usually identified by a three-digit alpha code designation for the corresponding airport.

***"Air Mail Center" (AMC)*** means any USPS or third Party location that acts as an origin or destination location for tendering mail to or from the aviation supplier outbound or inbound from a market or acts as an origin or destination location for tendering.

***"Airworthy"*** means the conformity of an ULD with the conditions set forth in Attachment III to the Operation Specifications

***"All Purpose Container" (APC)*** is a type of USPS mail transport equipment into which mail is sorted.

***"AMJ or M-1"*** an air cargo container with a footprint of 96 by 125 inches, an interior cubic capacity of 586 feet and maximum gross weight of 15,000 pounds

***"Aviation Supplier"*** under this agreement is a supplier of air transportation.

***"Break and Build"*** means the effort of loading and unloading both air and surface containers for the purpose of transporting mail.

**ATTACHMENT A**

**Evergreen EAGLE Concolidated THS Contracts**
**FINAL DRAFT 7-11-03**

**Cities Served & Daily Baseline Pounds For Daytime Network**

Effective March 1, 2003

| AIRSTOP | ORIGINATING POUNDS | DESTINATING POUNDS | TOTAL POUNDS |
|---|---|---|---|
| Des Moines - DSM | 34,541 | 68,964 | 103,505 |
| Detroit - DTW | 46,450 | 28,024 | 74,474 |
| Sioux Falls- FSD | 13,745 | 12,631 | 26,376 |
| Grand Forks - GFK | 17,684 | 21,507 | 39,191 |
| Grand Rapids - GRR | 21,173 | 30,853 | 52,025 |
| Wichita - ICT | 11,897 | 18,892 | 30,789 |
| Indianapolis - IND | 55,253 | 50,996 | 106,248 |
| Kansas City - MCI | 66,696 | 40,676 | 107,372 |
| Milwaukee - MKE | 79,700 | 73,275 | 152,976 |
| Minneapolis - MSP | 65,781 | 40,168 | 105,950 |
| Omaha - OMA | 34,215 | 35,380 | 69,596 |
| Chicago - ORD | 121,173 | 92,601 | 213,775 |
| Atlanta - ATL | 87,990 | 32,085 | 120,076 |
| Orlando - MCO | 81,767 | 99,070 | 180,837 |
| Miami - MIA | 88,427 | 98,818 | 187,245 |
| Knoxville - TYS | 19,617 | 18,192 | 37,809 |
| Honolulu HNL | - | 38,927 | 38,927 |
| Los Angeles - LAX | 164,777 | 156,065 | 320,842 |
| Oakland - OAK | 134,066 | 201,930 | 335,997 |
| San Francisco - SFO | 97,783 | 89,860 | 187,642 |
| Ontario - ONT | 100,971 | 80,271 | 181,241 |
| San Diego - SAN | 50,112 | 51,796 | 101,907 |
| Sacramento - SMF | 30,442 | 31,325 | 61,767 |
| | | | |
| TOTALS: | 1,424,261 | 1,412,305 | 2,836,567 |
| ANNUAL FREQUENCY | 307 | 307 | 307 |
| GRAND TOTALS | 437,248,169 | 433,577,747 | 870,825,917 |

# Part 1: Schedule

## Section A. Items and Prices

### A.1 Pricing

The purpose of these performance based service contracts is for the Postal Service to purchase and the Terminal Handling Supplier (THS) to provide integrated material handling services in support of the United States Postal Service's air and ground networks.

The contracts awarded under this solicitation shall be priced as follows:

Formatted: Font: 14 pt, Bold, Italic

a. The parties anticipate that the Postal Service will provide to the THS approximately 1.25 billion pounds of mail during each calendar year of the three contracts (SNET-01-GLR, SNET-01-PR, SNET-01-SER) and that the annual contract compensation for 1.25 billion pounds is estimated to be approximately $46.8 million, including fixed and variable costs. However, the parties recognize that the Postal Service does not guarantee a minimum weight of mail will be provided to the THS, and does not guarantee that annual compensation will total $46.8 million dollars. Actual compensation will vary according to the actual weight and density of mail provided to the THS, in accordance with Sections A.1.b through A.1.j.

b. Fixed Costs: The Postal Service shall pay the Supplier one twenty-sixth (1/26) of the agreed upon annual price as defined in schedule A.2.a to compensate the supplier for its fixed costs for all three contracts. The fixed cost will be paid on a bi-weekly basis. This annual price may not be altered without written authorization of the Contracting Officer.

c. Variable Costs:

1) The Supplier shall be compensated for its mail handling service pursuant to the density-based adjusting scale (the sliding scale). The per pound price by air stop is shown on schedule A.2.b. At each stop, as density varies from 6.5 pounds per cubic foot, variable price will vary in a direct inverse relationship. As pounds per cubic foot rises, variable price per pound will fall by the same ratio, and as pounds per cubic foot falls, variable price per pound will rise by the same ratio. The USPS reserves the right to adjust the density factor once a year based upon USPS historical operating data. Attachment A to the Statement of Work sets forth the baseline weight of the mail for each air stop. Variable cost compensation for a schedule period by air stop will be based upon the baseline weight per schedule period multiplied by the sliding scale price per pound using actual air stop density. For purposes of establishing bi-weekly payments to the supplier, a density factor of 6.5 lbs./ft$^3$ will be employed. No later than 21 days after the end of each schedule period, the Postal Service and the Supplier shall reconcile actual weights and

density to determine whether a compensation adjustment is necessary. The actual density of the mail shall be determined from the scanned data submitted by the Supplier, pursuant to the methodology described within Attachment N - Business Rules and pursuant to Section F.8 of the contract. The density of the mail during Christmas Season shall not be considered for purposes of calculating the average actual density achieved. The Supplier shall achieve the highest density reasonably practicable. The Postal Service reserves the right to review and evaluate the processes and procedures used by the Supplier to maximize the density of the mail. If the Postal Service identifies means or methodologies to enhance the ability of the Supplier to achieve higher densities, it will provide that information as it is developed. In any event, the Postal Service will conduct an initial study of the Supplier's mail handling procedures and techniques after the effective date of this Statement of Work and advise the Supplier of its finding no later than October 1, 2003.

