IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| EVERGREEN AVIATION GROUND LOGISTICS ENTERPRISES, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-11C<br>Allegra, J. |
| UNITED STATES, | ) | |
| Defendant. | ) | |

EAGLE'S BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS AND IN SUPPORT OF
EAGLE'S CROSS-MOTION FOR SUMMARY JUDGMENT

Frederick W. Claybrook, Jr.
(Counsel of Record)
Daniel R. Forman
Jenny Kim

Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington, D.C. 20004
(202) 624-2500
Attorneys for EAGLE

March 17, 2006

TABLE OF CONTENTS

Facts ........ 2

Argument ........ 4

I. The Reformed Contract Requires USPS to Provide the Quantity Specified If Available ........ 4

 A. The Reformed Contract Expanded the Sources and Amounts of Mail to Be Handled by EAGLE ........ 6

 B. The Reformed Contract on Its Face Requires USPS to Provide the Specified Amount If It Is Available ........ 9

 C. The Negotiation History of the Reformed Contract and Other Rules of Law Demonstrate the USPS Commitment ........ 17

II. USPS's Breach Is Material ........ 22

Conclusion ........ 25

# TABLE OF AUTHORITIES

Cases

*Ace-Federal Reporters, Inc. v. Bannum*,
226 F.3d 1329 (Fed. Cir. 2000) ........ 13, 16

*Arizona v. United States*,
595 F.2d 855 (Ct. Cl. 1978) ........ 11, 18

*ARP Films, Inc. v. Marvel Entm't Group, Inc.*,
952 F.2d 643 (2d Cir. 1991) ........ 23

*Barton Chemical Corp. v. Pennwalt Corp.*,
106 Ill. App. 3d 561, 436 N.E. 2d 51 (1st Dist. 1982) ........ 12

*Brooklyn & Queens Screen Mfg. Co. v. United States*,
97 Ct. Cl. 532 (1942) ........ 23

*Bryan D. Highfill*,
99-1 B.C.A. (CCH) ¶ 30,316 (HUD BCA 1999) ........ 14

*Centex Corp. v. United States*,
395 F.3d 1283 (Fed. Cir. 2005) ........ 5, 11

*Centronics Corp. v. Genicom Corp.*,
132 N.H. 133, 562 A.2d 187 (1989) ........ 14

*Coast Fed. Bank, FSB v. United States*,
323 F.3d 1035 (Fed. Cir. 2003) (*en banc*) ........ 6

*Consumers Oil Co.*,
86-1 B.C.A. (CCH) ¶ 18,647 (ASBCA 1985) ........ 24

*Crossroads v. United States*,
173 F. Supp. 805 (Ct. Cl. 1959) ........ 18

*Dot Sys., Inc. v. United States*,
231 Ct. Cl. 765 (1982) ........ 10

*DuBarry International, Inc. v. Southwest Forest Industries, Inc.*,
231 Cal. App. 3d 552, 282 Cal. Rptr. 181 (2d Dist. 1991) ........ 12

*E.H. Sales, Inc. v. United States*,
340 F.2d 358 (Ct. Cl. 1965) ........ 21

*Empire Gas Corp. v. Am. Bakeries Co.*,
840 F.2d 1333 (7th Cir. 1988) ........................................ 25

*Essex Electro Eng'rs, Inc. v. Danzig*,
224 F.3d 1283 (Fed. Cir. 2000) ........................................ 5

*Export Packing and Crating Co.*,
73-2 B.C.A. (CCH) ¶ 10,066 (ASBCA 1973) ........................................ 12

*Goldwasser v. United States*,
325 F.2d 722 (Ct. Cl. 1963) ........................................ 21

*Gould, Inc. v. United States*,
935 F.2d 1271 (Fed. Cir. 1991) ........................................ 11

*In re New Hampshire Elec. Coop., Inc.*,
131 B.R. 249 (D.N.H. 1991)........................................ 12

*Kozak Micro Sys., Inc.*,
91-1 B.C.A. (CCH) ¶ 23,342 (GSBCA 1991) ........................................ 14

*Lewis-Nicholson, Inc. v. United States*,
550 F.2d 26 (Ct. Cl. 1977) ........................................ 5

*Louisiana Power & Light Co. v. United Gas Pipe Line Co.*,
642 F. Supp. 781 (E.D. La. 1986)........................................ 15, 18

*Lowdenback Fertilizer Co. v. Tennessee Phosphate Co.*,
121 Fed. 298 (6th Cir. 1903) ........................................ 15

*Luria Bros. v. United States*,
369 F.2d 701 (Ct. Cl. 1966) ........................................ 5

*Malone v. United States*, 849 F.2d 1441,
*modified on other grounds*, 857 F.2d 787 (Fed. Cir. 1988) ........................................ 5, 6

*Mason v. United States*,
615 F.2d 1343 (Ct. Cl. 1980) ........................................ 10

*Maya Transit Co.*,
75-2 B.C.A. (CCH) ¶ 11,552 (ASBCA 1975) ........................................ 12

*New Valley Corp. v. United States*,
119 F.3d 1576 (Fed. Cir. 1997) ........................................ 6

*Newsom v. United States*,
676 F.2d 647 (Ct. Cl. 1982) ........................................ 20

*Orlosky Inc. v. United States*,
68 Fed. Cl. 296 (2005) ........ 5

*P.R. Burke Corp. v. United States*,
277 F.3d 1346 (Fed. Cir. 2002) ........ 20

*Pacificorp Cap., Inc. v. United States*,
25 Cl. Ct. 707 (1992)........ 6

*Perry and Wallis, Inc. v. United States*,
427 F.2d 722 (Ct. Cl. 1970) ........ 18

*Ralph Constr., Inc. v. United States*,
4 Cl. Ct. 727 (1984)........ 21

*Schneider v. Dumbarton Developers, Inc.*,
767 F.2d 1007 (D.C. Cir. 1985) ........ 23

