No. 06-11C
(Judge Allegra)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

EVERGREEN AVIATION GROUND LOGISTICS ENTERPRISES, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT, AND REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

DONALD E. KINNER
Assistant Director

PAUL R. WELLONS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th floor
1100 L Street, N.W.
Washington, D.C. 20530

Tel: (202) 616-8253
Fax: (202) 307-0972

April 14, 2006

Attorneys for Defendant

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . iii

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. THE PLAIN TERMS OF THE REFORMED CONTRACT PRECLUDE EAGLE'S CLAIM FOR DECLARATORY RELIEF . . . . 2

A. EAGLE Cannot Escape The Reformed Contract's Plain Terms By Asking The Court To Rewrite The Agreement . . . . . . . . . . . . . . . . . . 2

B. EAGLE Cannot Refute That It Assumed The Risk That USPS Would Not Supply The Estimated Quantity . . . . . . . . . . . . . . . . . . . . . 5

C. EAGLE's Proffered Interpretation Of The Reformed Contract Is Unreasonable . . . . 10

II. EAGLE's ALLEGATIONS REGARDING THE REFORMED CONTRACT'S HISTORY DO NOT SUPPORT ITS CLAIM FOR DECLARATORY JUDGMENT . . . . . . . . . . . . . . . . 14

A. Because The Reformed Contract Is Unambiguous, EAGLE May Not Rely Upon Allegations Regarding Statements Made During Negotiations . . . . . . . . . . . . . . 14

B. EAGLE's Allegations Regarding The Reformed Contract's Negotiation Do Not Preclude Summary Judgment In The Government's Favor . . 16

C. EAGLE's References To The Parties' Previous Agreements Do Not Rescue Its Claims In This Case . . . . . . . . . . . . . . . . . . . 19

III. EAGLE'S ARGUMENTS REGARDING BAD FAITH AND MATERIAL BREACH DO NOT SUPPORT ITS CLAIM FOR DECLARATORY RELIEF . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . 23

## TABLE OF AUTHORITIES

### CASES


Page

Ace-Fed. Reporters, Inc. v. Bannum,
226 F.3d 1329 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . 8

Bristol-Myers Squibb Co. v. United States,
48 Fed. Cl. 350 (2002) . . . . . . . . . . . . . . . . . . 19

Chicago Pneumatic Tool Co. v. Ziegler,
151 F.2D 784 (3d Cir. 1945)) . . . . . . . . . . . . . . . 19

Deal v. United States,
3 Cl. Ct. 151 (1983) . . . . . . . . . . . . . . . . . . . . 2

Dot Systs., Inc. v. United States,
231 Ct. Cl. 765 (1982) . . . . . . . . . . . . . . . . . . . 7

Firestone Tire & Rubber Co. v. United States,
195 Ct. Cl. 21, 444 F.2d 547 (1971)) . . . . . . . . . . . 16

Fortec Constructors v. United States,
760 F.2d 1288 (Fed. Cir. 1985) . . . . . . . . . . . . . 11, 14

Hemet Valley Flying Serv. Co. v. United States,
7 Cl. Ct. 512 (1985) . . . . . . . . . . . . . . . . . . . . 6

Hol-Gar Mfg. Corp. v. United States,
169 Ct. Cl. 384, 351 F.2d 972 (1965) . . . . . . . . . . . 15

Louisiana Power & Light Co. v. United Gas Pipe Line Co.,
642 F. Supp. 871 (E.D. La. 1986) . . . . . . . . . . . . . 9

Lowdenback Fertilizer Co. v. Tennessee Phosphate Co.,
121 Fed. 298 (6th Cir. 1903) . . . . . . . . . . . . . . . . 9

Mason v. United States,
222 Ct. Cl. 436, 615 F.2d 1343 (1980) . . . . . . . . 5, 6, 8

Medart, Inc. v. Austin,
967 F.2d 579 (Fed. Cir. 1992) . . . . . . . . . . . . . . . 2

Pacificorp Capital, Inc. v. United States,
25 Cl. Ct. 707 (1992) . . . . . . . . . . . . . . . . . . passim

Peterson-Sharpe Eng'g Corp. v. United States,
6 Cl. Ct. 288 (1984) . . . . . . . . . . . . . . . . . . . 15

Price v. United States,
46 Fed. Cl. 640 (2000) . . . . . . . . . . . . . . . . . . . . . 21

