IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| EVERGREEN AVIATION GROUND LOGISTICS ENTERPRISES, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-11C (Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S
PROPOSED FINDINGS OF UNCONTROVERTED FACT

Pursuant to RCFC 56, defendant, the United States, submits the following response to the proposed findings of uncontroverted fact filed by plaintiff, Evergreen Aviation Ground Logistics Enterprises, Inc.

1. Evergreen Aviation Ground Logistics Enterprises, Inc. (EAGLE), provides ground logistics and other transportation-related services, for both government and commercial customers. (Attach. A (Bonham Aff.) ¶ 3.)

Response To Plaintiff's Proposed Fact #1

Agree.

2. The United States acted in the matter through the United States Postal Service. The current USPS Contracting Officer is Cheryl R. Brazil. (EAGLE's Resp. to Defendant's Findings ¶¶ 2, 13; Attach. A (Bonham Aff.) ¶¶ 55-58 & exs. 21, 23.)

Response To Plaintiff's Proposed Fact #2

Agree.

3. In late 2000, USPS and FedEx entered into a contract for FedEx to transport mail by air for USPS in the United States. (Attach. A (Bonham Aff.) ¶ 4.)

Response To Plaintiff's Proposed Fact #3

Agree in part and disagree in part. Agree that the United States Postal Service ("USPS" or the "Postal Service") and FedEx entered into a contract by which FedEx agreed to transport mail by air for USPS in the United States. However, the parties entered into this contract in early 2001. See Emory Airlines v. United States, 264 F.3d 1071, 1074 (Fed. Cir. 2001).

4. Under the FedEx/USPS contract, FedEx agreed to handle Express, Priority, and First-Class Mail. (Attach. A (Bonham Aff.) ¶ 4.)

Response To Plaintiff's Proposed Fact #4

Agree.

5. In 2001, USPS under Solicitation HQ-2001-12 solicited contractors for its "Shared Network" (SNET) for air terminal handling of its mail. (Attach. A (Bonham Aff.) ¶ 5.)

Response To Plaintiff's Proposed Fact #5

Agree.

6. USPS in the SNET solicitation invited companies to propose offers for the mail handling for the entire United States, with the United States divided into seven regions.

Companies could submit offers on one or more regions. (Attach. A (Bonham Aff.) ¶ 5 & ex. 1.)

Response To Plaintiff's Proposed Fact #6

Agree.

7. USPS designed the SNET solicitation to support the contract it had entered into in late 2000 with FedEx for transportation by air of Express, Priority, and First-Class Mail. (Attach. A (Bonham Aff.) ¶¶ 4-5, 7-8, 12 & ex. 1.)

Response To Plaintiff's Proposed Fact #7

Agree.

8. USPS in Attachment A to the SNET solicitation provided estimated amounts of mail for the various air terminals specified in each of the regions. (Attach. A (Bonham Aff.) ¶ 7 & ex. 1, attach. 4.)

Response To Plaintiff's Proposed Fact #8

Agree.

9. In 2001, USPS awarded EAGLE SNET contracts under the SNET solicitation for three of the seven regions — Pacific, Southeast, and Great Lakes. The contract numbers are SNET-01-PR, SNET-01-SER, and SNET-01-GLR. USPS consolidated the contracts into a single contract document ("Initial Contract"). USPS awarded SNET contracts only to EAGLE for these regions. (Attach. A (Bonham Aff.) ¶¶ 6, 51 & ex. 1.)

Response To Plaintiff's Proposed Fact #9

Agree in part and disagree in part. Agree that USPS awarded EAGLE SNET contracts for the Pacific, Southeast, and Great Lakes regions and that the contract numbers are SNET-01-PR, SNET-0l-SER, and SNET-0l-GLR, respectively. Agree that the three contracts' terms were stated in a single document (the "Initial Contract"). As amended, the three contracts' terms presently are stated in a single document (collectively referred to as the "Reformed Contract"). Some common contract terms, such as the contracts' schedules and statements of work, are shared between the three contracts and are stated only once within the Reformed Contract. A 1, A 4. However, other contract terms are stated separately for each agreement. A 74.

10. The amount of mail estimated by USPS in Attachment A to the SNET solicitation (as amended) for the three regions it awarded to EAGLE was approximately 870 million pounds per year, combined. (Attach. A (Bonham Aff.) ¶ 7 & ex. 1.)

Response To Plaintiff's Proposed Fact #10

Agree.

11. The Initial Contract was a requirements-type contract specifying EAGLE as the "Terminal Handling Supplier" (THS). EAGLE as the THS was to handle all mail at the air terminals in its awarded regions that was transported by FedEx

under its contract for air transportation services with USPS. (Attach. A (Bonham Aff.) ¶¶ 8, 10 & ex. 1.)

Response To Plaintiff's Proposed Fact #11

Plaintiff's proposed finding of fact number 11 is a legal conclusion to which no response is required. To the extent it may be deemed to be a factual statement, agree in part and disagree in part. Agree that the Initial Contract identified EAGLE as the "Terminal Handling Supplier." Disagree that the Initial Contract was a "requirements-type" contract or that, pursuant to the Initial Contract, USPS had a legal obligation to use EAGLE to handle all mail transported by FedEx in the regions covered by the Initial Contract.

12. The Initial Contract contained the following provisions:

> a. "The contract awarded under this solicitation will be of the fixed price type as defined in Section 2.4.6 of the USPS Purchasing Manual. Offerors' price proposal shall be submitted by per annum rate." (§ A.1 at 1.)
>
> b. "The THS will be responsible for providing ground handling services, facility, mail drayage, loading and unloading mail or freight, building and breaking air containers, simple sortation and maintenance of ground handling equipment from and to the aircraft as specified throughout this Statement of Work." (§ B.1.c at 2.)
>
> c. "The basic purpose of this Statement of Work (SOW) is to specifically detail the duties and responsibilities of the third party ground handler and the United States Postal Service (USPS) and the contracted aviation supplier. . . . It is imperative that the THS accomplish the task set

> forth in order to assure success for both USPS and the aviation supplier. . . The THS will provide the ground handling and drayage services that will be the conduit between the aviation supplier and USPS and that guarantees on time performance.” (§ B.2.a, b, c at 2.)
>
> d. “The term of the contract shall be for a five (5) year term beginning on August 27, 2001 and ending at the close of business August 26, 2006. This agreement will also contain three - 1 year options.” (§ B.5.a at 3.)
>
> e. ***“‘Aviation Supplier’*** under this agreement is the sole supplier of air transportation and the terminal handler at the hub transfer point.” (§ G. 1 at 25 (emphasis in original).)

