IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| EVERGREEN AVIATION GROUND LOGISTICS ENTERPRISES, INC., Plaintiff, | |
| v. | No. 06-11C<br>Allegra, J. |
| UNITED STATES, Defendant. | |

EAGLE'S REPLY IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT

Frederick W. Claybrook, Jr.
(Counsel of Record)
Daniel R. Forman
Jenny Kim

Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2500

Attorneys for EAGLE

May 1, 2006

# TABLE OF CONTENTS

I. EAGLE'S Interpretation Harmonizes All the Contract Text and Fulfills Its Admitted Purpose ........ 3

II. The Reformed Contract Did Not Change the Contract Type to IDIQ ........ 8

III. The USPS Declarants Do Not Contest the Material Facts that Establish EAGLE's Interpretation ........ 11

A. Negotiations About the Commitment of 1.25 Billion Pounds ........ 12

B. Negotiations About the "No Guarantee" Language ........ 14

C. General Denials of Negotiation History ........ 15

D. Unsupported Denials for Lack of Knowledge........ 15

IV. USPS Concedes Its Breach Is Material in Amount ........ 17

Conclusion........ 18

# TABLE OF AUTHORITIES

Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........ 12

*Arizona v. United States*,
575 F.2d 855 (Ct. Cl. 1978) ........ 2

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........ 12

*Centrex Corp. v. United States*,
395 F.3d 1283 (Fed. Cir. 2005) ........ 7

*Coast Fed. Bank, FSB v. United States*,
323 F.3d 1035 (Fed. Cir. 2003) ........ 5

*Empire Gas Corp. v. Am. Bakeries Co.*,
840 F.2d 1333 (7th Cir. 1988) ........ 2

*Gould, Inc. v. United States*,
935 F.2d 1271 (Fed. Cir. 1991) ........ 2

*Gurary v. Winehouse*,
190 F.3d 37 (2d Cir. 1999) ........ 16

*Hemet Valley Flying Service Co. v. United States*,
7 Cl. Ct. 512 (1985) ........ 9

*Hol-Gar Mfg. Corp. v. United States*,
351 F.2d 972 (Ct. Cl. 1965) ........ 5, 6

*Hunt Constr. Group, Inc. v. United States*,
281 F.3d 1369 (2002) ........ 2

*Keebler Co. v. Murray Bakery Prods.*,
866 F.2d 1386 (Fed. Cir. 1989) ........ 16

*Lewis v. Knutson*,
699 F.2d 230 (5th Cir. 1983) ........ 16

*Lunderstadt v. Colafella*,
885 F.2d 66 (3d Cir. 1989) .......... 16

*Maldonado v. Ramirez*,
757 F.2d 48 (3d Cir. 1985) .......... 12

*Mason v. United States*,
615 F.2d 1343 (Ct. Cl. 1980) .......... 9, 10

*McAbee Constr., Inc. v. United States*,
97 F.3d 1431 (Fed. Cir. 1996) .......... 5

*New Am. Shipbuilders, Inc. v. United States*,
871 F.2d 1077 (Fed. Cir. 1989) .......... 16

*Opryland USA Inc. v. Great Am. Music Show, Inc.*,
970 F.2d 847 (Fed. Cir. 1992) .......... 16

*Pacificorp Cap., Inc. v. United States*,
25 Cl. Ct. 707 (1992) .......... 6

*Paddington Partners v. Bouchard*,
34 F.3d 1132 (2d Cir. 1994) .......... 16

*Perry and Wallis, Inc. v. United States*,
427 F.2d 722 (Ct. Cl. 1970) .......... 15

*Ralph Constr. Co. v. United States*,
4 Cl. Ct. 727 (1984) .......... 10

*Shader Contractors, Inc. v. United States*,
276 F.2d 1 (Ct. Cl. 1960) .......... 10

*Shavrnoch v. Clark Oil & Ref. Corp.*,
726 F.2d 291 (6th Cir. 1984) .......... 16

*THI-Hawaii, Inc. v. First Commerce Fin. Corp.*,
627 F.2d 991 (9th Cir. 1980) .......... 16

*Tech. Assistance Int'l, Inc. v. United States*,
150 F.3d 1369 (Fed. Cir. 1998) .......... 2, 9, 18