2) Variable cost payments will be reconciled on a schedule period basis to reflect actual volumes scanned. Until scanning for compensation is implemented, beginning March 1, 2003, the supplier will be paid, on a bi-weekly basis, 85% of one twenty-sixth (1/26) of the total projected annual variable cost. After scanning for compensation is implemented, payment will be made only on scanned mail. Scanning for compensation will begin on December 29, 2003 or thereafter. Additionally, an annual payment reconciliation will be made to adjust the total payment for 12 schedule periods. The first annual reconciliation will be made after the schedule period ending February 29, 2004.

d. Absorption: In the event that the average actual daily weight at any given air stop exceeds the designated baseline weight by twenty percent (20%) or less during each schedule period of the contract the Supplier shall not be entitled to any additional compensation. In the event the average daily actual weight exceeds the designated baseline weight by more than twenty percent (20%) during any scheduled period, the Supplier shall be entitled to additional compensation only for the weight of the mail in excess of the twenty-percent (20%) increase. If the average daily actual weight is more than 20% below the average daily designated baseline weight during any scheduled period, the Postal Service will be entitled to a reduction for each pound less than eighty percent (80%) of the average daily designated baseline weight. Pricing outside of the absorption ranges will be in accordance with schedule A.2.b and in accordance with the sliding scale.

e. Compensation for Services Provided During the Christmas Season: The Christmas Season shall be defined as the period beginning the day after Thanksgiving and concluding at midnight on December 24th. During the Christmas Season, the Supplier shall be compensated for the actual weight of the mail, but not at a rate per pound in excess of that established for each air stop at a density of 5.5 lbs./$ft^3$. In the event the actual density

## A.2 Items and Prices

| | Periods | Periodic Payment | Total Annual Payment |
|---|---|---|---|
| a. Fixed Costs | 26 | $244,768.90 | $6,363,991.40 |

(Contracts SNET-01-GLR, SNET-01-SER, and SNET-01-PR)

b. Variable Cost @ 6.5 lb/cu ft density

| Air Stop | Variable Price Per Pound |
|---|---|
| Des Moines - DSM | $0.0255 |
| Detroit - DTW | $0.0441 |
| Sioux Falls- FSD | $0.0439 |
| Grand Forks - GFK | $0.0329 |
| Grand Rapids - GRR | $0.0401 |
| Wichita - ICT | $0.0315 |
| Indianapolis - IND | $0.0402 |
| Kansas City - MCI | $0.0235 |
| Milwaukee - MKE | $0.0226 |
| Minneapolis - MSP | $0.0289 |
| Omaha - OMA | $0.0257 |
| Chicago - ORD | $0.0186 |
| Atlanta - ATL | $0.0274 |
| Orlando - MCO | $0.0258 |
| Miami - MIA | $0.0363 |
| Knoxville - TYS | $0.0298 |
| Honolulu HNL | $0.0441 |
| Los Angeles - LAX | $0.0410 |
| Oakland - OAK | $0.0529 |
| San Francisco - SFO | $0.0455 |
| Ontario - ONT | $0.0580 |
| San Diego - SAN | $0.0391 |
| Sacramento - SMF | $0.0253 |
| Total | $0.0366 |

## Section B Statement of Work

### B.1 Overview

The purpose of this performance based service contract is to provide integrated material handling services in support of the U. S. Postal Service's air and ground networks. The main components of the integrated material handling services are facilities, scanning services, container preparation, surface (roller-bed and /or dolly) transportation, limited simple distribution, record keeping and electronic data submissions at the locations listed in **Attachment A (Cities Served & Daily Baseline Pounds for Daytime Network).**

The components of this integrated material handling system must meet on time service performance (origin and destination tender times) a minimum of 98% of the time on a by site-by-site basis during each schedule period.

### B.2 Background

a. The Postal Service has entered into a contract with an aviation supplier for transportation service of U.S. Mail. The contract for transportation service requires the Postal Service to engage in expanded material handling operations, namely the scanning and loading and scanning and unloading of the above listed products into and out of air containers. The Postal Service determined that it would acquire the additional integrated material handling capabilities through a competitive outsourcing to qualified suppliers under Solicitation HQ-2001 -12, which resulted in a contract between the Postal Service and the terminal handling supplier (referred to throughout the contract documents as "the supplier" or "the THS").

b. This contract does not specify the processes that the THS must employ to achieve the services required by this contract. The Postal Service will provide the hours of operation, locations of operation, estimate of the mail that the THS should expect to process at each site, distribution requirements, the aviation supplier's ramp locations (for air container drayage planning) and information recording and Electronic Data Interchange (EDI) requirements.

**B.5 Term and Frequency of Contract**

a. Term

The term of the contract shall be from **March 1, 2003** through and including August 26, 2006. This contract contains three (3), one (1) year options exercisable by the Postal Service in its sole discretion upon delivery of written notice to the THS at least 60 days prior to the expiration of the contract.

b. Frequency

1) The integrated material handling services to be purchased are primarily intended to support Express, Priority and First Class Mail. Service will be daily except Mondays and the following widely observed holidays, New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving, and Christmas Day. If required to work on any of the above days, the THS will be compensated for variable costs only.

2) Annual operation will total approximately 307 days per year.

**B.6 Subcontracting**

a. The THS shall not, without the prior written approval of the contracting officer, subcontract any portion of the work that is a core function defined as follows: core functions are defined as a an integral component of the integrated material handling process described under section B.7

b. Non-core support functions, i.e., functions that are not directly related to the acceptance, packaging, or movement of mail, such as the fueling of ground equipment; do not require prior approval from the contracting officer.

## Section G. Special Clauses

**G.1 Definitions (Clause B-1) (January 1997) (Tailored)**

As used in this contract, the following terms have the following meanings:

***"AYY or AYY Container"*** also called a "DEMI" can is an air cargo container with a footprint of 62 by 88 inches, an interior cubic capacity of 201.5 feet.

***"Area Distribution Center" (ADC)*** means any USPS or third Party location that receives packages inbound to a market from the aviation supplier or acts as a destination that receives mail.

***"Air Stop"*** means a city, site or location where mail is dispatched or received, usually identified by a three-digit alpha code designation for the corresponding airport.

***"Air Mail Center" (AMC)*** means any USPS or third Party location that acts as an origin or destination location for tendering mail to or from the aviation supplier outbound or inbound from a market or acts as an origin or destination location for tendering.

***"Airworthy"*** means the conformity of an ULD with the conditions set forth in Attachment III to the Operation Specifications

***"All Purpose Container" (APC)*** is a type of USPS mail transport equipment into which mail is sorted.

***"AMJ or M-1"*** an air cargo container with a footprint of 96 by 125 inches, an interior cubic capacity of 586 feet and maximum gross weight of 15,000 pounds

***"Aviation Supplier"*** under this agreement is a supplier of air transportation.

***"Break and Build"*** means the effort of loading and unloading both air and surface containers for the purpose of transporting mail.

**From:** Brian Bauer [mailto:bbauer@evergreen-eagle.com]
**Sent:** Thursday, July 31, 2003 7:26 AM
**To:** Daniel Bonham (E-mail); Mike Spencer (E-mail); Liane Kelly (E-mail); Bob Miller (E-mail); Bob Lane (E-mail); Mark Walton (E-mail)
**Subject:** FW:
**Importance:** High

Full data – Liane/Bob please have mike confirm attachments

We will have call at 11:30 am est (8:30 pst)

Daniel if you could set up – perhaps using the marketing call in

Thanks
BB

-----Original Message-----
**From:** Griffith, Leslie A - Washington, DC [mailto:leslie.a.griffith@usps.gov]
**Sent:** Thursday, July 31, 2003 7:19 AM
**To:** bbauer@evergreen-eagle.com; Young, Dwight - Washington, DC; Brazil, Cheryl R - Washington, DC; Gillespie, Donna S - Washington, DC
**Subject:**
**Importance:** High

Brian,

Here is the complete document (so far as I know) that includes all of the documents except those referenced in the 7406 as being not changed or incorporated by reference.