*Stone Forest Indus., Inc. v. United States*,
973 F.2d 1548 (Fed. Cir. 1992) ........ 23

*Stratos Mobile Networks USA, LLC v. United States*,
213 F.3d 1375 (Fed. Cir. 2000) ........ 18

*Suburban Contracting Co. v. United States*,
76 Ct. Cl. 533 (1932)........ 23

*Tech. Assistance Int'l, Inc. v. United States*,
150 F.3d 1369 (Fed. Cir. 1998) ........ 13, 14

*Tecom, Inc. v. United States*,
66 Fed. Cl. 736 (2005) ........ 5,6

*Thanet Corp. v. United States*,
591 F.2d 629 (Ct. Cl. 1979) ........ 18

*Torncello v. United States*,
651 F.2d 756 (Ct. Cl. 1982) (*en banc*) ........ 13

*Travel Ctr. v. Barram*,
236 F.3d 1316 (Fed. Cir. 2001) ........ 8

*United States v. Stuart*,
489 U.S. 353 (1989) ........ 18

*United States v. Turner Constr. Co.*,
819 F.2d 283 (Fed. Cir. 1987) ........ 20

*United States v. Winstar Corp.*,
518 U.S. 839 (1996) .................................................. 19, 20

*Valley Forge Flag Co.*,
97-2 B.C.A. (CCH) ¶ 29,246 (VABCA 1997) .................................................. 12, 17

*Womack v. United States*,
389 F.2d 793 (Ct. Cl. 1968) .................................................. 17

Statutes and Regulations

U.C.C.
§ 2-305 & cmt. 3.................................................. 14
§ 2-306 & cmts. 1, 2, 5 .................................................. 14

USPS Domestic Mail Manual.................................................. 8

USPS Purchasing Manual
§ 2.4.6.c.1 .................................................. 10
§ 2.4.6.d.1.................................................. 12

Treatises

RESTATEMENT (SECOND) OF CONTRACTS (1981)
§ 201(2) .................................................. 18
§ 205.................................................. 5, 6, 14
§ 206.................................................. 20
§ 241 cmt. f (1981) .................................................. 24

STEVEN J. BURTON & ERIC G. ANDERSEN
CONTRACTUAL GOOD FAITH (1995)
§ 2.3.4.................................................. 6
§ 2.2.1.2.................................................. 14
§ 3.4.2.1 .................................................. 14
§§ 6.3 *et seq.* .................................................. 24

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| EVERGREEN AVIATION GROUND LOGISTICS ENTERPRISES, INC., Plaintiff, | |
| v. | No. 06-11C<br>Allegra, J. |
| UNITED STATES, Defendant. | |

EAGLE'S BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS AND IN SUPPORT OF
EAGLE'S CROSS-MOTION FOR SUMMARY JUDGMENT

USPS promises in the contract that it "will provide" EAGLE 1.25 billion pounds of mail per year to handle, but only "anticipates" that there will be that much mail available and does not "guarantee" it. In fact, USPS has had, and continues to have, enough mail to give EAGLE 1.25 billion pounds per year. It just finds it to its advantage not to give EAGLE that much. But that is an option the agreement does not give USPS.

EAGLE and USPS reformed their contract in 2003 to provide EAGLE with a good-faith assurance of increased amounts of mail to be handled to justify EAGLE's increased expenditures in facilities and personnel. USPS in the text of the Reformed Contract and during negotiations repeatedly told EAGLE that it would provide it 1.25 billion pounds of mail per year if it were available in USPS's air and grounds networks. Those volumes have been available, but instead of providing

them to EAGLE after executing the Reformed Contract, USPS has kept the volumes right around 1.0 billion pounds, obtaining close to maximum benefit of the "absorption collar" in the Reformed Contract that gave USPS a 20% "free zone." By not providing EAGLE the additional poundage for which it would have had to pay, USPS has cost EAGLE tens of millions of dollars in revenue in the last few years. USPS is in breach of contract, and materially so.

## Facts[1]

In 2001, EAGLE won consolidated contracts ("Initial Contract"[2]) for mail handling services for USPS in three regions of the country. Under the Initial Contract, EAGLE provided handling services to support USPS's contract with FedEx for air transportation of the mail. The Initial Contract did not expressly include other air transportation or USPS's ground network for mail transportation, only the FedEx requirements. (FF ¶¶ 3-15.)

In early 2003, EAGLE and USPS representatives had a series of meetings in which they negotiated a reformation of the Initial Contract. The "Reformed Contract" is the agreement currently in place between the parties. Negotiation of the Reformed Contract was made necessary because the amounts of mail handled under the Initial Contract were greatly in excess of those estimated – approximately

1 The facts are set out in greater detail in EAGLE's Proposed Findings of Uncontroverted Fact ("FF") and in the affidavits of Messrs. Bonham, Bauer, and Schrock. In this section, we will only summarize the relevant facts.

2 The relevant excerpts of the Initial Contract are exhibit 1 to the Bonham Affidavit, which is Attachment A to EAGLE's Proposed Findings of Uncontroverted Fact.

1.0 billion pounds per year instead of 870 million – resulting in substantial additional capital expenditures by EAGLE to handle the traffic. Under the Reformed Contract, the parties negotiated a further increase to the traffic level and the pricing scheme to compensate EAGLE in an acceptable amount. This involved, in part, expanding coverage to other sources of mail in the USPS air network and in the ground network and increasing the amount of mail to be tendered, if available, from the approximately 1.0 billion pounds previously experienced to approximately 1.25 billion pounds annually. (FF ¶¶ 16-62.)