Ralph Constr., Inc. v. United States,
4 Cl. Ct. 727 (1984) . . . . . . . . . . . . . . . . . . . . 5

Schweiger Constr. Co., Inc. v. United States,
49 Fed. Cl. 188 (2001) . . . . . . . . . . . . . . . . . . 10

Singer-General Precision, Inc. v. United States,
192 Ct. Cl. 435, 427 F.2d 1187 (1970) . . . . . . . . . . 17

Sylvania Elec. Prods., Inc. v. United States,
198 Ct. Cl. 106, 458 F.2d 994 (1972) . . . . . . . . . . . 15

Tech. Assistance Int'l, Inc. v. United States,
150 F.3d 1369 (Fed. Cir. 1998) . . . . . . . . . . . . . . 8

Technical Consultant Servs., Inc. v. Lakewood Pipe of Texas, Inc.,
861 F.2d 1357 (5th Cir. 1988) . . . . . . . . . . . . . . . 15

Torncello v. United States,
231 Ct. Cl. 20, 681 F.2d 756 (1982) . . . . . . . . . . . . . . 5

Travel Centre v. Barram,
236 F.3d 1316 (Fed. Cir. 2001) . . . . . . . . . . . . . . 5, 6

United Med. Supply Co. v. United States,
63 Fed. Cl. 430 (2005) . . . . . . . . . . . . . . . . . . 2, 8

Webco Lumber, Inc. v. United States,
230 Ct. Cl. 457, 677 F.2d 860 (1982) . . . . . . . . . . . . 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| EVERGREEN AVIATION GROUND LOGISTICS ENTERPRISES, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-11C (Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT, AND REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendant, the United States, pursuant to RCFC 7, 12(b)(6), and 56, files its opposition to plaintiff's cross-motion for summary judgment, and its reply brief in support of defendant's motion to dismiss or, in the alternative, for summary judgment. In support of this submission, we rely upon the complaint; our motion to dismiss or, in the alternative, for summary judgment; our proposed findings of uncontroverted fact; and the declarations of Thomas G. Black and J. Dwight Young, filed with this brief.

# ARGUMENT

## I. THE PLAIN TERMS OF THE REFORMED CONTRACT PRECLUDE EAGLE'S CLAIM FOR DECLARATORY RELIEF

### A. EAGLE Cannot Escape The Reformed Contract's Plain Terms By Asking The Court To Rewrite The Agreement

In its brief in support of its motion for summary judgment, plaintiff, Evergreen Aviation Ground Logistics Enterprises, Inc. ("EAGLE"), asserts that the Government guaranteed EAGLE 1.25 billion pounds of mail for processing annually as long as that much mail "were available." Pl.'s Br. at 1. EAGLE is wrong, and the contracts between the parties (collectively identified as the "Reformed Contract") contradict EAGLE's position. A 4. Because of this, the Court should deny EAGLE's request for declaratory judgment and should dismiss EAGLE's complaint.

This Court has repeatedly held that estimates of anticipated quantities create no guarantees and that, in cases like this one, the Court will not permit a plaintiff to engage in a "backhanded attempt to impose liability on defendant based upon the difference between the estimates and the amounts actually purchased under the contract." United Med. Supply Co. v. United States, 63 Fed. Cl. 430, 438 (2005); see also, Medart, Inc. v. Austin, 967 F.2d 579, 581 (Fed. Cir. 1992); Webco Lumber, Inc. v. United States, 230 Ct. Cl. 457, 677 F.2d 860, 863 (1982); Deal v. United States, 3 Cl. Ct. 151, 159 (1983).

In this case, the Reformed Contract plainly stated that the parties "recognize that the Postal Service does not guarantee a minimum weight of mail will be provided to [EAGLE], and does not guarantee that annual compensation will total $46.8 million dollars. Actual compensation will vary according to the actual weight and density of mail provided to [EAGLE] in accordance with Sections A.1.b through A.1.j." A 4.

EAGLE admits, as it must, that USPS made no unconditional guarantee of 1.25 billion pounds of mail for processing, and admits that the Reformed Contract "does not set minimum and maximum amounts of mail for EAGLE to handle." Pl.'s Proposed Fact. No. 56. Despite its admission that the plain language precludes a guaranteed volume, EAGLE insists that USPS was required by the contract to give it more than 1 billion pounds of mail per year, essentially claiming that the contract contains the guaranteed and minimum that EAGLE admits was not there. EAGLE argues that the Reformed Contract contains a convoluted and conditional "promise" that USPS will provide 1.25 billion pounds of mail, but only if that much mail first becomes available to tender to EAGLE: "USPS promises in the Reformed Contract that it 'will provide' EAGLE 1.25 billion pounds of mail per year to handle, but only 'anticipates' that there will be that much mail available and does not 'guarantee' it." Pl. Br. at 1.