(Attach. A (Bonham Aff.) ex 1.)

<u>Response To Plaintiff’s Proposed Fact #12</u>

Agree that, with the exception of omitted text, the Initial Contract is quoted accurately.

13. Under the Initial Contract, EAGLE was paid an annual, fixed fee for its services for each region, irrespective of the amount of mail handled. (Attach. A (Bonham Aff.) ex. 1 at 1 (Schedule).)

<u>Response To Plaintiff’s Proposed Fact #13</u>

Agree.

14. In the document itself, USPS did not identify the Initial Contract as an indefinite-delivery, indefinite-quantity (IDIQ) contract and did not specify maximum and minimum amounts of mail to be handled. (Attach. A (Bonham Aff.) ¶ 10 & ex. 1.)

Response To Plaintiff’s Proposed Fact #14

Agree in part and disagree in part. Agree that the Initial Contract did not state that it was an indefinite-quantity contract and did not specify maximum and minimum amounts of mail to be handled. Disagree with plaintiff’s statement that “USPS did not identify” the Initial Contract as an indefinite-delivery, indefinite-quantity contract. The Initial Contract was binding upon both parties. Disagree with any implication that the Initial Contract’s terms were inconsistent with an indefinite-delivery, indefinite-quantity contract.

15. USPS never stated to EAGLE that it considered the Initial Contract to be an IDIQ contract. USPS told EAGLE that the Initial Contract was a requirements contract to handle the mail transported by air by FedEx under its contract with USPS in the three regions awarded to EAGLE. (Attach. A (Bonham Aff.) ¶ 11.)

Response To Plaintiff’s Proposed Fact #15

Disagree. Regardless, the Reformed Contract governs the parties’ rights and obligations in this dispute. A 1.

Performance Under the Initial Contract

16. EAGLE began performance under the Initial Contract in mid-2001. The actual contract term, though, was to begin August 27, 2001, which coincided with the start-up of transportation services by FedEx under the FedEx/USPS contract. (Attach. A (Bonham Aff.) ¶ 12.)

Response To Plaintiff's Proposed Fact #16

Agree.

17. Partially due to measures taken by the Congress and USPS after the attacks of September 11, 2001, the amount of mail delivered to EAGLE for handling under the Initial Contract was overall significantly in excess of the estimates provided by USPS in the Initial Contract, achieving a rate of approximately 1.0 billion pounds per year at lesser densities than estimated. (Attach. A (Bonham Aff.) ¶ 13.)

Response To Plaintiff's Proposed Fact #17

Agree in part and disagree in part. Agree that, following the attacks on September 11, 2001, the Federal Aviation Administration prohibited commercial airlines from transporting mail weighing 16 ounces or more. Agree that this resulted in an increase in the amount of mail delivered via FedEx and, as a result, an increase in the amount of mail tendered to EAGLE for handling.

18. As a result of the greater-than-estimated amounts of mail provided to EAGLE under the Initial Contract, EAGLE had to expand substantially several of its handling facilities at the terminals for which it was responsible. EAGLE's personnel costs also increased substantially over what would have been necessary to handle the specified estimated amounts. (Attach. A (Bonham Aff.) ¶ 14.)

Response To Plaintiff's Proposed Fact #18

Agree in part and disagree in part. Agree that EAGLE expanded handling facilities at certain terminals. Disagree with plaintiff's statements regarding its costs and its motivations for expanding its handling facilities for lack of knowledge or information sufficient to form a belief as to their truth.

19. EAGLE informed USPS of its substantial and unexpected costs to handle the greater-than-estimated amounts of mail and requested compensation for its extra cost and a reformation of the Initial Contract. (Attach. A (Bonham Aff.) ¶ 15.)

Response To Plaintiff's Proposed Fact #19

Agree.

Negotiation of MOU

20. Beginning in early 2002 and continuing into 2003, USPS and EAGLE representatives met to negotiate a lump-sum payment to EAGLE and a reformation of the Initial Contract. (Attach. A (Bonham Aff.) ¶ 16 & ex. 2.)

Response To Plaintiff's Proposed Fact #20

Agree.

21. USPS prepared a "pay model" for a reformed arrangement that it presented for the first time in negotiations in early February 2003. The parties continued to use the pay model as a basis for discussion during the meetings of February, March, and April 2003. (Attach. A (Bonham Aff.) ¶ 18 & exs. 3-5.)

Response To Plaintiff's Proposed Fact #21

Agree in part and disagree in part. Agree that Postal Service representatives created a pay model for calculating estimated revenues for use in discussions between EAGLE and USPS representatives. Agree that the parties used this pay model as a basis for discussions during meetings in February, March, and April 2003.

Disagree with any implication that EAGLE was not actively involved in the development and revision of this model. Disagree with plaintiff's statement that USPS presented the pay model for the first time in early February 2003. According to an e-mail attached as exhibit six to the affidavit of Daniel G. Bonham, file by plaintiff, Mr. Bonham informed USPS and EAGLE representatives that "we first saw this model in early March and had developed different variations." Bonham Aff. Ex. 6 at 1.

22. EAGLE told USPS that the ultimate purpose of the negotiations was to generate sufficient revenue for EAGLE under the Reformed Contract on a going-forward basis that it would justify the additional capital expenditures made to that point by EAGLE to service USPS. The pay model, as modified during negotiations, generated revenues of approximately $46.8 million per year. That computation reflected in the pay model took into account the 20% absorption and made assumptions with respect to

variables such as density, volume, and weight. (Attach. A (Bonham Aff.) ¶¶ 19, 20, 37 & ex. 5; Attach. B (Bauer Aff.) ¶ 4.)