*Topalian v. Ehrman*,
954 F.2d 1125 (11th Cir. 1992) .......... 12

*Travel Ctr. v. Barram*,
236 F.3d 1316 (Fed. Cir. 2001) .......... 4, 10

*United States v. Stuart*,
489 U.S. 353 (1989) .......... 15

Other Authority

RESTATEMENT (SECOND) OF CONTRACTS (1981)
§ 202(1) .......... 5
§ 202(2) .......... 5
§ 202 cmt. c .......... 3, 5
§ 203(a) .......... 5, 9
§ 203(c) .......... 9
§ 205 cmts. a, d .......... 7

USPS Purchasing Manual
§ 2.4.6.c.1 .......... 8, 9
§ 2.4.6.d.1 .......... 8
§ 2.4.6.d.2 .......... 10

RCFC 56(d) .......... 15

RCFC 56(e) .......... 11, 12, 14, 15

If repetition were reason, USPS's Opposition would be unassailable. But just reciting and referencing the "no guarantee" portion of section A.1.a over and again and ignoring the first part of the section and the rest of the Reformed Contract – as well as the very purpose of the contract's reformation – does not carry the day.

So what answer does USPS have to the language immediately before the "no guarantee" language that says the parties anticipate USPS "will provide" approximately 1.25 billion pounds of mail per year to EAGLE? None. What answer does USPS have to the language expanding the sources of mail for handling from just FedEx in the Initial Contract to the entire air and ground networks of USPS in the Reformed Contract? None. What answer does USPS have to the fact that its interpretation does not satisfy the purpose of the reformation to give EAGLE more mail to handle in EAGLE's expanded facilities? None. USPS's interpretation is an exercise in avoidance, not harmonization.

USPS in its brief and declarations, at bottom, relies only on the fact that the Reformed Contract expressly states that USPS did not commit to any guaranteed minimum quantity. From this, USPS argues that it has made no commitment at all with respect to quantities. If this were true, no requirements-type contract could ever stand. As USPS states (at 8), "it is well-established that the mere existence of a requirements contract does not entitle a contractor to any guaranteed minimum." Exactly. And that is all the "no guarantee" language in section A.1.a says. But far from eviscerating all of a buyer's obligations, the fact that there is no guaranteed minimum obligation in a requirements contract makes a buyer's good faith duties to

supply available requirement all the more critical. Contrary to what USPS essentially argues, "a requirements contract is more than merely an option for the buyer to purchase the goods or services." *Tech. Assistance Int'l, Inc. v. United States*, 150 F.3d 1369, 1372 (Fed. Cir. 1998) (*quoting Empire Gas Corp. v. Am. Bakeries Co.*, 840 F.2d 1333, 1339 (7th Cir. 1988)).

As explained below, USPS's Opposition, including its Response to Plaintiff's Proposed Findings of Uncontroverted Facts ("FF/R"), only reinforces that EAGLE should prevail. First, it is EAGLE that interprets the Reformed Contract consistently with its purpose and reads all parts in harmony, giving effect to all. *See Hunt Constr. Group, Inc. v. United States*, 281 F.3d 1369, 1372 (2002) (contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts); *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed. Cir. 1991); *Arizona v. United States*, 575 F.2d 855, 863 (Ct. Cl. 1978). Second, neither the Reformed Contract nor the Initial Contract were IDIQ contracts, but requirements-type contracts. Third, the USPS declarants admit the specifics of the negotiations of the Reformed Contract. The generalities they have crafted to try to escape summary judgment do not, in fact, conflict with EAGLE's interpretation of the agreement or carry USPS's burden under Rule 56 to rebut with specificity. Finally, USPS does not contest that, if it is in breach, the amounts involved make it a material breach and that it acted in bad faith.

I. EAGLE'S Interpretation Harmonizes All the Contract Text and Fulfills Its Admitted Purpose

Only EAGLE's reading of the Reformed Contract reads all provisions in harmony and gives meaning to its purpose to increase the revenues of EAGLE for its expanded facilities, a purpose set out in the text of the parties' MOU and admitted by USPS in its responsive pleadings. (FF/R 22, 28, 29.)[1] That purpose could not be satisfied if USPS had no contractual obligation to give EAGLE an amount of mail above that which EAGLE was already carrying, 1.0 billion pounds per year. (FF/R 17.) It can only be honored by attaching some significance to the contract's recitation that USPS "will provide" (not "may provide") EAGLE 1.25 billion pounds per year.