Les

UNITED STATES POSTAL SERVICE

# Amendment to Transportation Services Contract

Les Griffith
Validity unknown
Digitally signed by Les Griffith
DN: cn=Les Griffith, o=US Postal Service, ou=Air Transportation CMC, c=US
Date: 2003.07.31 10:15:44 -04'00'
Reason: This document is ready for approval
Location: Washington, DC

## Part I - Amendment pursuant to

| 1a. Contract No. | 1b. Amendment No. | 1c. Effective Date | 1d. Begin Contract Term | 1e. End Contract Term |
|---|---|---|---|---|
| SNET-01-PR<br>SNET-01-SER<br>SNET-01-GLR | | 03/01/2003 | 08/27/2001 | 08/26/2006 |

| 1f. For Mail service in or between — City & State | City & State |
|---|---|
| Pacific, Great Lakes, Southeast Regions | |

## Part II – Contractor

| 2a. Name and address of contractor (street, city, state, and zip+4) | 2b. Social Security Number or Taxpayer ID No. / 2c. Telephone (Area code and number) |
|---|---|
| Evergreen Aviation Ground Logistics Enterprises Inc. (EAGLE)<br>EVERGREEN EAGLE<br>3850 Three Mile Lane<br>McMinnville, OR 97128-9496 | 2b. 93-0876736<br>2c. 503 472-9361 |

## Part III -- Description of amendment

Effective March 1, 2003, the U.S. Postal Service and the THS agree to a reformation of the contracts listed above, as follows:

Part 1, Schedule, including Sections A, B, C, D, E, F, and G, is replaced and superseded in its entirety by the attached revised Part 1, Sections A, B, C, D, E, F, and G.

Part 2, Section H of the contract, "General Clauses," attached, is replaced and superseded in its entirety by the attached revised Section H.

Section I of the contract, "List of Attachments," is replaced and superseded in its entirety by the attached revised Section I.

Section L of the contract, "Representations and Certifications," is incorporated by reference and remains in effect in the reformed contracts.

Attachments A, B, C, F, G, and K are replaced and superseded in their entirety by the attached revised Attachments A, B, C, G, and K.

Attachments G & K must be updated by the supplier for each of its sites and submitted to the contracting officer by August 30, 2003.

New Attachments M, "Terminal Handling Service Provider Operations Plan," and N, "Business Rules," attached, are included in the reformed contracts.

Attachment F of the contract, "Cargo Container Checklist," and Attachment L of the contract, "Wage Determinations," are incorporated by reference and remain in effect in the reformed contracts.

Existing sections and attachments of the contract which are not expressly incorporated into the reformed contracts as described above, will not become part of the reformed contracts and are no longer in effect after March 1, 2003.

The reformed contracts, as described above, the clauses and documents which the reformed contract expressly incorporates by reference, and this Form 7406 represent the entire agreement of the parties.

It is mutually agreed that any and all claims arising out of the contract period prior to March 1, 2003, will be resolved according to the Terms and Conditions contained in the Settlement Agreement and Release that was properly executed by the parties on April 18, 2003.

The parties hereunder have caused this amendment to be executed, effective the date set forth in Part III.

| Contractor | U.S. Postal Service |
|---|---|
| Signature of person authorized to sign and date<br><br>Signature Date | Signature of contracting officer and date<br><br>Signature Date |
| Name and title of person authorized to sign | Name and title of contracting officer |

# Part 1: Schedule

## *Section A. Items and Prices*

### A.1 Pricing

The purpose of these performance based service contracts is for the Postal Service to purchase and the Terminal Handling Supplier (THS) to provide integrated material handling services in support of the United States Postal Service's air and ground networks.

The contracts awarded under this solicitation shall be priced as follows:

a. The parties anticipate that the Postal Service will provide to the THS approximately 1.25 billion pounds of mail during each calendar year of the three contracts (SNET-01-GLR, SNET-01-PR, SNET-01-SER) and that the annual contract compensation for 1.25 billion pounds is estimated to be approximately $46.8 million, including fixed and variable costs. However, the parties recognize that the Postal Service does not guarantee a minimum weight of mail will be provided to the THS, and does not guarantee that annual compensation will total $46.8 million dollars. Actual compensation will vary according to the actual weight and density of mail provided to the THS in accordance with Sections A.1.b through A.1.j.

b. Fixed Costs: The Postal Service shall pay the Supplier one twenty-sixth (1/26) of the agreed upon annual price as defined in schedule A.2.a to compensate the supplier for its fixed costs for all three contracts. The fixed cost will be paid on a bi-weekly basis. This annual price may not be altered without written authorization of the Contracting Officer.

c. Variable Costs:

1) The Supplier shall be compensated for its mail handling service pursuant to the density-based adjusting scale (the sliding scale). The per pound price by air stop is shown on schedule A.2.b. At each stop, as density varies from 6.5 pounds per cubic foot, variable price will vary in a direct inverse relationship. As pounds per cubic foot rises, variable price per pound will fall by the same ratio, and as pounds per cubic foot falls, variable price per pound will rise by the same ratio. The USPS reserves the right to adjust the density factor once a year based upon USPS historical operating data. Attachment A to the Statement of Work sets forth the baseline weight of the mail for each air stop. Variable cost compensation for a schedule period by air stop will be based upon

the baseline weight per schedule period multiplied by the sliding scale price per pound using actual air stop density. For purposes of establishing bi-weekly payments to the supplier, a density factor of 6.5 $lbs./ft^3$ will be employed. No later than 21 days after the end of each schedule period, the Postal Service and the Supplier shall reconcile actual weights and density to determine whether a compensation adjustment is necessary. The actual density of the mail shall be determined from the scanned data submitted by the Supplier, pursuant to the methodology described within Attachment N - Business Rules and pursuant to Section F.8 of the contract. The density of the mail during Christmas Season shall not be considered for purposes of calculating the average actual density achieved. The Supplier shall achieve the highest density reasonably practicable. The Postal Service reserves the right to review and evaluate the processes and procedures used by the Supplier to maximize the density of the mail. If the Postal Service identifies means or methodologies to enhance the ability of the Supplier to achieve higher densities, it will provide that information as it is developed. In any event, the Postal Service will conduct an initial study of the Supplier's mail handling procedures and techniques after the effective date of this Statement of Work and advise the Supplier of its finding no later than October 1, 2003.