The parties reflected their basic agreement in one of the very first substantive provisions of the Reformed Contract[3]:

> The parties anticipate that the Postal Service will provide to [EAGLE] approximately 1.25 billion pounds of mail during each calendar year . . . and that the annual contract compensation for 1.25 billion pounds is estimated to be approximately $46.8 million, including fixed and variable costs. However, the parties recognize that the Postal Service does not guarantee a minimum weight of mail will be provided to [EAGLE], and does not guarantee that annual compensation will total $46.8 million dollars. Actual compensation will vary according to the actual weight and density of mail provided to [EAGLE] in accordance with Sections A.1.b through A.1.j.

(Reformed Contract § A.1.a at 3.) The rub has come in performance.

Despite the fact that USPS has had sufficient mail in its system to provide EAGLE the anticipated 1.25 billion pounds annually since the Reformed Contract went into effect, USPS has consistently refused to provide mail at that rate.

---

[3] The Reformed Contract is attached as the Appendix to USPS's motion and the relevant excerpts are exhibit 18 to the Bonham Affidavit.

Instead, USPS has continued to provide mail to EAGLE at a rate of approximately 1.0 billion pounds per year, a rate which minimizes EAGLE's benefits and maximizes those of USPS, due to the "absorption collar" provisions of the Reformed Contract. As a result of USPS's refusal to provide EAGLE with available mail up to 1.25 billion pounds per year, EAGLE has lost revenues in the tens of millions of dollars. (FF ¶¶ 63-65.)

## Argument

The principal issue of law is straightforward: Does USPS have a duty to supply the amount of mail the contract specifies it "will provide," assuming that amount is available? Put another way: Did EAGLE assume the risk that USPS could provide whatever amount of mail USPS wished, or did it only assume the risk that the anticipated amount of mail would not materialize from the USPS customers? USPS treats the contractual language as hortatory, admitting no obligations because the amount of mail was not "guaranteed." However, the "no guarantee" language drafted by USPS did not eliminate USPS's express and good faith duties to provide the mail if it were available.

### I. The Reformed Contract Requires USPS to Provide the Quantity Specified If Available

The only reasonable reading of the Reformed Contract is that USPS is required to provide approximately 1.25 billion pounds of mail per year to EAGLE, if such amounts of mail are available. This is apparent from a plain reading of the Reformed Contract, especially when it is read in the context of the relevant changes

made from the Initial Contract. It is also clear from the negotiation history of the Reformed Contract and its basic purpose.

All this must be viewed, of course, from the perspective that every government contract, of whatever type, carries with it implied duties of good faith and fair dealing. *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005); *Orlosky Inc. v. United States*, 68 Fed. Cl. 296, 311 (2005); *see* RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981). These duties require the parties to facilitate the performance of each other, allowing the other party to reap the expected benefits of the bargain: "Every contract, as an aspect of the duty of good faith and fair dealing, imposes an implied obligation 'that neither party will do anything that will hinder or delay the other party in performance of the contract.'" *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2000) (*quoting Luria Bros. v. United States*, 369 F.2d 701, 708 (Ct. Cl. 1966)); *accord Malone v. United States*, 849 F.2d 1441, 1445, *modified on other grounds*, 857 F.2d 787 (Fed. Cir. 1988); *Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 769-70 (2005). "The covenant imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex*, 395 F.3d at 1304 (*citing* RESTATEMENT (SECOND) OF CONTRACTS § 205). "Indeed, not only must the Government refrain from hindering the contractor's performance, it must do whatever is necessary to enable the contractor to perform." *Lewis-Nicholson, Inc. v. United States*, 550 F.2d 26, 32 (Ct. Cl. 1977) (citing authorities). These

implied duties prohibit any party from trying to recapture benefits foreclosed at the time of contracting. *See* STEVEN J. BURTON & ERIC G. ANDERSEN, CONTRACTUAL GOOD FAITH § 2.3.4 (1995). The compilers of the RESTATEMENT include among the list of breaches of good faith duties the "evasion of the spirit of the bargain, . . . willful rendering of imperfect performance, . . . and interference with or failure to cooperate in the other party's performance"; they instruct that good faith performance of a contract "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . . ." RESTATEMENT (SECOND) OF CONTRACTS § 205 cmts. a, d (1981) (*cited favorably in Malone*, 849 F.2d at 1445). USPS's conduct pursuant to its interpretation of the Reformed Contract breaches these basic, good faith duties.

A. The Reformed Contract Expanded the Sources and Amounts of Mail to Be Handled by EAGLE

The plain meaning of section A.1.a of the Reformed Contract must be examined is the context of the entire document. *See Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035 (Fed. Cir. 2003) (*en banc*); *New Valley Corp. v. United States*, 119 F.3d 1576, 1580 (Fed. Cir. 1997); *Tecom*, 66 Fed. Cl. at 747. In these circumstances, such consideration entails an examination of both the Initial Contract and the Reformed Contract and of the relevant changes from one to the other. *See Pacificorp Cap., Inc. v. United States*, 25 Cl. Ct. 707, 716 (1992) (if one contract refers to another, both should be considered).

A key consideration of the Reformed Contract was the further increase in the amount of mail to be handled by EAGLE in its recently expanded facilities. This

was to be accomplished, at least in part, by expanding the sources of mail from those to be transported by air only by FedEx (per the Initial Contract) to any or all mail in the USPS air and ground networks (per the Reformed Contract). This was reflected in several provisions in the Reformed Contract necessarily modified from the Initial Contract.

First, the Initial Contract was a requirements contract for all the air mail carried by FedEx in the regions. (FF ¶¶ 11, 15.) The Initial Contract identified the "basic purpose" of the Statement of Work as to "detail the duties and responsibilities of the third party ground handler [EAGLE] and [USPS] and the contracted aviation supplier [FedEx]." (Initial Contract § B.2.a at 2.) The Initial Contract used "aviation supplier" as a defined term, *i.e.*, "the <u>sole</u> supplier of air transportation" for mail to be handled. (Initial Contract § G.1 at 25 (emphasis added).) There is no mention of mail being provided to EAGLE for handling to support air transportation suppliers other than FedEx or to support USPS's ground distribution networks. (FF ¶¶ 11-12.)