To support this tortured interpretation, EAGLE rewrites the Reformed Contract's terms on page 10 of its brief. Specifically, EAGLE partially quotes from the contract and rearranges its terms so that the words "will provide" appear before the word "anticipates." Pl.'s Br. at 10. This type of slight of hand is insufficient to rescue EAGLE's claims.

EAGLE's attempt to shuffle the Reformed Contract's plain terms is thwarted by the agreement's plain statement that both parties only "anticipate[d] that the Postal Service will provide" a certain volume of mail and a certain level of compensation to EAGLE." A 4. Because the term "anticipates" modifies the terms "will provide," EAGLE cannot ask the Court to write a nonexistent guarantee into the contract.[1] A 4. Perhaps more importantly, as noted, the Reformed Contract plainly states that "the Postal Service does not guarantee a minimum weight of mail will be provided to [EAGLE]." A 4.

This language means exactly what it states. Thus, the Court should deny EAGLE's request for declaratory relief. Further, because EAGLE attached the relevant portions of the Reformed Contract to its complaint, the Court may dismiss EAGLE's complaint for failure to state a claim upon which the Court can grant relief without resorting to extrinsic evidence. RCFC 10

---

[1] Anticipate means "to give advance thought, discussion, or treatment to." Merriam-Webster's Collegiate Dictionary, 10th Ed. (2002).

("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.").

B. EAGLE Has Not Refuted That The Reformed Contract Is An Indefinite Quantity Contract In Which It Assumed The Risk That USPS Would Not Supply The Estimated Quantity

EAGLE provides no persuasive argument to refute the plain import of the Reformed Contract's terms: that the agreement is an indefinite quantity contract in which EAGLE assumed the risk that the Postal Service would not supply the estimated quantity.

Defining a contract is a question of law, and the Court will examine the legal rights bargained for by the parties in order to classify their agreement; the Court is not bound by the label–-or lack of label–-provided by the parties. Ralph Constr., Inc. v. United States, 4 Cl. Ct. 727, 731 (1984) (citing Torncello v. United States, 231 Ct. Cl. 20, 681 F.2d 756, 760 (1982)); Mason, 222 Ct. Cl. 436, 615 F.2d at 1346-47.

EAGLE argues that the Reformed Contract cannot be an indefinite quantity contract because it does not contain a "minimum quantity." This assertion misstates applicable law.

To prevent an indefinite quantity contract from being illusory, the Government generally must guarantee a certain minimum level of consideration. Travel Centre v. Barram, 236 F.3d 1316, 1319 (Fed. Cir. 2001). However, consideration may appear in the form of a minimum guaranteed payment, and need not

be tied to any minimum quantities of actual completed orders. After all, a contractor is better off receiving a guaranteed payment than incurring the expense of fulfilling actual orders.

Accordingly, this Court has upheld an indefinite quantity contract in which the Government compensated an air services provider for its availability–-regardless of whether the Government used the contractor's air services: "Rather, the contract is determined to be one for an indefinite quantity with a sufficient purchase requirement for 'availability' of the tankers to render it enforceable."). Hemet Valley Flying Serv. Co. v. United States, 7 Cl. Ct. 512, 516 (1985); see also Travel Centre v. Barram, 236 F.3d 1316, 1319 (Fed. Cir. 2001) (holding that $100 guaranteed payment was sufficient consideration to create enforceable indefinite quantity contract); Mason v. United States, 222 Ct. Cl. 436, 615 F.2d 1343, 1348 (1980) (holding that $5,000 guaranteed minimum payment was sufficient consideration to render contract an enforceable indefinite quantity contract).

EAGLE also appears to argue that the Reformed Contract has to guarantee EAGLE at least 1.25 billion pounds of mail to handle annually in order to "make practical, business sense." Pl. Br. at 19. Neither the law nor the facts support this position. First, there is no requirement that a party be guaranteed a windfall profit in order for an indefinite quantity contract to be enforceable. See Travel Centre, 236 F.3d at 1319; Mason v.

United States, 222 Ct. Cl. 436, 615 F.2d at 1348 (holding that a reasonable contractor would not submit a bid unless it "expected to receive at least enough work under it to recover his bid expenses.").