<u>Response To Plaintiff's Proposed Fact #22</u>

Agree in part and disagree in part. Agree that EAGLE representatives explained to Postal Service representatives that EAGLE sought additional revenues through negotiation. Disagree that the pay model generated revenues of approximately $46 million annually. The pay model reflected that revenues of approximately $46 million could be anticipated based upon certain assumptions regarding variables including density, volume, and weight. Decl. of Thomas G. Black ¶ 4.

23. In each variation of the pay model, USPS identified the number of pounds to be handled annually as 1.25 billion. (Attach. A (Bonham Aff.) ¶ 21 & exs. 3-5.)

<u>Response To Plaintiff's Proposed Fact #23</u>

Agree in part and disagree in part. Agree that, during negotiations, USPS representatives identified 1.25 billion pounds as an estimate of the amount of annual mail EAGLE might receive for processing. Decl. of J. Dwight Young ¶ 6. Disagree with any implication that USPS representatives guaranteed that USPS would tender 1.25 billion pounds of mail for processing in any given year. Decl. of Thomas G. Black ¶ 5; Decl. of J. Dwight Young ¶¶ 6, 7.

24. During discussions in 2003, USPS confirmed to EAGLE that it anticipated making 1.25 billion pounds of mail per year available for handling under the contract by EAGLE. (Attach. A (Bonham Aff.) ¶¶ 21, 37 & exs. 4, 5; Attach. B (Bauer Aft) ¶¶ 5, 6.)

Response To Plaintiff’s Proposed Fact #24

Agree in part and disagree in part. Agree that USPS and EAGLE representatives employed a pay model reflecting the compensation EAGLE might receive if USPS tendered 1.25 billion pounds of mail for handling. Disagree with any implication that USPS representatives guaranteed that USPS would tender 1.25 billion pounds of mail for processing in any given year. Decl. of Thomas G. Black ¶ 5; Decl. of J. Dwight Young ¶¶ 6, 7.

25. USPS never said in negotiations concerning the pay model or otherwise that it could choose not to provide EAGLE with 1.25 billion pounds of mail per year even if there were adequate mail in the system to do so. (Attach. A (Bonham Aff) ¶ 21; Attach. B (Bauer Aff.) ¶¶ 5, 7.)

Response To Plaintiff’s Proposed Fact #25

Agree in part and disagree in part. Disagree with plaintiff’s statement regarding representations USPS representatives may or may not have made regarding mail “in the system” as too vague to receive a meaningful response. Agree that USPS representatives never stated to EAGLE representatives

that USPS could choose to divert mail to be processed by EAGLE pursuant to the Reformed Contract to other mail handlers. Disagree with any implication that USPS representatives guaranteed that USPS would tender 1.25 billion pounds of mail for processing in any given year. Decl. of Thomas G. Black ¶ 5; Decl. of J. Dwight Young ¶¶ 6, 7.

26. During the meeting on or about April 11, 2003, the parties agreed that the density assumed by USPS should be reduced to 6.5 pounds/ft.$^3$. To retain the agreed upon revenue of $46.8 million, that required an adjustment of either the volume or the weight. EAGLE asked USPS which number should be adjusted. USPS responded that the volume should be revised and the 1.25 billion pounds should be retained, as the weight was a firm number. (Attach. A (Bonham Aff.) ¶ 22 & ex. 6.)

Response To Plaintiff’s Proposed Fact #26

Agree in part and disagree in part. Agree that, during negotiations, the parties agreed that the assumed density in the pay model should be 6.5 pounds per cubic foot. Disagree that USPS made the decision to change the pay model independently of EAGLE.

Disagree that there was any “agreed upon” revenue of $46.8 million. Rather, the pay model demonstrate that revenues of approximately $46.8 million could be anticipated based upon certain assumptions regarding variables including density,

volume, and weight. Decl. of J. Dwight Young ¶ 5. Disagree with any implication that USPS representatives guaranteed that USPS would tender 1.25 billion pounds of mail for processing in any given year. Decl. of Thomas G. Black ¶ 5; Decl. of J. Dwight Young ¶¶ 6, 7.

27. At the time of the negotiations in 2003, EAGLE understood that, if aviation suppliers in addition to FedEx and ground transportation suppliers were also considered, USPS would have available 1.25 billion pounds per year to supply to EAGLE for handling under the Reformed Contract, considering all types of mail. EAGLE's understanding was accurate. (Attach. A (Bonham Aff.) ¶ 23; Attach. B (Bauer Aff.) ¶ 6.)

Response To Plaintiff's Proposed Fact #27

Disagree with EAGLE's statement regarding what it, or its representatives, may have understood for lack of knowledge or information sufficient to form a belief as to its accuracy. Agree that, if ground transportation suppliers and aviation suppliers other than FedEx are considered, more than 1.25 billion pounds of mail passes through USPS networks for the regions covered by the Reformed Contract in a given year. Disagree with plaintiff's statement that USPS has or has had 1.25 billion pounds of mail available in locations supported by the Reformed Contract to supply to EAGLE for processing in any given year. A 1, 11; Decl. of J. Dwight Young ¶ 11.

28. On April 11, 2003, EAGLE and USPS executed a memorandum of understanding ("MOU") setting forth the principal terms and conditions upon which they had agreed in negotiations regarding amendments to the Initial Contract and that were to be finalized in a revised contract. (Attach. A (Bonham Aff.) ¶¶ 24-27 & ex. 7.)

Response To Plaintiff's Proposed Fact #28

Agree in part and disagree in part. Agree that the parties executed a memorandum of understanding. Disagree with any implication that this document set forth principal terms or conditions that bound the parties or that are dispositive of any issue in this case.

29. The MOU stated in part as follows: "The parties have valued the Contract at $46,800,000, including both variable and fixed costs and with anticipated weight of 1.25 billion pounds of mail." The MOU also set forth the agreed terms concerning "absorption." (Attach. A (Bonham Aff.) ¶¶ 25, 26 & ex. 7.)