EAGLE's understanding of the Reformed Contract does exactly that, while also giving meaning to the "no guarantee" language that immediately follows. The parties expressly stated their anticipation, or expectation, that USPS would provide approximately 1.25 billion pounds.[2] At the same time, they stated that USPS was

---

[1] USPS admitted (and did not counter with sworn declarations) that (a) EAGLE representatives told their USPS counterparts that EAGLE wanted to reform the contract to generate sufficient revenue on a going-forward basis so that would justify the additional capital expenditures made to that point by EAGLE to service USPS (FF/R 22) and (b) the MOU of the parties specified an anticipated weight of 1.25 billion pounds of mail as the way to do so. (FF/R 29.) With such a purpose disclosed, "further interpretation is guided by it. Even language which is otherwise explicit may be read with a modification needed to make it consistent with such a purpose." RESTATEMENT (SECOND) OF CONTRACTS § 202 cmt. c (1981).

[2] Webster's defines *anticipate*, in the sense obviously meant by the parties here, as "to look forward to as certain" and *anticipation* as synonymous with *expectation*. WEBSTER'S THIRD INT'L DICTIONARY 94 (2002).

not guaranteeing that such amounts of mail would be tendered to USPS or that such an amount would be provided exactly. (FF/R 37-41.) This does not, as USPS claims (at 11), read out of the contract that USPS "does not guarantee a minimum weight of mail will be provided." EAGLE acknowledges that USPS does not guarantee "under any circumstances" that it will have 1.25 billon pounds of mail available to tender to EAGLE, even though both parties "anticipate" that USPS "will provide" that much. (FF 38.)

This anticipation is given further credence by the Reformed Contract's text that EAGLE is now to support all of USPS's "air and ground networks." (FF/R 48, 49.) This language was a change from the Initial Contract's limitation of the work to the FedEx traffic. (FF/R 11, 12.) That the pool of available mail was being expanded was also made clear in the modification of the definition of "Aviation Supplier" from "sole" supplier in the Initial Contract to "a" supplier in the Reformed Contract and by the addition of text in the Reformed Contract to say the types of mail to be carried were "primarily," no longer exclusively, those handled by FedEx. (FF/R 12(e), 42-47.) *See Travel Ctr. v. Barram*, 236 F.3d 1316, 1319 (Fed. Cir. 2001) ("a" preferred vendor is not the same as "the" preferred vendor and connotes non-exclusivity).

USPS's reading of the "no guarantee" language forces it to take the incredible position (at 22-23; FF/R 63) that the Reformed Contract did not expand the sources of supply of the mail and that all USPS continues to promise under the Reformed Contract is FedEx traffic. This is galimatias and needs no sustained rebuttal. Only

EAGLE's reading gives meaning to these important changes in the language of the Reformed Contract. USPS's proffered interpretation improperly turns a blind eye to the context of these provisions and reads them out of the contract.[3] *See Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (*en banc*); RESTATEMENT (SECOND) OF CONTRACTS § 203(a) (1981).

USPS goes to great lengths (at 11-14) to explain that the absorption provisions of the contract work to EAGLE's advantage when the weight falls below the baseline amount (as they do to USPS's advantage when the weight falls above). USPS's purpose in doing so is to suggest that these "down-side" provisions would serve no purpose under EAGLE's interpretation, but that is simply not true. First, the down-side elements of the absorption provisions obviously would have increasing relevance to the extent that the anticipated weight of 1.25 billion pounds did not materialize from USPS's customers. Second, as USPS acknowledges (at 12-

---

[3] The parol evidence rule is not implicated when the text of the Initial Contract and the Reformed Contract are compared, and USPS appears to concede (at 19) that it is appropriate to consider the Initial Contract when construing the Reformed Contract. *See generally McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434 (Fed. Cir. 1996) (recognizing that a contract can integrate other contracts by reference); RESTATEMENT (SECOND) OF CONTRACTS § 202(2) ("all writings that are part of the same transaction are interpreted together"). However, even if the text of the Reformed Contract were viewed out of the context of the reformation of the contract and not interpreted from the vantage point of one "acquainted with the contemporaneous circumstances," *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 973 (Ct. Cl. 1965); RESTATEMENT (SECOND) OF CONTRACTS § 202(1) (contracts must be interpreted "in light of all the circumstances"), the only reasonable interpretation of the text is that the Reformed Contract was not limited to only FedEx traffic, but included that of other air and ground transportation suppliers of the mail as well.