2) Variable cost payments will be reconciled on a schedule period basis to reflect actual volumes scanned. Until scanning for compensation is implemented, beginning March 1, 2003, the supplier will be paid, on a bi-weekly basis, 85% of one twenty-sixth (1/26) of the total projected annual variable cost. After scanning for compensation is implemented, compensation will be computed based only on scanned mail. Scanning for compensation will begin on December 29, 2003 or thereafter as determined by the USPS. Additionally, an annual payment reconciliation will be made to adjust the total payment for 12 schedule periods. The first annual reconciliation will be made after the schedule period ending February 29, 2004.

d. Absorption: In the event that the average actual daily weight at any given air stop exceeds the designated baseline weight by twenty percent (20%) or less during each schedule period of the contract the Supplier shall not be entitled to any additional compensation. In the event the average daily actual weight exceeds the designated baseline weight by more than twenty percent (20%) during any scheduled period, the Supplier shall be entitled to additional compensation only for the weight of the mail in excess of the twenty-percent (20%) increase. If the average daily actual weight is more than 20% below the average daily designated baseline weight during any scheduled period, the Postal Service will be entitled to a reduction for each pound less than eighty percent (80%) of the average daily designated baseline weight. Pricing outside of the absorption ranges will be in accordance with schedule A.2.b and in accordance with the sliding scale. After scanning for compensation is implemented, the

average daily actual weight will be the average daily actual weight scanned. The average daily actual weight scanned shall include only volumes receiving all required scans enumerated in Section F.8.

e. Compensation for Services Provided During the Christmas Season: The Christmas Season shall be defined as the period beginning the day after Thanksgiving and concluding at midnight on December 24th. During the Christmas Season, the Supplier shall be compensated for the actual weight of the mail, but not at a rate per pound in excess of that established for each air stop at a density of 5.5 $lbs./ft^3$. In the event the actual density achieved exceeds 5.5 $lbs./ft^3$, the actual density shall be used to calculate the compensation due to the Supplier.

f. Labor Rates for Extra Services: The Postal Services shall compensate the Supplier for out-of-scope work directed by the Contracting Officer or the designated COTR based on the loaded hourly labor rates and the loaded overtime rates by air stop as described herein. The Contracting Officer or COTR must authorize this work before it is performed. The Postal Service may audit and verify the loaded hourly labor rates and the loaded overtime rates.

g. Separations: In the event that the Postal Service adds separations in excess of those permitted pursuant to section B.2.e, the Postal Service shall compensate the Supplier at the additional separation rate established for each air stop as set forth herein. In the event that the Postal Service exercises its option to receive a credit for up to twelve (12) separations, the Postal Service shall be entitled to a credit equivalent $66.47 per separation per operating day, which is the average additional daily separation rate for those sites which have had separation reduction since the beginning of the contract period. If the Postal Service does not exercise its option to receive credit for these twelve separations, the Postal Service may instead, use this credit to increment separations until the end of the contract period. The Postal Service is entitled to a net additional 46 separations without additional charge until the end of the contract period. However, should the Postal Service request a net increase of more than four separations at any site or a net of more than 58 separations at all sites, a daily site charge per schedule A.2.C - Separation Pricing will be incurred. Additionally, should the Postal Service request a further reduction in separations, schedule A.2.C rates will be used to determine the daily credit per site.

h. Ad Hoc Services: In the event that the Postal Service directs the Supplier to expand its window of operations for any shift at any air stop on an ad hoc basis to address unexpected early arrivals, delays or work load, the Supplier shall not be entitled to additional compensation for the first hour before the commencement of a shift or the first hour after the completion of a shift. For services provided in excess of the first hour before the commencement of a shift or the first hour after completion of a shift, compensation will be at the hourly rates defined under schedule A.2.d.

i. Compensation for Services Provided between February 28, 2003, and the Effective Date of the Amended Statement of Work: The Supplier's compensation for work performed between March 1, 2003, and the effective date of this amended Statement of Work shall be calculated and paid pursuant to the terms of this amended Statement of Work.

j. Supplemental Invoices for Product or Services Rendered at Prices Not Specified in the Schedules: Any invoices for products or services rendered at prices that are not specified in the pricing Schedules herein, must be submitted to the contacting officer and accompanied by data explaining the following:

1. The cause(s)

2. The effective dates and locations

3. A detailed description of the methodology used to arrive at the estimated costs - if such costs are not based upon actual costs incurred for the particular product or service.

Note: No invoice for subcontractor services shall be based upon cost plus a percentage of cost.

k. Scanning: The Postal Service and supplier agree that pay for scanning will be implemented effective December 29, 2003, or thereafter as determined by the USPS.

**A.2 Items and Prices**

| | Periods | Periodic Payment | Total Annual Payment |
|---|---|---|---|
| a. Fixed Costs | 26 | $244,768.90 | $6,363,991.40 |

(Contracts SNET-01-GLR, SNET-01-SER, and SNET-01-PR)

b. Variable Cost @ 6.5 lb/cu ft density

| Air Stop | Variable Price per Pound |
|---|---|
| Des Moine | $0.0255 |
| Detroit - D | $0.0441 |
| Sioux Falls | $0.0439 |
| Grand Fork | $0.0329 |
| Grand Rap | $0.0401 |
| Wichita - I( | $0.0315 |
| Indianapoli | $0.0402 |
| Kansas Cit | $0.0235 |
| Milwaukee | $0.0226 |
| Minneapoli | $0.0289 |
| Omaha - C | $0.0257 |
| Chicago - ( | $0.0186 |
| Atlanta - A | $0.0274 |
| Orlando - N | $0.0258 |
| Miami - MI | $0.0363 |
| Knoxville - | $0.0298 |
| Honolulu H | $0.0441 |
| Los Angele | $0.0410 |
| Oakland - ( | $0.0529 |
| San Franci | $0.0455 |
| Ontario - C | $0.0580 |
| San Diego | $0.0391 |
| Sacrament | $0.0253 |
| | |
| Total | $0.0366 |

## *Section B Statement of Work*

### B.1 Overview

The purpose of this performance based service contract is to provide integrated material handling services in support of the U. S. Postal Service's air and ground networks. The main components of the integrated material handling services are facilities, scanning services, container preparation, surface (roller-bed and /or dolly) transportation, limited simple distribution, record keeping and electronic data submissions at the locations listed in **Attachment A (Cities Served & Daily Baseline Pounds for Daytime Network).**

The components of this integrated material handling system must meet on time service performance (origin and destination tender times) a minimum of 98% of the time on a by site-by-site basis during each schedule period.

### B.2 Background

a. The Postal Service has entered into a contract with an aviation supplier for transportation service of U.S. Mail. The contract for transportation service requires the Postal Service to engage in expanded material handling operations, namely the scanning and loading and scanning and unloading of the above listed products into and out of air containers. The Postal Service determined that it would acquire the additional integrated material handling capabilities through a competitive outsourcing to qualified suppliers under Solicitation HQ-2001 -12, which resulted in a contract between the Postal Service and the terminal handling supplier (referred to throughout the contract documents as "the supplier" or "the THS").

b. This contract does not specify the processes that the THS must employ to achieve the services required by this contract. The Postal Service will provide the hours of operation, locations of operation, estimate of the mail that the THS should expect to process at each site, distribution requirements, the aviation supplier's ramp locations (for air container drayage planning) and information recording and Electronic Data Interchange (EDI) requirements.

c. During the term of the contract, the Postal Service will periodically provide the THS updated matrices estimating the mail that the THS should expect to process at each site.