In the Reformed Contract, the purpose of the contract was restated (by USPS) as "to provide integrated material handling services in support of the U.S. Postal Service's <u>air and ground networks</u>." (Reformed Contract § B.1 at 10 (emphasis added).) Similarly, in the initial sentence of the Schedule of the Reformed Contract, USPS stated that the purpose of the contracts was for USPS "to purchase and [EAGLE] to provide integrated material handling services in support of [USPS]'s <u>air and ground networks</u>." (Reformed Contract § A.1 at 3 (emphasis

added).) The definition of "Aviation Supplier" in the Reformed Contract was changed to "a supplier of air transportation," eliminating the "sole supplier" language in the Initial Contract and deleting another phrase applicable only to FedEx.[4] (Reformed Contract § G.1 at 51 (emphasis added).)

Second, the Initial Contract does not specify what type of mail will be provided to EAGLE, although it was known to EAGLE that the FedEx contract with USPS called for it to provide transportation of Express, Priority, and First-Class Mail. (FF ¶¶ 3, 4, 7.) In the Reformed Contract, USPS added the following statement: "The integrated material handling services to be purchased are primarily intended to support Express, Priority and First Class Mail." (Reformed Contract § B.5.b(1) at 12 (emphasis added).) Obviously, "primarily" does not mean "exclusively." *Cf. Travel Ctr. v. Barram*, 236 F.3d 1316, 1319 (Fed. Cir. 2001) ("preferred" source is not equivalent to "exclusive" source). Other types of mail that USPS could provide to EAGLE for handling include Standard Mail and Periodicals. *See* USPS Domestic Mail Manual, http://pe.usps.gov/text/dmm300/dmm300_landing.htm, §§ 150 (Parcel Post), 160 (Bound Printed Matter), 170 (Media Mail), 180 (Library Mail), 240 (Standard Mail), 707 (Periodicals).

---

4 The Initial Contract defined "Aviation Supplier" in full as "the sole supplier of air transportation and the terminal handler at the hub transfer point." The latter phrase was deleted in the Reformed Contract, as it only applied to FedEx handling the mail at its Memphis hub. (FF ¶¶ 12, 42-47.)

USPS argues (at 15-16) that section G-10 references other terminal handling suppliers. In fact, as can be easily seen from the prior reference in that section to "aviation supplier," "supplier" there refers to other transportation

(continued…)

Third, the parties changed the pricing provisions significantly. Under the Initial Contract, EAGLE was to provide all handling services for the FedEx traffic in the regions for a fixed, annual fee. The total estimated quantity was set as approximately 870 million pounds per year. (FF ¶¶ 10, 13.) Under the Reformed Contract, a detailed pricing structure was set up in the Schedule with payment basically by the pound. The parties also added an "absorption collar" provision to the Reformed Contract, under which, for the first 20% over the estimated quantities of the Initial Contract (which were incorporated into the Reformed Contract), EAGLE would receive no additional compensation, but would then begin receiving compensation again, on a per-pound basis, for every pound over the 20% collar. (Reformed Contract § A.1.d at 4-5.) Thus, there is effectively a "free zone" for USPS for amounts between 870 million pounds and 1.0 billion pounds per year.[5] (FF ¶ 60.)

### B. The Reformed Contract on Its Face Requires USPS to Provide the Specified Amount If It Is Available

From the face of the Reformed Contract, and particularly in consideration of the material changes made from the Initial Contract, the only reasonable reading of

(…continued)

suppliers like FedEx, not terminal handling suppliers like EAGLE. (FF ¶ 52.)

[5] This is an oversimplification, because the absorption collar is actually based on separate figures for each of the locations serviced by EAGLE. (FF Attach. C (Schrock Aff.) tab 2.)

the language in section A.1 concerning the 1.25 million pounds of mail annually is as follows:

> (a) USPS agrees to expand the sources of mail that are available for EAGLE to handle to include not just FedEx mail but also other mail in the USPS air and ground networks; and
>
> (b) USPS agrees it "will provide" mail to EAGLE for handling at a rate of approximately 1.25 billion pounds per year; and
>
> (c) the parties "anticipate" that much mail will be available, but EAGLE takes the risk that there will be insufficient mail in USPS's air and ground networks to supply EAGLE with that much mail.

This gives full, harmonizing weight to all parts of section A.1.a, in contrast to the reading pressed by USPS in its motion to dismiss.

USPS asserts (at 10-12) that it has no obligation to provide EAGLE with any given amount of mail, calling the Reformed Contract an "IDIQ" contract. While labels are not dispositive, the Reformed Contract certainly is not an IDIQ contract. It does not claim to be, and it states neither a minimum nor a maximum quantity that must be purchased, which is the *sine qua non* of an IDIQ contract and required by USPS regulation. *See* USPS Purchasing Manual, http://www.usps.com/cpim/ftp/manuals/pm/html/chap2.html, § 2.4.6.c.1 ("An indefinite-quantity contract provides for an indefinite quantity of specific supplies or services, within a stated minimum and maximum . . ."); *Travel Ctr.,* 236 F.3d at 1318-19; *Dot Sys., Inc. v. United States*, 231 Ct. Cl. 765, 768-69 (1982); *Mason v. United States*, 615 F.2d 1343, 1346 n.5 (Ct. Cl. 1980). Far from stating a requisite minimum amount as it would have had to have done if it were an IDIQ contract, the Reformed Contract states

expressly to the contrary, that USPS "does not guarantee a minimum weight of mail." (Reformed Contract § A.1.a at 3.)