Here, EAGLE was assured of receiving far more than either $100 or its bid expenses. In fact, the Reformed Contract established that EAGLE would recoup $6,363,991.40 per year for its fixed costs. A 8. It also established that EAGLE would receive a minimum of an additional $6,436,389.76 per year for mail processing services. A 5, 8.[2]

EAGLE argues that the Reformed Contract's use of an estimated quantity without a guarantee is "wholly inconsistent" with an indefinite quantity contract. Pl.'s Br. at 12-13 (emphasis in original). EAGLE is wrong.

In indefinite quantity contracts, contractors assume the risk that the Government may not purchase the estimated quantity. Dot Systs., Inc. v. United States, 231 Ct. Cl. 765, 768-69 (1982). Such contracts routinely employ estimated quantity clauses to assist both parties in assessing risk. For example, in Dot Systs., Inc., the Court had no trouble recognizing the difference between a guarantee and an estimate within an indefinite quantity contract:

---

[2] This amount can be calculated by adding up the 20 percent minimum guaranteed amount of each estimated baseline for all 23 locations covered by the Reformed Contract. A 4, 8.

> The general rule is clear: a contractor cannot sign a contract which allocates the risk of loss to it and then 4 years later come to this court, having lost its gamble, and insist that the risk be placed on the Government . . . . The present contract is not a requirements contract; it is an indefinite quantity contract. This distinction is crucial to an understanding of the parties' legitimate expectations and their responsibilities. The contractor here cannot expect the kind of accuracy in estimation that it can in a requirements or fixed price contract. By the same token, the Government cannot be held to the negligence standard for requirements contracts . . . .

231 Ct. Cl. at 768-69; see also Mason, 222 Ct. Cl. 436, 615 F.2d at 1348 (holding that contract containing estimated quantity was an indefinite quantity contract).

EAGLE appears to assume that its position would be bolstered if the Court interprets the Reformed Contract to be a requirements contract. Pl. Br. at 13. However, it is well-established that the mere existence of a requirements contract does not entitle a contractor to any guaranteed minimum. United Med. Supply Co., 63 Fed. Cl. at 438.

Further, the cases EAGLE cites to support its position do nothing to rescue its claims. See Tech. Assistance Int’l, Inc. v. United States, 150 F.3d 1369, 1373 (Fed. Cir. 1998)(reversing decision of the Court of Federal Claims that held that the Government breached requirements contract by decreasing its requirementse); Ace-Fed. Reporters, Inc. v. Bannum, 226 F.3d 1329, 1331-32 (Fed. Cir. 2000) (contracts containing standard

requirements clauses enforceable where contractors had possibility of obtaining work from listing in schedule); Lowdenback Fertilizer Co. v. Tennessee Phosphate Co., 121 Fed. 298, 302-03 (6th Cir. 1903) (plaintiff breached contract for sale of all the phosphate rock needed for ordinary requirements of its property where plaintiff refused to buy from defendant); Louisiana Power & Light Co. v. United Gas Pipe Line Co., 642 F. Supp. 871, 800 (E.D. La. 1986) (holding that a supplier of natural gas was obligated to supply one-third of a customer's requirements up to a certain amount).

None of these cases holds or even implies that a contractor is entitled to a minimum guarantee of orders when the plain terms of the operative agreement state that the parties "recognize that the Postal Service does not guarantee a minimum weight of mail will be provided to [EAGLE], and does not guarantee that annual compensation will total $46.8 billion dollars." A 4.

Finally, EAGLE points out that a letter from the contracting officer referenced the term "negligent estimates." Pl. Br. at 21. According to EAGLE, this reference "implicitly conceed[ed] that [USPS] understood the Reformed Contract to be a requirements-type contract." Pl. Br. at 21.

EAGLE's argument fails to address the contract's plain terms and falls far short of indicating that either party

believed, or reasonably could have believed, that the Reformed Contract was anything other than an indefinite quantity contract in which EAGLE assumed the risk that the estimate would not be supplied. See, e.g., Schweiger Constr. Co., Inc. v. United States, 49 Fed. Cl. 188, 196-198 (2001) (noting the uncertainty regarding the proper standard when reviewing Government estimates in indefinite quantity contracts and noting that the Court should apply a standard more strict than negligence).