Response To Plaintiff's Proposed Fact #29

Agree in part and disagree in part. Agree that the MOU contained the referenced statement. Disagree that the MOU contained any binding agreement regarding absorption. The parties rights and obligations in this case are governed by the Reformed Contract. A 1.

30. On or about April 18, 2003, EAGLE and USPS executed a "Settlement Agreement and Release" that provided for additional payments to EAGLE for performance under the Initial Contract through February 2003. (Attach. A (Bonham Aff.) ¶ 28 & ex. 8.)

Response To Plaintiff's Proposed Fact #30

Agree.

Negotiation of the Reformed Contract Text

31. On or about April 8, 2003, USPS provided to EAGLE for its review and comment a revised contract. USPS later provided EAGLE with a freestanding revised Schedule including a revised section A.l, "Items and Pricing." (Attach. A (Bonham Aff.) ¶ 29 & exs. 9, 11.)

Response To Plaintiff's Proposed Fact #31

Agree.

32. EAGLE and USPS exchanged several drafts of the Reformed Contract from April 2003 through July 2003. (Attach. A (Bonham Aff.) ¶¶ 29, 30 & exs. 9, 10, 12-17.)

Response To Plaintiff's Proposed Fact #32

Agree.

33. On or about July 31, 2003, USPS forwarded to EAGLE a draft of the Reformed Contract with additional modifications. On or about July 31, 2003, EAGLE informed USPS that it would accept the July 31 draft of the Reformed Contract as presented. That

draft became the executed Reformed Contract. (Attach. A (Bonham Aff.) ¶¶ 31, 32 & ex. 18.)

Response To Plaintiff's Proposed Fact #33

Agree.

Negotiation of the 1.25B Provision

34. On or about May 30, 2003, USPS in the negotiation of the Reformed Contract proposed the amended pricing clause as follows:

> The contract awarded under this solicitation shall be priced as follows:
>
> a. This Contract, including prices for the suppliers' [sic] fixed and variable cost, is valued at approximately $46,800,000 annually. Actual paid compensation may vary from this amount depending upon the weight and density of the mail handled by the Supplier. The anticipated weight of the mail per annum is 1.25 billion pounds, including the twenty percent (20%) absorption factor discussed below.

During negotiation of the Reformed Contract, EAGLE made no material modifications to this proposed section A.l.a. (Attach. A (Bonham Aff.) ¶ 33 & ex. 11.)

Response To Plaintiff's Proposed Fact #34

Agree in part and disagree in part. Agree that the Postal Service proposed the language quoted. Disagree with any implication that EAGLE representatives were not actively involved in discussing changes to the proposed language. Decl. of J. Dwight Young ¶ 4. Disagree with any implication that EAGLE did

not agree to modify this language when it executed the Reformed Contract. Pl. Proposed Fact No. 33; A 4.

35. In the July 11, 2003, proposed draft of the Reformed Contract USPS provided to EAGLE, USPS revised section A.l.a, without input from EAGLE, to read as follows:

> The contract awarded under this solicitation shall be priced as follows:
>
> a. The parties anticipate that the Postal Service will provide to the THS approximately 1.25 billion pounds of mail during each calendar year of the contract and that the annual contract compensation for 1.25 billion pounds of mail could reach approximately $46.8 million. However, the parties recognize that the Postal Service does not guarantee a minimum weight of mail to be provided to the THS, and does not guarantee that annual compensation will total $46.8 million dollars. Actual compensation will vary according to the actual weight and density of mail provided to the THS, in accordance with Sections. A.1.b through A.1.j.

(Attach. A (Bonham Aff.) ¶ 34 & ex. 16.)

<u>Response To Plaintiff’s Proposed Fact #35</u>

Agree in part and disagree in part. Agree that Postal Service representatives proposed the quoted language. Disagree with any implication that “USPS revised” this section without input from EAGLE. Decl. of J. Dwight Young ¶ 4.

36. In the draft of the Reformed Contract which USPS submitted to EAGLE on or about July 17, 2003, USPS revised section A.1.a of the July 11 version by specifying the three contract numbers and changing “could reach approximately $46.8

million" to "is estimated to be approximately $46.8 million, including fixed and variable costs." This version of the section is as it appears in the Reformed Contract, and it reads as follows:

> The contracts awarded under this solicitation shall be priced as follows:
>
> a. The parties anticipate that the Postal Service will provide to the THS approximately 1.25 billion pounds of mail during each calendar year of the three contracts (SNET-01-GLR, SNET-01-PR, SNET-01-SER) and that the annual contract compensation for 1.25 billion pounds is estimated to be approximately $46.8 million, including fixed and variable costs. However, the parties recognize that the Postal Service does not guarantee a minimum weight of mail will be provided to the THS, and does not guarantee that annual compensation will total $46.8 million dollars. Actual compensation will vary according to the actual weight and density of mail provided to the THS in accordance with Sections A.l.b through A.l.j.

(Attach. A (Bonham Aff.) ¶ 34 & exs. 17 at 1, 18 at 3.

<u>Response To Plaintiff's Proposed Fact #36</u>

Agree in part and disagree in part. Agree that USPS proposed the referenced language. Disagree with any implication that "USPS revised" this section without input from EAGLE. Decl. of J. Dwight Young ¶ 4.

37. Mr. Bonham of EAGLE asked Mr. Tom Black of USPS why USPS had added the "no guarantee" language to section A.l.a. Mr. Black told Mr. Bonham that USPS had added it because USPS could not guarantee that it would have available any specific

amount of mail in the future, as the amount of mail tendered to USPS by the public was not in the control of USPS. Mr. Bonham informed Mr. Bauer of EAGLE of the substance of this conversation prior to Mr. Bauer's executing the Reformed Contract. (Attach. A (Bonham Aff.) ¶ 36; Attach. B (Bauer Aff) ¶ 7.)