13), the absorption collar is not calculated on a total poundage basis accumulated from all 23 locations. Rather, it works on a location-by-location and day-by-day basis. Thus, it is entirely possible that USPS could meet its total commitment of 1.25 billion pounds in a year and yet fall below the baseline weight in certain of the 23 individual locations for certain periods during any given year.

Having said this, it is also true that the overall effect of USPS giving EAGLE only 1.0 billion total pounds per year is to approximate a maximum use of the "free zone" of the absorption collar in USPS's own favor, which USPS could do by simply continuing operations at the pre-reformation, 1.0-billion-pound level – the level that led to EAGLE's insistence that the contract be reformed in the first place. (FF/R 17, 22.) Without a commitment to tender available traffic, there would be an obvious potential for gaming that no rational businessman would simply leave in the hands of USPS, and that EAGLE certainly did not. (FF 61.) A contract must be given a meaning that would be understood by a "reasonably intelligent person acquainted with the contemporaneous circumstances." *Hol-Gar Mfg. Corp. v. Untied States*, 351 F.2d 972, 973 (Ct. Cl. 1965); *Pacificorp Cap., Inc. v. United States*, 25 Cl. Ct. 707, 715 (1992). The USPS suggestion that the contract should be interpreted to have left in its unfettered discretion whether to increase the amount of mail tendered, when the whole purpose of the reformation was to get more mail to EAGLE than the 1.0 billion per year then being tendered through FedEx, does not pass this test.

The first sentence of section A.1.a of the Reformed Contract stating that the "parties anticipate" that USPS "will provide" EAGLE "approximately 1.25 billion pounds of mail" each year is not nimiety; it is at the heart of the agreement. To that express provision attached good faith duties that USPS would take reasonable measures to effectuate, not frustrate, that central expectation of the parties. *Centrex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005) (good faith requires a party not to destroy the reasonable expectations of the other party); RESTATEMENT (SECOND) OF CONTRACTS § 205 cmts. a, d (1981). USPS admits that it had 1.25 billion pounds of mail available to give EAGLE, but, for whatever reason, just did not do so:

> Agree that, if ground transportation suppliers and aviation suppliers other than FedEx are considered, more than 1.25 billion pounds of mail passes through USPS networks for the regions covered by the Reformed Contract in a given year.
>
> Agree that, since March 1, 2003, USPS has had more than 1.25 billion pounds of mail combined per year in all of its air and ground networks in the regions covered by the Reformed Contract.

(FF/R 27, 63.) USPS's failure to provide available poundage of approximately 1.25 billion was a violation of its express duty to provide that amount of mail and a breach of its good faith duties to make the effort to do so.[4]

---

[4] Mr. Young's statements (at ¶¶ 11, 12) that USPS has tendered to EAGLE the amount "available" must be read in the context of the quoted admissions, which clarify that he is only counting FedEx traffic as "available" for EAGLE. *See also* USPS Opp. at 23 (relying on Mr. Young's statements to say USPS has not used other companies "to support USPS's contract with FedEx").

## II. The Reformed Contract Did Not Change the Contract Type to IDIQ

USPS tries to salvage its position by asserting (at 5-10) that the Reformed Contract is an IDIQ contract, but it is not. USPS admits that the Reformed Contract does not say it is an IDIQ contract and that USPS negotiators never told their EAGLE counterparts that it was. (FF/R 56, 57.) The Reformed Contract does not meet the definition of an IDIQ contract as set out in the USPS procurement regulations in effect when it was negotiated, and it does not contain the USPS standard IDIQ clause. *See* USPS Purchasing Manual, http://www.usps.com/cpim/ftp/manuals/pm/html/chap2.html, § 2.4.6.c.1 ("An indefinite-quantity contract provides for an indefinite quantity of specific supplies or services, within a stated minimum and maximum . . ."). Instead, as EAGLE explained in its initial brief (at 12-13), the Reformed Contract can properly be categorized as either a partial requirements contract or as a fixed-quantity contract with the risk of customer mail not materializing being allocated to EAGLE.