The Postal Service will provide such updated matrices from six (6) times per year up to fifteen (15) times per year, without modifying the pricing or other terms of the contract.

d. Distribution requirements at origin are to scan and trans-load mail, from Postal Service supplied mail transport equipment to air carrier supplied air containers, into either bypass (direct) or mixed air containers.

e. Distribution requirements at destination are to unload the mail from air containers, scan and separate mail into either shape based and/or zip code range as listed in Attachment C (Separations). The Postal Service may make unlimited changes to the specific destinating separations listed in Attachment C (Separations) at no additional cost to the Postal Service as long as the absolute total net number of separations for a given site does not increase. The THS agrees to provide at no cost to USPS up to fifty-eight (58) net additional separations during the life of the contract, including a maximum of four (4) net additional separations at any air stop. However, if the ceiling of four (4) net separations is exceeded at any given site, or a net of fifty-eight separations across all sites, a daily site charge per schedule A.2.C will be incurred.

For purposes of this provision, a substitution of one separation for another at any given air stop shall not constitute an additional separation within the meaning of this provision. An increase in the absolute total number of separations for a given site must be approved in writing by the contracting officer prior to implementation.

**B.3 Supplier Qualifications**

The THS shall maintain its ability to meet the service requirements specified in this contract.

**B.4 Scope**

The sites covered by this contract are listed in Attachment A (Cities Served & Daily Baseline Pounds for Daytime Network). Additional sites may be added to the Network during the contract period. All fixed costs and variable costs for any new site will be approved by the Contracting Officer prior to start up of the new site.

**B.5 Term and Frequency of Contract**

a. Term

The term of this reformed contract shall be from **March 1, 2003** through and including August 26, 2006. This contract contains three (3), one (1) year options exercisable by the Postal Service in its sole discretion upon delivery of written notice to the THS at least 60 days prior to the expiration of the contract.

For purposes of the application of the Department of Labor Area Wage Determinations per the Service contract Act, the original effective date of the contract, August 27, 2001, shall apply.

b. Frequency

1) The integrated material handling services to be purchased are primarily intended to support Express, Priority and First Class Mail. Service will be daily except Mondays and the following widely observed holidays, New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving, and Christmas Day. If required to work on any of the above days, the THS will be compensated for variable costs only.

2) Annual operation will total approximately 307 days per year.

**B.6 Subcontracting**

a. The THS shall not, without the prior written approval of the contracting officer, subcontract any portion of the work that is a core function defined as follows: core functions are defined as a an integral component of the integrated material handling process described under section B.7

b. Non-core support functions, i.e., functions that are not directly related to the acceptance, packaging, or movement of mail, such as the fueling of ground equipment; do not require prior approval from the contracting officer.

**B.7 Operational Requirements**

a. The THS shall design and implement an integrated material handling system that provides the following services to outbound mail:

## *Section G. Special Clauses*

### G.1 Definitions (Clause B-1) (January 1997) (Tailored)

As used in this contract, the following terms have the following meanings:

***"AYY or AYY Container"*** also called a "DEMI" can is an air cargo container with a footprint of 62 by 88 inches, an interior cubic capacity of 201.5 feet.

***"Area Distribution Center" (ADC)*** means any USPS or third Party location that receives packages inbound to a market from the aviation supplier or acts as a destination that receives mail.

***"Air Stop"*** means a city, site or location where mail is dispatched or received, usually identified by a three-digit alpha code designation for the corresponding airport.

***"Air Mail Center" (AMC)*** means any USPS or third Party location that acts as an origin or destination location for tendering mail to or from the aviation supplier outbound or inbound from a market or acts as an origin or destination location for tendering.

***"Airworthy"*** means the conformity of an ULD with the conditions set forth in Attachment III to the Operation Specifications

***"All Purpose Container" (APC)*** is a type of USPS mail transport equipment into which mail is sorted.

***"AMJ or M-1"*** an air cargo container with a footprint of 96 by 125 inches, an interior cubic capacity of 586 feet and maximum gross weight of 15,000 pounds

***"Aviation Supplier"*** under this agreement is a supplier of air transportation.

***"Break and Build"*** means the effort of loading and unloading both air and surface containers for the purpose of transporting mail.

**G.9 FAA and Local Airport Authority Requirements**

The THS must comply with all lawful requirements of FAA and local airport authorities. This includes, but is not limited to, weight and balance compliance, ramp access restrictions, and other matters within the jurisdiction of such authorities

**G.10 Other Contracts**

The THS has agreed to operate a terminal handling for the air operations defined under this contract. The THS must cooperate fully with the aviation supplier and carefully fit the mail transported by them into the THS's ground handling operation. The THS must not commit or permit any act that will interfere with the performance of work by any other supplier or by Postal Service employees.

**G.11 Responsibility for Postal Containers**

The THS assumes the risk of, and shall be responsible for, any loss or destruction of, or damage to postal containers while they are in the custody and control of the THS. However, the THS is not responsible for reasonable wear and tear to such containers. The THS will take all measures necessary to remedy any loss, destruction or damage to Postal containers that exceeds reasonable wear and tear.

**G.12 Ceiling on Termination for Convenience Costs**

a. In the event that the Postal Service terminates this contract for convenience prior to its expiration date, as that date may be extended, the supplier's total termination costs shall be determined in accordance with the Termination for Convenience clause of this contract. However, the supplier agrees that the total maximum termination costs to which it is entitled shall be limited to an amount no greater than the total of the contract price of completed services, plus:

i. eighty percent of the supplier's total annual facilities and equipment costs, with mark-ups for G&A and profit, if the effective date of termination is from August 2001 through July 2002; or

**ATTACHMENT A** **March 1, 2003**

**Evergreen Cities Only Extracted from Master Attachment A)**

**Cities Served & Daily Baseline Pounds For Daytime Network**

**PACKAGE 1**

| PACIFIC AREA | AIRSTOP | ORIGINATING POUNDS | DESTINATING POUNDS |
|---|---|---|---|
| HONOLULU HI | HNL | 0 | 38,927 |
| LOS ANGELES CA | LAX | 164,777 | 156,065 |
| OAKLAND CA | OAK | 134,066 | 201,930 |
| ONTARIO CA | ONT | 100,971 | 80,271 |
| SACRAMENTO CA | SMF | 30,442 | 31,325 |
| SAN DIEGO CA | SAN | 50,112 | 51,796 |
| SAN FRANCISCO CA | SFO | 97,783 | 89,860 |
| TOTAL | | 578,151 | 650,174 |