USPS's proffered "IDIQ" interpretation also fails because it makes superfluous the first sentence of section A.1.a, which says the parties anticipate USPS "will provide" 1.25 billion pounds and will "compensat[e]" EAGLE approximately $46.8 million per year. *See generally Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991 (language is not to be read to make it meaningless and is to be harmonized with other provisions) (*quoting Arizona v. United States*, 595 F.2d 855, 863 (Ct. Cl. 1978)). Under USPS's now-proffered interpretation, the first sentence was inserted by USPS as a "gotcha" – it is just there to suggest a satisfactory arrangement that, in reality, USPS is making no commitment to fulfill, as USPS does not have to provide the poundage if it decides not to do so. But it is unreasonable to read the second sentence of section A.1.a as effectively canceling out the first. USPS assumed an express duty to provide 1.25 billion pounds of mail per year if that anticipated amount materialized, and that express term is reinforced by implied duties of good faith and fair dealing. EAGLE assumed a real risk by virtue of the "no guarantee" language, but it was a limited risk. EAGLE's risk was only that customers would not use USPS's services enough to generate sufficient mail to meet the anticipated amounts (and, thus, the anticipated revenues). This reading harmonizes all the section's language and leaves it all meaningful.

To the extent that labels are relevant, the Reformed Contract could be viewed either as a definite quantity contract with the risk that the specified quantity will not materialize put on EAGLE[6] or, probably better, as a "partial requirements contract" as specified in the USPS Purchasing Manual.[7] That this is a type of requirements contract is supported by the facts that the Initial Contract was a requirements contract (FF ¶¶ 11, 15) and that the changed language in the Reformed Contract increases, not diminishes, the sources of mail for handling. This conclusion also follows from the very "no guarantee" language on which USPS places its sole reliance: "no guaranteed minimum" language is wholly <u>inconsistent</u>

---

[6] The Reformed Contract says USPS "will provide" EAGLE with "approximately" 1.25 billion pound of mail per year, but the fact that the 1.25 billion is an approximation does not disqualify the contract from being viewed as a definite quantity contract. The "approximately" is a recognition of the fact that it would be impossible for the amount to be achieved exactly. (FF ¶ 41.) USPS's good faith duties still require it to achieve as close to the amount as is reasonably possible, whatever the contract type. *See Centex*, 395 F.3d at 1304.

[7] The USPS Purchasing Manual at section 2.4.6.d.1 provides, "A requirements contract provides for filling all <u>or specified portions of</u> actual purchase requirements of designated activities for specific supplies and services . . . ." (Emphasis added.) The ASBCA has called contracts promising less than all requirements a "limited form" of requirements contracts. *E.g.*, *Maya Transit Co.*, 75-2 B.C.A. (CCH) ¶ 11,552 (ASBCA 1975); *Export Packing and Crating Co.*, 73-2 B.C.A. (CCH) ¶ 10,066 (ASBCA 1973). Cases involving partial requirements contracts in other contexts include *In re New Hampshire Electric Cooperative, Inc.*, 131 B.R. 249 (D.N.H. 1991) (contract for needs not met by two other power plants); *DuBarry International, Inc. v. Southwest Forest Industries, Inc.*, 231 Cal. App. 3d 552, 282 Cal. Rptr. 181 (2d Dist. 1991) (contract to supply "up to 60,000 tons/year" of cardboard); *Barton Chemical Corp. v. Pennwalt Corp.*, 106 Ill. App. 3d 561, 436 N.E. 2d 51 (1st Dist. 1982) (contract for part of chemical requirements); and *Valley Forge Flag Co.*, 97-2 B.C.A. (CCH) ¶ 29,246 (VABCA 1997) (contract to supply 60% of agency's flag requirements).

with an IDIQ contract, but it is entirely consistent with a requirements contract, under which the buyer states no minimum amount but generally does provide an estimate of what it anticipates the requirements will be. *See Torncello v. United States*, 651 F.2d 756, 761 (Ct. Cl. 1982) (*en banc*).

The absorption pricing provision that creates a pricing floor of 20% of the baseline quantities, on which USPS (at 13-14) tries to build a "minimum guarantee" for an IDIQ contract, does not change the analysis. Not only does the absorption pricing provision not read as if it were setting an IDIQ minimum quantity, but that pricing provision is also wholly consistent with a requirements-type contract. *See Tech. Assistance Int'l, Inc. v. United States*, 150 F.3d 1369, 1373 (Fed. Cir. 1998) (observing that a seller in its requirements contract is free to tailor risk-limiting provisions). The absorption provision is unique, but it does not change the contract type, and it does not make the Reformed Contract unenforceable. As the Federal Circuit stated in *Ace-Federal Reporters, Inc. v. Bannum*, 226 F.3d 1329, 1332 (Fed. Cir. 2000), "A contract is not unenforceable merely because it doesn't fit neatly into a recognized category." In that case, the agency could select other schedule contract suppliers to provide the services and argued that, *ipso facto*, the contract was not of a requirements type. The court brushed this aside, finding the contract was of a requirements type and enforceable because it had the requisite mutuality of obligation and definiteness.[8] *Id.*

---

[8] This, of course, dispenses with USPS's suggestion (at 15-16) that this cannot be a requirements-type contract because USPS has other terminal handlers

(continued…)

Without rehearsing the legion of cases which confirm that good faith duties attach to every contract, EAGLE points out that such duties particularly are inherent in a requirements-type contract. *See generally Tech. Assistance Int'l*, 150 F.3d at 1371-73. The quantities are not guaranteed ahead of time, and so the parties agree that the supplier will provide all or a specified part of the buyer's needs. The buyer breaches his good faith obligations if he artificially manipulates his needs by doing some of the work himself or if he diverts some of the business to a cheaper supplier. Such conduct breaches the duties to cooperate with and to facilitate the other party's performance and impermissibly recaptures benefits foregone at the time of contracting.[9] *Id.*; *see also Centronics Corp. v. Genicom Corp.*, 132 N.H. 133, 144, 562 A.2d 187, 193 (1989) (Souter, J.) ("the concept of good faith in performance addresses the particular problem raised by a promise subject to such

(…continued)

in the region, even though USPS misreads the Reformed Contract in this regard. (FF ¶¶ 52, 53 & Attach. A (Bonham Aff.) ¶¶ 5, 50, 51.)