Under the plain terms of the Reformed Contract, the parties agreed that EAGLE would be compensated for its fixed costs at a minimum of $ 6,363,991.40 billion annually. A 8. They further agreed that EAGLE was guaranteed an annual payment of $6,436,389.76 for mail handling services. A 5, 8. However, they did not agree that EAGLE was guaranteed that it would receive at least 1.25 billion pounds of mail annually. In fact, they specifically disclaimed any such guarantee. A 4.

For this reason, EAGLE's request for declaratory judgment should be denied, and EAGLE's complaint should be dismissed.

### C. EAGLE's Proffered Interpretation Of The Reformed Contract Is Unreasonable

EAGLE's argument has consistency. Once again it insists that the contract contains a guaranteed volume that EAGLE admits at the outset was not there. Although EAGLE asserts that any reading of the Reformed Contract that does not include a

guaranteed volume would be commercially unreasonable, and would render portions of the contract wholly meaningless.

This argument is contrary to contract interpretation principles. It is well established that, "[w]hen interpreting the language of a contract, a court must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless." Pacificorp Capital, Inc. v. United States, 25 Cl. Ct. 707, 716 (1992) (citing Fortec Constructors, 760 F.2d 1288, 1292 (Fed. Cir. 1985); United States v. Johnson Controls, Inc., 713 F.2d 1541, 1555 (Fed. Cir. 1983).

EAGLE's argument reads out of the contract the language that explicitly excludes a guarantee of a minimum weight of mail, in violation of the contract interpretation principles. After reading out the operative terms, EAGLE then asks the Court to read into the contract terms not agreed upon by the parties.

In its brief, EAGLE implies that the pricing terms the parties agreed upon would be unfair if the Reformed Contract contained no guarantee of 1.25 billion pounds because the contract contains a "free zone" of services for which EAGLE is not paid. Pl.'s Br. at 20. EAGLE further claims that it would be subject to USPS's "whim or caprice" without a guaranteed minimum volume, because USPS could manipulate volumes. Pl.'s Br. at 16. According to EAGLE, the estimated quantity can only serve as a "gotcha" clause if it is not enforced as a guarantee.

Pl.’s Br. at 11. Thus, EAGLE asserts that the contract must be read to include protection of EAGLE from the risk it was otherwise assuming. There is no legal or factual basis to add such non-existent terms to this unambiguous contract.

EAGLE’s arguments ignore how compensation pursuant to the Reformed Contract actually works. EAGLE receives compensation based upon variable prices per pound calculated for 23 different mail processing locations. A 4, 8. For each compensation period, payments are reconciled for each location based upon anticipated baseline volumes. A 4, 8. This reconciliation is based upon a 20 percent “absorption collar”–-a risk management tool that aides EAGLE in certain circumstances and aides USPS in others.

For example, when EAGLE processes between 100 percent and 120 percent of the baseline amount for a location during a period, EAGLE may not charge more than the price it otherwise would charge for processing 100 percent of the baseline. A 4. Once EAGLE passes the 20 percent absorption collar (and processes 121 percent or more of the baseline), the amount USPS must pay rises again. A 4, 8. Thus, simply to call this range a “free zone” is deceptive. It would be more accurate to characterize this range as a discount. Indeed, there is nothing free about this zone. EAGLE is receiving the full fixed price pursuant to the contract for that volume of mail.

Perhaps more importantly, EAGLE ignores the way the absorption collar applies when EAGLE processes less than 100 percent of an anticipated baseline volume. As noted, EAGLE is guaranteed payment for 20 percent of the baseline amount for each location, even if it never processes an ounce of mail. A 5, 8. Adding these guaranteed payments for all 23 locations yields a guaranteed annual payment of $6,436,389.76 per year. A 5, 8.

Further, if EAGLE processes between 80 percent and 100 percent of the anticipated baseline volume for a given location, it automatically receives 100 percent of the anticipated payment. A 5, 8. If EAGLE processes between 20 percent and 80 percent of the anticipated baseline volume for a given location, USPS is not required to pay EAGLE the full baseline amount; rather, USPS pays EAGLE only for the mail it actually processed plus the 20 percent absorption amount. For example, if EAGLE processes 70 percent of the baseline amount for a particular location, then it receives compensation for 90 percent of the baseline amount (70 percent plus the guaranteed 20 percent). A 5.