Response To Plaintiff's Proposed Fact #37

Agree in part and disagree in part. Agree that Mr. Bonham of EAGLE asked Mr. Black why USPS had added the "no guarantee" language to section A.l.a. Agree that Mr. Black informed Mr. Bonham that USPS could not guarantee that it would have available any specific amount of mail in the future. Decl. of Thomas G. Black ¶ 7. Disagree with any implication that Mr. Black told Mr. Bonham that this was the sole reason why USPS insisted that it would not guarantee any minimum quantity of mail to EAGLE. Decl. of Thomas G. Black ¶ 7. Disagree with any implication that Mr. Black stated or implied to Mr. Bonham that USPS guaranteed that it would supply 1.25 billion pounds of mail per year to EAGLE if USPS had that much mail available across all of its networks or under any other circumstances. Decl. of Thomas G. Black ¶ 7. Disagree with plaintiff's statement regarding what Mr. Bonham told Mr. Bauer for lack of knowledge or information sufficient to form a belief as to its truth.

38. EAGLE understood that it was accepting the risk that the customers might not tender as much as 1.25 billion pounds of

mail to USPS. However, EAGLE understood that USPS was agreeing to provide that amount of mail if it were available. (Attach. A (Bonham Aff.) ¶¶ 19-21, 37; Attach. B (Bauer Aff.) ¶¶ 6- 9.)

Response To Plaintiff's Proposed Fact #38

Disagree with plaintiff's statements regarding what it understood for lack of knowledge or information sufficient to form a belief as to their truth.

39. USPS never told EAGLE prior to EAGLE's acceptance of the Reformed Contract that, under USPS's interpretation of any version of the language of section A.1.a, USPS had the option to supply EAGLE with mail at a rate of less than 1.25 billion pounds per annum even if that amount of mail were available. (Attach. A (Bonham Aff.) ¶¶ 38, 58; Attach. B (Bauer Aff.) ¶¶ 5, 8.)

Response To Plaintiff's Proposed Fact #39

Disagree. Postal Service representatives repeatedly and consistently informed EAGLE representatives, including Brian T. Bauer, EAGLE's President, and Daniel G. Bonham, EAGLE's Director of Marketing, that USPS would not guarantee 1.25 billion pounds of mail to EAGLE for processing under any circumstances. Decl. of Thomas G. Black ¶ 7, 8, 9; Decl. of J. Dwight Young ¶ 6, 7.

40. EAGLE told USPS during negotiations of the MOU and the Reformed Contract that it understood USPS to be committing to supply it with approximately 1.25 billion pounds of mail annually

under the Reformed Contract. (Attach. A (Bonham Aff.) ¶ 37; Attach. B (Bauer Aff.) ¶¶ 4, 5.)

Response To Plaintiff's Proposed Fact #40

Disagree. Decl. of Thomas G. Black ¶¶ 8, 9; Decl. of J. Dwight Young ¶ 6, 7.

41. EAGLE understood that it was accepting the risk that the estimated poundage and revenue would not be exactly 1.25 billion pounds and $46.8 million, as it is impossible to provide a given poundage of mail precisely, especially as the total is a combination of different amounts for over twenty terminals over three regions. In addition, the dollar figure is subject to different pricing by location and adjustments spelled out in section A.1 (such as for density experienced). Thus, EAGLE understood itself to be taking the risk of minor variations from the poundage, provided USPS used good faith efforts to meet the specified amount. (Attach. A (Bonham Aff.) ¶ 39.)

Response To Plaintiff's Proposed Fact #41

Disagree with EAGLE's statements regarding what its representatives understood for lack of knowledge or information sufficient to form a belief as to their truth.

Negotiation of "Aviation Supplier" Definition

42. In its initial draft of the revised Statement of Work it provided EAGLE in April 2003, USPS amended the definition of "Aviation Supplier" to read as follows: ***"Aviation Supplier'*** under

this agreement is a supplier of air transportation and terminal handler at hub transfer point." (Emphasis in original.) (Attach. A (Bonham Aff.) ¶ 40 & ex. 9 at 46.)

Response To Plaintiff's Proposed Fact #42

Agree in part and disagree in part. Agree that USPS proposed the referenced draft language. Disagree with any implication that "USPS amended" this language without input from EAGLE. Decl. of J. Dwight Young ¶ 4.

43. The phrase "terminal handler at hub transfer point" also appeared in the definition of "Aviation Supplier" in the Initial Contract. (Attach. A (Bonham Aft) ¶ 41 & ex. 1 at 25.)

Response To Plaintiff's Proposed Fact #43

Agree.

44. Under the Initial Contract, "Aviation Supplier" related expressly to a "sole" supplier of air transportation, which was FedEx. (Attach. A (Bonham Aff.) ¶ 42 & ex. 1 at 25.)

Response To Plaintiff's Proposed Fact #44

Agree.

45. Under the Initial Contract, the phrase "terminal handler at hub transfer point" in the definition of "Aviation Supplier" referred to the fact that FedEx was handling the mail itself at Memphis, the "hub transfer point" of FedEx, even though Memphis was one of the terminals originally listed in the SNET solicitation. (Attach. A (Bonham Aff.) ¶ 43 & ex. 1 at 25.)

Response To Plaintiff's Proposed Fact #45

Agree.

46. In comments on a draft submitted during late May or June 2003, EAGLE suggested deleting the phrase "and terminal handler at hub transfer point" from the definition of "Aviation Supplier" in the Reformed Contract. USPS accepted that deletion without further comment. (Attach. A (Bonham Aff.) ¶ 44 & exs. 13 at 43, 15 at 49, 16, 17, 18 at 51.)

Response To Plaintiff's Proposed Fact #46

Agree in part and disagree in part. Agree that the parties deleted the phrase "and terminal handler at hub transfer point" from the definition of "Aviation Supplier" in the Reformed Contract. Disagree with plaintiff's statements that EAGLE representatives suggested this change and that USPS representatives accepted it without comment for lack of knowledge or information sufficient to form a belief as to their accuracy.

47. EAGLE suggested deletion of the phrase "and terminal handler at hub transfer point" because FedEx was no longer intended to be the sole service supplier of air transportation under the Reformed Contract. (Attach. A (Bonham Aft) ¶ 45.)