USPS has no answer to its own regulations and cannot explain why the Reformed Contract is not a "partial requirements" contract as defined in those regulations. *Id.* § 2.4.6.d.1. Instead, USPS argues (at 12-14) that all this can be ignored because the absorption provisions, taken independently, would operate to provide some level of compensation to EAGLE even if USPS gave EAGLE no mail to handle, from which it asserts that the Reformed Contract can legitimately be viewed as an IDIQ contract. The absorption provisions can't carry this water. They do not read like IDIQ provisions, because they are not IDIQ provisions and are

obviously not designed to be (and USPS puts forward no witness stating they are).[5] They do not set a minimum quantity that USPS must provide, which is an essential element of an IDIQ contract as specified by USPS's own procurement regulations. *Id.* § 2.4.6.c.1. *See also Mason v. United States*, 615 F.2d 1343, 1349-50 (Ct. Cl. 1980) (IDIQ contract must contain minimum quantity guarantee). Rather, the quantity provisions of the Reformed Contract are found in section A.1.a, and that section states that USPS anticipates it "will provide" EAGLE 1.25 billion pounds per year, although USPS expressly declines to guarantee a minimum volume. The absorption provisions do not override the express provisions in the contract about quantity obligations. *See generally* RESTATEMENT (SECOND) OF CONTRACTS § 203(c) (specific terms govern general language). The fact that USPS has a minimum payment obligation under the absorption provisions is a legal "so what?" As the Federal Circuit has observed, a seller in a requirements contract is free to tailor risk-limiting provisions, *Tech. Assistance Int'l*, 150 F.3d at 1373, which encompass minimum payment obligations.

The Reformed Contract, then, taken as a whole, does not "clearly indicate[ ] that the contracting party is guaranteed . . . a non-nominal minimum amount" of

---

5 In *Hemet Valley Flying Service Co. v. United States*, 7 Cl. Ct. 512 (1985), on which USPS relies (at 6), the contract expressly purchased "availability" of aircraft at certain sites on a non-exclusive basis and with options for use of the aircraft. The court held this was not a requirements contract, but an IDIQ contract. Assuming *arguendo* the court properly held that it was an IDIQ contract instead of a definite quantity contract with options, the factual distinctions between the contract in *Hemet* and the Reformed Contract are obvious.

orders. *Travel Ctr.*, 236 F.3d at 1319. Any guaranteed quantity whatsoever is expressly disclaimed. Thus, the Reformed Contract, by definition, is not an IDIQ contract. Rather, it has all the hallmarks of a requirements contract. *See also Ralph Constr. Co. v. United States*, 4 Cl. Ct. 727, 732 (1984) (when ambiguous, contract is to be construed as requirements-type, rather than IDIQ).

Again, the logic of USPS's incorrect interpretation forces it to take an extreme position. USPS admits that the parties when they reformed the Initial Contract did not change the contract type. (FF/R 58.) This requires USPS to argue (at FF/R 11, 14, 15) that the Initial Contract was also an IDIQ contract, but that is obviously incorrect and, in any event, is an argument foreclosed as a matter of law.

As with the Reformed Contract, USPS did not identify the Initial Contract as an IDIQ contract and did not specify maximum and minimum amounts of mail to be handled, but instead gave estimated amounts (as is normal in a requirements-type contract and required under USPS regulation, USPS Purchasing Manual § 2.4.6.d.2). (FF/R 10, 14.) The Initial Contract specified that EAGLE was to provide handling services in its regions for the "sole supplier of air transportation," FedEx. (FF/R 7, 8, 12.) USPS awarded only one contract per region. (FF/R 9, 53.) The reason that the Initial Contract looked, smelt, and tasted like a requirements contract is that it was one. That it was fixed-cost does not change the analysis, because fixed-cost contracts "are totally consistent with requirements contracts." *Mason v. United States*, 615 F.2d 1343, 1346 (Ct. Cl. 1980) (*citing Shader Contractors, Inc. v. United States*, 276 F.2d 1, 7 (Ct. Cl. 1960)).