**PACKAGE 2**

| SOUTHEAST AREA | AIRSTOP | ORIGINATING POUNDS | DESTINATING POUNDS |
|---|---|---|---|
| ATLANTA GA | ATL | 87,990 | 32,085 |
| KNOXVILLE TN | TYS | 19,617 | 18,192 |
| MIAMI FL | FLL / MIA | 88,427 | 98,818 |
| ORLANDO FL | MCO | 81,767 | 99,070 |
| TOTAL | | 277,801 | 248,165 |

| GREAT LAKES AREA | AIRSTOP | ORIGINATING POUNDS | DESTINATING POUNDS |
|---|---|---|---|
| CHICAGO O'HARE IL | ORD | 121,173 | 92,601 |
| DETROIT MI | DTW | 46,450 | 28,024 |
| GRAND RAPIDS MI | GRR | 21,173 | 30,853 |
| INDIANAPOLIS IN | IND | 55,253 | 50,996 |

| MIDWEST AREA | AIRSTOP | ORIGINATING POUNDS | DESTINATING POUNDS |
|---|---|---|---|
| DES MOINES IA | DSM | 34,541 | 68,964 |
| GRAND FORKS ND | GFK | 17,684 | 21,507 |
| KANSAS CITY MO | MCI | 66,696 | 40,676 |
| MILWAUKEE WI | MKE | 79,700 | 73,275 |
| MINNEAPOLIS MN | MSP | 65,781 | 40,168 |
| OMAHA NE | OMA | 34,215 | 35,380 |
| SIOUX FALLS SD P&DC | FSD | 13,745 | 12,631 |
| WICHITA KS | ICT | 11,897 | 18,892 |
| TOTAL | | 568,308 | 513,967 |

| | | |
|---|---|---|
| EVERGREEN TOTAL: | 1,424,260 | 1,412,306 |
| FREQUENCY | 307 | 307 |
| | 437,247,820 | 433,577,942 |
| **GRAND TOTAL:** | | **870,825,762** |

EVERGREEN
3850 Three Mile Lane McMinnville, OR 97128
Phone (503) 472-9361 Fax (503) 472-9150

March ~~8, 2006~~ 30, 2004

**VIA USPS EXPRESS MAIL**

Ms. Cheryl Brazil
Contracting Officer
Transportation Purchasing
United States Postal Service
475 L'Enfant Plaza SW, Room 4900
Washington, DC 20260-6210

**Re: Year End Reconciliation**

Dear Ms. Brazil:

Pursuant to the SNET-01 Agreements, we respectfully submit for your review the enclosed exhibits summarizing the weight and MAIL volumes handled at each of our terminal handling locations during the period March 1, 2003 through February 29, 2004. Exhibit A provides a summary of the total weight of the mail handled by location and by block period. A more detailed breakdown of the weight, volume and density of the mail by block period at each location can be found in Exhibit B. A summary of the daily weight and cubic volume, with respect to both originating and destinating operations, is presented in Exhibit C. Finally, EAGLE's compensation calculations are detailed in Exhibit D. Compensation was calculated using the Pay Model developed George Rudy (USPS) and tailored by Tom Black (USPS) for use in connection with this Contract.

The Statement of Work governing the Contract, signed into effect as of March 1, 2003, is premised upon three Postal Service representations set forth in a Memorandum of Understanding between the parties: (i) that the estimated total annual value of the Contract is $46.8 million (exclusive of adjustments for changes in the Consumer Price Index); and (ii) that the Postal Service would present approximately 1.25 billion pounds of mail to EAGLE for handling; and (iii) that the density of the mail presented to EAGLE would be 6.5 pounds per cubic foot. The Postal Service failed to satisfy the most fundamental of these elements. Specifically, the aggregate weight of the mail handled in Evergreen's twenty-three terminal handling facilities was less than 950 million pounds. The shortfall, more than 300 million pounds, represents a twenty-five percent (25%) decrease in the volume of mail that served as the basis for pricing EAGLE's performance under the Contract.

EVERGREEN

3850 Three Mile Lane McMinnville, OR 97128
Phone (503) 472-9361 Fax (503) 472-9150

Given the representations made by the Postal Service regarding the volume of mail to be handled by EAGLE and EAGLE's justifiable reliance on that representation in planning its operations, it would be inappropriate for EAGLE's compensation to be calculated under the Pay Model that too was premised upon a larger volume of mail. Indeed, pursuant to the Pay Model, EAGLE is entitled to only $45.1 million total compensation, including the 15% increase attributed to the August 27, 2004 adjustment to the Consumer Price Index. Accepting this amount would not compensate EAGLE adequately for the costs incurred in performing its operations.

In order to rectify the inequitable circumstances created by the shortfall in mail provided to EAGLE and adequately compensate EAGLE for the services provided, we propose that the Postal Service reduce the twenty percent (20%) absorption factor to four and nine/tenths percent (4.9%). (See Exhibit E). This revised absorption factor was determined using the reduced mail volume while maintaining the same relative discount created by the contracted absorption factor. Applying this modified absorption figure would result in an equitable adjustment that is fair and reasonable to both parties. (See Exhibit D-1).

We look forward to discussing this significant issue with you at your earliest convenience.

Sincerely,

Brian Bauer
President
Evergreen-EAGLE

cc: D. Young
D. Bonham
L. Kelly

EVERGREEN EAGLE

3850 Three Mile Lane McMinnville, OR 97128
Phone (503) 472-9361 FAX (503) 472-9150

September 20, 2005

Cheryl R. Brazil
Purchasing and Supply Management Specialist
United States Postal Service
475 L' Enfant Plaza SW Room 4900
Washington DC 20260-6012

Re: Continued Shortfall Under
<u>EAGLE's Reformed SNET Contract</u>

Dear Ms. Brazil:

Another contract year has just concluded, and USPS continues to fail to provide EAGLE with the weight of mail to which it is contractually entitled. This failure by USPS has put EAGLE in a significant loss position under the SNET contract. As a result, EAGLE must demand assurances from USPS that it will conform to its contractual obligations.

When we negotiated the reformed contract in the spring and summer of 2003, one of the most significant building blocks – if not the most significant – was that USPS would increase the volume of mail then being handled by EAGLE by approximately 25%, to 1.25 billion pounds per year. USPS has never come through on that commitment, despite repeated requests by EAGLE and despite there being more than adequate mail in the USPS air and ground networks to provide those volumes to EAGLE for handling. EAGLE has tried to work with USPS on this matter, repeatedly reminding it of its obligations, but the total weight handled for the contract year ending August 26, 2005, like for the prior contract year, was under 1.0 billion pounds. Largely because of USPS's failure to provide the amount of mail it said it would, EAGLE is suffering significant losses under the Contract.

Unless USPS begins to comply with its contractual obligations to give EAGLE 1.25 billion pounds of mail per year, EAGLE is faced with the prospect of continuing, substantial losses for the remaining year of the base contract period and the three option years. Thus, EAGLE must demand immediate assurances by USPS that USPS will make all good faith efforts required to provide EAGLE for handling 1.25 billion pounds of mail from USPS's air and ground networks for all four of these contract years. We would also appreciate identification of what steps USPS is or will be taking to reach this contractual weight commitment.

Your prompt response would be greatly appreciated.