9 *E.g.*, *Bryan D. Highfill*, 99-1 B.C.A. (CCH) ¶ 30,316 at 149,905 (HUD BCA 1999) ("HUD breached Appellant's [requirements] contract by providing contract services using Government personnel"); *Kozak Micro Sys., Inc.*, 91-1 B.C.A. (CCH) ¶ 23,342 at 117,058 (GSBCA 1991) ("The Government may not develop and use additional capabilities to eliminate a part of work that the contractor had every expectation of receiving"); *Maya Transit Co.*, 75-2 B.C.A. (CCH) at 55,125 ("a contract for requirements in excess of that capability does not give the Government the right to develop and use additional capability at the expense of the contractor"). *See generally* STEVEN J. BURTON & ERIC G. ANDERSEN, CONTRACTUAL GOOD FAITH §§ 2.2.1.2, 3.4.2.1 (1995); RESTATEMENT (SECOND) OF CONTRACTS § 205 cmts. a, d & illus. 5 (1981). *Cf.* U.C.C. §§ 2-305 & cmt. 3 (discretion in one party to set price term bounded by duty of good faith), 2-306 & cmts. 1, 2, 5 (good faith duties inherent in requirements contracts).

a degree of discretion that its practical benefit could seemingly be withheld"). The following cases involving requirements-type contracts are illustrative.

In *Lowdenback Fertilizer Co. v. Tennessee Phosphate Co.*, 121 Fed. 298 (6th Cir. 1903), the buyer agreed to purchase all its phosphate rock requirements from the seller for five years at a fixed price. The purpose of the rock was to allow the buyer to manufacture acid sulfate from it and then to sell the manufactured product as fertilizer. However, for more than a year during the term of the contract, the market price was below the contract price for the rock, and the buyer ceased its own manufacture and purchased acid phosphate directly from other manufacturers. The Sixth Circuit instructed that this was a breach of the buyer's good faith duties. By purchasing acid phosphate from others, rather than manufacturing its own, the buyer abused its discretion for a purpose not reasonably contemplated by the parties, materially breaching the contract and excusing the seller of any future obligations to deliver. *Id*. at 302-03.

In *Louisiana Power & Light Co. v. United Gas Pipe Line Co.*, 642 F. Supp. 781 (E.D. La. 1986), the contract required United to deliver one-third of LP&L's natural gas requirements for a given plant, subject to certain maximums. LP&L argued that it could group its purchases over the entire term of the multi-year contract as long as it had taken one-third of its requirements from United over the entire period (*i.e.*, it could take none for some period and then greater than one-third over another period to average out to one-third), thus allowing it to play the market to some degree. The court found that this interpretation "would come

dangerously close to destroying the mutuality of obligation required for a valid contract" because it would "place United largely at the mercy of LP&L's whim or caprice on any given day, and for long periods of time." *Id*. at 798. The court concluded that, to the contrary, LP&L "was obligated to exert its best efforts to take 1/3 of its fuel requirements from United at all times . . . ." *Id*.

In *Ace-Federal Reporters*, GSA obtained reporting services from companies other than those, like Ace-Federal, to whom it had previously issued overlapping (and thus "partial" or "limited") requirements contracts for various regions. This subjected Ace-Federal to competition from not just the other schedule providers with partial requirements contracts like itself (from one to four other competitors in the various regions for which it had a contract), but to thousands of competitors in the affected markets. *Id.* at 1332. The court instructed that GSA had breached its express and implied obligations to Ace-Federal by recapturing an opportunity foreclosed by the contract, *i.e.,* by competing its work in the broader marketplace. *Id.* at 1332-33.

The appropriate principles and their application as reflected in these cases – and as reflected in section 205 of the RESTATEMENT (SECOND) OF CONTRACTS – are apparent. While USPS did not promise to let EAGLE handle its entire requirements in its air and ground networks, it did agree to provide EAGLE with approximately 1.25 billion pounds per year if that anticipated poundage materialized. For whatever reasons USPS decided not to give EAGLE the full 1.25 billion pounds of mail, even though it was available – whether because it wanted to

do the work itself, because it could get the work performed more cheaply elsewhere, or because it wanted to minimize its overall price per pound by not materially exceeding the absorption collar – it tried to recapture opportunities foregone and violated EAGLE's reasonable expectations. As a result, USPS breached its express and good faith duties under the Reformed Contract.

The "no guarantee" language on which USPS exclusively relies cannot be read out of context and converted into a license to ignore the stated promise that USPS "will provide" the anticipated amount of mail. It did not put EAGLE at the risk of USPS deciding to divert mail for handling by itself or others. A partial requirements contract "does not give the Government the right to simply order work at its option," *Valley Forge Flag Co.*, 79-2 B.C.A. (CCH) ¶ 29,246 at 161,581 (VABCA 1997); *see Womack v. United States*, 389 F.2d 793, 801 (Ct. Cl. 1968), and a definite quantity contract certainly does not. USPS has express and good faith duties to provide the anticipated amount of mail to EAGLE.

### C. The Negotiation History of the Reformed Contract and Other Rules of Law Demonstrate the USPS Commitment

Several aspects of the negotiation history underscore the correctness of EAGLE's plain reading of the Reformed Contract to require USPS to use its good faith efforts to supply it with 1.25 billion pounds of mail per year. EAGLE's reading is also required by several applicable rules of law.