Nothing in the Reformed Contract states that the absorption collar only permits USPS to reduce its payments to EAGLE when less than 1.25 billion pounds of mail are “available.” A 4. After all, if EAGLE were correct that it is guaranteed payment

for processing a total of 1.25 billion pounds of mail annually, there would be no need for a complicated formula permitting USPS to lower its payments to EAGLE when EAGLE does not process a given baseline volume. Instead, the Reformed Contract would simply state that USPS owes EAGLE at least $46 million dollars–-the calculated payment for processing 1.25 billion pounds of mail--whenever it has 1.25 billion pounds of mail in its networks. A 4.

EAGLE's interpretation renders nonsensical that portion of the absorption collar that permits USPS to adjust payments downward if EAGLE processes less mail than an estimated baseline amount. As a result, EAGLE's interpretation should be rejected. Pacificorp Capital, Inc., 25 Cl. Ct. at 716 (1992

Because EAGLE's interpretation of the contract is refuted by the agreement's plain terms, and would render portions of the Reformed Contract meaningless, the Court should deny EAGLE's request for declaratory relief.

## II. EAGLE's ALLEGATIONS REGARDING THE REFORMED CONTRACT'S HISTORY DO NOT SUPPORT ITS CLAIM FOR DECLARATORY JUDGMENT

### A. Because The Reformed Contract Is Unambiguous, EAGLE May Not Rely Upon Allegations Regarding Statements Made During Negotiations

It is well-established that the interpretation of Government contracts is a matter of law. Pacificorp Capital, Inc., 25 Cl. Ct. at 715 (citing Fortec Constructors v. United

States, 760 F.2d 1288, 1291 (Fed. Cir. 1985); Hol-Gar Mfg. Corp. v. United States, 169 Ct.Cl. 384, 386, 351 F.2d 972, 973 (1965). For this reason, the Court will only consider factors outside the four corners of contracts when agreements are ambiguous. Pacificorp Capital, Inc., 25 Cl. Ct. at 715 (citing Sylvania Elec. Prods., Inc. v. United States, 198 Ct. Cl. 106, 126, 458 F.2d 994, 1005 (1972). "[W]hen the terms of a contract are clear and unambiguous, there is no need to resort to extraneous circumstances, such as prior negotiations or custom of the trade for its interpretation." Pacificorp Capital, Inc. at 716 (quoting Peterson-Sharpe Eng'g Corp. v. United States, 6 Cl.Ct. 288, 295 (1984)).

A contract is only ambiguous if reasonably susceptible to more than one interpretation. Pacificorp Capital, Inc. at 716 (citing Technical Consultant Servs., Inc. v. Lakewood Pipe of Texas, Inc., 861 F.2d 1357, 1362 (5th Cir. 1988)). Pursuant to the parol evidence rule, interpretation of an unambiguous contract may not be affected by the contentions of either party that it meant something else. Pacificorp Capital, Inc. at 716.

EAGLE's brief relies extensively upon alleged statements made during the negotiation of the Reformed Contract. Pl.'s Br. at 2, 6-9, 20, 21. However, EAGLE makes no showing that any provision within the Reformed Contract is ambiguous and requires extrinsic evidence to aid in interpretation. Without a showing

that the contract is ambiguous, the parties' allegations regarding statements made during their negotiations should have no bearing on the outcome of this dispute.

The unambiguous terms of the Reformed Contract clearly state that EAGLE is not guaranteed 1.25 billion pounds of mail annually under any circumstances: "the Postal Service does not guarantee a minimum weight of mail will be provided to [EAGLE}, and does not guarantee that annual compensation will total $46.8 million dollars." A 4.

Because the plain language of the Reformed Contract precludes the declaratory relief EAGLE seeks in this case, the Court should deny EAGLE's request and should dismiss EAGLE's complaint.

B. EAGLE's Allegations Regarding The Reformed Contract's Negotiation History Do Not Preclude Summary Judgment In The Government's Favor

To the extent the Court determines that the Reformed Contract could be ambiguous and, thus, it is permissible to review the Reformed Contract's negotiation history, EAGLE's own admissions demonstrate that EAGLE is not entitled to declaratory relief. It is well-established that "[t]he unexpressed, subjective, unilateral intent of one party is insufficient to bind the other contracting party, especially when the latter reasonably believes otherwise." Pacificorp Capital, Inc., 25 Cl. Ct. at 716 (quoting Fire-Stone Tire & Rubber Co., 195 Ct.

Cl. 21, 30, 444 F.2d 547, 551 (1971); Singer-General Precision, Inc. v. United States, 192 Ct. Cl. 435, 446-47, 427 F.2d 1187, 1193 (1970)).