Response To Plaintiff's Proposed Fact #47

Disagree with plaintiff's statements regarding why it may have suggested a change in proposed contract language for lack of knowledge or information sufficient to form a belief as to their truth.

Negotiation of Other Relevant Provisions

48. The opening paragraph of section A.l was proposed by USPS in the initial draft of the Reformed Contract to read as follows:

> The purpose of this performance based service contract is for the Postal Service to purchase and the Terminal HS to provide integrated material handling services in support of the United States Postal Service's air and ground networks.

EAGLE never proposed a substantive amendment to this provision, and it appears in the Reformed Contract as initially proposed by USPS (except in one non-substantive respect, *i.e.,* "Terminal HS" modified to "Terminal Handling Supplier (THS)"). (Attach. A (Bonham Aff.) 46 & exs. 9 at 2, 10 at 1, 11, 15 at 1, 16, 17, 18 at 3.)

Response To Plaintiff's Proposed Fact #48

Agree in part and disagree in part. Agree that EAGLE proposed changing "Terminal HS" to "Terminal Handling Supplier (THS)" in the draft Reformed Contract. Disagree with any implication that USPS authored the referenced language without input from EAGLE. Decl. of J. Dwight Young ¶ 4.

49. The first sentence of section B.1 was proposed by USPS in the initial draft of the Reformed Contract to read as follows: "The purpose of this performance based service contract is to provide integrated material handling services in support of the U.S. Postal Service's air and ground networks." EAGLE never

proposed an amendment to this provision, and it appears in the Reformed Contract as initially proposed by USPS. (Attach. A (Bonham Aff.) ¶ 47 & exs. 9 at 4, 10 at 3, 12 at 2, 13 at 1, 14, 15 at 7, 16, 17, 18 at 10.)

Response To Plaintiff's Proposed Fact #49

Agree in part and disagree in part. Agree that the referenced language appears in the Reformed Contract as proposed by USPS. Disagree with any implication that USPS authored this language without input from EAGLE. Decl. of J. Dwight Young ¶ 4.

50. Section B.5.b(1) was proposed by USPS in the initial draft of the Reformed Contract to read as follows: "The integrated material handling services to be purchased are primarily intended to support Express, Priority and First Class Mail." EAGLE never proposed an amendment to this provision, and it appears in the Reformed Contract as initially proposed by USPS. There was no corresponding provision in section B.5.b of the Initial Contract. (Attach. A (Bonham Aff.) ¶ 48 & exs. 9 at 6, 10 at 5, 12 at 4, 13 at 3, 14, 15 at 9, 16, 17, 18 at 12.)

Response To Plaintiff's Proposed Fact #50

Agree in part and disagree in part. Agree that the referenced language appears in the Reformed Contract as proposed by USPS. Agree that the referenced language did not appear in the Initial Contract. Disagree with any implication that USPS

authored this language without input from EAGLE. Decl. of J. Dwight Young ¶ 4.

51. The Attachment A list of terminals and baseline weights is conformed to the terminals actually serviced and uses the original figures in the Initial Contract. Thus, the combined total baseline weight around which the absorption collar operates is approximately 870 million pounds. (Attach. A (Bonham Aff.) ¶ 49 & ex. 18, attach. A.)

Response To Plaintiff's Proposed Fact #51

Agree.

52. Section G-10 of the Reformed Contract refers to "work by any other supplier or by Postal Service employees." The suppliers referenced in this section are not other mail handlers like EAGLE, but suppliers of mail transportation services like FedEx and the Postal Service itself. (Attach. A (Bonham Aff.) ¶ 50 & ex. 18 at 62.)

Response To Plaintiff's Proposed Fact #52

Agree in part and disagree. Agree that Section G-10 of the Reformed Contract refers to "work by any other supplier or by Postal Service employees." A 62. Disagree that anything in this language indicates that it is limited to suppliers of mail transportation services like FedEx. A 62.

53. The last sentence of section B.2.a of the Reformed Contract refers to "qualified suppliers" in addition to EAGLE.

In this sentence, USPS points out that, when USPS competed the entire country under the SNET solicitation, it divided the country into seven different regions and awarded seven contracts, one for each region, with multiple handling suppliers invited to quote on each region. USPS awarded only one SNET contract for each of the three regions that EAGLE won (consolidating them into one document), and the Initial Contract was a requirements contract for all of the mail transported by air by FedEx in those three regions. (Attach. A (Bonham Aff.) ¶¶ 5, 51 & exs. 1, 18 at 10.)

<u>Response To Plaintiff's Proposed Fact #53</u>

Agree in part and disagree in part. Agree that the last sentence of section B.2.a refers to "qualified suppliers." A 11. Agree that USPS awarded contracts for mail handling services to cover different regions, and that USPS awarded one SNET contract for each of the three regions for which USPS formed a contract with EAGLE. Agree that the parties have stated the three contracts in the Reformed Contract. Disagree with plaintiff's statement that the Initial Contract was a requirements contract for all of the mail transported by air by Fed Ex in the three regions covered by the contracts between EAGLE and USPS.

<u>Reformed Contract Terms</u>

54. On or about August 3, 2003, the parties amended the Initial Contract and USPS reissued it almost in its entirety as the Reformed Contract. The amendment has an effective date of March 1, 2003. (Attach. A (Bonham Aff.) ¶ 32 & ex. 18.)

<u>Response To Plaintiff's Proposed Fact #54</u>

Agree.