Beyond this, as Mr. Bonham testified in his affidavit, USPS representatives never told their EAGLE counterparts that USPS considered the Initial Contract to be an IDIQ contract and, to the contrary, USPS representatives told them that the Initial Contract was a requirements contract to handle the mail transported by air by FedEx in the three regions awarded to EAGLE. (FF/R 15.) It does no good for USPS in its responsive pleading just to say, "Disagree." (FF/R 15.) USPS had a duty to bring forward sworn testimony of its own to contest the sworn testimony of Mr. Bonham, but it did not, and so the fact that the parties expressly agreed that the Initial Contract was a requirements contract is now established as a matter of law. RCFC 56(e); see part III *infra*.

The logic is elemental: (a) the Initial Contract was a requirements contract, and (b) the parties did not change the contract type when they reformed the contract; thus, (c) the Reformed Contract is a requirements contract. That is also obvious from the face of the Reformed Contract, and USPS admits that it never told EAGLE to the contrary during the negotiations. (FF/R 57.) USPS cannot slough its good faith duties to provide EAGLE with the specified quantities the parties correctly anticipated would be available by belatedly, and incorrectly, labeling the Reformed Contract as an IDIQ contract.

## III. The USPS Declarants Do Not Contest the Material Facts that Establish EAGLE's Interpretation

While summary judgment must be granted for EAGLE based on the relevant contractual documents alone, the negotiation history of the Reformed Contract also requires that result. USPS in its responsive pleadings either (a) fails to present

sworn counter-testimony, relying instead on general denials; or (b) resorts to cleverly crafted conclusory comments that effectively admit EAGLE's sworn testimony. In both instances, USPS has failed to carry its burden to put forward competent evidence to show any material fact in dispute.

Rule 56(e) instructs that

> an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

RCFC 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (interpreting identical provision under Federal Rules of Civil Procedure). "Mere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment. Nor may non-movants rest upon mere allegations made in their pleadings without setting forth specific facts establishing a genuine issue worthy of trial." *Topalian v. Ehrman*, 954 F.2d 1125, 1131-32 (11th Cir. 1992) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986), and other cases); *see also Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir. 1985). Within this framework, EAGLE will discuss four aspects of its proof and USPS's responsive submissions.

### A. Negotiations About the Commitment of 1.25 Billion Pounds

Messrs. Bonham and Bauer of EAGLE testified in their affidavits that USPS made a conditional commitment to provide EAGLE with 1.25 billion pounds of mail

per year. They did not claim that USPS ever said this amount was "guaranteed" by USPS. To the contrary, they both stated that they discussed with USPS and understood that USPS would not guarantee that that amount of mail would be available from its customers. (Bonham Aff. ¶¶ 36, 37; Bauer Aff. ¶¶ 5, 6.)

USPS counters with the declarations of Messrs. Young and Black that USPS representatives never told their EAGLE counterparts that "USPS guaranteed EAGLE that USPS would supply 1.25 billion pounds of mail" and affirmatively told them that USPS could not do so "under any circumstances," which USPS also insisted on putting in the text of the Reformed Contract. (Young Decl. ¶¶ 7-10; Black Decl. ¶¶ 5-9.) This testimony does not conflict. Messrs. Bonham and Bauer concur that the parties agreed there was no guarantee on the poundage. But they go on to testify that the parties agreed that 1.25 billion pounds would be provided if it eventuated (as the Reformed Contract also states). To this, Messrs. Young and Black respond nary a word. Instead, they admit that the USPS pay model used during negotiations consistently used 1.25 billion pounds as the anticipated volume. (Young Decl. ¶¶ 5, 6; Black Decl. ¶ 4; *see also* FF/R 21-26.)

Based on the testimony of Messrs. Bonham and Bauer, EAGLE proposed the following findings of fact:

> During discussions in 2003, USPS confirmed to EAGLE that it anticipated making 1.25 billion pounds of mail per year available for handling under the contract by EAGLE.
>
> USPS never said in negotiations concerning the pay model or otherwise that it could choose not to provide EAGLE with 1.25 billion pounds of mail per year even if there were adequate mail in the system to do so.