Sincerely,

Brian T. Bauer
President

cc: D. Bonham
L. Kelly

SUPPLY MANAGEMENT

UNITED STATES POSTAL SERVICE

October 14, 2005

Mr. Brian Bauer
Evergreen E.A.G.L.E.
3850 Three Mile Lane
McMinnville, OR 97128-9496

Dear Mr. Bauer:

This is in response to your letter, dated September 20, 2005, where you state that the Postal Service continues to fail to provide EAGLE with the weight of mail to which it is contractually entitled. You mention that because of this failure, EAGLE continues to suffer financial loss under the reformed SNET contracts. You demand adequate assurances that the Postal Service will provide EAGLE with the 1.25 billion pounds of mail you state is required for this contract year and for the 3 option years left on these contracts.

The Postal Service is not required to provide EAGLE with 1.25 billion pounds of mail under the three reformed SNET contracts (PR, SER, GLR) and so it will not be making such assurances. In addition, it has not been decided yet whether the Postal Service will even exercise any of the three options, so such assurance would be premature at best for that portion of the contracts.

As we stated in our April 28, 2005 letter to you on this matter, the contracts specifically state that the 1.25 billion pounds was an estimate and not a guarantee. Instead, the parties agreed that actual compensation would vary according to the actual weight and density of mail provided to EAGLE. See Section A.1 (a)-(j).

Once again, it is my understanding that the two parties jointly developed this contractual volume estimate as a fair and reasonable projection of future volume. The total number of pounds was based on density of the mail flow at the time and it has changed over time. Unfortunately, the actual volume has not reached the projection of late. Even if you disagree that the parties came up with the numbers jointly, I understand that the Postal Service contributed numbers that were based on historical and trend data available at the time and so reflected our best forecast of the expected volume in future years. Since the Postal Service consulted historical data, we believe our estimates were not negligent or careless and we certainly did not offer them in bad faith. We offered the best data we could at that time.

We would also like to point out that we have provided EAGLE an advance copy of each schedule block matrix at least twenty-one days in advance of the start of each schedule block, allowing EAGLE to react and plan accordingly for the appropriate labor. With few exceptions, the matrices have been accurate. EAGLE has also been compensated for the changes in density as related to the baseline. These density adjustments have consistently resulted in higher prices per pound over the baseline.

We consulted our attorneys concerning your previous allegations of negligently generated estimates. It is our understanding that the relevant case law would show that a 25% shortfall is not a grossly unreasonable estimate. We also understand the case law to state that when an estimate forms part of a government contract, like it did in this case, the risks associated with variances between actual requirements and estimated quantities are allocated to the supplier. Therefore, it was a risk EAGLE took when it signed this reformation which listed these numbers as estimates only--that the numbers might fall short. We also understand that it would be EAGLE's burden to show the Postal Service

475 L'ENFANT PLAZA SW
WASHINGTON DC 20260-6210
202 268 2098
FAX: 202 268 4313

negligently prepared the estimate. Since I understand the numbers to have been determined jointly, a factual issue would be present and have to be decided before one could determine the Postal Service prepared the estimate negligently.

Finally, we understand the case law to state that a supplier cannot succeed in these types of cases simply by arguing that a more reasonable approach to estimating the requirement was available or that the Postal Service could have created or searched for more accurate data.

Since this is our position, we are unable to give EAGLE any assurances that the volume it receives will be at any particular level. We believe we are performing our contract requirements as negotiated by the parties and as memorialized in the reformed contracts.

Sincerely,

Cheryl R. Brazil
Contracting Officer

cc: Mr. Pajunas
Mr. Young
Mr. Spatola
Mr. Griffith
Ms. Vance

1001 Pennsylvania Avenue, NW, Washington, DC 20004-2595 ▪ p202 624-2500 ▪ f202 628-5116

crowell moring

Frederick W. Claybrook, Jr.
(202) 624-2695
RClaybrook@crowell.com

October 25, 2005

**BY TELECOPY**

Cheryl Brazil,
Contracting Officer
U.S. Postal Service
Room 4900
475 L'Enfant Plaza, SW
Washington, D.C. 20260-6210

Re: Request for Final Decision on Contract Interpretation Claims Under SNET Contract

Dear Ms. Brazil:

Evergreen Aviation Ground Logistics Enterprises Inc. ("EAGLE") has asked me to respond your letter of October 14, 2005, in which you stated that USPS has no obligation under the SNET contract to provide EAGLE with approximately 1.25 billion pounds of mail annually to ground handle. EAGLE requests a final decision that USPS does have such an obligation. In addition, EAGLE requests a final decision that USPS is in material breach.

1.25 Billion Pounds Interpretation Claim

USPS committed in the reformed SNET Contract (SNET-01-PR, SNET 01-SER, and SNET-01-GLR, as reformed and effective March 1, 2003) to provide EAGLE with approximately 1.25 billion pounds of mail annually. USPS has not done so since the effective date of the reformed contract, and you effectively stated in your letter of October 14, 2005, that USPS will not make the necessary efforts to do so because it did not guarantee that weight to EAGLE. EAGLE requests USPS to reconsider that position and to recognize its contractual obligation to provide approximately 1.25 billion pounds of mail to EAGLE per year.

The central provision of the SNET Contract is found in section A of the Schedule and reads as follows:

**A.1 Pricing**

The purpose of these performance based service contracts is for the Postal Service to purchase and the Terminal Handling Supplier (THS) to provide integrated material handling services in support of the United States Postal Service's air and ground networks.

The contracts awarded under this solicitation shall be priced as follows:

a. The parties anticipate that the Postal Service will provide to the THS approximately 1.25 billion pounds of mail during each calendar year of the three contracts (SNET-01-GLR, SNET-01-PR, SNET-01-SER) and that the annual contract compensation for 1.25 billion pounds is estimated to be approximately $46.8 million, including fixed and variable costs. However, the parties recognize that the Postal Service does not guarantee a minimum weight of mail will be provided to the THS, and does not guarantee that annual compensation will total $46.8 million dollars. Actual compensation will vary according to the actual weight and density of mail provided to the THS in accordance with Sections A.1.b through A.1.j.

As stated in section B.5.b(1), "The integrated material handling services to be purchased are primarily intended to support Express, Priority, and First-Class mail." USPS does not claim that there is insufficient "Express, Priority, and First-Class" mail in its "air and ground networks" for the regions covered by EAGLE's contract to provide EAGLE sufficient mail to meet the 1.25 billion pounds specified, and EAGLE is well aware that there are sufficient volumes of these three "primar[y]" classes to meet the specified weight. If needed, USPS could also supply Standard mail to meet that specified weight.

In fact, despite repeated requests, USPS has not increased the weight of the mail handled by EAGLE under the SNET Contract to the anticipated levels, even though there was sufficient mail in the system to do so, and has taken a position that it has no obligation to do so because it did not guarantee that 1.25 billion pounds of mail would be provided. This interpretation is in error for the following reasons, among others:

(1) USPS's interpretation as expressed in your October 14 letter makes the contract language about 1.25 billion pounds meaningless and the contract illusory and void for indefiniteness and lack of mutuality. A commitment by one party only to provide a certain amount of mail if it wants to – and not if it doesn't – is no commitment at all. *See* RESTATEMENT (SECOND) OF CONTRACTS § 37 (1979) (if performance is optional, contract is illusory). Such an interpretation is disfavored at law. *See E.H. Sales, Inc. v. United States*, 340 F.2d 358, 360 (Ct. Cl. 1965).