First, EAGLE told USPS how it understood the contract, and so that interpretation controls. As a matter of law, when one party prior to contract formation tells the other party how it interprets the words used and the other party

does not voice an objection to that interpretation, the meaning expressed by the first party is binding as a matter of law. *United States v. Stuart*, 489 U.S. 353, 368 n.7 (1989) (describing this principle as "hornbook contract law"); *Perry and Wallis, Inc. v. United States*, 427 F.2d 722, 725 (Ct. Cl. 1970); *Crossroads v. United States*, 173 F. Supp. 805, 811 (Ct. Cl. 1959) ("The same is true if he had reason to know what the other party intended."); RESTATEMENT (SECOND) OF CONTRACTS § 201(2) (1981). Here, prior to execution of the Reformed Contract, not only did EAGLE tell USPS that it understood USPS to be committed to provide approximately 1.25 billion pounds of mail per year, but USPS repeatedly confirmed to EAGLE that USPS was committed to do so if the mail were available. (FF ¶¶ 24, 59.) Moreover, EAGLE confirmed with USPS that the "no guarantee" language USPS added near the end of the drafting process would only apply when USPS customers did not provide sufficient mail. (FF ¶ 37.) This negotiation history alone is conclusive of the matter.

Second, a contract "must be read in light of its purpose and consistently with common sense." *Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1380 (Fed. Cir. 2000). "Provisions of a contract must be construed so as to effectuate the spirit and purpose of the contract." *Thanet Corp. v. United States*, 591 F.2d 629, 633 (Ct. Cl. 1979). The purpose of the Reformed Contract was to continue the FedEx work under the Initial Contract (which was a requirements contract) and to add to it enough other mail from the USPS air and ground networks to generate approximately $46.8 million per year. (FF ¶¶ 22-29.) It was

understood by all involved that EAGLE needed additional revenue under the contract to operate its expanded operations profitably. (FF ¶ 22.) The pricing models provided by USPS consistently showed that USPS would provide 1.25 billion pounds of mail per year to accomplish that purpose. (FF ¶ 23.) During negotiations, USPS confirmed the validity of that number to EAGLE, and the parties specified it in their MOU that led to the Reformed Contract. (FF ¶¶ 24-25, 28-29.) This purpose – written into the Reformed Contract in the very first sentence of the very first pricing provision – is shredded if one interprets the agreement to give USPS unfettered discretion to provide EAGLE with whatever amount of mail it wishes. USPS's current interpretation makes a mockery of the negotiations and the very purpose of the reformation – not to mention the "will provide" language of the section itself.

Third, a contract must be interpreted in such a way as to have it make practical, business sense. *See United States v. Winstar Corp.*, 518 U.S. 839, 863-64 (1996); *Arizona*, 575 F.2d at 863; *LP&L,* 642 F. Supp. at 798. Obviously, EAGLE would have never signed up to the Reformed Contract if it had believed it was giving USPS unbridled discretion to tender it less than the poundage specified whether or not it was available. Especially is this true when the negotiated pricing structure had an absorption collar "free zone" which could easily be manipulated if USPS had no good faith duties to provide additional mail that was available. (FF ¶ 60.) USPS's interpretation simply makes no common, business, or any other sense, because it leaves EAGLE subject to USPS's "whim or caprice." *See id.* In

*Winstar*, the Supreme Court said it would have been irrational to interpret a contract as having the contractor assume the risk that Congress would revise a statute. 518 U.S. at 863-64. In this case, the business risk USPS asserts EAGLE accepted in the Reformed Contract is many times greater, and many times more irrational. If USPS had ever stated that it believed it had the option to provide however much mail it desired, EAGLE would never have entered into the contract, especially when the 20% "free zone" was so easy to manipulate to EAGLE's detriment. (FF ¶ 61.) As Mr. Bauer, CEO of EAGLE, states in his affidavit, "Taking such a risk would have been foolhardy and unacceptable to EAGLE." (FF Attach. B (Bauer Aff.) ¶ 9.)

Fourth, EAGLE's interpretation is also compelled by the rule of *contra proferentem*. *See P.R. Burke Corp. v. United States*, 277 F.3d 1346, 1355 (Fed. Cir. 2002); *Newsom v. United States*, 676 F.2d 647, 649 (Ct. Cl. 1982); RESTATEMENT (SECOND) OF CONTRACTS § 206 (1981). USPS relies on the "no guarantee" language to argue that it had no good faith obligations to provide the anticipated volume of 1.25 billion pounds. That language can even more easily be understood (as EAGLE understood it) to mean that, as in all requirements contracts, USPS was not guaranteeing that the mail would actually eventuate and would not be liable if it did not. Because USPS was the drafter of this provision (FF ¶¶ 34-36), any ambiguity as to the meaning of the "no guarantee" language must be construed against it. *See United States v. Turner Constr. Co.*, 819 F.2d 283, 286 (Fed. Cir. 1987).

Fifth, even if there were doubt about whether to classify the Reformed Contract as an IDIQ or requirements-type contract, the law would require EAGLE's interpretation to be adopted. When there is an ambiguity as to that issue, the presumption is that it is of a requirements type. *Ralph Constr., Inc. v. United States*, 4 Cl. Ct. 727, 732 (1984) (*citing E.H. Sales, Inc. v. United States*, 340 F.2d 358 (Ct. Cl. 1965); *Goldwasser v. United States*, 325 F.2d 722 (Ct. Cl. 1963)).

Sixth, USPS's argument that the Reformed Contract is an IDIQ contract is a Johnny-come-lately attempt to avoid its own commitments. The Initial Contract was a requirements contract, and there is not a jot or a title in either the Initial Contract or the Reformed Contract about minimum or maximum quantities. Instead, both versions of the SNET contract talk in terms of estimated quantities, a hallmark of requirements-type contracts. Indeed, in response to the demand letter, USPS also spoke in terms of "negligent estimates," implicitly conceding that it understood the Reformed Contract to be a requirements-type contract. (FF ¶ 69.) It was only in the final decision that USPS first asserted its current IDIQ position. (FF ¶ 71.) During negotiations to reform the Initial Contract, USPS never said it intended to change the contract type. (FF ¶ 58.) While identification of the contract type is a matter of law, USPS's own actions demonstrate that EAGLE reasonably understood the Reformed Contract, like the Initial Contract, to be a requirements-type contract. If anything, it was converted to a definite quantity contract.