USPS officials wholly refute EAGLE's claims that Postal Service representatives never explained that the Reformed Contract's "no guarantee" language meant exactly what it said: "the Postal Service does not guarantee a minimum weight of mail will be provided to [EAGLE], and does not guarantee that annual compensation will total $46.8 million dollars." A 4. See Decl. of J. Dwight Young ¶¶ 7-9; Decl. of Thomas G. Black ¶¶ 7, 8.

Regardless of the plain contract and the officials' testimony, EAGLE's own account of the Reformed Contract's negotiation demonstrates that the Government is entitled to summary judgment, even if the Court determines that the Reformed Contract is ambiguous. EAGLE acknowledges that USPS's solicitation for the agreements reflected in the Reformed Contract provided only "estimated amounts of mail for the various air terminals specified in each of the regions." Pl.'s Proposed Fact No. 8. EAGLE further acknowledges that the Reformed Contract "does not set minimum and maximum amounts of mail for EAGLE to handle." Pl.'s Proposed Fact. No. 56.

Finally, EAGLE acknowledges that USPS first proposed language disavowing any guaranteed volume as early as May 2003. Pl.'s Proposed Fact No. 34. According to EAGLE's own account of

the negotiations, the parties considered and agreed upon changes to this language over months. Pl.'s Proposed Fact Nos. 34, 35, 36. Ultimately, EAGLE agreed to language disclaiming any guaranteed volume without insisting that USPS change the proposed language to include a guarantee of 1.25 billion pounds of mail to be tendered to EAGLE per year. Pl.'s Proposed Fact Nos. 34, 35, 36. Given these circumstances, EAGLE's reliance upon the parties' negotiations is misplaced. Pacificorp Capital, Inc., 25 Cl. Ct. at 716

EAGLE's account of the Reformed Contract's negotiation history also explains why it would have made no sense for USPS to guarantee a minimum quantity of mail for processing: "it is impossible to provide a given poundage of mail precisely, especially as the total is a combination of different amounts for over twenty terminals over three regions." Pl.'s Proposed. Fact No. 41.

Finally, EAGLE attempts to rely upon the bare fact that USPS representatives drafted changes to negotiated language to invoke the doctrine of contract proferentem. However, EAGLE acknowledges that it was an active participant in the negotiation of the Reformed Contract, and that the parties exchanged multiple drafts of the Reformed Contract between April 2003 and July 2003. Pl.'s Proposed Fact No. 32; see also Decl. of J. Dwight Young ¶ 4. It is well-established that "[w]hen the

contract terms are negotiated, contra proferentem is inapplicable." Bristol-Myers Squibb Co. v. United States, 48 Fed. Cl. 350, 361 (2002) (citations omitted).

EAGLE's citations to the negotiation history of the Reformed Contract do not support its claim for declaratory relief, and the Court should deny EAGLE's request.

C. EAGLE's References To The Parties' Previous Agreements Do Not Rescue Its Claims In This Case

EAGLE attempts to persuade the Court that it is entitled to 1.25 billion pounds of mail to handle annually by referring to changes that occurred between the parties' "Initial Contract" and the Reformed Contract. This attempt is unpersuasive.

EAGLE correctly cites the general rule that, when determining whether a contract is ambiguous, if one contract refers to another contract, the Court should construe the agreements together to determine the parties' intent. Pacificorp Capital, Inc., 25 Cl. Ct. at 716 (citing Chicago Pneumatic Tool Co. v. Ziegler, 151 F.2d 784, 795 (3d Cir.1945)).

However, this rule cannot be relied upon to alter the Reformed Contract's plain terms. After all, the Reformed Contract "replaced and superseded in [their] entirety" the Initial Contract's terms regarding pricing and services. A 1. Further, to the extent the Reformed Contract did not "expressly incorporate[] by reference" the parties' prior agreements, these

agreements did “not become part of the reformed contracts and are no longer in effect after March 1, 2003.” A 1. Thus, to the extent EAGLE relies upon the terms of the Initial Contract to support its interpretation of the Reformed Contract, that reliance is misplaced.

Indeed, EAGLE merely cites to changes in the contract’s stated purpose and changes in the definitions of terms without offering any explanation of how these changes entitle it to declaratory relief in this case. Pl. Br. at 8. EAGLE appears to imply that these changes reflect that the parties intended “a further increase in the amount of mail to be handled by EAGLE in its recently expanded facilities.” Pl. Br. at 7. However, this does not require, or even support, EAGLE’s request that the Court rewrite the contract’s plain terms to include a guarantee that the parties expressly disclaimed. EAGLE cannot rely upon “replaced and superseded” portions of a contract no longer in effect to support its claims. A 1.