55. The Reformed Contract contains the following provisions:

> a. "Effective March 1, 2003, the U.S. Postal Service and the THS agree to a reformation of the contracts listed above [SNET-01-PR, SNET-0l-SER, and SNET-01-GLR] . . . ." (Title pg.)
>
> b. **"A.1 Pricing**
>
> "The purpose of these performance based service contracts is for the Postal Service to purchase and the Terminal Handling Supplier (THS) to provide integrated material handling services in support of the United States Postal Service's air and ground networks.
>
> "The contracts awarded under this solicitation shall be priced as follows:
>
> > "a. The parties anticipate that the Postal Service will provide to the THS approximately 1.25 billion pounds of mail during each calendar year of the three contracts (SNET-0l-GLR, SNET-01-PR, SNET-01-SER) and that the annual contract compensation for 1.25 billion pounds is estimated to be approximately $46.8 million, including fixed and variable costs. However, the parties recognize that the Postal Service does not guarantee a minimum weight of mail will be provided to the THS, and does not guarantee that annual compensation will total $46.8 million

dollars. Actual compensation will vary according to the actual weight and density of mail provided to the THS in accordance with Sections A.l.b through A.l.j." (§ A.l at 3 (emphasis in original).)

c. "Absorption: In the event that the average actual daily weight at any given air stop exceeds the designated baseline weight by twenty percent (20%) or less during each schedule period of the contract the Supplier shall not be entitled to any additional compensation. In the event the average daily actual weight exceeds the designated baseline weight by more than twenty percent (20%) during any schedule period, the Supplier shall be entitled to additional compensation only for the weight of the mail in excess of the twenty-percent (20%) increase. . . . (§ A.1.d at 4.)

d. "The purpose of this performance based service contract is to provide integrated material handling services in support of the U.S. Postal Service's air and ground networks." (§ B.l at 10.)

e. "The term of this reformed contract shall be from **March 1, 2003** through and including August 26, 2006. This contract contains three (3), one (1) year options exercisable by the Postal Service in its sole discretion upon delivery of written notice to the THS at least 60 days prior to the expiration of the contract." (§ B.5.a at 12 (emphasis in original).)

f. "The integrated material handling services to be purchased are primarily intended to support Express, Priority and First Class Mail." (§ B.5.b at 12.)

g. ***"Aviation Supplier'*** under this agreement is a supplier of air transportation." (§ G.1 at 51 (emphasis in original).)

(Attach. A (Bonham Aff.) ex. 18.)

Response To Plaintiff's Proposed Fact #55

Agree.

56. The Reformed Contract does not identify itself as an IDIQ contract, does not contain the standard USPS clause for IDIQ contracts, and does not set minimum and maximum amounts of mail for EAGLE to handle. (Attach. A (Bonham Aft) ex. 18.)

Response To Plaintiff's Proposed Fact #56

Agree.

57. Prior to execution of the Reformed Contract, USPS never stated to EAGLE that, in its opinion, the Reformed Contract was or would be an IDIQ contract. (Attach. A (Bonham Aff.) ¶ 58; Attach. B (Bauer Aff.) ¶ 8.)

Response To Plaintiff's Proposed Fact #57

Agree in part and disagree in part. Agree that USPS representatives likely never stated that, in their opinion, the Reformed Contract was an indefinite quantity contract. Disagree with any implication that the Reformed Contract is not an indefinite quantity contract or that the parties' opinions vary the Reformed Contract's plain terms.

58. Prior to execution of the Reformed Contract, USPS never told EAGLE that the Reformed Contract would change the contract type from that of the Initial Contract. (Attach. A (Bonham Aff.) ¶ 58.)

Response To Plaintiff's Proposed Fact #58

Agree in part and disagree in part. Agree that USPS representatives never informed EAGLE that the type of contract

between the parties would change. Disagree with any implication that the Initial Contract was a requirements contract or that the type of contract between the parties changed when they formed the Reformed Contract.

59. Prior to the execution of the Reformed Contract, USPS told EAGLE that, under the Reformed Contract, EAGLE would continue to handle all the FedEx traffic, plus more, to give EAGLE 1.25 billion pounds and $46.8 million annually. (Attach. A (Bonham Aff.) ¶¶ 37, 38, 58; Attach. B (Bauer Aff.) ¶¶ 5, 6, 8.)

Response To Plaintiff’s Proposed Fact #59

Disagree. Postal Service representatives repeatedly and consistently informed USPS representatives, including Brian T. Bauer, EAGLE’s President, and Daniel G. Bonham, EAGLE’s Director of Marketing, that USPS would not guarantee 1.25 billion pounds of mail to EAGLE for processing under any circumstances, including by diverting to EAGLE mail transported by carriers other than FedEx. Decl. of Thomas G. Black ¶ 9; Decl. of J. Dwight Young ¶¶ 8, 9.

60. If the Reformed Contract were an IDIQ contract or USPS otherwise had the option to order less than 1.25 billion pounds per year in its discretion, EAGLE would be at risk that USPS would only take sufficient quantities to take advantage of the

20% “free zone” of the absorption collar and no more. (Attach. A (Bonham Aff.) ¶ 59; Attach. B (Bauer Aff.) ¶ 9.)

Response To Plaintiff’s Proposed Fact #60

Plaintiff’s proposed fact number 60 constitutes a legal conclusion and plaintiff’s characterization of its case, to which no response is required. Further disagree with plaintiff’s characterization of the Reformed Contract as containing a “free zone.” A 4, 8.

61. In EAGLE’s view, taking the risk of giving USPS unlimited discretion in how much mail it was to provide to EAGLE would have made no business sense and would have been foolhardy and unacceptable. (Attach. A (Bonham Aff.) ¶¶ 60, 61; Attach. B (Bauer Aff.) ¶ 9.)

Response To Plaintiff’s Proposed Fact #61

Disagree with plaintiff’s statements regarding its views for lack of knowledge or information sufficient to form a belief as to their truth.

62. Based on the fact that USPS never increased the amount of mail that EAGLE was to handle above its approximate “free zone” of the 20% absorption collar, EAGLE believes that there is substantial reason to suspect that USPS never intended to provide the additional amounts of mail to EAGLE and that USPS did not negotiate or perform in good faith. (Attach. A (Bonham Aff.) ¶ 59.)

Response To Plaintiff's Proposed Fact #62

Disagree with plaintiff's statements regarding what it believes for lack of knowledge or information sufficient to form a belief as to their truth.

Performance and Damages Suffered by EAGLE

63. USPS has had enough mail in its air and ground networks in the regions covered by the Reformed Contract to supply mail to EAGLE under the Reformed Contract at a rate of 1.25 billion pounds per year from March 1, 2003, to the present. (Attach. A (Bonham Aff.) ¶ 23; Attach. B (Bauer Aff.) ¶ 6.)