(FF/R 24, 25.) As there is no specific rebuttal to these statements by the USPS declarants, they are established as a matter of law. RCFC 56(e).

B. Negotiations About the "No Guarantee" Language

Mr. Bonham had direct conversation with Mr. Black about the "no guarantee" language and its purpose being only to allocate the risk to EAGLE if the mail were not made available by USPS's customers. (Bonham Aff. ¶ 36; Black Decl. ¶ 7.) Mr. Black admitted the substance of this conversation, saying he told Mr. Bonham that "a guarantee would make no sense because USPS cannot control the volume of mail that it has available to render to EAGLE for processing." (Black Decl.¶ 7.) He then goes on to say, "I did not imply, however, that this was the only possible reason that the USPS may render either greater than or less than the estimated 1.25 billion pounds." (Black Decl. ¶ 7.) Obviously, Mr. Black did not give any other reason, either, and does not claim that he did. Thus, what Mr. Black actually confirms by his testimony is that, as Mr. Bonham testified, the lack of available mail is the only reason Mr. Black (and anyone else at USPS) gave for the "no guarantee" language.

If Mr. Black or others had said more, USPS had an affirmative obligation under Rule 56(e) to provide that specific testimony, but USPS did not, and so the conversation as Mr. Bonham recited it is effectively conceded. Mr. Black may have thought something else, but, as USPS itself notes (at 16-17), the subjective, unexpressed interpretations of a party are irrelevant. What Mr. Black expressed to Mr. Bonham was confirmation of EAGLE's understanding of the contested language – a confirmation on which EAGLE relied – and that makes it conclusive as a matter

of law. *United States v. Stuart*, 489 U.S. 353, 368 n.7 (1989); *Perry and Wallis, Inc. v. United States*, 427 F.2d 722, 725 (Ct. Cl. 1970).

C. General Denials of Negotiation History

Throughout its Response to EAGLE's Proposed Findings of Uncontroverted Fact, USPS relies on general denials and on conclusory statements by Messrs. Young and Black. This is especially true with respect to the negotiation history of both the Initial and Reformed Contracts. (FF/R 11, 14, 15, 34-36, 42, 48-50.) These denials are ineffective under Rule 56, and thus the facts as stated by EAGLE "shall be deemed established." RCFC 56(d), (e).

In repeated instances, Mr. Bonham points out that USPS drafted the contract language of relevance in this case. USPS does not deny that it was the drafter of the language, but to attempt to avoid the rule of *contra proferentem* it relies (at 18-19) on the declarations of Messrs. Young and Black that EAGLE representatives were involved in the whole drafting process. Such generalized denials are insufficient. If USPS had wanted to say that some of the language at issue had been drafted or revised by EAGLE, it had the duty to come forward with "specific facts" in rebuttal. RCFC 56(e). It did not.

D. Unsupported Denials for Lack of Knowledge

At several points, USPS denies proposed facts based on "lack of knowledge or information sufficient to form a belief as to its truth." This is insufficient under Rule 56. If the adverse party does not have evidence at its disposal to counter the allegations, it must prepare an affidavit to explain the situation; general denials,

including for lack of knowledge or belief, are insufficient, especially if the evidence is available to the adverse party. *See Opryland USA Inc. v. Great Am. Music Show, Inc.*, 970 F.2d 847, 852 (Fed. Cir. 1992); *New Am. Shipbuilders, Inc. v. United States*, 871 F.2d 1077, 1081 (Fed. Cir. 1989); *Keebler Co. v. Murray Bakery Prods.*, 866 F.2d 1386, 1389 (Fed. Cir. 1989); *see also Gurary v. Winehouse*, 190 F.3d 37, 43-44 (2d Cir. 1999) (the failure to file a 56(f) affidavit is "fatal" even if a need for discovery is alluded to in a pleading); *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir. 1994) ("failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate"); *Lunderstadt v. Colafella*, 885 F.2d 66, 70 (3d Cir. 1989); *Shavrnoch v. Clark Oil & Ref. Corp.*, 726 F.2d 291, 294 (6th Cir. 1984); *Lewis v. Knutson*, 699 F.2d 230, 240 (5th Cir. 1983); *THI-Hawaii, Inc. v. First Commerce Fin. Corp.*, 627 F.2d 991, 994 (9th Cir. 1980).