(2) Such an interpretation also violates common sense and does violence to the understandings of the parties when they negotiated the reformed contract. EAGLE recognized that, in a contract of this type, it would be impossible to hit 1.25 billion pounds exactly. However, EAGLE understood USPS to be committing itself to providing approximately that poundage if it were available and to making the necessary efforts to do so. In essence, the reformed SNET Contract is a requirements contract for up to 1.25 billion pounds of mail annually.

(3) That is not only expressed in the contract, but also implied as a matter of law. The covenant of good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner. *See* RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981). "Every contract, as an aspect of the duty of good faith and fair dealing, imposes an implied obligation that neither party will do anything that will hinder or delay the other party in performance of the contract." *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2000). The covenant "imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to . . . destroy the reasonable expectations of the other party regarding the [purpose] of the contract." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005).

(4) Similarly, EAGLE did not understand the contract to give USPS an "out" to ignore the 1.25 billion pounds language because it did not "guarantee" that weight of mail. EAGLE understood that it was taking the risk that there might be a major drop-off in the mail sent by customers of USPS. It did not understand itself to be taking the risk that, even though customer mailings would be sufficient to support a 1.25-billion-pound level, USPS could elect not to provide that much mail.

(5) The pricing structure of the contract would not make sense otherwise. *See United States v. Winstar Corp.*, 518 U.S. 839, 863-64 (1996) (Souter, J.) (contract should not be read in a way that would not make business sense). The parties had extended discussions during negotiations in 2003 about the absorption "collar" for variable costs. Under the terms as insisted upon by USPS, USPS pays EAGLE nothing for the first 20% of weight over the baseline weight. The only way that made economic sense for EAGLE was for USPS to commit to an additional 25% beyond the collar for which EAGLE would be paid if those mail volumes were available. Again, EAGLE thought that the risk it was taking that the mail would be unavailable was minimal; it did not take the risk that USPS, for whatever reason, could decide not to tender available mail to EAGLE.

For these reasons, EAGLE requests USPS to reconsider its interpretation expressed in your October 14 letter and to issue a final decision concerning USPS's contractual commitment under section A.1. In particular, EAGLE requests a final decision that USPS is obligated under the SNET Contract to provide EAGLE with approximately 1.25 billion pounds of mail annually if there is sufficient mail in USPS's air and ground networks to do so.

Material Breach Interpretation Claim

For purposes of this material breach claim, EAGLE assumes that USPS in its final decision does not concur with EAGLE's contract interpretation concerning the weight obligation. USPS, for its part, must assume for purposes of this material breach claim that EAGLE's contract interpretation is the correct one. EAGLE requests a final decision that, under the two assumptions just stated, USPS has been and is continuing in material breach. The amounts involved are in the millions, with USPS denying EAGLE approximately 25% of the promised volume. This alone makes USPS's breach material. *See Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1550-52 (Fed. Cir. 1992).

Summary of Requests for Final Decisions

In summary, EAGLE requests final decisions from the Contracting Officer confirming as follows:

(1) USPS is obligated under the SNET contract to provide EAGLE for ground handling approximately 1.25 billion pounds of mail annually from its air and ground networks if available;

(2) If USPS does not provide the requested final decision interpretation in (1) above but EAGLE's interpretation on this issue is correct, USPS was and is in material breach.

As the damage to EAGLE from USPS's breach continues to accumulate, EAGLE requests your final decision to be issued as promptly as possible and well before the sixty-day deadline of the Contract Disputes Act. EAGLE reserves its right to file damages claims and to raise additional theories of entitlement when doing so, including but not limited to fraud in the inducement and promissory estoppel, should facts discovered or positions taken by USPS so warrant.

Sincerely yours,

Frederick W. Claybrook, Jr.
Attorney for EAGLE

cc: Mr. Brian Bauer
Mr. Daniel G. Bonham
Ms. Liane C. Kelly
David P. Hendel, Esq.

2262402v2

SUPPLY MANAGEMENT

UNITED STATES
POSTAL SERVICE

**VIA CERTIFIED MAIL RETURN RECEIPT**
**REQUESTED NO. 7099 3400 0008 5889 7029**

January 3, 2006

Mr. Brian T. Bauer, President
Evergreen Aviation Ground
Logistics Enterprises, Inc. – E.A.G.L.E.
3850 Three Mile Lane
McMinnville, OR 97128

Re: Final Decision on Non-Monetary Dispute Dated October 25, 2005

Dear Mr. Bauer:

We are in receipt of your request for a final decision and contract interpretation on the three reformed SNET contracts, SNET-01-PR, SNET-01-SER and SNET-01-GLR. Evergreen has alleged that these contracts are requirements contracts and that the Postal Service did not give it all its required volume for these three contracts to Evergreen, thereby missing the 1.25 billion pound per year contract estimate and breaching the contracts.

The Postal Service disagrees with your characterization of the referenced contracts as "requirements" contracts. The Postal Service asserts that these contracts are instead Indefinite Quantity contracts where the consideration is the yearly fixed cost described in Section A.1.b. of the contract, which is paid bi-weekly, irrespective of the volume of mail processed by Evergreen. In fact, Evergreen will receive this fixed cost even if it does not process one piece of mail under these contracts.

At contract reformation, effective March 1, 2003, that fixed payment was over $6.3 million per year and has been adjusted up per bilateral modification according to the terms of the contracts. Since the above referenced agreements are indefinite quantity contracts containing sufficient consideration, there is no breach of contract as you allege.

Furthermore, estimates and how they were derived are irrelevant to a discussion of breach in an indefinite quantity contract. However, even if these contracts were requirements contracts, the law is clear that the estimate, here 1.25 billion pounds per year, is not guaranteed. Even in requirements contracts, breach does not occur if the actual amounts tendered do not reach the estimated amounts.

This is the final decision of the contracting officer pursuant to the Contract Disputes Act of 1978 and the clause of your contract entitled Claims and Disputes. You may appeal this decision to the Postal Service Board of Contract Appeals by mailing or otherwise furnishing written notice (preferably in triplicate) to the contracting officer within 90 days from the date you receive this decision. The notice

should identify the contract by number, reference this decision, and indicate that an appeal is intended. Alternatively, you may bring an action directly in the United States Court of Federal Claims within 12 months from the date you receive this decision.

Sincerely,

Cheryl R. Brazil
Contracting Officer

cc: Mr. Claybrook, Jr.
Mr. Hendel
Mr. Young
Mr. Pajunas
Mr. Griffith
Mr. Spatola
Mr. O'Reilly
Ms. Vance
Mr. Shapiro