For all these reasons, USPS's now-proffered interpretation of the Reformed Contract as an IDIQ contract must be rejected. The Reformed Contract does not

state it is an IDIQ contract, and the negotiation history obliterates any such suggestion. In fact, prior to execution, EAGLE expressed its understanding that USPS was committed to give it 1.25 billion pounds per year if it were available, and USPS confirmed that understanding. Thus, EAGLE must prevail as a matter of law.

## II. USPS's Breach Is Material

The issue of the materiality of a breach is necessarily a fact-intensive inquiry. That being said, under the undisputed facts supporting this motion, the breach of USPS is material as a matter of law. While EAGLE thinks it likely that other facts that could be discovered would buttress that conclusion, the facts currently known are sufficient.

In determining the materiality of a breach, the Federal Circuit has adopted section 241 of the RESTATEMENT (SECOND) OF CONTRACTS, which reads as follows:

> In determining whether a failure to render or to offer performance is material, the following circumstances are significant:
>
> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*See Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1550-51 (Fed. Cir. 1992) (adopting § 241). While these factors are multiple, two circumstances established on the uncontested facts dictate that the breach here is material.

As an initial matter, despite repeated demands for assurance, USPS has refused to tender to EAGLE about 25% of the amounts promised, worth tens of millions of dollars in lost revenues. (FF ¶¶ 64, 65.) This is a material amount by any measure, and it makes this case indistinguishable from *Stone Forest*. In that case, the Federal Circuit found material the agency refusal to tender less than 16% of the timber provided under the contract. *Id.* at 1552. Here, the injury, in both percentage and absolute dollar terms, is much greater. As Mr. Schrock states in his affidavit, EAGLE has lost over $28,000,000 in revenues under the Reformed Contract through January 20, 2006. (FF ¶ 65.) Thus, *Stone Forest* dictates a finding of materiality here. *See also SUFI Network Servs., Inc.*, 04-2 B.C.A. (CCH) ¶ 37,714 (ASBCA 2004) (finding material breach when the contractor sustained an 18% reduction in average monthly billings and a 27% reduction in average revenues due to the breach).[10]

---

10 The failure to tender promised amounts in a situation like this is analogous to failure to tender payment, which "is generally deemed a material breach of contract." *ARP Films, Inc. v. Marvel Entm't Group, Inc.*, 952 F.2d 643, 649 (2d Cir. 1991) (*citing Schneider v. Dumbarton Developers, Inc.*, 767 F.2d 1007, 1014 (D.C. Cir. 1985). *See generally Brooklyn & Queens Screen Mfg. Co. v. United States*, 97 Ct. Cl. 532 (1942) (failure to pay $2,250 is material breach); *Suburban Contracting Co. v. United States*, 76 Ct. Cl. 533 (1932) (slight delay (continued…)

But there is more involved here. The RESTATEMENT (SECOND) OF CONTRACTS in section 241(e) calls for examination of "the extent to which behavior of the party failing to perform . . . comports with standards of good faith and fair dealing." Here, the very essence of the breach is USPS's failure to give any heed to its duties of good faith and fair dealing. Instead, USPS has staked out a position that it has no obligations to provide the stated amount of traffic to EAGLE, even if it has the ability to do so. Whether or not discovery would uncover that USPS intended from the start to short EAGLE or only decided to "game" the absorption collar after signing the deal, EAGLE certainly has good reason to suspect its contracting partner of intentional, as well as unintentional, breaches of good faith duties. (FF ¶ 62.) In such circumstances, the contracting relationship is effectively ruptured and the breach is material. *See* RESTATEMENT (SECOND) OF CONTRACTS § 241 cmt. f (1981); *see generally* STEVEN J. BURTON & ERIC G. ANDERSEN, CONTRACTUAL GOOD FAITH §§ 6.3 *et seq*. (1995).

This does not mean, of course, that it is incumbent upon EAGLE to prove willfulness before a finding of materiality can be made. *Id*. The Federal Circuit has explained that, with respect to requirements-type contracts, the agency acts in bad

(…continued)

in payment is material breach); *Consumers Oil Co.*, 86-1 B.C.A. (CCH) ¶ 18,647 at 93,711 (ASBCA 1985) ("for nearly a century the former Court of Claims had consistently held that construction contractors are justified in refusing to proceed with performance upon the Government's failure to pay a single monthly progress payment when due").

faith simply by attempting to recapture benefits it bargained away, as USPS has done here:

> "Bad faith" includes actions "motivated solely by a reassessment of the balance of advantages and disadvantages under the contract." That is, if the buyer "had second thoughts about the terms of the contract," and decreased its requirements in an attempt to avoid its obligations under the contract, the buyer is deemed to have endeavored to manipulate the contract and thus to have acted in bad faith.

*Tech. Assistance Int'l*, 150 F.3d at 1372 (*quoting Empire Gas Corp. v. Am. Bakeries Co.*, 840 F.2d 1333, 1340-41 (7th Cir. 1988)).

In sum, on two, independent grounds the USPS breach is material. First, the amounts involved, in both relative and absolute terms, are significant. Second, the particular type of breach involved implicates directly the duties of good faith and fair dealing and the very basis of the bargain between the parties. Thus, on the uncontested facts, the breach is material.

## Conclusion

For the reasons stated above and in EAGLE's Proposed Statement of Uncontested Facts and supporting affidavits, EAGLE requests that summary judgment be granted in its favor. USPS has breached its duty to provide EAGLE with approximately 1.25 billion pounds of mail per year under the Reformed Contract, and that breach is material.

Respectfully submitted,

s/Frederick W. Claybrook, Jr.
Frederick W. Claybrook, Jr.
(Counsel of Record)
Daniel R. Forman
Jenny Kim

Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington, D.C. 20004
(202) 624-2500
Attorneys for EAGLE

March 17, 2006

DCIWDMS: 2725060_1