EAGLE’s references to changes made to the parties’ contracts over time do not support its request for declaratory relief. Thus, its request should be denied.

## III. EAGLE'S ARGUMENTS REGARDING BAD FAITH AND MATERIAL BREACH DO NOT SUPPORT ITS CLAIM FOR DECLARATORY RELIEF

Throughout its brief, EAGLE relies upon vague and unsubstantiated allegations regarding the duty of good faith and fair dealing. Pl. Br. at 5, 6, 11, 17, 24. EAGLE also argues that USPS is in material breach of the reformed contract by failing to supply 1.25 billion pounds of mail for handling. Pl. Br. at 22, 23. However, EAGLE cannot demonstrate that USPS has breached the Reformed Contract. In fact, USPS has even compensated EAGLE at an amount higher than that estimated in the Reformed Contract. Decl. of J. Dwight Young ¶ 13.

It is established law that there is a strong presumption that the Government acts in good faith. Further, it is settled law that an alleged violation of the implied covenant of good faith and fair dealing must be based upon a contract's express provisions. Price v. United States, 46 Fed. Cl. 640, 651 (2000). The implied obligation of good faith and fair dealing only attaches to "a specific substantive obligation, mutually assented to by the parties." Id. (citations omitted). This implied obligation cannot create express obligations where none exist. Id.

Other than its allegation that USPS failed to supply 1.25 billion pounds of mail annually, EAGLE fails to identify any alleged contract breach. For example, EAGLE argues that USPS has failed to tender approximately 25 percent of "amounts

promised." Pl. Br. at 23. As noted, USPS never guaranteed EAGLE that USPS would provide any particular amounts of mail for processing, let alone 1.25 billion pounds. A 4.

Further, even EAGLE's tortured interpretation of the Reformed Contract requires USPS to supply 1.25 billion pounds of mail to EAGLE only when USPS has that much total mail "available" across the 23 locations EAGLE services.

Thus, even if EAGLE's interpretation of the Reformed Contract as a requirements contract were correct, EAGLE cannot demonstrate a material breach. Under the Reformed Contract, EAGLE provides services supporting USPS's air and ground transportation network. A 1, 11. Specifically, EAGLE supports USPS's contract with an aviation supplier, FedEx. A 11; Pl.'s Proposed Fact Nos. 11. For outgoing mail, these services included scanning and loading the mail from USPS equipment into containers provided by the air carrier transporting the mail for USPS. A 12. For incoming mail, these services included unloading the mail from air containers, scanning it, and separating for local delivery. A 12.

Although 1.25 billion pounds of mail may travel through all of the Postal Service's air and ground networks in the regions covered by the Reformed Contract in a given year, not all of this mail is available to be handled by EAGLE. For example,

commercial airliners carry some mail and provide their own mail handling services.

Further, USPS has not relied upon any mail handling service provider other than EAGLE to support USPS's contract with FedEx in any of the 23 locations covered by the Reformed Contract. Decl. of J. Dwight Young ¶ 12. Thus, to the extent EAGLE is correct that the Reformed Contract is a requirements contract for mail handling services, EAGLE cannot demonstrate that USPS has breached it by having its requirements filled by any other service provider.

Because USPS has complied with all terms of the Reformed Contract, EAGLE cannot prevail upon its allegations of bad faith and material breach, and its request for declaratory relief should be denied.

## CONCLUSION

For these reasons, we respectfully request that the Court grant defendant's motion to dismiss or, in the alternative, for summary judgment.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ DONALD E. KINNER
DONALD E. KINNER
Assistant Director

s/ PAUL R. WELLONS
PAUL R. WELLONS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 616-8253
Fax: (202) 307-0972

Attorneys for Defendant

OF COUNSEL:

MICHAEL F. KIELY
Law Department
United States Postal Service
Washington, D.C. 20260

April 14, 2006

CERTIFICATE OF FILING

I hereby certify that on April 14, 2006, a copy of the foregoing DEFENDANT'S OPPOSITION TO PLAINTIFF’S CROSS-MOTION FOR SUMMARY JUDGMENT, AND REPLY IN SUPPORT OF DEFENDANT’S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT” was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ PAUL R. WELLONS