Response To Plaintiff's Proposed Fact #63

Agree in part and disagree in part. Agree that, since March 1, 2003, USPS has had more than 1.25 billion pounds of mail combined per year in all of its air and ground networks in the regions covered by the Reformed Contract. Disagree with any implication that USPS is obligated to tender to EAGLE all of the mail in USPS's air and ground networks under the Reformed Contract, which is in support of USPS's contract with an "aviation supplier"--FedEx. A 4, 11; Pl.'s Proposed Fact Nos. 11, 53.

64. The actual volumes of mail handled by EAGLE under the Reformed Contract since its effective date of March 1, 2003, through February 28, 2006, are as follows:

| Year | Actual Pounds | Annualized Pounds |
|---|---|---|
| 2003 | 784,601,929 | 941,522,315 |
| 2004 | 1,010,089,544 | 1,010,089,544 |
| 2005 | 1,050,499,950 | 1,050,499,950 |
| 2006 | 53,321,649 | 1,023,109,140 |

These amounts are based on EAGLE's records, which show more poundage than USPS claims EAGLE has handled. (Attach. C (Schrock Aff.) ¶ 5 & tab 2.)

Response To Plaintiff's Proposed Fact #64

Disagree with plaintiff's statement regarding the total amount of mail it claims to have processed on an actual or "annualized" basis for lack of knowledge of information sufficient to form a belief as to their truth.

65. Computed using the method USPS claims to apply for the absorption calculation, if USPS had provided EAGLE with 1.25 billion pounds per year, assuming the same rate of increase over the various terminals EAGLE services under the Reformed Contract, EAGLE would have had additional revenues of approximately $28,000,000 for the period of March 1, 2003, through February 28, 2006, or approximately $10,000,000 per year. (Attach. C (Schrock Aff.) ¶ 4 & tab 1.)

Response To Plaintiff's Proposed Fact #65

Plaintiff's proposed fact number 65 constitutes plaintiff's characterization of its case, to which no response is required. Further disagree that plaintiff's hypothetical reflects reality. EAGLE processes mail for USPS at 23 different terminals. Pl. Proposed Facts No. 41. For several locations, USPS has supplied EAGLE with more mail for processing during the cited period than the baseline amounts estimated in the Reformed Contract, and has provided total annual compensation exceeding the $46.8 million estimated in the Reformed Contract. Decl. of J. Dwight Young ¶ 13.

EAGLE Complaints and USPS Final Decision

66. As early as March 2004, EAGLE complained to USPS that USPS was not providing mail under the Reformed Contract at a rate of 1.25 billion pounds per year. (Attach. A (Bonham Aft) ¶ 52 & ex. 19.)

Response To Plaintiff's Proposed Fact #66

Agree.

67. EAGLE repeatedly thereafter complained to USPS about the shortfall in pounds of mail delivered by USPS to EAGLE for handling under the Reformed Contract. (Attach. A (Bonham Aff.) ¶ 53.)

Response To Plaintiff's Proposed Fact #67

Agree in part and disagree in part. Agree that EAGLE representatives complained to USPS representatives that EAGLE was not receiving the volumes of mail to which they believed EAGLE was entitled. Disagree that any "shortfall" existed in the amount of mail EAGLE received for processing from USPS.

68. In a letter from Mr. Brian T. Bauer, President of EAGLE, to Contracting Officer Brazil dated September 20, 2005, EAGLE demanded assurances from USPS that it would conform to its contractual obligations to provide 1.25 billion pounds annually. (Attach. A (Bonham Aff.) ¶ 54 & ex. 20.)

Response To Plaintiff's Proposed Fact #68

Agree in part and disagree in part. Agree that Mr. Bauer sent Ms. Brazil the referenced letter, which is the best evidence of its contents. Disagree with any implication that USPS has any contractual obligation to provide EAGLE with 1.25 billion pounds of mail annually.

69. By letter dated October 14, 2005, Contracting Officer Brazil responded to Mr. Bauer's September 20 letter by stating that USPS would not make any assurances that it would provide EAGLE with mail at a rate of 1.25 billion pounds annually because that amount as stated in the Reformed Contract is an estimate and not a guarantee. She did not claim that the Reformed Contract is

an "Indefinite Quantity" or IDIQ Contract. (Attach. A (Bonham Aff.) ¶ 55 & ex. 21.)

Response To Plaintiff's Proposed Fact #69

Agree.

70. By letter dated October 25, 2005, EAGLE requested a final decision from Contracting Officer Brazil that USPS had an obligation under the Reformed Contract to provide EAGLE with approximately 1.25 billion pounds of mail annually if such mail is available from the USPS air and ground networks in the regions covered by the Reformed Contract. EAGLE also requested a final decision that USPS is and has been in material breach. (Attach. A (Bonham Aff.) ¶ 56 & ex. 22.)

Response To Plaintiff's Proposed Fact #70

Agree.

71. By letter dated January 3, 2006, Contracting Officer Brazil issued her final decision. She denied that USPS has any contractual obligations to tender the amount of mail specified in the Reformed Contract if it is available. She claimed that the Reformed Contract is an "Indefinite Quantity" Contract, rather than a requirements-type contract. She did not address the issue of the materiality of the asserted breach. (Attach. A (Bonham Aff.) ¶¶ 57, 58 & ex. 23.)

Response To Plaintiff's Proposed Fact #71

Agree.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ DONALD E. KINNER
DONALD E. KINNER
Assistant Director

OF COUNSEL:

MICHAEL F. KIELY
Law Department
United States Postal Service
Washington, D.C. 20260

s/ PAUL R. WELLONS
PAUL R. WELLONS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 616-8253
Fax: (202) 307-0972

Attorneys for Defendant

April 14, 2006

CERTIFICATE OF FILING

I hereby certify that on April 14, 2006, a copy of the foregoing “DEFENDANT’S RESPONSE TO PLAINTIFF’S PROPOSED FINDINGS OF UNCONTROVERTED FACT” was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ PAUL R. WELLONS