Applying this settled law, the following of EAGLE's proposed findings of fact are effectively admitted by USPS:

> Mr. Bonham informed Mr. Bauer of EAGLE of the substance of this conversation [with Mr. Black about the "no guarantee" language] prior to Mr. Bauer's executing the Reformed Contract.
>
> EAGLE understood that it was accepting the risk that the customers might not tender as much as 1.25 billion pounds of mail to USPS. However, EAGLE understood that USPS was agreeing to provide that amount of mail if it were available.
>
> EAGLE understood that it was accepting the risk that the estimated poundage and revenue would not be exactly 1.25 billion pounds and $46.8 million, as it is impossible to provide a given poundage of mail precisely, especially

> as the total is a combination of different amounts for over twenty terminals over three regions. In addition, the dollar figure is subject to different pricing by location and adjustments spelled out in section A.1 (such as for density experienced). Thus, EAGLE understood itself to be taking the risk of minor variations from the poundage, provided USPS used good faith efforts to meet the specified amount.
>
> In comments on a draft submitted during late May or June 2003, EAGLE suggested deleting the phrase "and terminal handler at hub transfer point" from the definition of "Aviation Supplier" in the Reformed Contract. USPS accepted that deletion without further comment.
>
> In EAGLE's view, taking the risk of giving USPS unlimited discretion in how much mail it was to provide to EAGLE would have made no business sense and would have been foolhardy and unacceptable.

(FF/R 37, 38, 41, 46, 61.)

## IV. <u>USPS Concedes Its Breach Is Material in Amount</u>

USPS admits (at 22; FF/R 27, 63) it has had 1.25 billion pounds of year in its air and ground networks but has not provided that amount to EAGLE. USPS argues (at 22-23) it has not committed a material breach, even if the Reformed Contract is a requirements-type contract, on the basis that it is only required to provide EAGLE with FedEx tonnage. USPS's defense against the materiality of the breach, therefore, stands or falls with the assumption that EAGLE's mail pool under the Reformed Contract is limited to FedEx traffic. And fall it does. The available sources for mail were expanded in the Reformed Contract in several provisions, including by no longer referring to FedEx as the "sole supplier" of USPS mail for EAGLE's handling. (FF/R 40-48.)

USPS does not dispute that, assuming it is in breach, it has denied EAGLE revenues of approximately $10,000,000 per year and that this is material by any measure.[6] Nor does USPS contest, assuming it is in breach, that it has breached its good faith duties and acted in bad faith as described by the Federal Circuit in *Tech. Assistance Int'l.* 150 F.3d at 1372. Thus, summary judgment should also be entered that USPS's failures to provide EAGLE with 1.25 billion pounds per year are material.

Conclusion

The Reformed Contract does not give USPS the unfettered option whether to give EAGLE the 1.25 billion pounds of mail specified. USPS has express and good faith duties to provide that anticipated amount of mail if it materializes from customers. It has openly repudiated that obligation in its performance and in its papers, but it cannot turn back the clock to the pre-reformed contract and limit the covered mail to only that carried by FedEx. USPS has violated, in a material way, both its express and implied commitments and has eviscerated the purpose of the Reformed Contract.

6 USPS does purport to "disagree" with EAGLE's statement of poundage carried and revenues lost (FF/R 64, 65), but for the reasons stated above such generalized denials are ineffective. USPS had the ability to contest the figures sworn to by Mr. Schrock, but it did not put forward any contradictory sworn testimony. Thus, Mr. Schrock's testimony is established as a matter of law under Rule 56.

For the reasons stated in this and its other pleadings, EAGLE requests that summary judgment be entered in its favor and that the motions of USPS be denied. Oral argument is requested.

Respectfully submitted,

/s/Frederick W. Claybrook, Jr.

Frederick W. Claybrook, Jr.
(Counsel of Record)
Daniel R. Forman
Jenny Kim

Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington, D.C. 20004
(202) 624-2500

Attorneys for EAGLE

May 1, 2006

DCIWDMS: 2759842_1